UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JAMES KOPPEL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 1:20-cv-11479-LTS |
| v. | ) |
| | ) |
| WILLIAM MOSES, | ) |
| | ) |
| Defendant. | ) |

Opposition to Motion for Dismissal and Memorandum of Law in Opposition

Plaintiff James Koppel by counsel hereby opposes the motion for dismissal served by the defendant on August 12, 2020. Document 6. In opposition plaintiff refers to and relies on the allegations in the Complaint in the Middlesex Superior Court filed on or about April 13, 2020 and served on May 4, 2020. This action was removed to this Court on or about August 5, 2020. That removal is the subject of a motion to remand filed by this plaintiff. A copy of the Complaint is attached as Exhibit C for convenience.

Argument

The Standard Applicable to the Motion.

On a motion to dismiss this Court "must assume the truth" of all well-pleaded facts and "give plaintiff the benefit of all reasonable inferences therefrom." Ruiz v. Bally Total Fitness Holding Corp., 496 F.3d 1, 5 (1st Cir. 2007). To survive a motion to dismiss the complaint must state a claim that is "plausible" on its face. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). The factual allegations "must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell,

supra at 555. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility" that a defendant has acted unlawfully. Ashcroft v. Iqbal, 556 U.S. 662, 678, (2009). Dismissal is appropriate if the facts as alleged do not "possess enough heft" to show that plaintiff is entitled to relief. Ruiz Rivera v. Pfizer Pharms., LLC, 521 F.3d 76, 84 (1st Cir. 2008).

The Motion for Dismissal Served August 17, 2020 is Premature.

A motion for dismissal cannot be filed or considered until the default is vacated, if at all. Byron v. HSBC Bank USA, N.A., No. 2:15-cv-360-GZS, 2016 U.S. Dist. LEXIS 10972, at *3-4 (D. Me. Jan. 29, 2016). A District Court has the power to vacate a default only if the civil action has been timely removed. Sindi v. El-Moslimany, Civil Action No. 13-10798-GAO, 2014 U.S. Dist. LEXIS 40108, 2014 WL 1281522, at *2 (D. Mass. Mar. 26, 2014). In that event, the federal court is allowed to treat the default as if it had been entered in the federal court. Id.

Count I in Defamation is not proper to be dismissed.

1. The March 2 email includes multiple false and damaging statements purporting to be based on facts.

The principal argument in the motion as to Count I (defamation) (Mem. 5-9) is that the March 2 email communication expresses a vague, imprecise and entirely non-factual opinion of the sort that cannot be confirmed or disconfirmed. Plaintiff relies on case law involving vague opinions which cannot be either confirmed or disproved. Mem. 5-9.

This argument and all others in the motion ignores the contents of the March 2 email. Defendant argues as if the email said no more than that this plaintiff makes some people uncomfortable in an entirely subjective sense. See Mem. 10-11. That the defendant puts his head in the sand is not an argument.

The March 2 communication does not merely say that the plaintiff makes people uncomfortable Mem. 1, 10-11. It says that plaintiff engages in objectively observable behavior which is reprehensible and unacceptable. His acts and conduct make keyholders "<u>deeply uncomfortable</u>." Koppel continued to actively <u>make keyholders</u> deeply uncomfortable <u>in spite of requests to stop</u> his bad behavior. Behavior is necessarily involved because otherwise Koppel could not coherently stop or <u>continue</u> to make people deeply uncomfortable <u>in spite of requests</u> that he stop. It is incoherent to say that someone <u>continued in spite of requests to stop</u> unless the words refer to behavior which is voluntary and which can be stopped. Koppel's bad behavior, the primary chief subject of this email, <u>had apparently gone on for some time</u> before it was recently detected. Only bad behavior can "go on" or *persist* over time. Only bad behavior and bad <u>interactions</u> can be <u>continued in spite of requests to stop, or be severe, consistent or widespread</u>.

The reports of the bad behavior are <u>consistent, severe</u> and involve <u>widespread interactions</u>. Interactions are conduct, Koppel. The descriptions of that behavior, the "stories," involve "severe" bad acts. The decision to expel Koppel was a <u>necessity</u> in order to make sure that the society is a place where everyone is safe and <u>comfortable</u>. The <u>response was required and "quite exceptional</u>." The response reflects a need for the society to do <u>better to be a safe environment for everyone</u>.

