UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                          )
James Koppel,                             )
                                          )
                Plaintiff,                )
                                          )
        v.                                )
                                          )   Civil Action No. 1:20-cv-11479-LTS
William Moses,                            )
                                          )
                Defendant.                )
_____)

<u>Amended Complaint with Jury Demand</u>

1.      Plaintiff James Koppel is 29 years of age and resides at 70 Pacific St. #224B, Cambridge, MA 02139.

2.      Defendant William Moses is 24 years of age and resides at 5965 10th Rd. N, Arlington, VA 22205. During the events that led to this civil action, he resided at 70 Pacific St. #491B, Cambridge, MA 02139. Koppel and Moses were friends since 2015 and until the events involved in this lawsuit. Koppel as of April 2021 is a graduate student at a major university in the Boston area. He is working on a PhD in computer science. He has been educated in computer science and has demonstrated substantial talent and promise in that area.

3.      Koppel was diagnosed with autism spectrum disorder at a young age. He still exhibits some of the signature ailments such some difficulty with eye contact

and being slower to notice nonverbal cues. Long before any of the events described here Koppel put in immense efforts to overcome this disability.

4.      In addition to his graduate work, in March 2020 Koppel was a teaching assistant for computer science undergraduates. In that role he conducted weekly tutorials for undergraduates sponsored by the university as part of its undergraduate curriculum. The weekly tutorials were used by undergraduate computer science students to review classroom subjects and to strengthen their skills.

5.      Koppel after he earns his Ph. D. intends to grow his existing business and continue his professional work in computer science in private enterprise, including possibly a startup venture. He is a skilled teacher and researcher and may seek work in a university. Because of advanced skills and training Koppel, but for the events described here, has an excellent reputation in his field and would be an extremely strong candidate for high- level positions and opportunities in his field. Koppel has worked literally for years to develop his skills, excellent reputation and comprehensive knowledge of the field.

6.      Defendant Moses is a graduate student in computer science at the same university in the Boston area.

7.      After first meeting in late 2015 Koppel and Moses over time developed a casual friendship. At various points in 2018 and 2019 they discussed living together as roommates. Moses, because of his friendship as with Koppel as of

February 2020, was familiar with private details of the personal and biographical background of the Plaintiff.

    a.  <u>The Student Information Processing Board.</u>

    8.    The Student Information Processing Board ("SIPB") is an informal organization sponsored by the local university. Its purpose is to encourage the high-level informal exchange of concepts and ideas related to computer science among persons within and outside the university, and to provide and support computing services at the university.

    9.    The most active SIPB participants are undergraduate and graduate students at the university who are knowledgeable in computer science and enthusiastic about the latest issues and developments. The student participants and hundreds of alumni and other persons not related to the university use and promote SIPB online sites, lectures, chat rooms and other SIPB offering. The participants and users are a worldwide community with shared interests in computer science.

    10.    Over the past several years SIPB has become a recognized and important forum for communications as to extracurricular issues and ideas in the field of computer science. Those are of substantial interest to the computer science community at the local university and worldwide.

    11.    SIPB communications and resources, including participation by members and non-members allow for professional development and encouragement

of the computer science community at the major university and beyond. SIPB is used for the development of innovative ideas, collegial conversations, and the creation and encouragement of a worldwide virtual community of persons interested in cutting-edge issues in computer science.

12.    The most active members typically are computer science students at the same major university. Hundreds of other persons, including former students at the university, participate from locations worldwide.

13.    SIPB is allowed to occupy a large physical working or meeting space or office at the local university. That space is funded by the university. The meeting space is used by students as a work area and as a meeting place for work and social connections. The workspace has printers, computers, and other office equipment and facilities. The meeting space allows for and encourages in-person interactions.

14.    Certain members of SIPB are from time to time elected to keyholder status. A keyholder is a member recognized for significant participation and contributions to SIPB.

15.    Keyholders are nominated and elected by existing keyholders. Keyholders are then eligible for election to the executive committee and to other positions of responsibility. Keyholder status is a desirable recognition.

16.    As of February 2020, plaintiff was working on an assigned project for SIPB in order to earn keyholder status. Apart from that project he made a number of

significant recognized contributions to SIPB starting in 2018. His project in 2020 was a lecture series. It was launched successfully and very near to completion in February 2020. Overall, the plaintiff had performed in excess of one hundred (100) hours in service to SIPB to qualify for keyholder election.

    b.  <u>The Unusual and Concealed Attack on Koppel.</u>

17.    On February 10, during or after a closed-door meeting of keyholders convened for a different purpose, SIPB keyholder Cel Skeggs stated that Koppel should not be made keyholder because Koppel had made a political comment in a chatroom the preceding September, stating something that Skeggs disliked.

