UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                                    )
James Koppel,                                )
                                                    )
            Plaintiff,                           )
                                                    )
      v.                                          )
                                                    )        Civil Action No. 1:20-cv-11479-LTS
William Moses,                              )
                                                    )
            Defendant.                        )
_____)


<u>Requests for Admissions by Defendant</u>

The defendant is requested to admit or deny the following requests within 30 days pursuant to Rule 36 of the Federal Rules of Civil Procedure.

***

1.      Defendant Moses ("Moses") sent an email to sipb-office@mit.edu on March 2, 2020 at 7:23 p.m. ("the March 2 email").

2.      The persons on the email list for the March 2 email included hundreds of past keyholders of SIPB presently working in the field of computer science.

3.      The persons on the email list for the March 2 email included hundreds of past keyholders of SIPB presently working in the field of computer science in positions and locations throughout the world.

4.      The persons on the email list for the March 2 email was an audience of at least or approximately 500 persons worldwide.

5.      The audience of persons on the email list for the March 2 email included hundreds of MIT graduates in computer science.

6.      The audience of persons on the email list for the March 2 email included hundreds of persons worldwide who are accomplished in computer science and who are interested in cutting-edge issues in computer science.

7.      The audience of persons on the email list for the March 2 email included hundreds of persons worldwide who work actively in the field of computer science in the private sector and in universities worldwide.

8.      The audience of persons on the email list for the March 2 email included hundreds of persons worldwide who share with Koppel a serious high-level interest in computer science.

9.      The audience of persons on the email list for the March 2 email included hundreds of persons worldwide some of whom who know Koppel and many of whom work in Koppel's chosen field, computer science, in the private sector and in universities worldwide.

10.     The audience of persons on the email list for the March 2 email were mostly persons who are very accomplished in computer science and very interested in cutting edge issues in computer science.

2

11.    The title of the March 2 email is "Removal of JKoppel and making SIPB a welcoming place."

12.    Moses in the March 2 email said he was writing to let the audience know about a "hard conversation" that keyholders had "this past week" about SIPB member Koppel.

13.    Everything that is communicated in the March 2 email could have been effectively communicated without express mention of Koppel by name.

14.    Moses decided that the March 2 email should mention Koppel by name.

15.    Moses decided that the title to the March 2 email should include reference to Koppel by name.

16.    The title to the March 2 email would have effectively conveyed all of the same information without identification to Koppel by name.

17.    Moses in referring to the "hard conversation" "this past week" on March 2 was in fact referring to an email discussion among some of the SIPB keyholders which commenced on February 26, 2020 at 4:21 p.m. and ended on February 27 at 6:11 p.m., a duration of about 26 hours.

18.    In the March 2 email Moses wrote that the stories from the keyholders to him within the last week identified severe misconduct by Koppel which continued despite requests to stop.

19.    In the March 2 email Moses wrote that the stories from keyholders within the last week identified persistent misconduct by Koppel which continued despite requests to stop.

20.    In the March 2 email Moses wrote that the stories from keyholders within the last week identified widespread misconduct by Koppel which continued despite requests to stop.

21.    Throughout the hard conversation referred to in the March 2 email, no key holder in fact shared any story about Koppel making that person deeply uncomfortable by reason of any unwelcome physical contact by Koppel.

22.    Throughout the hard conversation referred to in the March 2 email, no key holder in fact shared any story about Koppel making that person deeply uncomfortable by reason of any unwelcome physical contact by Koppel which continued in spite of requests to stop.

23.    Throughout the hard conversation referred to in the March 2 email no key holder in fact shared any story about Koppel engaging in sexual harassment.

24.    Throughout the hard conversation referred to in the March 2 email no key holder in fact shared any story about Koppel engaging in sexual harassment which continued in spite of requests to stop.

25.  In the March 2 email Moses wrote or implied that the stories from keyholders within the last week identified unwelcome physical touching by Koppel which continued despite requests to stop.

26.  In the March 2 email Moses wrote or implied that the stories from keyholders within the last week identified inappropriate physical touching by Koppel which continued despite requests to stop.

27.  In the March 2 email Moses wrote or implied that the SIPB keyholder stories in the past week identified severe misconduct by Koppel which was not detected for a prolonged period of time.

28.  In the March 2 email Moses wrote or implied that the SIPB keyholder stories in the past week identified inappropriate physical touching by Koppel which was not detected for a prolonged period of time.

