UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| James Koppel, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. 1:20-cv-11479-LTS |
| William Moses, | ) |
| | ) |
| Defendant. | ) |

Objection by Plaintiff to Document 98, the Report and Recommendation as to
Dismissal of Count V

Plaintiff James Koppel, pursuant to Rule 2 of the Local Rules as to Practice before a Magistrate in this District, hereby objects to Document 98, the Report and Recommendation of the Hon. Donald L. Cabell entered February 14, 2022 (hereafter "Opinion"). The Opinion recommends dismissal of Count V of the Amended Complaint, a claim under the Massachusetts Civil Rights Act, M. G. L Chapter 12, sec. 11H and 11I. The relevant standard of review is set forth in the Opinion at pages 2-3 and the cases cited there.

A. Facts from the Amended Complaint, Doc. 54.

Koppel and defendant at all relevant times were each computer science Ph.D. students at a local major university. Doc. 54, Amended Complaint ¶¶ 2, 3 (hereafter,

2, 3). Starting in 2015 the two were friends. 3. Koppel from birth has suffered from limited autism 3. As of February 2020, Moses knew all private details as to Koppel. 7. By then both were members of a student group known as SIPB. 16, 18. Moses was the Chair. 18. Koppel, starting in 2018, made substantial contributions to SIPB and hoped to soon be voted from member to keyholder status within the group. 18.

Moses learned on February 10, 2020 that Koppel made a political comment in a "chatroom" which offended a SIPB keyholder. Moses began asking acquaintances of Koppel to privately share with Moses "stories" that would be damaging to Koppel. 17, 18. Moses drafted a list of false and inaccurate accusations against Koppel, all but one about Koppel's public speech. Moses sent the list to approximately 140 SIPB keyholders and alumni and asked them to review the list and "discuss accusations regarding Koppel making people 'uncomfortable.'" 18-21, 70, 71.

After collecting several negative responses based on the false list, Moses asked to meet with Koppel. When they met on February 27 Moses told Koppel he was being expelled from SIPB. 27. The only reason Moses gave for the expulsion was that Koppel's public internet political speech six months earlier made one or more members "uncomfortable." 25, 69, 73, 85, 86.

One hour after the meeting with Koppel on February 27, Moses sent a detailed highly defamatory e-mail to the same list of 140 people falsely accusing Koppel of serial and very serious sexual harassment over a long period of time. 31-33.

On March 2 Moses sent a very similar email to somewhere between 500-700 people comprising a worldwide network of sophisticated and influential persons highly skilled in computer science and related fields. 34, 61.

The falsity of both emails was made more damaging by fabrication of numerous false details. In both Koppel is described as a threat to public safety. 48. 50, 51, 52, 77. Both falsely say he engaged in severe, persistent harassment over a long period of time 33, 48, 77. Moses says falsely that Koppel's bad acts were the subject of widespread, consistent. reports to Moses. 35, 46. Both falsely say he is being expelled because he persisted in harassment of victims "despite requests to stop" 38, 45.

Both of the emails were deliberately and excessively published, with the effect that the expulsion and the defamations were extremely damaging to Koppel. 29, 30, 38, 39, 47, 52-54, 78. The recipients were persons who by reason of their accomplishments and professional interests were important and relevant to Koppel's future professional prospects and career. 58-61, 62-65. Moses knew that publication to these audiences would be extremely and immediately damaging to Koppel. 64, 65.

Both emails implied that Koppel had secretively abused multiple victims and intimidated his victims into silence to avoid detection. 50. Both stated in substance that his participation in the group and in the community was unsafe. 33, 48, 78, 79. The expulsion and the defamations deprived Koppel of all existing associations within the group and all future associations and speech within the group and as to future political public speech.[1] 86.

