UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JAMES KOPPEL, | ) | |
| | ) | |
| Plaintiff, | ) | No. 20-cv-11479-LTS |
| | ) | |
| v. | ) | **FILED UNDER SEAL PURSUANT TO** |
| | ) | **ORDER DATED MARCH 3, 2022** |
| WILLIAM MOSES, | ) | **(DOC. NO. 100)** |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
MOTION OF DEFENDANT WILLIAM MOSES FOR SUMMARY JUDGMENT**

Jeffrey J. Pyle (BBO #647438)
jpyle@princelobel.com
Nicole J. Cocozza (BBO #693523)
ncocozza@princelobel.com
PRINCE LOBEL TYE LLP
One International Place, Suite 3700
Boston, MA 02110
T: 617-456-8000
F: 617-456-8100

4392521

INTRODUCTION

Plaintiff James Koppel's defamation claim is based on two emails defendant William Moses, the Chair of the Executive Committee of the Student Information Processing Board at the Massachusetts Institute of Technology, sent to other members of that group in February and March, 2020. In the emails, Moses stated that the Executive Committee had asked Koppel to leave the group because of reports that he had made other members uncomfortable.

The emails are subject to the qualified "common interest" privilege recognized under Massachusetts law. Moses and the recipients of the emails shared a common interest in the Executive Committee's action and the reasons for it, and the emails were reasonably calculated to serve that interest. Koppel cannot show by clear and convincing evidence that Moses recklessly abused the privilege. Accordingly, there is no genuine issue for trial.

There also is no genuine issue of fact as to whether Moses's emails were false. At his deposition, Koppel did not deny that he engaged in conduct – including the uninvited touching of at least three different people – that members of the student group reported made them or others uncomfortable. A substantially true statement cannot support a defamation claim.

In support of his motion, Moses submits the accompanying statement of undisputed facts and the Affidavits of Jeffrey J. Pyle, William S. Moses, Olu Brown, and Emma Batson.

FACTS

**A.     The Student Information Processing Board**

The Student Information Processing Board ("SIPB") is a computer science group at the Massachusetts Institute of Technology ("MIT"). (Am. Compl., Doc. No. 54, ¶ 8; Answer, Doc. No. 61, ¶ 8; Affidavit of Jeffrey J. Pyle, Ex. 1).[1] SIPB is officially chartered by MIT, and has

---

[1] Except where otherwise indicated, the designation "Ex. __" will refer to the exhibits attached to the Affidavit of Jeffrey J. Pyle.

4392521

been in existence for more than 50 years. (Affidavit of William Moses ("Moses Aff."), ¶ 3; Ex. 2, Deposition of William Moses at 18). SIPB offers talks, classes, computing infrastructure, and answers to computing questions. (Moses Aff., ¶ 3). SIPB controls certain spaces at MIT, including the "SIPB Office," which contains computing-related equipment and resources. (*Id*.)

SIPB is guided by a constitution. (Moses Aff., ¶ 5; Ex. 1). The constitution provides that a person can become a member of SIPB by "assenting to its principles" and "participating in the work" of the group. (Ex. 1 at Koppel_0001). A SIPB member can also be elected a "keyholder," a status that confers full privileges, including the maintenance of one's student email address indefinitely after graduation. (*Id.* at Koppel_0001; Ex. 3, Deposition of James Koppel at 442).

SIPB keyholders retain their status and privileges after graduation. (Ex. 3, Koppel Dep. at 395-397). The SIPB Constitution defines non-student keyholders, including alumni, as "associate keyholders." (Ex. 1 at Koppel_0002; Ex. 3, Koppel Dep. at 395-396). Alumni members and keyholders often work on SIPB projects, and frequently have been present at the SIPB Office. (Ex. 3, Koppel Dep. at 396-400; Moses Aff., ¶ 6). A keyholder is issued a physical key to the SIPB office, which may be kept after graduation. (Ex. 3, Koppel Dep. at 394; Moses Aff., ¶ 5).

SIPB has a nine-member Executive Committee that makes decisions concerning the governance of the organization. (Moses Aff., ¶ 11; Ex. 1 at Koppel_0003). The Executive Committee has an obligation, and a historic practice, of keeping SIPB members informed of its actions. (Ex. 3, Koppel Dep. at 403-404; Ex. 1 at Koppel_0007-0008; Batson Aff., ¶ 3).

At all relevant times, members of the Executive Committee used email distribution lists to communicate with SIPB members. (Ex. 3, Koppel Dep. at 400; Batson Aff., ¶ 3). One of those lists, SIPB-Office@mit.edu, includes keyholders and members, and is used to convey information relating to the SIPB Office. (Moses Aff., ¶ 8; Affidavit of Olu Brown at ¶ 12). The

SIPB-Office distribution list is one of two "predominant" email lists used to convey information to SIPB members. (Ex. 3, Koppel Dep. at 401; Batson Aff., ¶ 3). Another list, SIPB-Private@mit.edu, consists of a subset of SIPB keyholders. (Moses Aff., ¶ 10). Its primary use is for discussions about whether a member should be a keyholder. (*Id.*; Ex. 3, Koppel Dep. at 443).

## B.    The Parties

Defendant William Moses is a Ph.D candidate at MIT. (Moses Aff., ¶ 1). At the time of the events at issue in this case, he was 24 years old, and was a SIPB keyholder. (*Id.*, ¶ 2).