The core argument for dismissal (Mem. 6-8) is that this language is vague, Mem. 6, hereafter in this section (6); it "merely expresses personal judgment" (6) by use of words which are "amorphous" (6) and "not adequately specific" (6). Argument that the March 2 email text is "merely a personal view" (6) is surely false. The email says the opposite: The collective decision to expel Koppel was <u>not taken lightly</u> but was <u>a necessity</u> which <u>reflects the will of the current keyholders</u>. So much for "subjective" [sic] or "personal" "interpretations." Mem. 6.

The motion persists. The March 2 email is "opinion" (6) with "nothing in it capable of being proved true or false," (6). That too is plainly false: Koppel either did or did not engage in horrible, consistent, and widespread bad behavior justifying his expulsion. He did or did not refuse to stop. His conduct either was or was not a threat to the safety of the society.

The March 2 email proclaims repeatedly how and why it is based on "ascertainable and verifiable" events. But see Mem. 6-7. It says the expulsion decision was <u>a necessity</u> and involved <u>a required response</u> to a <u>circumstance</u>. Both were <u>exceptional</u>. Both <u>reflect a need for the society to do better to be a safe environment for everyone</u>. <u>But see</u> Mem. 7 citing cases involving "a multitude of fairly describable meanings" (7); words of "tremendous imprecision" (7); words "able to be interpreted in various ways" (7); words which are "only loosely definable" (7) or "hopelessly imprecise" (7); "broad descriptive terms susceptible to varying interpretations" (7); words "not based on commonly understood social norms" (7), "generalized statements not able to be measured as true or false" (7), and "indefinite and ambiguous words" (8).

All cases involving vague language (Mem. 6-8) are irrelevant to the March 2 email because Koppel's bad behavior required expulsion and other sanctions as a <u>necessity</u> and a <u>required response</u> to protect and create <u>a safe community</u>.[1] The inescapable import and meaning of the March 2 email is that it is a <u>fact-based</u> report as to Koppel.

If for sake of discussion we draw inferences in favor of this <u>defendant</u>, the March 2 email at best is a communication based on a mix of facts plus opinions of the keyholders based on those facts. Viewed in that light the March 2 email is actionable as a matter of law. <u>Smith v. Suburban</u>

---

[1] In the final two paragraphs of the email, Moses uses terms which are more vague in suggesting anonymous reporting to make it easy for members to voice their concerns [sic] when they are made uncomfortable [sic] so that everyone can feel safe and supported [sic]. These terms are irrelevant to the factual language used as to the expulsion of Koppel. <u>See</u> Point 6 below.

4

Restaurants, Inc., 374 Mass. 528, 530 (1978). (Smith holds that if a publication is susceptible of both defamatory and harmless meanings, that creates a question for the trier of fact and cannot be ruled non-libelous as matter of law.) Inferences which might be drawn by a considerable and respectable segment of the community can make a publication actionable. Id.

Defendant argues that the March 2 email is not factual and is not defamatory because the statements in the email are incapable of being true or false, citing Pan Am Sys. v. Atlantic Northeast Rails & Ports, Inc., 804 F.3d 59, 68 (1st Cir. 2015) (Mem. 1, 6-8.)[2] That principle has no application to the March 2 email. Keyholders either did or did not share stories as to behavior of Koppel. Koppel either did or did not engage in the behavior. He either did or did not continue the bad behavior "in spite of requests to stop." The bad behavior was either severe, consistent, and widespread, or it was not. The behavior either did or did not justify expulsion and public widespread denunciation of Koppel by name. All of these are either true or false.

Statements that are in the email are not able to be confirmed or denied (Mem. 1, 6-8.) applies to vague assertions such as "Tom Brady, not Joe Montana, is the greatest quarterback of all time." That does not defame Joe Montana because no one can ever know. There are no tests for truth or falsity. There is no standard. The statement invites endless debate. Because the statement cannot be tested, it cannot be damaging. That irrelevant point is defendant's main point. See Ayyadurai v. Floor64, Inc., 270 F. Supp. 3d 343, 358 (D. Mass. 2017)( Mem. 1,6,13,16,17) (whether someone did or did not contribute to the development of email was not damaging because the meaning of "invent email" is "amorphous" and "unknowable" ).