18.    Shortly after being elected Chair of SIPB of February 17, 2020, Moses began planning to open a discussion amongst SIPB keyholders arguing that Koppel should not be nominated to become a keyholder. Doing that is very unusual. Moses began asking acquaintances of Koppel to share stories that would be damaging to Koppel. Moses opened this discussion with several false accusations against Koppel. Beginning on February 21, Moses, along with collaborator Cel Skeggs, rewrote a handful of minor or nonexistent accusations to make them seem far more serious and recent.

19.    On the afternoon of February 26, Moses sent an E-mail to sipb-private, an E-mail list of approximately 140 people, primarily consisting of recent keyholders

5

of SIPB but including some alumni from up to around 20 years ago and possibly more. Koppel was without excuse or justification deliberately excluded.

20.     This E-mail listed four bullet points as to Koppel's alleged recent misbehavior. All four are false. At least one is deliberately false and known by Moses to be false. All are baseless and contrived. None of them do not substantiate the February 27 or March 2 defamations described below.

21.     The February 26 email invited SIPB keyholders to anonymously discuss accusations regarding Koppel making people "uncomfortable" in addition to the four false accusations.

22.     On February 26, approximately 5 hours after the initial February 26 E-mail, Moses told the SIPB Executive Committee ("EC") that Koppel should be banned from SIPB. He told the committee the next morning that Koppel should be informed of the expulsion immediately. No new information or allegations as to Koppel's 1.5 years in SIPB had arrived in the meantime.

c.   The Feb 27 Meeting and Defamation.

23.     On February 27, 2020 defendant Moses asked to meet with the plaintiff.

24.     The two met in person on February 27. Their meeting lasted approximately one (1) hour. The only persons present were the plaintiff and the defendant.

6

25.     During that meeting Moses told Koppel he was being expelled because plaintiff at dates not specified caused not named members of SIPB to be "uncomfortable" or to "feel uncomfortable" because of public political statements by Koppel about matters of public interest. Koppel made some of those statements in a public chatroom the preceding September. The chatroom had no connection with SIPB. The statements had no connection with SIPB. Moses otherwise declined to give any details as to what Koppel had allegedly done to make anyone uncomfortable.

26.     Moses on February 27 said that a SIPB keyholder had started an E-mail thread 3 weeks earlier stating Koppel had made them uncomfortable, and that over time many more chipped in to build an overwhelming consensus that Koppel should be removed. All of that was false.

27.     Moses told the plaintiff he was going to be expelled from SIPB. He gave no specific reason.

28.     Koppel politely made clear that he had not done anything inappropriate. He made clear that without more details he could not respond or refute the accusations. He pointed out accurately that no member or keyholder had reported these rumors to him or anything of the kind.

29.     Koppel made clear that he objected to expulsion. He protested against expulsion and asked that any expulsion decision be reversed. When Moses said the

decision was final, Plaintiff asked that the baseless expulsion be done privately if at all. Moses refused to agree to private expulsion.

30.     Moses stated that Koppel's expulsion would be announced to "current keyholders, and some recent keyholders," suggesting a small group of at most 50 people. Moses at no time in the February 27 meeting said or suggested that any expulsion would be widely announced. Moses falsely told the Plaintiff on February 28 "I will request that it [news of Koppel's expulsion] remain limited to SIPB folks."

31.     Approximately one hour after the February 27 meeting, and without informing Plaintiff, Moses announced Koppel's expulsion on the sipb-private mailing list. ("the February 27 Email"). That mailing list contains most of the SPIB keyholders from the preceding 20 years and possibly earlier, totaling approximately 140 people ("the February 27 Email").

32.     The wording of the February 27 E-mail strongly implies that there had been many more reports against Koppel not shared with the group ("the vast majority…. mostly through individual replies"). That is false. The Email falsely states that Koppel "has been given several opportunities to change his behavior and failed to do so."