29.  In the March 2 email Moses wrote or implied that SIPB keyholder stories identified unwelcome physical touching by Koppel which was not detected for a prolonged period of time.

30.  In the March 2 email Moses wrote that many keyholders shared stories about how Koppel made them deeply uncomfortable and that Koppel continued to do so in spite of requests to stop.

31.  In the "hard conversation" referred to in the March 2 email (the 26 hour period of time between the February 26 email and the February 27 email) no

5

keyholder shared any story about Koppel making that person "deeply uncomfortable" by reason of any physical contact which continued despite requests to stop.

32. In the March 2 email Moses wrote or implied that the keyholders during the past week told Moses multiple stories of conduct by Koppel which was sexual harassment.

33. In the March 2 email Moses wrote or implied that that the stories from keyholders within the past week described conduct by Koppel which involved multiple instances of sexual harassment by Koppel which continued despite requests to stop.

34. In the March 2 email Moses wrote or implied that Koppel is being expelled because SIPB is taking a stand against sexual harassment.

35. In the March 2 email Moses wrote that because of the severity, consistency and widespread nature of the stories about Koppel, SIPB asked that Koppel refrain from any further participation in SIPB.

36. On February 27 when meeting with Moses in person, Koppel voluntarily agreed to respect the expulsion decision that Moses announced to him, but Koppel never agreed he had done anything inappropriate.

37. Moses wrote in the March 2 email that the expulsion of Koppel was the will of the current keyholders. That was false. There was no keyholder vote.

Only a very small fraction of the active keyholders participated in the 23 hour email "conversation."

38. In the March 2 email Moses wrote that the immediate public expulsion of Koppel from SIPB was a "necessity" for SIPB to be a safe environment.

39. In the "hard conversation" referred to in the March 2 email (the 23 hour period of time between the February 26 email and the February 27 email) no keyholder shared any story about Koppel making that person "deeply uncomfortable" by reason of any physical contact which continued despite requests to stop.

40. Koppel was not a recipient of the email on March 2 at 7:23 P.M. sent to a worldwide audience about J Koppel announcing that Koppel was expelled and describing the reasons.

*** 

41. On March 12 at 2:16 p.m. Moses sent an email admitting that the email he sent on March 2 included certain details about Koppel "which upon further reflection" could have remained private, that is, could have been communicated only to the Executive Committee of SIPB.

42. Moses on March 12 at 2:16 P.M. sent an email apologizing for the fact that his March 2 email communicated details as to Koppel which should have not been included.

7

43. Moses on March 12 at 2:16 P.M. sent an email in which he admitted that his March 2 email about Koppel was not accurate on several points.

44. Moses on March 12 at 2:16 P.M. sent an email in which he admitted that his March 2 email about Koppel was not accurate because Koppel in fact had not been warned as to any alleged inappropriate conduct.

45. Moses on March 12 at 2:16 P.M. sent an email in which he admitted that his March 2 email about Koppel was not accurate because Koppel in fact did not fail or refuse to cure or alter any of his conduct after any warning or warnings from SIPB leadership.

46. Moses on March 12 at 2:16 P.M. sent an email in which he admitted that his March 2 email about Koppel was not accurate because it may have given the impression that any issue related to Koppel was clear or not disputed.

47. Moses on March 12 at 2:16 P.M. sent an email in which he admitted that all of his communications about Koppel in the March 2 email involved issues on which reasonable persons "can and do disagree."

*** 

48. At the time he sent the March 2, 2020 email Moses had received at most one firsthand report as to Koppel making a person uncomfortable by reason of perceived inappropriate touching,

49.   At the time he sent the March 2, 2020 email Moses had received at most one firsthand report as to Koppel making any person uncomfortable by reason of perceived inappropriate touching, and that one report involved Koppel touching a person on the arm or elbow.

50.   At the time he sent the March 2, 2020 email Moses had received at most one firsthand report as to Koppel making any person uncomfortable by reason of perceived inappropriate touching, and that one report involved Koppel touching a person on the arm or elbow.

51.    The person who said she was uncomfortable because Koppel had once touched her on the elbow or arm later told Moses on February 27 that she was not aware of Koppel having done anything that was offensive. WM 447.

52.   The person who said she was uncomfortable because Koppel had once touched her on the elbow or arm told Moses on February 27, 2020 that she was not aware of Koppel having done anything that was offensive but that she thought Koppel was "subtly off-putting." WM 447.