The facts alleged as to punishment for speech and compelled exclusion from the group show improper deprivation of constitutional rights. The March 2 email was expressly distributed in order to publicize the expulsion which, in turn, was punishment for Koppel's political speech. 74. Moses in this civil action has disclosed, as support for the expulsion and defamations, more than 100 instances of Koppel's prior political speech going back several years. 73. The March 2 email was expressly distributed in order to publicize the expulsion which, in turn, was punishment for Koppel's political speech. 74. The admitted purpose of the March 2 email was to punish persons who by political speech caused others to be uncomfortable. 75. This punished Koppel for past speech. 85, 86. It naturally chilled or attempted to chill his future speech. 67, 86.

---

[1] The expulsion was illegitimate. The written SIPB Constitution requires that no member be expelled unless the member gets notice of the accusations and an opportunity to respond plus a two thirds vote of the SIPB Executive Committee. 42, 43. None of that happened. Id.

The expulsion was severely damaging and publicly humiliating 50, 51. Koppel in the emails is described as a threat to the community. 40, 77. Moses described the expulsion as a "necessity" because of prolonged predatory behavior which the community had "endured" while Koppel was undetected for a prolonged period of time. 33, 48, 77. Both emails implied that Koppel had secretively abused multiple victims and intimidated his victims into silence to avoid detection. 50. Both stated in substance that his participation in the group and in the community was unsafe. 33, 48, 78, 79. The expulsion and the defamations deprived Koppel of all existing associations within the group and all future associations and speech within the group and as to future political public speech. 86.

B. Coercion is Adequately Pled.

"Coercion" is "the use of physical or moral force to compel another to act or assent." Freeman v. Planning Bd., 419 Mass. 548, 565 (1995). Coercion under MCRA may take various forms and is not limited "to actual or attempted physical force." Buster v George, 438 Mass. 635, 647 (2003). Coercion occurs when one person causes a constitutional deprivation. Redgrave v. Boston Symphony Orchestra, Inc., 399 Mass. 93(1987) (deprivation of contract rights and denial of performance); Buster v George 438 Mass. 635, 647 (2003) (deprivation of employment because of sexual harassment): Batchelder v. Allied Stores Corp., 393 Mass. 819, 823 (1985) (coercion or

intimidation within the statute when security guard ordered the victim to leave premises where he was engaged in political speech).

Coercion does not require allegation or proof of specific intent. Redgrave, supra, at 99. There is no requirement of proof of any state of mind, or that the challenged conduct be willful. Id. Coercion is found when a constitutional deprivation is the "natural consequence" and a neutral effect of conduct. Id at 100.

The alleged acts of Moses were coercion or an attempt to coerce Koppel as to Koppel's constitutional rights. Moses created false, excessively published allegations of persistent undetected sexual harassment by Koppel. He expelled and banished Koppel by name, twice, to worldwide audiences. Moses told Koppel that the public expulsion was based primarily Koppel's prior public political speech on the internet. This coerced Koppel immediately, and at least for a time, to limit his public presence on the internet (and television) to avoid adding to his public humiliation by drawing fresh public attention to himself. Point A above. He stopped all internet posts for a time and declined to appear on a nationwide television show to discuss his work related to detection of election fraud. Koppel deliberately limited his physical and media visibility at MIT and beyond to avoid drawing attention to himself. Id.

Koppel was separately coerced and intimidated because he was commanded and thereby coerced not to enter the SIPB physical space and was barred from

communications within the group or about his ongoing projects or other group activities. Batchelder, supra, 393 Mass at 823.

In Redgrave coercion and a natural tendency to coerce was adequately pleaded based on the reasoning in Batchelder. In Batchelder a security guard enforced a rule of the defendant shopping center against distribution of materials and solicitation. Id. The guard told the MCRA victim that he needed to leave. The plaintiff complied. The coercion requirement of the MCRA was satisfied "simply because the natural effect of the mandate was to coerce" the victim in the exercise of his rights. Batchelder v. Allied Stores Corp., 393 Mass. 819, 823 (1985). That liberal and common-sense view of "coercion" and of "natural consequence" is consistent with the liberal construction which is afforded civil rights statutes. Id.