Plaintiff James Koppel was also a Ph.D candidate at MIT. (Ex. 3, Koppel Dep. at 10-11). He matriculated at MIT in the winter of 2015 and became a SIPB member in August or September 2018. (*Id.* at 390). Koppel has since graduated. (*Id.* at 10-11).

Koppel and Moses met in 2015 at an MIT programming languages retreat. (Ex. 3, Koppel Dep. at 429-430). They began "hanging out" as friends in 2017, including getting meals together. (*Id.* at 430; Ex. 2, Moses Dep. at 6). In 2018 and 2019, Moses and Koppel considered becoming roommates. (Ex. 3, Koppel Dep. at 430-431). Moses appeared to Koppel to be interested in maintaining a friendship during 2019 and early 2020. (*Id.* at 433).

At various times, Koppel would hug Moses. (Ex. 3, Koppel Dep. at 433-434). Koppel would not "rule it out" that he would come up to Moses and hug him from behind. (*Id.* at 435). Eventually, in 2019, Koppel determined that Moses perhaps "was not into the hugs." (*Id.* at 436-437). Koppel testified that he collected enough "data" to determine that Moses was not "into" the hugs after hugging him between two and ten times during the fall of 2019. (*Id.* at 439).

## C.    SIPB's Discussion of Koppel and the February 27, 2020 Email.

On February 10, 2020, Moses was present in the SIPB Office after a meeting. (Ex. 4, Moses Dep. at 6-7). Someone brought up the subject of whether Koppel should be made a SIPB

keyholder. (*Id.* at 6-7). Several members and keyholders stated that Koppel made them uncomfortable. (*Id.* at 6). One member stated that Koppel had made comments in an online forum that the member deemed offensive. (*Id.* at 7). Another member stated that Koppel had belittled that person or their knowledge of certain subjects. (*Id.* at 8). Moses recalls that he may have stated that Koppel made him uncomfortable by giving him unwanted hugs. (*Id.* at 6).

A week later, on February 17, 2020, Moses was elected Chair of the SIPB Executive Committee. (Ex. 4, Moses Dep. at 20-21). In remarks at a SIPB meeting in connection with his nomination, Moses stated that, if elected, he would seek to continue the ongoing trend of SIPB becoming a kinder and more welcoming place. (*Id.* at 20-21; Ex. 5, p. 3).

After Moses' election, he began a conversation about Koppel among members of the Executive Committee on messaging platform called "Mattermost." (Moses Aff., ¶ 12; Ex. 6). Moses proposed soliciting the views of other SIPB keyholders about whether Koppel should be made a keyholder via an email to SIPB-Private. (*Id.* at WM00387-389). Other Executive Committee members edited Moses's proposed email to SIPB-Private. (*Id.*).

On February 26, 2020 at 4:21 p.m., Moses sent an email to the SIPB-Private list inviting comment on the prospect of Koppel's keyholdership. (Ex. 7). The email noted that "[s]ocial integration is a key aspect of keyholdership and it is also all of our duty to ensure everyone feels comfortable in SIPB spaces (both physical and virtual)." (*Id.* at WM00370). The email described some of the interactions that persons had cited on February 10 as making them uncomfortable and offered keyholders an opportunity to discuss their experiences and thoughts. (*Id.*).

The response was immediate, voluminous, and unanimously negative. At 5:27 p.m. on February 26, keyholder ██████████ replied: "Jimmy definitely makes me extremely uncomfortable. He often tries to single me out and makes it very hard to leave. He also tries to

touch me in 'socially acceptable' ways as much as possible in a very disturbing way." (Ex. 7 at WM00371). ███ stated that one of her best friends told her that Koppel's involvement in SIPB, along with that of another "creepy dude," was the reason she did not participate in SIPB. (*Id.*)

On the same date, keyholder Brian Chen replied that "several people I trust have told me that they have had uncomfortable interactions with [Koppel] similar to the incidents described" in Moses' email. (*Id.* at WM00372). A third keyholder who wished to remain anonymous wrote, "I've definitely noticed [Koppel] making people uncomfortable, not just in SIPB."[2] (*Id.*)

Most seriously, on February 27 at 9:18 a.m., SIPB keyholder ███████ wrote to Moses that in their leadership capacity in another student organization,[3] they had received a report from a keyholder "describing an incident with Jimmy that is nothing short of sexual assault." (Ex. 7, at WM000375). ███████ said they were "viscerally afraid" of Koppel "knowing what he's capable of," and asked that SIPB not give him "any more power." (*Id.*).

As a result, on Thursday, February 27, 2020, the Executive Committee authorized Moses to speak with Koppel and ask him to leave SIPB. (Ex. 2, Moses Dep. at 36-38; Ex. 6, at WM000392-393). Moses met with Koppel that evening. (Ex. 3, Koppel Dep. at 481). Moses informed Koppel that he was unlikely to be elected keyholder, and stated: "'I'm going to ask you to leave SIPB. You make a lot of people, members, keyholders . . . uncomfortable especially female members or keyholders, . . .'" (*Id.* at 482). Koppel asked Moses what he had done, but Moses replied that he could not disclose that information. (*Id.*).