---

[2] Pan Am Sys does not stand for that proposition. The holding there is that the defendants could not be liable because the plaintiff could not show as to statements involving issues of public concern (the investigation of the causes of a train derailment ) that the falsity was material. Id. at 68. This case as to the expulsion of Koppel does not involve any issue of public concern or any related constitutional protections. Point 6 below.

5

The First Amendment does not allow courts to "distort the reality of events under the guise of protecting freedom of expression." This court must instead "evaluate a speaker's statement as it was given and must resist the temptation to replace what was actually said with some more innocuous alternative." Levinsky's, Inc. v. Wal-Mart Stores, 127 F.3d 122, 131 (1st Cir. 1997) (emphasis added) (discussing private versus public concerns).

2. The email is severely and improperly damaging even if it is viewed as a statement of opinion, which it is not.

The March 2 email would be defamatory and actionable even if it were a statement of opinion, which it is not. The reason for that outcome unfavorable to the defendant is that the March 2 email repeatedly invokes non-disclosed factual support consisting of all of the events within the stories having to do with the reprehensible behavior of this plaintiff.

> A simple expression of opinion based on disclosed or assumed nondefamatory facts is not itself sufficient for an action of defamation, no matter how unjustified and unreasonable the opinion may be or how derogatory it is. But an expression of opinion that is not based on disclosed or assumed facts and therefore implies that there are undisclosed facts on which the opinion is based, is treated differently. The difference lies in the effect upon the recipient of the communication. In the first case, the communication itself indicates…that there is no defamatory factual statement. In the second, it does not, and if the recipient draws the reasonable conclusion that the derogatory opinion expressed in the comment must have been based on undisclosed defamatory facts, the defendant is subject to liability.

Restatement (Second) of Torts § 566 comment c. The same comment says this presumption of damaging import is similar to the rule used when a communication is subject to more than one meaning. The meaning of a communication is that which the recipient correctly, or mistakenly but reasonably, understands that it was intended to express. Id.

> It is the function of the court to determine whether an expression of opinion is capable of bearing a defamatory meaning because it may reasonably be understood to imply the assertion of undisclosed facts that justify the expressed opinion about the plaintiff or his conduct, and the function of the jury to determine whether that meaning was attributed to it by the recipient of the communication. (See § 614).

6

<u>Restatement</u> (Second) <u>of Torts</u> § 566 comment c. The March 2 email relentlessly and repeatedly implies severely damaging and negative factual information as to the bad behavior of this plaintiff. That bad behavior is the "consistent, severe, and widespread" bad or negative "interactions" of the plaintiff with keyholders. Those not disclosed bad acts plus the refusal of the plaintiff to stop his bad behavior "despite requests" made his expulsion and other sanctions a <u>necessity</u> and <u>required</u> response to confront an <u>exceptional circumstance</u>. All of these very negative statements are based on concealed facts as to the bad behavior.

Viewed as opinion, which it is not, the March 2 email is indisputably actionable because it openly relies on non-disclosed facts. <u>Restatement 2d of Torts,</u> § 566. comment c.

> The requirement that a plaintiff prove that the defendant published a defamatory statement of fact about him that was false is complied with by proving the publication of <u>an expression of opinion of the mixed type</u> if the communication is reasonably understood <u>as implying the assertion of the existence of undisclosed facts about the plaintiff</u> that must be defamatory in character in order to justify the opinion.

<u>Restatement 2d of Torts,</u> § 566.comment c. If the March 2 email is viewed as opinion, which it is not, it is actionable under this rule as opinion.[3] The March 2 email openly says it relies on undisclosed facts. Opinion is actionable when described as supported by facts.

---

[3] Innocent opinion cases are entirely different. See <u>Gray v. St. Martin's Press, Inc.</u>, 221 F.3d 243, 249 (1st Cir. 2000) (Mem,1). The reasoning in <u>Gray</u> is the "book made quite clear that Gray did have contacts at the highest levels; the word "fake" was used to imply that Gray was exaggerating his "closeness" to a former president. Identification of exaggeration is "just the kind of subjective judgment" that <u>is only minimally about "what happened"</u> but expresses instead <u>a vague and subjective characterization</u> of what happened. Id.