33.     It continues "I am sad that this is something that our members had to endure" and that "SIPB will take a strong stance against sexual harassment," ( emphasis added) implying that there were numerous consistent reports of

8

widespread and persistent sexual harassment directed against members of SIPB while Koppel was a member That is false in multiple ways.. Moses under oath in March 2020 was only able to name one "report" of alleged behavior of Koppel that "might have been" sexual harassment, an incident which the sole reporter described to Moses <u>not as</u> sexual harassment but as "subtly off-putting."

    d.  <u>The March 2 Defamatory Communication</u>.

34.    On March 2, 2020 defendant Moses purporting to act on behalf of the Executive Committee of SIPB transmitted an email to sipb-office@mit.edu. That is on information <u>the largest E-mail list under control of SIPB.</u> It is agreed to contain between 500 and 700 members; the exact number is disputed. The SIPB EC internally referred to this E-mail as "our **public** E-mail about Koppel."

35.    That email was defamatory and false in multiple respects. It said that Koppel had engaged in "severe, consistent, and widespread behavior" which made many keyholders "deeply uncomfortable" and "continued in spite of requests to stop."

36.    Plaintiff on March 6 demanded a retraction. On March 12, 2020 Moses sent out a purported retraction. It did not reinstate plaintiff to membership. It falsely implied that Plaintiff had received warnings to correct his unspecified misbehavior. A first retraction on March 12 in error enclosed a complete repetition of the initial March 2 defamatory communication. It thereby repeated the March 2 defamation.

37.    Several hours later on March 12 Moses sent a second retraction without the repetition of the initial defamatory March 2 communication.

38.    The February 27 and March 2 communications were defamatory and damaging in multiple respects. Without excuse or justification, the March 2 defamation was excessively published. On reliable information it was sent to hundreds of email addresses worldwide. It was sent to hundreds of persons who are not keyholders and who are not active members or participants in SIPB as of March 2, 2020.

39.    The March 2 communication need not have been sent to anyone. Public notice of expulsion of a member is not required by any SIPB rule.

e.  Falsity and Damage.

40.    The February 27 and March 2 communications were false and severely damaging in multiple ways. The title "Removal of jkoppel [plaintiff] and making SIPB a welcoming place," implies that Koppel's participation alone made SIPB an unwelcoming place. That implies that Koppel by his presence alone negatively impacted all persons in the group and would do so in the future as to any other group.

41.    The February 2 and March 2 E-mails say that non-identified SIPB keyholders within the week prior to March 2 had a "hard conversation" [sic] about the plaintiff. This "hard conversation" actually took place electronically and from start to finish involved a time span of 5 hours on February 26, based entirely on one

slightly negative report plus other reports which were negative because the writer inaccurately assumed that Koppel had ignored warnings, plus a handful of relatively neutral or inaccurate comments.

42.    Nothing in the written Constitution of SIPB requires or allows keyholder participation in discipline of a member. The written SIPB constitution on the contrary stipulates that the executive committee alone decides discipline issues by two-thirds vote.

43.    The SIPB Constitution requires advance notice to any member as to the reasons for consideration of any discipline, plus an opportunity to respond to the executive committee before imposition of any discipline. That procedure was not followed as to Plaintiff.

44.    The March 2 missives go on to say that in the so-called hard conversation many keyholders [sic] shared stories [sic] about how the plaintiff had made non-identified persons "deeply uncomfortable." It falsely suggests that the unfavorable accounts were universal. It falsely asserts that improper conduct of the plaintiff which caused unnamed persons to be "deeply uncomfortable" continued in spite of requests that Koppel stop the conduct. All of that is false. The falsity of the March 2 communication is admitted in the March 12 retraction.

45.     The description of unsuccessful "requests" to Koppel to stop offensive acts on February 26 and on March 2 and the assertion that he repeatedly refused to stop is false, mean-spirited and severely damaging, compounding the harm.

46.     The offending acts or communications by plaintiff are described in the March 2 missive as severe, persistent, and widespread. That is false. The putative reports at worse involved minor or fabricated incidents during plaintiff's previous 5 years as a student at MIT.

47.     The March 2 communication says that the Executive Board requested that plaintiff not use any SIPB resources. That is much true. It falsely implies however that plaintiff agreed to expulsion. He did not. He agreed only that if unjustifiably expelled he would not violate the terms of the expulsion. Precisely because plaintiff agreed to honor the illegitimate expulsion, the March 2 letter was not required to prevent or warn local or distant persons to watch out for use of SIPB resources by the plaintiff.