53.   The person who told Moses she found Koppel "subtly-off putting" used those words to make clear that Koppel had not ever touched her arm or elbow in a way that was not appropriate. WM 447.

54.    The person who told Moses she found Koppel "subtly-off putting" used
       those words to make that she did not think Koppel had sexually harassed
       her.

55.    When Moses read the message sent on February 27 from the person who
       was touched on the arm saying that Koppel was "subtly off-putting, " Moses
       knew that the person was telling him that Koppel had done nothing
       offensive. WM 447

56.    When Moses read the message on February 27 from the person who said
       Koppel was "subtly off -putting, " Moses knew that the person was telling
       him that Koppel had done nothing to her that was sexual harassment. See
       WM 447.

*** 

57.    Moses sent an email to keyholders of SIPB at SIPB-private on February 27,
       2020 at 6:11 p.m. ("the February 27 email").

58.    In the February 27 email at 6:11 pm Moses wrote that the decision to ask
       Koppel not to participate in SIPB anymore was a "necessity" that reflects the
       "vast majority" of people [sic]who "took part in this discussion." That was
       false. The vast majority relied on the four bullet points they assumed to be
       true. In fact all four bullet points were false or inaccurate.

59.    The discussion referred to by Moses in the February 27 email is an email discussion among keyholders which commenced on February 26 at 4:21 p.m. and ended by 6: 11 pm on February 27, a duration of about 26 hours.

60.    In the February 27 email Moses wrote that the reports from the keyholders to Moses within the last 26 hours identified "interactions" by Koppel which were "severe."

61.    In the February 27 email Moses wrote that the reports from keyholders to Moses within the last 26 hours identified" interactions" by Koppel which were "persistent."

62.    In the February 27 email Moses wrote that the reports from the keyholders to Moses within the last 26 hours identified "interactions" by Koppel which were "widespread."

63.    In the February 27 email Moses implied that the reports from the keyholders to Moses within the last 26 hours identified unacceptable or unwelcome "interactions" by Koppel which were "widespread."

64.    In the February 27 email Moses implied that the reports from the keyholders to Moses within the last 26 hours identified unacceptable or unwelcome "interactions" by Koppel which were "severe."

65.     In the February 27 email Moses implied that the reports from keyholders to

        Moses within the last 24 hours identified unacceptable or unwelcome

        "interactions" by Koppel which were "persistent."

66.     In the February 27 email Moses wrote that Koppel had "been given several

        opportunities to change his behavior" which was persistent, severe and

        widespread, and that Koppel had "failed to do so." That was false.

67.     In the February 27 email Moses wrote or implied that Koppel had "been

        given several opportunities to change behavior" which was unacceptable or

        unwelcome, and that Koppel had "failed to do so." That was false.

68.     In the February 27 email when Moses wrote that SIPB "will take a strong

        stance against sexual harassment," he was referring to the decision to request

        that Koppel refrain from participating in SIPB.

69.     In the February 27 email when Moses wrote that SIPB "will take a strong

        stance against sexual harassment" he was referring (in part) to the decision

        to request that Koppel refrain from participating in SIPB based on reports of

        persistent, severe, and widespread misconduct by Koppel.

70.     In the February 27 email when Moses wrote that SIPB "will take a strong

        stance against sexual harassment" he was referring (in part) to the decision

        to request that Koppel refrain from participating in SIPB based on reports of

        persistent, severe, and widespread sexual harassment by Koppel

71.   In the February 27 email Moses wrote that Moses was "sad" that SIPB members "had to endure" interactions with Koppel.

72.   In the February 27 email Moses wrote that Moses was "sad" that SIPB members "had to endure" interactions with Koppel which involved unwelcome touching by Koppel.

73.   In the February 27 email Moses wrote or implied that Moses was "sad" that SIPB members "had to endure" interactions with Koppel which involved sexual harassment by Koppel.

74.   At the time he sent the February 27 email Moses wrote or implied that Koppel had engaged in severe, persistent, and widespread sexual harassment.

75.   At the time he sent the February 27 email Moses intended to communicate that Koppel had engaged in severe, persistent, and widespread sexual harassment of SIPB members.

76.   In the February 27 email Moses wrote that SIPB "needs to do better" to be a "safe environment." In writing that, Moses implied that Koppel's recently discovered interactions were inconsistent with a safe environment at SIPB.