C. The Opinion is in error as to pleading of intent.

The Opinion (7-8) rules that neither coercion nor intimidation is sufficiently alleged because the Amended Complaint does not allege that Moses "sought to place Koppel in fear" so as to deter him from future speech (Op. 7-8) (emphasis added). This implies that intent must be pleaded. That is incorrect.

The MCRA does not require proof of motivation or intent of the bad actor. It may be violated "regardless of whether the defendant specifically intended to interfere with a right to which the plaintiff is entitled." Redgrave v. Boston Symphony Orchestra, Inc., 399 Mass. 93, 95-100 (1987). If the MCRA did require an intention to interfere

7

with future speech, which it does not, that is sufficiently alleged. Moses intended to "'make an example of Koppel' and encourage other clubs to… punish persons because of protected political speech."[2]

    D. <u>Count V adequately pleads deprivation of Koppel's First Amendment rights.</u>

The Opinion is in error (pages 9-10) as to what is adequately and plausibly alleged as to deprivation and chilling of Koppel's speech. The Opinion reaches an incorrect conclusion based on either an innocent misreading of the Amended Complaint or by reason of adverse inferences as to what is alleged.

The Opinion (page 9) concedes that self-censorship within MIT is plausibly alleged. That is legally sufficient to support Count V. That establishes that chilling of Koppel's speech is plausibly alleged as a natural consequence of the conduct of the defendant.

That same point establishes that a chilling impact (and at least temporary self-censorship) is plausibly alleged to be a rational and "natural" reaction to the highly personalized defamations in dispute, at least "within the MIT community." Op. 9. "Local" chilling of Koppel is chilling of a constitutional right. Count V is therefore viable. No more need have been written.

---

[2]     A different error in same part of the Opinion, at 7- 8 is discussed at Point E.

The Opinion in error goes beyond that sufficient point (chilling of speech by Koppel within the MIT community) to discuss chilling beyond the MIT campus or community. The Opinion refers to Koppel's non-use of the internet for posts and declination of media attention or other social life "outside of MIT" [sic] as "the far-reaching extent [Koppel] claims". Op. 10. As to those claims the Opinion in error finds or infers that Koppel alleges <u>permanent</u> chilling. That is an incorrect adverse inference. The chilling alleged is described as "near-total" at least for a time, but it is not alleged to be permanent. That error, an innocent adverse inference, taints the following discussion of what the Court perceives to be "plausibly" alleged as the "natural outcome" of the conduct by Moses. Op. 10.

The error as to what is alleged causes the Court to find that Koppel's allegation of broad chilling indisputably alleges no more than a non- actionable "overreaction." The Opinion rules that an "overreaction" is incompatible with a naturally caused constitutional deprivation. Op. 9-10. That view requires multiple not permitted inferences. The "overreaction" finding is an inappropriate dispositive finding of a fact as to loss causation. A ruling or finding that the allegations indisputably express only, and no more than, non-actionable "overreaction," Op. 10, is error in the context of a motion for dismissal.[3]

---

[3] The language of the Complaint is not fatally defective if it seems to "go too far." Op. 9. Allegation of geographically extensive deprivations or impacts logically include more local harms.

The allegations in Count V plausibly allege a natural and near-total chilling of speech, at least a limited period of time immediately after the world-wide defamations. Here because the email denunciations were sent world-wide to personal and professional contacts of Koppel (Amended Complaint at 59-63), and because the internet is world-wide, the natural and highly plausible chilling impact, at least temporarily, was far more extensive than the MIT campus. Op. 9. The distinction is unwarranted.[4] In the internet age no defamation or controversy is assured to be local. A victim very naturally would refrain from public communications and certainly from a national TV appearance to avoid drawing attention to his name in the aftermath of a damning and highly personal worldwide denunciation.[5]

The "overreaction" by Koppel noted in the Opinion (based on innocent misreading of what Koppel alleges) is a finding or ruling that the Court sees the

---

[4]   See Op. 9, drawing a distinction contrast between Koppel being caused "for a period of time" not to exercise speech and other rights "at MIT" as opposed to "activities far beyond the university campus or community." The difference is one of degree, not of kind. Emails, posts, and television visible within or "at MIT" are simultaneously sent and received worldwide. What is actionable under MCRA "often depends on the circumstances." Maroney v. Fiorentini, 405 F. Supp. 3d 282, 293 (2019) (Cabell, J.).