---

[2] Some of the keyholders who responded to the SIPB-Private thread were no longer students, but rather alumni "associate keyholders." (Exs. 1, 7). These included ███████, class of 2015, who thanked Moses "for sending out this email and for doing this delicate, but highly important, work." (*Id.* at WM00371)).

[3] ███████ uses the pronouns "they/them."

5

That evening, after the meeting with Koppel, Moses sent a reply to the SIPB-Private email thread in which Koppel's potential keyholdership had been discussed, reporting that the Executive Committee had decided to ask Koppel to disengage from the group. (Ex. 7 at WM000375-376). In relevant part, the email states:

> It is clear from this conversation (most of which was through individual replies to me), that jkoppel should not be nominated for keyholdership. Moreover, given the severity, consistency, and widespread nature of his interactions, the EC has concluded that we should request jkoppel to refrain from participating in SIPB any more. I have just spoken with jkoppel informing him of this conclusion.

> This decision was not taken lightly, but is a necessity that reflects the vast majority of people who took part in this discussion (again mostly through individual replies). He has also been given several opportunities to change his behavior, and failed to do so. I am sad that this is something that our members had to endure, and SIPB will take a strong stance against sexual harassment.

> This discussion has also made it clear that SIPB needs to do better to be a safe environment for everyone to take part in. Specifically, we need to establish mechanisms that make it easy for members to come forward when they are made uncomfortable. . . . (*Id.*).

Koppel alleges that this email, hereinafter referred to as "the February 27 Email," was false and defamatory. (Am. Compl., Doc. No. 54, ¶¶ 23-33).

## D.    The March 2 Email

Between February 27 and 28, 2020, Moses and Koppel communicated over the application Facebook Messenger. (Ex. 8). In response to an oral request by Koppel not to inform his ex-girlfriend, a SIPB keyholder, about SIPB's request that he disengage from the group, Moses stated that the Executive Committee reserves the right "to inform all sipb individuals about anything related to sipb (such as your non keyholdership/request to disengage/ justification), but I will personally do my best to ensure be fair and limit information to where it seems appropriate." (*Id.*). Koppel responded, "Okay. Thank you," and asked, "This isn't going outside SIPB, right?" Moses replied, "No, I will request that it remain limited to SIPB folks

6

(though no promises on enforcement.)" Koppel responded, "I appreciate all efforts to limit the damage to me to what the EC sees as necessary to protect SIPB interests." (*Id.*). Koppel did not make any further request to limit the distribution of the notification.

The Executive Committee decided that a broader group of SIPB-affiliated persons than the keyholders on SIPB-Private should be notified of Koppel's disengagement from the group and the reasons for it. (Ex. 2, Moses Dep. at 79; Ex. 6, at WM000397-398). The purposes of the communication included: (1) apprising SIPB members of the Executive Committee's actions; (2) encouraging persons who may have been avoiding SIPB because of Koppel to return to the group; (3) demonstrating that SIPB leadership takes seriously its obligation to ensure that students are comfortable in SIPB spaces; and (4) to begin a discussion about how to ensure that SIPB members can report similar interactions in the future. (Ex. 4, Moses Dep. at 117-118; Moses Aff., ¶ 14; Batson Aff., ¶ 15). Moses prepared an initial draft of the email based on input from other SIPB Executive Committee members. (Ex. 6, at WM000397-398).

On March 2, 2020 at 1:29 p.m., Moses asked the Executive Committee members on the Mattermost thread what SIPB distribution list the mail should be sent to. (Ex. 6, at WM000399). Emma Batson, the immediate past Chair of SIPB, responded that it should go to SIPB-Office, on the ground that Koppel's withdrawal should be "pretty general knowledge so people act accordingly." (*Id.*) Batson pointed out that SIPB had made similar announcements on SIPB-Office concerning other personae non grata. (*Id.*; Ex. 2, Moses Dep. at 79-80; Batson Aff., ¶¶ 6-9; Exs. 9-11). Batson believed that the SIPB-Office list was the list best suited to reach the relevant audience for the information in the email. (Batson Aff., ¶ 13). Executive Committee member Cel Skeggs concurred. (Ex. 6, at WM000399). Lizhou Sha, an earlier past SIPB Chair, gave Moses the same advice. (Moses Aff., ¶ 15). Moses received no contrary opinions. (*Id.*)

4392521

On March 2, 2020, Moses sent the following email to SIPB-Office@mit.edu:

> I am writing to let you know about a hard conversation that SIPB keyholders had this past week about SIPB member Jimmy Koppel (jkoppel).
>
> Many keyholders shared stories about how he had made them deeply uncomfortable, which continued in spite of requests to stop. Given the severity, consistency, and widespread nature of his interactions, we have requested that jkoppel refrain from participating in SIPB any more (interacting in SIPB spaces, participating in SIPB projects & events, etc). I have already spoken with jkoppel informing him of this, which he has agreed to.
>
> This decision was not taken lightly, but is a necessity that and reflects both the need for SIPB to be a place where everyone is comfortable and the will of the current keyholders.
>
> This circumstance and required response was quite exceptional and also reflects a need for SIPB to do better to be a safe environment for everyone. Specifically, we need to establish mechanisms that make it easy for members to voice their concerns when they are made uncomfortable as this had apparently gone on for some time. At minimum, we need to introduce some sort of anonymous reporting as keyholders only felt comfortable sharing anonymously or just to the chair. We will discuss this at the next EC meeting on 3/6 and I would encourage all members to contribute their ideas.
>
> SIPB is not just a club of those who care about computing, but it is first and foremost a community where everyone should feel safe and supported. If someone ever makes you uncomfortable, you can always bring this up to me or any member of the EC. We will respect any requests for confidentiality, including not sharing with other EC members.
>
> Sincerely,
> The Chair

(Ex. 12). Koppel alleges that this email, referred to herein as the March 2 Email, is false and defamatory. (Am. Compl., Doc. No. 54, ¶¶ 34-39).