<u>Tartaglia v. Townsend</u>, 19 Mass. App. Ct. 693, 698 (1985) (Mem. 1) similarly involves harmless opinion. Tartaglia is decided on summary judgment. The publication in a local newspaper was "jocular" and "tongue-in-cheek." The article described an event involving "apparently friendly" cousins. The innuendo at worst was that the plaintiff acted somewhat petulantly, abruptly and with impatience. Id, at 698. Inaccuracies "if any did not indicate any hostility or animosity" of the author. Id, at 698 The tone of the article was "mischievous, not defamatory." Id, at 697.

Ward v. Zelikovsky, 136 N.J. 516, 538 (1994) (accusation of bigotry is actionable if made in such manner or under such circumstances as would fairly lead a reasonable listener to conclude that the person making the accusation had knowledge of specific facts supporting the conclusory accusation).

The March 2 communication that is at issue here is entirely about what happened, namely a series of very bad undisclosed acts attributed to this plaintiff, and not at all about what the writer Moses subjectively thinks. The communication repeats the theme that the stories are reliable and consistent. The expulsion and more will be undertaken to address a serious factual problem that has been not adequately detected or addressed yet. The risk to safety of all remains. That risk is incompatible with purposes of the society. Moses and those for whom he speaks express no hesitation or uncertainty about the factual concrete nature of the danger. More condemnatory "opinion" [sic] is hard to imagine.

3. The March 2 email relies on very damaging non-disclosed facts.

Defendant shifts tactics at page 9 and commences to argue that if the March 2 email relies on nondisclosed facts, those facts cannot plausibly be viewed as damaging, harmful to reputation or tending to hold the plaintiff up to scorn ridicule hatred or contempt. Id. This argument misses any target. It once again ignores the text of the March 2 email.

The defendant argues that the undisclosed facts are not alleged to be damaging. Mem. 10-11. That is inaccurate; see Complaint para. 32-49 alleging damage and falsity. When read in context (Mem. 10) everything said in the March 2 email as to Koppel is indisputably damaging to him. He is condemned based on his history of bad behavior evidenced by his "interactions." His bad acts "required" his expulsion and a public denunciation by name. Serious future measures are needed to protect the safety of all members as to similar bad conduct. Mem. 10. The concealed

and not disclosed reports are indisputably negative because they mandate and support expulsion, public denunciation and a future program of increased vigilance.[4]

Defendant tries to ignore the unmistakably negative contents of the March 2 email as to Koppel by quoting from last two paragraphs of that email. Mem. 10. Those paragraphs do not involve Koppel. In them Moses advocates that members actively and anonymously report on other members so that everyone in the society will feel "comfortable, safe, and supported." [sic]. Id. The quoted statements (Mem. 10) are not directly damaging to Koppel but that is because they are irrelevant to the preceding defamations of Koppel. The statements ("comfortable, safe, and supported") are not about Koppel. They are irrelevant to any issue argued in the motion. They are irrelevant to the statements in the March 2 email referring to Koppel were not damaging. But see Mem. 10.

Plaintiff's bad behavior is such that the executive committee is apologetic that plaintiff was not detected and expelled much sooner. Exhibit A. Plaintiff's underlying not disclosed conduct is inconsistent with a "safe" community. It is hard to conceive of a communication more likely to damage reputation and to hold a "person to scorn, hatred, ridicule, and contempt." Mem., 9. The damaging and negative implications are inescapable. But see Mem. 9-11 relying on cases in which the negative connotations (referred to as "defamatory") are "not easily understood" or in which it is "unclear" that the description is negative.

---

[4] Defendant pretends to confuse the very negative concealed reports with the separate issue of what exactly is said in the highly negative concealed reports. See Mem. 11, arguing that what is concealed is necessarily harmless. This argument is specious. The statement "X needs to go to prison for reasons we don't want to discuss" in no way suggests that the concealed reasons are harmless.