48.     The baseless expulsion of the plaintiff is described on March 2 as a decision "not taken lightly" but as a "necessity" for the organization "to be a place" [sic] where "everyone is comfortable." This falsely portrays the not-identified misconduct of the plaintiff as a threat to the core purposes and the future of a worldwide organization.

49.     This baseless expulsion is described as "quite exceptional" but "required." This falsely portrays the plaintiff as a major ("exceptional") threat to a thriving worldwide organization.

50.     The March 2 letter falsely implies that non-identified destructive wrongdoing by Koppel involved multiple victims over a substantial period of time prior to very recent detection. That is deliberately and inexcusably false. The March 2 communication says that in light of the unnamed wrongdoing by this plaintiff, the organization has realized it needs to "do better" and to establish "mechanisms to make it easy for members to voice their concern when they are made uncomfortable." This falsely suggests that SIPB members were abused over prolonged periods of time and intimidated by this plaintiff to be silent as to his abuse. That is false. The March 2 letter falsely implies that the plaintiff's misconduct alone has caused the Executive Board to see the need to do better by enactment of sweeping future protections. That too is false and severely damaging. The March 2 letter, in referring to future protective measures, is baseless and damaging. It slanders plaintiff by falsely tying his expulsion to organizational resolution of the much broader issue of anonymous complaints by members against other members. That issue was openly and widely discussed within SIPB long before February 2020. Association of Plaintiff with the recognition and approval of future anonymous complaints as part of an effort to "do better' is contrived, false, and deeply damaging.

51.     The March 2 communication describes SIPB as a place where "everyone should feel safe and supported" [sic], falsely suggesting that the plaintiff's unidentified offenses have caused this worldwide organization to see for the first time that it has failed to provide those protections to participants and needs to do better.

52.     The March 2 letter says that SIPB recognizes it "needs to do better to be a safe environment for everyone," falsely suggesting that this plaintiff is responsible for substantial, prolonged, and concealed harms which escaped detection despite due diligence. This also falsely suggests that detection of the misconduct of this plaintiff has caused the Executive Board to see that his wrongs alone demonstrate to the Executive Board that it must "do better" to protect all SIPB members going forward. This is false and independently damaging. The linkage of these issues in the March 2 letter is false and maligns the plaintiff.

53.     The March 2 communication is an artful and sly catalogue of deliberately damaging and false accusations. They are inexcusable. The excessive publication was inexcusable.

54.     No expulsion was justified. If the Executive Board after notice to plaintiff of the allegations and a response by plaintiff had voted for expulsion, the expulsion could and should have been done privately or with minimal publication within SIPB. Not doing that is inexcusable in this instance. The putative expulsion

was flawed by lack of notice and opportunity to respond. It is flawed by multiple instances of egregious and gratuitous falsity.

55.    The March 2 email purports to have been written on behalf of the SIPB Executive Committee by the chairperson, defendant Moses.

56.    Moses is in fact the primary author, having drafted the E-mail and applied minor edits suggested by others.

f.    Continuing Publication of Defamatory Statements.

57.    After the onset of this civil action Moses after June 2020 contacted at least five of Koppel's friends and acquaintances either directly or indirectly through an accomplice. Three of the five presently identified had never attended a SIPB meeting. A fourth had not attended an SIPB meetings since mid-2017. The fifth left the Boston area a year prior to Koppel's joining SIPB in September 2018. None of them could have plausibly provided information supporting the defamatory communication. On information Moses republished the all or part of false and defamatory statements to these persons. At least one of Koppel's long-time friends unfriended him on Facebook as a result.

g.    Reputational and Professional Damages.

58.    Of the hundreds of persons targeted for the public March 2 notice of expulsion and the internal February 27 notice, virtually all of them are affiliated or were affiliated with SIPB by reason of past or current academic activities at the

university or very high-level interest in cutting-edge issues as to computer science and information systems and technologies.

59.     The hundreds of persons who received the expulsion email included numerous persons who are social or professional acquaintances or friends of the plaintiff. The distribution list included numerous persons currently involved in professional and academic activities relevant to all forms of future employment of the plaintiff. The persons who received the defamatory communications on March 2 and March 12 included numerous persons who, but for the defamations, were likely to provide favorable references or contact information to the plaintiff and able and willing to give him networking and employment opportunities worldwide.

60.     The same is true of the persons who received the defamatory communication on February 27.

61.     The excessive distribution included persons located worldwide ranging in age from approximately 18 years to persons in their 60s and 70s and possibly older. SIPB membership and former members and former keyholders are a sophisticated active worldwide community highly relevant to all of the professional skills which the plaintiff has developed in his undergraduate and postgraduate education and highly relevant to his future employment, business, and professional achievement.