77.   In the February 27 email Moses wrote that SIPB is "first and foremost a community where everyone should feel safe and supported." In writing that,

Moses implied that Koppel's recently discovered interactions were inconsistent with an environment in which everyone at SIPB could feel safe.

78. The February 27 email could have been sent only to the Executive Committee.

79. Moses decided that the February 27 email should include reference to Koppel by name.

80. Koppel did not receive a copy of the Moses email on February 27 at 6:11 p.m. announcing that Koppel was expelled and describing the reasons.

\*\*\*

81. On February 26, 2020 at 4:21 p.m. defendant Moses sent an email with four bullet points. No copy of that email was sent to Koppel.

82. In the email with four bullet points sent on February 26 at 4:21 p.m. ("the email with four bullet points"). Moses invited discussion by the active SIPB keyholders of behavior by Koppel that made them uncomfortable.

83. Approximately 140 active keyholders were the audience for the February 26 email.

84. In the 26 hours after transmission of the February 26 email, a total of 16 keyholders participated in the 26- hour conversation.

85.   One participant in the 26 hour email conversation said Koppel was "subtly off putting". WM 447. That person also told Moses about a friend who had possibly avoided SIPB because of Koppel ("the friend").

86.   As of March 2, 2020 the friend was not a keyholder.

87.   On or prior to March 2, 2020 the friend did not directly or indirectly report to Moses any offensive physical contact by Koppel.

88.   As of March 2, 2020 the friend had been persistently and seriously sexually harassed during the summer of 2017 by someone other than Koppel while participating in SIPB activities.

89.   Koppel did not attend or participate in any SIPB meetings until 2018.

90.   The friend was sexually harassed at SIPB in 2017 by a person other than Koppel.

91.   The friend in 2017 openly complained to SIPB about her harassment within SIPB in 2017 by someone other than Koppel.

92.   The friend complained in 2017 that the person who harassed her in 2017 was the chair of SIPB at the time.

93.   SIPB took no action in response to the 2017 complaints by the friend as to her allegations that she was sexually harassed by the chair of SIPB in 2017.

94.   The complaints by the friend as to sexual harassment in 2017 were never investigated by SIPB.

95. The 2017 complaints by the friend as to sexual harassment in 2017 were never the subject of any charges or accusation against the former chair.

96. The former chair as of 2021 is a keyholder in good standing in SIPB.

97. The friend in 2021 said she was uncomfortable one time when Koppel asked her for a hug after a friendly chat in the SIPB office.

98. The friend gave Koppel the hug because she was a friend of Koppel and "did not want to make a big deal about it."

99.  The friend was also sometimes uncomfortable because Koppel would pat her on the head.

100. The friend at the time of the hug did not believe that Koppel had sexual intentions towards her.

101. The friend did not believe that Koppel ever touched her in a way that was sexual in nature.

102. The friend did not on or before March 2 report to Moses the patting on the head or the hug.

103. The friend in 2021 said that Koppel was not a significant contributor to her decision to avoid SIPB.

104. The friend was not a keyholder of SIPB as of March 2, 2020 or ever.

***

105. Koppel had a girlfriend in 2015 ("the 2015 former girlfriend"). As of February 26, 2020 defendant Moses had never met the 2015 former girlfriend.

106. As of February 26, 2020 defendant Moses did not know the 2015 former girlfriend.

107. As of February 26, 2020 defendant Moses did not know the 2015 former girlfriend was a former girlfriend of plaintiff.

108. As of February 26, 2020 and prior to March 2, 2020, the 2105 former girlfriend did not make any "report" identified in the email by Moses to keyholders on February 27 at 611 pm.

109. As of March 2, 2020 the 2015 former girlfriend did not make any "report" identified in the email by Moses to SIPB worldwide on March 2, 2020 at 7:23 pm.

***

110. SIPB as of February 26, 2020 and all prior dates at operated pursuant to a written Constitution ("Constitution").

111. The SIPB Constitution is a written document which governs the procedures of the group.

112. As of February 26 the Constitution provided for discipline of individuals if they were detrimental to the functioning and goals of SIPB. Constitution, Article X.

113. The Constitution provided as of February 26, 2020 that if the actions of individuals were found to be detrimental to the functioning and goals of SIPB, the Executive Committee had the power to sanction those individuals by banishment or expulsion from space is controlled by SIPB and by other measures.

114. As of February 26, 2020 any member of SIPB under consideration for possible expulsion had the right to be informed of the reasons for which the sanctions were being considered.