[5]   The Opinion describes the temporary chilling within MIT a natural result of criticism of Koppel plus his expulsion. Op. 9. That description is incomplete. Koppel alleges that temporary near-total deprivation of his speech is based on (i) the world-wide defamations, plus (ii) multiple communications to Koppel by Moses and others within SIPB that the expulsion and the defamations were the result of Koppel's political speech on the internet. Those caused Koppel to limit his public presence and avoid one television appearance to decrease the risk that by public use of his name would trigger renewed publication of the defamations. Point A above.

(misperceived) permanent chilling as "doubtful in fact." If so, the motion to amend should have been allowed. See Op. at 3, describing the standard of review as permitting amendment even if some allegations are "doubtful in fact."

Temporary chilling of speech "outside MIT" is just as plausible or more so than is chilling only within the MIT community. Op. 9. The latter view is an adverse inference and inconsistent with the internet age. A strict distinction between chilling of speech within MIT and chilling beyond MIT at a minimum requires multiple inferences adverse to Koppel as what the "natural" consequences of the harm caused to Koppel in the internet age.

The Amended Complaint alleges worldwide, public, false denunciations and defamations by name, public banishment from group and personal associations, plus liability for all naturally caused impacts. The extent of those impacts involves factual issues not appropriate for disposition on a motion for dismissal. The same is true as to any partial possible defense based on "overreaction" by the victim. Op. 9-10. Absent undisputed facts, trials and juries decide what is credible.

Count V is sufficiently alleged based on the ruling that Koppel was naturally chilled within MIT (9). Nothing more was required to be said as to Count V.[6]

---

[6] The Opinion correctly notes the lack of merit in the Moses' arguments that the constitutional deprivations alleged are insufficiently important. (Doc. 98, p.10).

11

E. <u>The Opinion is in error as what MCRA requires to be pleaded.</u>

The Opinion is in error in the discussion of intimidation at pages 7-8. In that context the Opinion says, inaccurately, that Koppel does not allege violation of his rights as to future speech. That is incorrect. Points A, D, above. The Opinion at pages 9-10 openly discusses Koppel's allegations that Moses interfered with his future speech in the context of coercion. The Opinion agrees that coercion is sufficiently alleged as to Koppel's communications within the MIT community, Op. 9, a ruling which, by itself requires that the Recommendation be rejected. Points B, D, above.

The Opinion at 7-8. However, says that allegation of interference with <u>future</u> speech is always required under MCRA, citing <u>Eck v. Neal</u>, No. 14-CV-13693 ADB, 2017 WL 4364171, at *7 (D. Mass. Sept. 29, 2017) and <u>Barbosa v. Conlon</u>, 962 F. Supp. 2d 316, 332 (D. Mass. 2013). Op. 8.

MCRA does not includes any such requirement. Apart from that, as mentioned, Koppel does plead interference with future speech within the MIT community and far beyond it. Point D above. This error in the Opinion at 7-8 is appropriate to be addressed because if not corrected if could give rise to an incorrect outcome on this Objection.

<u>Eck</u> and <u>Barbosa</u> each involve direct deprivations of rights by police officers. Police notably have defenses under <u>Younger</u>, (which was rejected in <u>Eck)</u>, and other immunities. The issue in <u>Eck</u> and <u>Barbosa</u> was is whether alleged direct unlawful

12

police misconduct is "in addition" also a MCRA violation. Not all police misconduct is a MCRA violation. Barbosa at 332 and cases there.