On March 6, Moses received a letter from counsel to James Koppel. (Ex. 13). The letter demanded a "retraction" of the March 2 Email and threatened a lawsuit. (*Id.*). The letter set forth proposed retraction language. (*Id.*). After consulting with MIT counsel, on March 12, Moses sent an email to SIPB-Office clarifying that SIPB leadership (as opposed to one or more individuals)

had not warned Koppel about any prior conduct. (Ex. 12, at WM000363). It also stated that the March 2 email "included certain details relating to Mr. James Koppel (jkoppel) that, on further reflection, we have concluded could have remained within the SIPB leadership." (*Id.*).

On or about March 20, 2020, Koppel used his access to MIT's computer systems to determine the recipients of the March 2, 2020 email. (Ex. 3, Koppel Dep. at 522-527; Ex. 14). He ran a computer query that generated a list of 697 email addresses associated with SIPB-Office. (*Id.*). Koppel did not determine whether any of the addresses on the list were terminated and therefore unable to receive March 2 Email. (Ex. 3, Koppel Dep. at 533-535). Koppel acknowledged that it is possible that fewer than 697 accounts received it. (*Id.* at 534-535).

Olu Brown, MIT's Associate Vice President, Technology, reviewed the status of each of the email addresses on Koppel's list. (Affidavit of Olu Brown, ¶¶ 4-9). He states in his affidavit that 183 of the 697 email accounts in Koppel's list had been terminated as of March 2, 2020, and therefore could not have received the March 2 Email. (*Id.*, ¶ 6). His affidavit attaches a spreadsheet highlighting in yellow the 183 terminated email addresses. (*Id.* and Ex. C). Based on the spreadsheet, deduplication, and other work, Moses determined that the maximum number of persons to whom he sent the March 2, 2020 email was 508. (Moses Aff. ¶ 17).

Koppel has produced no evidence that any person unconnected to SIPB received either the February 27 or March 2 Emails. He pleads in his Amended Complaint that "virtually all" the recipients "are affiliated or were affiliated with SIPB. . . ." (Am. Compl. Doc. No. 54, ¶ 58).

**E.      Facts Demonstrating the Substantial Truth of the Allegedly Defamatory Emails**

As noted above, SIPB keyholder ███████ reported on February 26 that a friend was staying away from SIPB in part because of Koppel. (Ex. 7 at WM000371). That person was ███████ (Ex. 15, Deposition of ███████ at 23-27). At her deposition, ███ testified

that during her junior year, she had a conversation with Koppel at the SIPB office while she was using a printer. (Ex. 16, Deposition of ███ at 22-23). As ███ was preparing to leave, Koppel asked "will you give me a hug?" (*Id*. at 23). ███ testified: "I think I was moderately freaked out by this and like said yes and left, but -- and then I just didn't go back again, because I was like hmm, apparently, nothing good ever happens in the SIPB office." (*Id.*). ███ testified that she "had had similar experiences to that in the SIPB office" before, and that she made a decision -- triggered by the interaction with Koppel -- that she would never return. (*Id.* at 25). ███ also testified that Koppel made her "pretty uncomfortable" by patting her on the head. (*Id.* at 13). Koppel confirmed it is "likely" that the hugging event occurred. (Ex. 3, Koppel Dep. at 426). He further testified that he has no reason to doubt ███'s testimony that she was uncomfortable and that she decided to avoid the SIPB Office. (*Id.* at 425-428).

███████ testified that during her junior year, Koppel struck up a conversation with her in the SIPB office. (Ex. 15, ███ Dep. at 17-20). He asked about her experience of working with her boyfriend on a startup, seemingly questioning whether that arrangement could work. (*Id*. at 18-19). ███ testified that the conversation "made me uncomfortable because I didn't ask for judgment for my personal life decisions. . . ." (*Id*. at 19). During the conversation, ███ made a comment that wasn't funny, and Koppel reacted by laughing, reaching out, and stroking ███'s upper arm. (*Id*. at 19-20). ███ stated that this touching "made me very uncomfortable" and "made me feel unsafe in the SIPB office." (*Id*. at 19). She testified, "I felt like he was hitting on me and I didn't like it. (*Id*. at 122-126). After that, ███ testified she avoided Koppel. (*Id.* at 123). In his deposition, Koppel acknowledged that it was "plausible" that he touched ███ on the arm, (Ex. 3, Koppel Dep. at 515), and described the contact as "a brief touch that like might have like felt -- had some effect of gravity to feel as a brush maybe." (Ex. 3, Koppel Dep. at 419-420).