4. <u>The March 2 email is not a harmless report about emotions without any basis in fact.</u>

Defendant next argues that the March 2 email is similar to non-fact-based expressions of discomfort which, the defendant says, are tolerated these days in university settings. Mem. 10-11. This would be non-fact-based opinion in the form: "A is uncomfortable in the presence of B." This form of expression has nothing to do with the March 2 email. The contrast between the two confirms that the March 2 email is factual and severely damaging. Point 3, above.

A statement in the form "A is uncomfortable in the presence of B" with no fact basis is arbitrary and non-rational. It is a report of an emotion felt by A. The emotion of A is the sole topic. If not publicized, there is a good chance no one will ever be harmed by the emotion.

For sake of discussion and <u>making all assumptions favorable to the defendant</u> (Mem. 10-11), if one or more keyholders merely reported to Moses that Koppel caused them to feel uncomfortable but did not disclose any fact basis for their emotions (Mem. 10-11), Moses very likely should have done nothing. Arbitrary non-rational feelings are not a basis to expel someone from an academic society. They are never "exceptional." They do not create ongoing risk to the "safety" of the community. They never "require" denunciation of the person not reporting the arbitrary feelings.

The March 2 email by Moses makes no sense and is incoherent as a report of non-fact based and arbitrary emotions. Arbitrary feelings of anonymous keyholders do not support any email report to anyone. They do not support a denunciation of Koppel by name.

Continuing to make all assumptions most favorable to this argument by defendant (Mem. 10-11) and assuming keyholders did demand expulsion and a public report, Moses at most could and should have written as of March 2, 2020 only this:

> One member recently made one or more keyholders uncomfortable. As a result that member has been expelled.

The difference between this hypothetical email never sent and the March 2 email is staggering. The hypothetical text would never be sent because it is incoherent. On its face it is needless. A non-confirmable private emotion of one person is not a coherent or defensible basis for the expulsion of another person from any society after "he refused to stop" his not disclosed but horrific conduct. The chair of the executive committee of an academic scholarly society would never have cause to report on emotions of a keyholder or anyone else unsupported by any fact. Emotions not based in fact are of no interest to anyone except perhaps a therapist.

A report of the expulsion of a person <u>naming that person</u> is patently irrational, needless and incoherent unless there is an ongoing, confirmed, <u>factual</u> safety risk. Point 1, above. This March 2 email is incompatible with the suggested model (Mem. 10-11) of student reports of random emotions not based in fact. The March 2 email indisputably is a report as to facts. Point 1, above.

5. <u>Arguments based on isolated snippets of the March 2 email are futile. They require impermissible inferences. They ignore the basic rule that a defamatory communication must be read as an entirety and in context.</u>

The Motion is frivolous in seeking dismissal based on discussion of isolated phrases together with argumentative requests for inferences. (Mem. 11-16.) Study of isolated words or phrases in never appropriate to see if a communication is defamatory or actionable. The defendant agrees:

> Context matters in assessing defamation claims: the court must examine the statement in its totality in the context in which it was uttered in or published. <u>This task requires an examination of the totality of the circumstances in which these specific challenge statements were made including the general tenor in context of the statements …</u>

Memorandum, page 10 (emphasis added; internal citations and edits omitted). Argumentative discussion of isolated words or phrases (Mem. 11-16) is for that reason pointless and inappropriate, especially on a motion for dismissal. All of the arguments (Mem. 11-16) rehash the points already

11

argued at the start of the memorandum (Mem. 5-9) to the effect that the email is harmless and vague.

It gets worse. The motion seeks inferences favorable to the defendant by self-contradictory assertions. Koppel alleges that the statement he refused to stop offensive behavior is false. Mem. 12-13, but also somehow "never alleges the falsity of the statement" [sic] 13. This argument is pointless because Moses in the retraction admits Koppel was never asked to stop: "James was not… warned… not did he fail or refuse to… alter any conduct…" Retraction Exhibit B… that the contents of the email should have been kept confidential and never disclosed. Mem., not numbered dot at 12-13. This is pointless. A retraction does not eliminate the initial defamation. Id. The libel that Moses persisted in offensive conduct "despite requests to stop" is not eliminated by the retraction in which the falsity is confirmed. See Mem., not numbered dot at 12-13. The motion also argues that "interactions" are not "behavior." Last dot, p. 14. Any difference is immaterial. Both refer to severely offensive conduct by Koppel. We are also told (dot at 14-15) that the accusation of "behavior" inconsistent with the safety of members is akin to a professional critic writing that theater production is "the worst play" the writer has ever seen. Mem. 15. This repeats prior arguments (Mem. 5-9) and fails. A bad theatre production is never a cause for someone to be banished to protect the safety of the community.