62.     SIPB participants and members, past, present, and future, are a unique and important resource for the career development of any member. Every member of SIPB past, present, and future has or will have multiple contacts within and outside SIPB.

63.     The persons on the SIPB distribution list used for the March 2 letter and persons known to those persons are a vast worldwide network of influential persons highly skilled in computer science. They are and will be in the future important in the business and practice of highly- developed information technology and systems. That network of persons touches or includes persons likely to be involved at very high levels in every aspect of computer science worldwide in the lifetime of this plaintiff.

64.     The defendant and the SIPB Executive Committee knew or should have known all of the facts in the preceding five (5) paragraphs as of March 2, 2020. They knew or should have known that the broad distribution of the March 2 notice would result in communication of highly damaging and highly personal information to every member in a large worldwide network of persons actively engaged in the chosen profession of this plaintiff.

65.     Moses knew the broad distribution of the March 2 defamation before sending it.

66.     The defendant and persons acting in concert with him as of March 2 knew or should have known that broadcast of the March 2 communication allegations to hundreds of SIPB members worldwide would create widespread and irreparable damage to the reputation of the plaintiff personally and in all aspects of his future professional and academic endeavors.

h.   Intimidation of Speech.

67.     Koppel holds strong views as to certain matters of public interest and debate. When appropriate he advocates, for example, for gender equality and free speech.

68.     Koppel mostly keeps his political beliefs private. Since 2018 he has on occasion spoken up. He argued that law and morality are distinct in a September 2019 department-wide meeting. He has made comments on public websites in support of gender equality.

69.     During the initial February 27 conversation in which Koppel was informed of his expulsion from SIPB, the only reason given to Koppel by Moses is that multiple SPIB members complained about statements Koppel made in a public chatroom the previous September in which he stated that both men and women were capable of abusing power.

70.     According to Moses, on February 10 Cel Skeggs made that complaint about Koppel. In response, Moses began seeking out negative information about

Koppel on February 18, telling another keyholder "there were some anti jimmy [sic] sentiments from some bad things he apparently said on zephyr [sic] as well as elsewhere (of a sexist kind […])." On February 20 an active member of the EC explicitly named "his [Koppel's] public discourse" as a reason for him to be excluded from SIBP. On February 20th or 21st Moses stated the EC should avoid discussing the accusations against Koppel with other keyholders because "discussion may head directions we don't [sic] know." Between February 21 and 26, Moses and Skeggs collected, fabricated, and rephrased several accusations to make them maximally damaging, which were then used in the first February 26 Email.

71.     When Moses and Skeggs were drafting these accusations, Moses pulled up an E-mail thread from mid-2018 (before Koppel had joined SIPB, on a mailing list unrelated to SIPB), in which Koppel had argued against efforts to intimidate participants at a "Free Speech Rally" to be held in Boston. Skeggs proposed using this to stand for the accusation that Koppel engaged in "Hostile conversations."

72.      Defendant's actions from February 18 to February 26 show a persistent motivation to punish Koppel for his speech about matters of public interest.

73.     Moses and others in SIPB have stated that Koppel's online public communications on the Epstein scandal and other public issues contributed to complaints by SIPB members about Koppel in the run-up to the March 2, 2020 E-

mail. Moses has disclosed more than 100 pages of public speech involving Koppel as support for the defamations of Koppel.

74.    Moses wrote and sent the March 2 E-mail in response to a request by Skeggs to "make public discussion of jkoppel's expulsion possible," an act which caused Koppel to be ostracized based on false allegations of harassment fabricated in retaliation for political speech which made people "uncomfortable" [sic].

75.    Skeggs on March 2 stated that she hoped Koppel's mistreatment by SIPB would in the future serve as an example to other MIT groups. Moses on March 2 knowingly acted to "make an example of Koppel" and encourage other clubs to expel and denounce and punish persons who caused others to be "uncomfortable" because of protected political speech or on other bases.

76.    The effect of the expulsion and the defamations has been near-total self-censorship by Koppel after the February 27 and March 2 defamation, including hesitancy to "like" a slightly political statement by a friend on social media. Koppel declined an invitation to appear on the Fox News show "The Ingraham Angle" to speak about a matter of public interest on March 19 in part due to this same fear.

i.    The Misconduct Alleged is Severe and Inexcusable.