115. As of February 26, 2020 any member of SIPB under consideration for possible expulsion had the right to be informed of the reasons why expulsion was being considered and the opportunity to respond.

116. As of February 26, 2020 any member of SIPB under consideration for possible expulsion had the right to be informed of the reasons why expulsion was being considered and the opportunity to respond.

117. Prior to an in person meeting with Moses starting at about 4:30 PM on the afternoon of Thursday February 27 Koppel was not informed of any of the reasons for which his expulsion was being considered.

118.   Prior to an in person meeting with Moses starting at about 4:30 PM on the afternoon of Thursday February 27 Koppel was not given any opportunity to respond to any of the reasons for which expulsion was being considered.

***

119.   On February 26, 2020 at 4:21 p.m. defendant Moses sent an email with four bullet points ("the email with four bullet points"). Moses invited discussion by the active SIPB keyholders of behavior by Koppel that made them uncomfortable.

120.   The February 26 email listed four bullet points.

121.   One of those four bullet points was that Koppel had "repeatedly initiated physical contact with someone who had specifically told him to stop doing so."

122.   That was the only February 26 discussion bullet point that related to unwelcome physical touching.

123.   In the February 26 discussion bullet point about "initiating physical contact with someone" who had "told him to stop" Moses was referring to Koppel giving hugs to Moses himself.

124.   The bullet point description of Koppel's unwelcome physical contact with someone referred to hugs which Koppel gave Moses at a time when Koppel and Moses were friends.

125.    The February 26 email did not disclose that the bullet point reference to
"initiating physical contact with someone" who had "specifically told him to
stop" referred to hugs given to Moses by Koppel.

126.    The February 26 bullet point reference to "initiating unwelcome physical
contact" implied that Koppel had repeatedly engaged in unwelcome physical
contact.

127.    In the February 26 email by Moses to the keyholders, Moses requests
comments about Koppel. Moses did not disclose that reference to "repeated
touching despite requests to stop" in fact refers to hugs given to Moses by
Koppel at various dates when Koppel thought they were friends.

***

128.    On the evening of February 26 at 9:19 PM Moses told the SIPB Executive
Committee that Koppel should not be nominated for keyholder and should
be expelled.

***

129.    At a meeting between Moses and Koppel starting at about 4:30 PM on the
afternoon of Thursday, February 27, Koppel was told he was being expelled.

130. Koppel agreed to respect the decision, but did not agree he had done
anything wrong.

130.   When Moses spoke to Koppel on February 27 to tell Koppel he was no longer welcome at SIPB, Moses did not mention unwelcome physical touching.

131.   When Moses spoke to Koppel on February 27 to tell Koppel he was no longer welcome at SIPB, Moses did not mention sexual harassment by Koppel.

132.   When Moses spoke to Koppel on February 27 to tell Koppel he was no longer welcome at SIPB, Moses did not mention any unwelcome touching by Koppel which continued despite requests to stop.

***

133.   Koppel and Moses prior to March 2, 2020 were for a time relatively close friends.

134.   Koppel and Moses had meals together on at least one occasion.

135.   Koppel and Moses had meals together on multiple occasions.

136.   Moses had at one point asked permission to spend the night in Koppel's apartment.

137.   Koppel and Moses in 2019 discussed becoming roommates at MIT housing.

138.   Koppel and Moses in 2019 entered a housing lottery to be roommates at MIT housing.

139. Moses in 2019 had at some point was assigned to move into the apartment then occupied by Koppel.

140. Moses then changed his mind. He requested that the responsible persons at MIT housing nullify or withdraw his request for assignment to the apartment occupied by Koppel.

141. On or about February 12, 2020 Moses by email sent Koppel a happy birthday greeting saying "happy birthday friendo."

Respectfully submitted,

James Koppel,
by his attorneys,

/s/ Paul G. Boylan

_____
Paul G. Boylan, BBO 052320
Adrianna K. Michalska, BBO 703715
Freeman Mathis & Gary, LLP
60 State Street, Suite 600
Boston, Massachusetts 02109
pboylan@fmglaw.com
amichalska@fmglaw.com

Dated: October 19, 2021         Tel: (617) 963-5972

22

<u>Certificate of Service</u>

I hereby certify that the within document was served on opposing counsel Jeffrey Pyle by email.


Dated: October 19, 2021

*/s/ Paul G. Boylan*

_____

Paul G. Boylan