Eck, in discussing "in addition" says that MRCA requires [sc. as applied against police] an allegation that the police "interfered with the victim's free speech rights in the future, not merely to retaliate against him [sic]." Eck, at 19-20. Eck cites Barbosa and other direct violation police cases for this statement. Id. at 20. This statement in Eck is not found in Barbosa., Barbosa shows that the statement in Eck is inaccurate unless limited to a judicial rule used only in police or state actor direct violation cases. Direct violation cases however are not relevant here because that analysis is applicable only against state.

Barbosa quotes and relies on Planned Parenthood League v. Blake, 417 Mass. 467, 474 (1994) ("Planned") in which "defendants' invasion and blockade of abortion clinics violated the MCRA because the "case involved more than simple direct action in denial of the rights of women seeking abortion services." In Planned, there was "no doubt that the defendants' conduct involved physical confrontations accompanied by threats of harm." Santiago v. Keyes, 890 F. Supp. 2d 149, 155 (D. Mass. 2012), describing Planned. As that description makes clear, Planned involves a completed, past, deprivation of rights. That case and others show that future interference with rights is not a requirement or essential element part of MCRA except perhaps in "direct violation" of law police cases, a body of law not relevant

here. Planned finds a MCRA violation based on interference with access to premises and medical care. Eck also describes Planned as involving "interference with patients' exercise of legal right to access abortion." Eck, at 19. Planned does not discuss or require future deprivations of rights of the victims. Batchelder is another ready at hand counterexample to the view in the Opinion at 7-8: it finds a violation based on a past coercion, and does not discuss future protected expression by the victim.

No identified case says that MCRA is exclusively concerned with deprivations of future rights. The text of MCRA does not say or suggest that. A past deprivation of rights often will "naturally" impact the victim in the future, but MCRA does not limit violations to pleading and proof of future deprivation.[7] If that were correct, and it is not, Koppel in any event sufficiently alleges that Moses caused future or ensuing deprivation of speech rights. Point D, above; Op. 9. The impacts on Koppel speech immediately after the defamations indisputably were "in the future" because they were subsequent to the predicate acts by Moses.

---

[7] Direct violation cases always involve state actors. Cases in this circuit have used conflicting frameworks in direct violation cases. See Santiago, supra, at 155-156, (collecting cases ). Direct violation caselaw is irrelevant here.

F. <u>The expulsion is separately actionable.</u>

The expulsion and related defamations punished Koppel for past speech and attempted or accomplished chilling and deprivation of his future speech, especially on political issues. 86. Koppel was compelled to immediately end all associations within the group and compelled not to communicate as to any topics discussed within the group. This was sufficient intimidation and coercion to satisfy the statute. This "interpretation is consistent with the liberal construction" which should be afforded civil rights statutes and provides the State remedy for civil right violations that the Legislature sought. <u>Batchelder v. Allied Stores Corp.</u>, 393 Mass. 819, 823 (1985)

In the immediate aftermath of the defamations Koppel was also for a time threatened or intimidated to the point that he declined to make any online public statements or posts and refused an unrelated opportunity to appear on a national television. Point A above. In doing that he was trying to prevent drawing fresh attention to himself and to the recent very public defamations. 76, 86.

G. <u>The expulsion was a separate violation of the MCRA.</u>

The expulsion was coercion to stay away from the SIPB space and all expression and associations enjoyed by members or guests or by the community. Coercion is the application to another of such force "either physical or moral, as to constrain him to do against his will something he would not otherwise have done."

Op. 5; see Delaney v. Chief of Police of Wareham, 27 Mass App Ct 398, 409 (1989) (claims stated under MCRA; insufficient trial evidence that agreement was induced by duress). The public expulsion coerced and intimidated Koppel against participation. The defamations assured Koppel would be unwelcome and shunned if he tried to participate. They made certain that the ban that the ban would be widely enforced. If Koppel ignored the ban physical confrontation was foreseeable and probable.