10

Koppel testified that he made SIPB keyholder ███████ uncomfortable with certain comments. (Ex. 3, Koppel Dep. at 484-489). These included describing to ████ how a computer programming tool called "COQ," ("pronounced cock"), came to have its name. (*Id.*).

Koppel further testified that on October 26, 2016, his ex-girlfriend, SIPB keyholder ████████, told him in a text exchange that she was "physically uncomfortable" around him because of "the way you were touching me" at a conference earlier that year. (Ex. 3, Koppel Dep. at 232 and Ex. 17). Koppel interpreted this statement as a "threat" that could get him "ostracized and/or jailed," and stated to another MIT student the next day that he might call "a lawyer and/or the police." (Ex. 3, Koppel Dep. at 270; Ex. 18). Sure enough, the next month, Koppel called the MIT police on ████ when she appeared at an extracurricular event that he was attending. (Ex. 3, Koppel Dep. at 258-266). When officers arrived, Koppel told them that he could not be in the same room as ████ because she had "threatened" him, referring to the text exchange described above. (*Id.* at 260). The officers spoke to ████, and then informed Koppel that she would soon be leaving to teach a class. (*Id.* at 263-264). When Koppel was asked at his deposition if calling the police on someone might make them uncomfortable, he replied, "If I called the police on you, I would hope you would feel uncomfortable." (*Id.* at 264-265).

 In July 2019, ████ recounted in another communication to Koppel that at the conference in 2016, he had grabbed her right buttock without her permission, an act that, she explained, she interpreted "as an expression of romantic and sexual affection and I felt really uncomfortable about it." (Ex. 3, Koppel Dep. at 324-328; Ex. 19 at Koppel_01169). Koppel responded, "[w]hile it is possible I squeezed your butt, it seems very unlikely that I did so intentionally." (Ex. 3, Koppel Dep. at 326-344; Ex. 20 at Koppel_01189). At his deposition, Koppel denied that he

squeezed ███'s buttock, and said that all he had meant by saying it was "possible" was that it "would not have violated any laws of physics." (Ex. 3, Koppel Dep. at 326-331).

Koppel testified further that an independent living group at MIT called Epsilon Theta ("ET") asked him in 2018 and 2019 to refrain from participating in that group's team for a student activity, and to stay away from the house during rush season, because members were "uncomfortable with your presence." (Ex. 3, Koppel Dep. at 349-356; Ex. 21; Ex. 22).

Koppel acknowledged that he has had "difficulty reading people's signals as to whether they want[] physical contact" with him, and agreed that he has "struggled with that" over time. (Ex. 3, Koppel Dep. at 341).

**F.      Procedural History**

On April 13, 2020, Koppel filed this action against Moses in Middlesex Superior Court. Moses removed the case to this court and filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6). (Doc. No. 1). The Court granted the motion as to every claim except Count I, for defamation. (Doc. No. 24 at 12, 17-18). On July 16, 2021, Koppel filed an amended complaint that included a claim under the Massachusetts Civil Rights Act. (Doc. No. 54). On March 7, 2022, the Court granted Moses' motion to dismiss the MCRA claim. (Doc. No. 101). Accordingly, the only remaining count is Koppel's defamation claim (Count I).

<u>ARGUMENT</u>

**I.      THERE IS NO ISSUE FOR TRIAL BECAUSE THE ALLEGEDLY DEFAMATORY EMAILS ARE PROTECTED BY THE COMMON INTEREST PRIVILEGE.**

There is no genuine issue of fact for trial on Koppel's defamation claim because the February 27 and March 2 emails are subject to the Massachusetts qualified common interest

privilege, and Koppel cannot demonstrate by clear and convincing evidence that Moses recklessly abused that privilege.

"A defamatory communication is protected by a conditional common law privilege provided the publisher and recipient share some legitimate mutual interest 'reasonably calculated' to be served by the communication." *Catrone v. Thoroughbred Racing Assocs. of N. Am., Inc.*, 929 F.2d 881, 887 (1st Cir. 1991), quoting *Sheehan v. Tobin*, 326 Mass. 185, 190-91 (1950) (privilege applies "where the publisher and the recipient have a common interest, and the communication is of a kind reasonably calculated to protect or further it.").

The common interest privilege extends to communications within organized groups like SIPB, whether incorporated or not. Restatement (Second) of Torts § 596 (1977), cmt. e; *Kalika v. Stern*, 911 F.Supp. 594, 604 (E.D.N.Y.1995) (privilege applies "where members of an organization discuss among themselves matters of concern to the organization") (internal quotations omitted); Robert D. Sack, SACK ON DEFAMATION: LIBEL, SLANDER, AND RELATED PROBLEMS, § 9.2.3, at 9–29, n.117 (2022). Among other things, it protects communications "concerning the qualifications of the officers and members and their participation in the activities of the society," such as "alleged misconduct of some other member that makes him undesirable for continued membership, or the conduct of a prospective member." *Id.; Thorsen v. Sons of Norway*, 996 F. Supp. 2d 143, 173-74 (E.D.N.Y. 2014) ("[s]uch common interest privilege regularly is found where the speaker and the listeners were generally members of a group or organization—which undoubtedly suggested a robust common interest existed.").