The entirety of the Memorandum at 11-16 is frivolous in the context of this motion for dismissal. The entire exercise is inappropriate. Id.

6. Constitutional protections do not apply.

This defendant is not protected by constitutional protections. But see Mem. 16-17. This defendant is not a media defendant protected by an elevated standard of liability Gertz v. Robert Welch, 418 U.S. 323, 392 (1974). Plaintiff is not a public figure required to prove reckless falsity.

Philadelphia Newspapers v. Hepps, 475 U.S. 767, 775 (1986) and case cited there (reading *York Times* for the proposition that a public official is allowed the civil defamation remedy only if he establishes that the utterance was recklessly false); Herbert v Lando, 441 U.S. 153, 179 ( 1979) (public figure plaintiff must focus on the editorial process and prove a false publication is the result of media culpability).

All cases involving public figure plaintiffs are irrelevant. In Ayyadurai v. Floor64, Inc., 270 F. Supp. 3d 343, 358 (D. Mass. 2017) (Mem. 1), (plaintiff was a public figure). In addition, no facts were pleaded to show that the statements were made for any reason other than to report on an issue of public concern. Id at 379.

All discussion of issues of "public concern" (Mem. 16-17) is baseless. Moses in the retraction admits that the most damaging factual references to Koppel never should have been disclosed to the membership. The damaging March 2 email "included certain details" relating to Koppel "that should have remained within the… leadership," that is, be treated as personal and highly confidential even if believed to be true. See Levinsky's, Inc. v. Wal-Mart Stores, 127 F.3d 122, 132 (1st Cir. 1997).

Argument that the March 2 email involves a matter or matters of public concern (Mem. 16-17) is not available on this motion because it requires multiple impermissible inferences. The motion fallaciously argues that because the SIPB society sometimes does work that is of public interest, the March 2 email concerns a matter of public interest. Mem. note 6. That is a confusion. What matters on this motion is whether the expulsion of plaintiff is a subject of public concern, not whether other activities of the society sometimes do so. Id. Expulsion of a member from a private academic society for concealed reasons is not a matter of public concern. By this illogic (Mem. 16-17) every termination of any private employee would be a matter of public concern.

This argument is also counterfactual and futile because Moses in the retraction admits that certain details as to Koppel "should have remained within the… leadership." Retraction, Exhibit B. The reasons for expulsion did not involve any issue of public concern even within the society . See Exhibit B, Retraction. Moses apologized for the error. Id. That admission is conclusive. Contrary argument Mem 16-17, note 6, is pointless and relies entirely on the last two paragraphs of the March 2 email which are very different from the first three.

In the last two paragraphs of the March 2 email Moses advocates anonymous reporting by members of their random feelings as to who or does or does not make them feel comfortable. Those parts of the March 2 email are irrelevant to the prior insults directed at Koppel. The first three paragraphs of the March 2 email are scandalous falsehoods not appropriate for any publication. The last two paragraphs of the March 2 email could and should have been sent separately if at all. They indirectly smear Koppel as described immediately below, but are not essential in a legal sense to his defamation claims based on the prior statements in the first three paragraphs.

The last two paragraphs of the March 2 email are relevant to Koppel only if the reader is deceived by Moses in the March 2 email. The deception is the false implication that the carefully documented and horrendous bad conduct of this plaintiff described in the first three paragraphs of the March 2 email are identical to or very similar to the subject of the last two paragraphs. In those Moses advocates that student A should anonymously report to Moses and others if A feels uncomfortable in the presence of student B. This is addressed at Point 4 above . Moses in this part of the text is inviting whimsical, arbitrary anonymous reports not based on facts. Mem. 10-11; see Point 4 above. He is falsely and deceptively implying that the preceding fact-based denunciations of Koppel are similar to the whimsical, nonrational, reports which Moses is inviting in the last two paragraphs.