77.    The March 2 communication including the worldwide notice that exclusion of Koppel was a necessity. Those impacts are worse if the allegation is

made without any specification of the cause or any factual corroboration. The March 2 communication caused extremely damaging social and professional ostracism.

78.     The defendant and the persons acting in concert misused the March 2 email sent to hundreds of persons. They employed it recklessly and wantonly in a deliberate and highly damaging manner. They embroidered the March 2 falsehoods as essential to the survival and maintenance of important professional and academic objectives of a worldwide community of scholars and professionals.

79.     The defamations alleged here and the resulting ostracism and damage are made worse by the false assertions that plaintiff persisted in wrongdoing after requests to stop, and by the baseless assertions that his wrongs make it clear to better informed persons that anonymous reporting and other protections must be enacted so that the Executive Committee, better informed as to the relevant the facts, can "do better" to protect the most important goals of a worldwide association of students, scholars and professionals. The false posturing as to the future need for protective measures makes the defamation and the other wrongdoing described here more severely damaging and more outrageous.

80.     The damages wrongfully caused by this defendant and others acting with him based on presently known facts could be found by a jury to be at least $500,000 based solely on damage to professional reputation and loss of economic opportunities for employment and advancement. That $500,000 figure is based on

facts to be shown as to those economic harms alone. It does not include other damages appropriate to compensate plaintiff for anguish, humiliation, opprobrium and other recoverable but not easily quantifiable suffering and losses.

<u>Count I</u>
(Defamation)

81.    Plaintiff repeats and incorporates by reference the allegations above as if fully set forth here.

82.    The letters published by defendants on February 27, 2020, March 2, 2020, and March 12, 2020 were false and purported to be based on facts known to the defendants. Those statements were defamatory and inexcusably subjected the plaintiff to professional and personal scorn, ridicule, and disapproval. The defamatory communications were needlessly and excessively published and have directly and severely damaged the plaintiff.

83.    Defendant and others have caused substantial damages to the plaintiff. Plaintiff is entitled to the recovery of damages in amounts to be determined including the dollar amounts identified in paragraph 75 above referring to tangible or measurable economic opportunities, plus all other recoverable damages for non-economic harms, plus interest, costs, and attorney's fees to the extent permitted by law.

 (Counts II through IV deliberately omitted based on prior rulings of this Court.)

<u>Count V</u>
(Violation of the Massachusetts Civil Rights Act (MCRA))

84.     Plaintiff repeats and incorporates by reference the allegations above as if fully set forth here.

85.     By reason of the foregoing Moses has violated the right of Plaintiff to protection against interference by threats, intimidations, or coercion, and against attempts to interfere by threats, intimidation, or coercion, with the exercise of enjoyment of rights secured by the constitution or laws of the United States and of the Commonwealth of Massachusetts, including those of Articles CXIV and LXXVII of the Massachusetts constitution. The Massachusetts Constitution guarantees a positive right to freedom of speech stronger than the negative right of the US Constitution. MCRA has been interpreted to prohibit private action punishing free speech.

86.     Defendant has wrongfully punished the plaintiff for free speech, He has used defamation and public expulsion to punish and intimidate plaintiff for protected political speech, and to have him ostracized in ways disrupting his freedom to speak and his ability to engage in associations for protected activity.

87.     By reason of the foregoing plaintiff is entitled to the recovery of damages in amounts to be determined plus interest, costs, and attorney's fees to the extent permitted by law.

## Jury Demand

The plaintiff James Koppel requests a trial by jury of all issues so triable.

## Prayer for Relief

Plaintiff James Koppel requests entry of judgment in his favor on each of the counts in the complaint plus the award of monetary damages in amounts to be determined, plus interest, costs, and attorneys' fees to the extent permitted by law plus other relief as is appropriate.

Respectfully submitted,
JAMES KOPPEL,
By his attorney,


*/s/ Paul G. Boylan*

_____
Paul G. Boylan, BBO 052320
Freeman Mathis & Gary, LLP
60 State Street, 6th Floor, Suite 600
Boston, Massachusetts 02109
pboylan@fmglaw.com
(617) 963-5972

Date: July 16, 2021

Certificate of Service

    I hereby certify that the within document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and by first-class mail to any non-registered participants.


                        */s/ Paul G. Boylan*

                        _____

Date: July 16, 2021                Paul G. Boylan