The expulsion alleged is not, on this motion, able to be ignored as a lawful exercise of competing speech by the group so as to legitimately exclude non-members. See Footnote 1 above. The expulsion and defamations were an irrational, highly public, personalized form of bullying. Id. This expulsion, as an unjustified coercion, is far more severe and damaging than the coercion and intimidation of the Batchelder victim. The victim there complied with an authorized order of a security guard. The compelled deprivations of rights here were less justifiable than Redgrave, where the victim complied with an authorized mandate of the BSO that prohibited her from performing in public as punishment for past speech.

Moses illegitimately, unjustifiably, in a very public way banished Koppel by name from the group and all associations and communications within the group related to it. Point A. Moses expelled Koppel as a result of Koppel's public speech, Point A, using a false denunciation as to sexual harassment as the vehicle for a

baseless public expulsion by name.. The expulsion naturally and indisputably caused loss of Koppel's rights of local speech and association as to matters related to the group. Points A, B, D.

    H. Count V is sufficiently alleged pleaded because it alleges punishment for past speech.

Retaliation for past speech satisfies the MCRA requirement of threats, intimidation, or coercion. Coercion is routinely found without explicit discussion of coercion or threat where a plaintiff claims under the MCRA based on retaliation for past speech. See Redgrave, supra, 299 Mass. 93, 95-100 (1987) (cancellation of performance and contract in response to past speech is a threat, coercion, or intimidation); Kournikova v. Trustees of Emerson College, 725 F. Supp. 73, 75-77 (D. Mass 1989) (denial of tenure in response to past political speech).

    I. Count V is viable based on the disability allegations.

The Complaint (paragraph 85) cites Article CXIV of the Massachusetts Constitution, which states:

> No otherwise qualified handicapped individual shall, solely by reason of his handicap, be excluded from the participation in, denied the benefits of, or be subject to discrimination under any program or activity within the Commonwealth.

The stated reason for Koppel's expulsion and denunciation was making people "uncomfortable." Amended Complaint at 25, 44. If and to the extent the improper motivation for the wrongs done to Koppel was not Koppel's political

speech, the defamations and the expulsion are alleged to be wrongfully based at least in part on Koppel's limited autism (Amended Complaint at 3) plus related, all too common misperceptions of autistic persons by others, some of whom no doubt feel "uncomfortable" [sic] in the presence of an autistic person. Moses repeatedly used that imprecise word to damage Koppel. Point A. The expulsion plus defamations coerced Koppel to not associate or participate in the group by reason of his handicap.

The Opinion does not mention any of this. The allegations as to autism are independently sufficient to support Count V.

J. Constitutional deprivations are alleged.

The Opinion at page 6 states that the Court agrees with Moses that no constitutional deprivations are alleged by Count V. Op. 6. Nothing further is expressly said on that topic in the Opinion. To the extent the Opinion impliedly supports that view, Koppel has attempted to address all points in the Opinion.

As to the expulsion, past speech and all other deprivations of rights, the Opinion does not mention the MCRA prohibition on "attempts" to deprive of rights. In fairness, neither side argued a mere attempt. The concept has relevance, however, if the Opinion is read to be based on other, not expressed, rulings that no constitutional deprivation was alleged.

18

Conclusion

Koppel requests that the Recommendation in Document 98 be not accepted and that this Court deny the motion to dismiss Count V on the ground that it is sufficiently pleaded in Document 54. In the alternative if this Court finds that MCRA requires more detailed or explicit allegation of items mentioned in the Opinion, such as reasons for the temporary withdrawal from public expression of political views, Plaintiff requests leave to amend the Complaint to add more detailed allegations.

                        Respectfully submitted,

                        James Koppel,
                        by his attorneys,

                        */s/ Paul G. Boylan*
                        Paul G. Boylan, BBO 052320
                        Freeman Mathis & Gary, LLP
                        60 State Street, Suite 600
                        Boston, Massachusetts 02109
                        pboylan@fmglaw.com
Dated: February 28, 2022           Tel: (617) 963-5972

<u>Certificate of Service</u>

  I hereby certify that the within document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and by first-class mail to any non-registered participants.

Date: February 28, 2022    */s/ Paul G. Boylan*