The privilege is not absolute. It may be lost if there is a reckless "abuse of the privilege." *Sheehan*, 326 Mass. at 190; *Catrone,* 929 F.2d at 889. "On [a] motion for summary judgment, the plaintiff bears the burden of establishing abuse of the conditional privilege . . . by 'clear and

convincing' evidence." *Catrone,* 929 F.2d at 889, quoting *Anderson v. Liberty Lobby, Inc.,* 477

U.S. 242, 244 (1986), and *Petition of Retailers Com. Agency, Inc.,* 342 Mass. 515 (1961).

Whatever the asserted manner of abuse, "recklessness, at least" is required before the privilege is

lost. *Bratt v. International Business Machines,* 392 Mass. 508, 515 (1984).

The applicability of the common interest privilege, and the sufficiency of evidence of

abuse thereof, is frequently decided at summary judgment. *See Catrone,* 929 F. 2d at 887;

*Downey v. Chutehall Const. Co.,* 86 Mass. App. Ct. 660, 665–66 (2014) (affirming summary

judgment where allegedly defamatory statement was "conditionally privileged, and there is no

genuine issue of material fact regarding recklessness.")*.* Indeed, "summary judgment procedures

are especially favored in defamation cases." *King v. Globe Newspaper Co.,* 400 Mass. 705, 708

(1987); *Appleby v. Daily Hampshire Gazette,* 395 Mass. 32, 37 (1985).

> **A.    The February 27 and March 2, 2020 Emails Are Subject to the Common Interest Privilege.**

The February 27 and March 2 Emails are subject to the common interest privilege

because the sender (Moses/the SIPB Executive Committee) and the recipients (other SIPB

members) shared an interest in the Executive Committee's request to Koppel that he disengage

from the group and the reasons for it, and the emails were "reasonably calculated" to serve that

interest. *Sheehan,* 326 Mass. at 190-91; Restatement (Second) of Torts § 596 (1977), cmt. e

(privilege applies to statements about fitness of person to be in group, or his alleged misconduct).

It is beyond dispute that SIPB members and keyholders had an interest in the subjects of

the two allegedly defamatory emails: the Executive Committee's decision to ask Koppel to

disengage from the group, the reasons for it, and SIPB's response to reports of improper conduct

generally. Restatement (Second) § 596, cmt. e. The communications were made through the

SIPB distribution lists typically used for such purposes. (Moses Aff., ¶ 8-10; Batson Aff., ¶ 3-4;

4392521

Exs. 9-11). Each of the recipients of the emails had the right (1) to be informed of the Executive Committee's actions, (2) to be informed that Koppel would not be present in SIPB spaces in the future, and (3) to understand that the Executive Committee takes seriously any allegations that SIPB member made another person uncomfortable. (Moses Aff., ¶ 14; Batson Aff., ¶ 15).

Courts have held similar communications to be privileged. In *Sheehan,* the defendants published an article in *The International Teamster,* the official magazine of the International Brotherhood of Teamsters, reporting that two union members in Local 25 had been brought before a committee on charges of "brutally assault[ing] . . . a man old enough to be their father." *Sheehan*, 326 Mass. at 186-187. The court held that the statements in the article were conditionally privileged because "the members of a labor union are interested in the doings of their officers and committees and have a right to such information." *Sheehan,* 326 Mass. at 191. Further, "[i]t was the duty of the defendant to furnish them with that information in the only way provided by the Brotherhood, by the publication of it in the official magazine which was sent to all members."[4] *Id.* So here, Moses had a privilege to inform SIPB members of the Executive Committee's action via its normal channel of communication: the SIPB-Office list.

Similarly, in *Tynecki v. Tufts Univ. Sch. of Dental Med.*, a university student was accused of desecrating a cadaver, and he sued university administrators for communicating with each other about the charge. 875 F. Supp. 26, 35 (D. Mass. 1994). The court held that "[b]y discussing the charges against Tynecki, the defendants promoted their 'common interest' in the Dental School's reputation for integrity, morality and professionalism." *Id.* Further, it held that "the conditional privilege extends to the educational arena under Massachusetts law." *Id.* Other cases

---

[4] The *Sheehan* decision does not state how many members the Teamsters union had in 1946, when the article was published, but an online history maintained by George Washington University places the union's membership at 534,000 in 1943, and 1.2 million in 1950. https://library.gwu.edu/teamsters-history-and-timeline#1850.

4392521

have likewise applied the privilege in educational contexts. *Panse v. Nelson*, No. 01–P–1304, 2003 WL 342117, *1 (2003) (defendant teacher privileged to make statement about a "fellow teacher in furtherance of the interest of Massachusetts Bay Community College to see that its faculty members act in a professional way, and not in such a way that would be detrimental to the students' welfare"); *Meyer v. Beta Tau House Corp.*, 31 N.E.3d 501, 515–16 (Ind. Ct. App. 2015) (communications about plaintiff being banned from a fraternity house privileged); *Bondalapati v. Columbia Univ.*, 95 N.Y.S.3d 198, 200 (2019) (university's statements about student's academic dishonesty protected by common interest privilege where they were not "published to any persons outside the university"); *Dobbyn v. Nelson*, 2 Kan. App. 2d 358, 362, opinion adopted, 225 Kan. 56 (1978) (letter about librarian being rude to freshman).

The question, then, is whether Koppel can adduce sufficient facts to show by "clear and convincing" evidence that Moses recklessly abused the privilege. As shown below, he cannot.