The encouragement of anonymous denunciations in the last two paragraphs of the March 2 email does not cause the entire March 2 email to be a matter of "public concern." Moses in the retraction admits the denunciations at the start of the email should <u>never</u> have been made public. Argument that last two paragraphs convert the entire document into a matter of public concern ignores the text and is contrary to the admission by Moses in the retraction. The same arguments (Mem. 10-11, 16-17 ) repeatedly violate the rule that no inferences are permitted to this defendant on this motion.

Count II: Interference with Advantageous Relations

To state a claim for intentional interference with advantageous relations, a plaintiff must allege that (1) he had an advantageous relationship with a third party (e.g., a present or prospective contract or employment relationship); (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant's interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions. <u>Blackstone v. Cashman</u>, 448 Mass. 255, 260, 860 N.E.2d 7 (2007). <u>Ayyadurai v. Floor64, Inc.</u>, 270 F. Supp. 3d 343, 369 (D. Mass. 2017).

An improper motive can be established by showing "retaliation or ill will toward the plaintiff." <u>Cavicchi v. Koski</u>, 67 Mass. App. Ct. 654, 658, 855 N.E.2d 1137 (2006). Improper means include violation of a statute or common-law precept, e.g., by means of threats, misrepresentation, <u>or defamation</u>. Id.; <u>United Truck Leasing Corp. v. Geltman</u>, 406 Mass. 811, 817, 551 N.E.2d 20 (1990).

There is no requirement that specific advantageous or future contractual relations be identified in the pleading, or the improper motive be specified, or that the plaintiff plead in detail exactly what Moses knows. But see Mem. 18. These putative requirements of the pleading are

fiction. Compare Mem. 18 with Ayyadurai, supra, 270 F. Supp. 3d at 369 (D. Mass. 2017) (Saylor J.), quoted above. Putting that aside, these putative requirements are satisfied. Defendant Moses is a friend of the plaintiff and knows him very well. Complaint, para. 7. Moses knows that this plaintiff is highly skilled as a teacher and researcher, has an excellent reputation in his field, and is "an extremely strong candidate for high level positions and opportunities" in all future ventures because of his "skills, excellent reputation and comprehensive knowledge." Complaint, para. 5. The Complaint, para. 80, alleges that the misconduct of this "defendant and others… employs wrongful and improper means and is damaging to the present and future advantageous relations of the plaintiff." This is more than sufficient.

Count III: Invasion of Privacy

Defendant argues against this count that it relies solely on the defamation. Mem. 17-18. That is incorrect. See Complaint, para. 57-71. The gravamen of Count III is that if the not disclosed facts in the March 2 email refer to the fact that the plaintiff, like millions of other persons, works hard to overcome a disability, the March 2 email invades his privacy whether or not it is defamatory. Count III alleges invasion of privacy "including but not limited to false disclosure of private facts." See Complaint, p. 17. Assuming the "false light" subpart of the tort is not yet recognized in Massachusetts (Mem. 19) that is immaterial. The violation alleged is the broader tort of invasion of privacy. Count IV. The facts alleged in any event show wrongful publicity given to private life. Restatement (Second) Torts, Sec 652D. See Fox Tree v. Harte Hanks Communications, Inc., 398 Mass. 845, 849 (1986) ("we leave for another day the determination whether Massachusetts will adopt the tort of false light invasion of privacy").

The label of a sub-part of the tort is immaterial as a matter of law because Massachusetts recognizes an actionable right of privacy more inclusive than "false light." Mem. 19. See Chapter

16

214, § 1B. ("Chapter 214"). Chapter 214 provides that a person shall have a right against "unreasonable, substantial or serious interference with his privacy." Id. Chapter 214 prohibits disclosure of facts that are of a highly personal or intimate nature when there exists no legitimate, countervailing, interest. Restatement (Second) of Torts § 652D comment b (1977). <u>Ayash v. Dana-Farber Cancer Inst.</u>, 443 Mass. 367, 382 (2005); <u>Bratt v. Int'l Bus. Mach. Corp</u>., 392 Mass. 508, 467 N.E.2d 126, 133-34 (1984) and cases there. On the present record if and to the extent the email disclosed and drew attention to the disability of this plaintiff (Mem., notes 5, 7), there was no justification or countervailing legitimate interest. His expulsion, even if for a disability, was never an appropriate subject of a public email.