### B.     Koppel Cannot Present Clear and Convincing Evidence that Moses Recklessly Abused the Privilege.

To prevail on this motion, Koppel must establish a reckless "abuse of the conditional privilege . . . by 'clear and convincing' evidence." *Catrone,* 929 F.2d at 889 (internal citation omitted). The privilege "may be abused either through 'unnecessary, unreasonable or excessive publication of the defamatory matter' or by publishing defamatory information with 'actual malice.'" *Catrone,* 929 F.2d at 889, quoting *Galvin v. New York, N.H. & H.R. Co.*, 341 Mass. 293, (1960), and cases cited. Whether abused through excessive publication or actual malice, Massachusetts law holds that "'recklessness, at least, should be required' before the privilege is considered forfeit." *Id.*, citing *Bratt*, 392 Mass. at 515.

Koppel cannot clear this hurdle. There is, for example, no evidence sufficient to create a genuine issue of fact as to whether Moses recklessly over-published the emails. The emails were

sent only to persons with a connection to SIPB.[5] (Am. Compl., Doc. No 54, ¶ 58; Moses Aff., ¶ 18). Further, Moses followed the advice of other, more senior Executive Committee members and a past SIPB Chair about the proper SIPB audience for the emails, and adhered to precedent on the issue. (Batson Aff., ¶ 12; Exs. 9-11; Ex. 6 at WM 000399). Moses did not research the numbers or identities of the constituent non-terminated emails of the SIPB-Office list before he sent the March 2 Email, but that doesn't make him reckless. *Downey,* 86 Mass. App. Ct. at 667 ("Recklessness is a difficult standard to meet."). It is undisputed that SIPB-Office was the list the organization routinely used for similar purposes; Moses' use of it, in adherence to precedent, was not "reckless" by any stretch. (Ex. 3, Koppel Dep. at 401; Batson Aff., ¶ 12 and Exs. 9-11).

Koppel cannot show abuse of the privilege merely by complaining that the emails were received by several hundred people "worldwide," as he has repeatedly asserted. (Am. Compl., Doc. No. 54, ¶¶ 9,10,11,12,38,48). The common interest privilege can apply to communications to thousands of people. *Straitwell v. Nat'l Steel Corp*., 869 F.2d 248 (4th Cir. 1989) (press release concerning investigation into steel plant employees published to news media in Weirton, West Virginia was not excessive); *Garrity v. John Hancock Mut. Life Ins. Co*., No. CI.A. 00–12143–RWZ, 2002 WL 974676, at *4 (D. Mass. 2002) (life insurance company "had an obvious legitimate business purpose, *as to all employees,* if it so chose" to communicate plaintiffs' termination for receiving sexually explicit emails) (emphasis in original); *Schrader v. Eli Lilly and Co*., 639 N.E.2d 258 (Ind. 1994) (company's publication of information about plaintiffs'

---

[5] Before the March 2 Email, Koppel requested that any notification of his disengagement and the reasons for it not be sent "outside SIPB," implicitly recognizing that other SIPB members had an interest in such communications. (Ex. 8).

terminations for misconduct to 1,500 employees not excessive). The question of excessive publication is based on individual facts, not arbitrary numerical standards.[6]

Nor can Koppel establish abuse of the privilege by other means. For example, there is no evidence "that [Moses] in fact entertained serious doubts as to the truth of his publication[s]." *HipSaver, Inc. v. Kiel*, 464 Mass. 517, 530 (2013), quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968); *Downey*, 86 Mass. App. Ct. at 667. Moses had received numerous reports that Koppel made others uncomfortable, and he had no reason to doubt them. (Moses Aff., ¶ 12). Indeed, Moses testified that Koppel made *him* uncomfortable by hugging him and rubbing his head even after he asked Koppel to stop. (Ex. 2, Moses Dep. at 9-10). Nor does the secondhand nature of some of the reports defeat the privilege.[7] *Catrone*, 929 F.2d at 891 (privilege applied where "some of the statements in the reports were attributed to unidentified informants.").

Koppel also cannot produce clear and convincing evidence that the allegedly defamatory communications were made "chiefly" for some purpose other than "furthering the interest which

---

[6] The March 12, 2020 clarifying email, which stated that some information "could have" been excluded from the March 2 communication, does not create a genuine issue of fact. (Ex. 12). The mere fact that SIPB leadership had a range of available choices in how to communicate Koppel's separation from SIPB does not constitute clear and convincing evidence that Moses recklessly abused the privilege by sending the March 2 Email, or diminish the interests identified in sending the email as it was sent. (Moses Aff., ¶ 14; Batson Aff., ¶ 15); *Catrone*, 929 F.2d at 889.