Contrary to the argument in the motion as to privacy (Mem., note 7, p. 19), defendant Moses in the retraction <u>admits</u> that the March 2 email included confidential and highly private information that should have been kept confidential: "remained within the… leadership." Motion, Exhibit B, retraction.

> Every individual has some phases of his life and his activities and some facts about himself that he does not expose to the public eye, but keeps entirely to himself or at most reveals only to his family or to close personal friends. When these intimate details of his life are spread before the public… in a manner highly offensive to the ordinary reasonable person, there is an actionable invasion of his privacy, unless the matter is one of legitimate public interest.

<u>Restatement (Second) of Torts</u> § 652D comment b (1977); <u>Ayash v. Dana-Farber Cancer Inst.</u>, 443 Mass. 367, 382 (2005).

<u>Count IV: Civil Conspiracy.</u>

This count is entirely proper and well pleaded. But see Mem. 1, 17. The conspiracy allegations are distinct from and go beyond the defamation and other wrongs by Moses alone. They allege that all harm by Moses was assisted and increased by the wrongful help of others. Id. The contrary argument (Mem. 17) ignores what is plainly alleged.

17

The March 2 communication is far more damaging because the author writes as The Chair of the Executive Committee of SIPB. He speaks for them all. All of his points are presented as decided and authorized by a unanimous and well-informed SIPB executive committee. Complaint, para. 47. One or more of those persons and possibly others (e.g. keyholders) no doubt argued for expulsion and actively assisted and contributed to the March 2 text. Moses prior to March 2 actively concealed the identity of all of all involved persons. Complaint 19, 20, 32, 48. The contents of specific communications between Moses, the executive committee, and keyholders is still not known, Complaint, 19, 20, 32, 34. All active participants in the March 2 defamation will be joined as defendants as soon as they are able to be identified. Id. 48.

The March 2 email is severely damaging <u>because of</u> the participation of the conspirators. Complaint, 32, 42, 43, 85, 86. The March 2 email is sent by The Chair expressly speaking for entire executive committee. Complaint, para. 72-75. The executive committee as to this expulsion relied on reports and "stories" from keyholders. It evidently voted for expulsion without notice or any hearing and in violation of the written constitution of SIPB. Complaint, para. 32-33. The full committee evidently authorized everything written in the March 2 email. That makes it worse.

The Complaint plainly alleges that all persons who actively participated in these torts are jointly liable. Id. 49. It alleges that their collective power, plus worldwide distribution of the March 2, 2020 defamatory communication, greatly increased the harm done. Complaint, 72-75, 85, 86. Collective exercise of power was the basis for the expulsion. Collective power supposedly legitimizes the expulsion and all other harms to Koppel. The expression of collective denunciation makes the damage far worse. Id. The explicit invocation of the full executive committee as joining in all of the contents of the March 2 email makes it far worse than a decision by Moses alone or an email by him alone. The assembly of severe, consistent, and horrific stories of Koppel's bad

behavior add to the harm. All of the details of the email convey that the needless public denunciation is the result of a collective, reliable, fair, and documented investigation. Collective acts forced the expulsion and the created the harm.

There is no basis to dismiss Count IV.

## Conclusion

For the reasons set forth the plaintiff requests that the motion to dismiss this complaint served on or about August 12, 2020 be denied with prejudice and that this plaintiff be granted other appropriate relief.

                                      Respectfully submitted,

                                      James Koppel,
                                      By his attorneys,

                                      */s/ Paul G. Boylan*

                                      Paul G. Boylan, BBO #052320
                                      Ben Dunlap, BBO #661648
                                      Freeman Mathis & Gary, LLP
                                      60 State Street, Suite 600
                                      Boston, Massachusetts 02109
                                      pboylan@fmglaw.com
                                      bdunlap@fmglaw.com
                                      Tel: (617) 963-5978

Dated: September 2, 2020

<u>Certificate of Service</u>

  I hereby certify that the within document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and by first-class mail to any non-registered participants.

            */s/ Paul G. Boylan*
            _____
            Paul G. Boylan