[7] Koppel also cannot complain that the emails exceeded the privilege by naming him, or by specifying that he had made others uncomfortable. It was necessary to include Koppel's name in the email to alert people who were avoiding SIPB because of him that they could return without fear of more uncomfortable interactions. (Moses Aff., ¶ 14; Batson Aff, ¶ 15; Ex. 4, Moses Dep. at 117-118). Further, stating the reason why Koppel had been asked to leave -- that he made others "deeply uncomfortable" -- conveyed the message to SIPB members that they should refrain from conduct like Koppel's, and should speak up if they were the victim of such conduct in the future. (*Id.*). Further, it was SIPB's practice to identify persons who were not welcome at the SIPB Office *and* to explain why, as past SIPB Chair Emma Batson did in 2018 with respect to former member John Hawkinson. (Ex. 10, (Batson email to SIPB-Office stating: "A large number of SIPB members have been made very uncomfortable by jhawk, including current students.")); *contrast Noonan v. Staples, Inc.*, 556 F.3d 20, 30 (1st Cir. 2009) (finding triable issue on ill-will where manager, in twelve years with the company, "had never previously referred to a fired employee by name in an e-mail or other mass communication.").

is entitled to protection." *Ezekiel v. Jones Motor Co.*, 374 Mass. 382, 390 n.4 (1978). While "spite or ill will can support a finding of malice, it is not enough to show that the defendant merely disliked the plaintiff or that such animosity was part of the defendant's motivation." *Dragonas v. Sch. Comm. Of Melrose*, 64 Mass. App. Ct. 429, 439, citing SACK ON DEFAMATION § 9.3.1 (3d ed. 2005). Here, there is no evidence that Moses held any spite or ill will toward Koppel at all; to the contrary, the two were friendly. (Ex. 2, Moses Dep. at 6). Moses states in his affidavit that he sent the emails to serve what he considered to be SIPB's best interests. (Moses Aff., ¶ 14). Koppel has no evidence, let alone evidence creating a genuine issue of material fact, that Moses sent the emails "solely from spite or ill will" or for some other non-privileged purpose. Restatement (Second) of Torts § 603, cmt a. (1977).

## II.   KOPPEL CANNOT ESTABLISH A GENUINE ISSUE OF FACT REGARDING THE FALSITY OF THE EMAILS.

Summary judgment should be granted for a second, independently sufficient reason: there is no genuine issue of fact as to whether the allegedly defamatory statements are false. *Taylor v. Swartwout*, 445 F.Supp.2d 98, 102 (D.Mass.2006) ("The lodestar of Massachusetts defamation law is the axiom that truth is an absolute defense to defamation."). An allegedly defamatory statement "need not state the precise truth" to be deemed "substantially true," and thus immune from liability. *Reilly v. Associated Press*, 59 Mass. App. Ct. 764, 770 (2003), citing *Dulgarian v. Stone*, 420 Mass. 843, 847; *Tartaglia v. Townsend*, 19 Mass. App. Ct. 693, 698 (1985). "Minor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.'" *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 516-17 (1991), quoting *Heuer v. Kee*, 15 Cal.App.2d 710, 714 (1936).

Koppel does not dispute that he touched at least three SIPB members – ███████████, ███████████, and William Moses – in ways that they testified made them uncomfortable. (Ex.

3, Koppel Dep. at 415-439; Exs. 2, 4, 15, 16). He also testified that he believes he made SIPB keyholder ████████ uncomfortable with a discussion about a programming language "pronounced cock." (Ex. 3, Koppel Dep. at 484-489). And, he testified that he would hope that he made SIPB keyholder ████████ uncomfortable by calling the MIT police on her based on her text message accusing him of engaging in unwanted touching of her earlier that year. (*Id.* at 264-266). Based on this testimony and other facts set forth on pages 10-12, *supra,* it is undisputed that Koppel engaged in the conduct that made other SIPB members uncomfortable, which is the "gist" or "sting" of the allegedly defamatory emails.

Koppel cannot demonstrate substantial falsity from the mere fact that SIPB leadership had not made any formal "requests" that he stop his unwanted touching and other offensive conduct as of the allegedly defamatory emails. (Ex. 12). Koppel testified that the incidents with ████, ████ and Moses occurred in 2019 and 2020, <u>after</u> October 2016, when ████ told Koppel that he had touched her in a way that made her uncomfortable, and after the heads of Epsilon Theta told Koppel in 2018 and 2019 that his presence made people there uncomfortable. (Ex. 3, Koppel Dep. at 415, 425, 435-439). Accordingly, the allegedly defamatory sting of the emails— that Koppel continued to engage in conduct that made people uncomfortable even when he knew or should have known he was doing so—is undisputedly true. *Masson*, 501 U.S. at 516.

<u>CONCLUSION</u>

For the foregoing reasons, Moses requests that his motion for summary judgment be allowed, and that judgment be entered in his favor.

20

4392521

Respectfully submitted,

WILLIAM MOSES,

By his attorneys,

/s/ Jeffrey J. Pyle
Jeffrey J. Pyle (BBO #647438)
jpyle@princelobel.com
Nicole J. Cocozza (BBO #693523)
ncocozza@princelobel.com
PRINCE LOBEL TYE LLP
One International Place, Suite 3700
Boston, MA 02110
T: 617-456-8000
F: 617-456-8100

Dated: January 23, 2023

## CERTIFICATION PURSUANT TO LOCAL RULE 7.1

I hereby certify that on January 19, 2023, I conferred with counsel for plaintiff James Koppel in a good faith attempt to resolve or narrow the issues presented in this motion.

/s/ Jeffrey J. Pyle
Jeffrey J. Pyle

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing document by email on counsel for plaintiff on January 23, 2023.

/s/ Jeffrey J. Pyle
Jeffrey J. Pyle

21

4392521