UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| JAMES KOPPEL, | ) | |
| | ) | |
| Plaintiff, | ) | No. 20-cv-11479-LTS |
| | ) | |
| v. | ) | FILED UNDER SEAL PURSUANT TO |
| | ) | ORDER DATED MARCH 3, 2022 |
| WILLIAM MOSES, | ) | (DOC. NO. 100) |
| | ) | |
| Defendant. | ) | |

_____)

DEFENDANT WILLIAM MOSES'S
STATEMENT OF UNDISPUTED FACTS WITH RESPONSES AND ADDITIONAL FACTS
BY PLAINTIFF

Pursuant to Local Rule 56.1, defendant William Moses submits this statement of undisputed material facts as to which there is no genuine issue to be tried in support of his motion for summary judgment.

1.      The Student Information Processing Board ("SIPB") is a computer science group at the Massachusetts Institute of Technology ("MIT"). (Am. Compl., Doc. No. 54, ¶ 8; Answer, Doc. No. 61, ¶ 8; Affidavit of Jeffrey J. Pyle, Ex. 1).[1]

Admitted.


2.      SIPB is officially chartered by MIT, and has been in existence for more than 50 years. (Affidavit of William Moses ("Moses Aff."), ¶ 3; Ex. 2, Deposition of William Moses at 18).

Admitted

---

[1] Except where otherwise indicated, the designation.Ex __"will refer to the Exhibits attached to the Affidavit of Jeffrey J. Pyle.

3.      SIPB offers talks, classes, computing infrastructure, and answers to computing questions. (Moses Aff., ¶ 3).

Admitted

4.      SIPB controls certain spaces at MIT, including the"SIPB Office,"which contains computing-related equipment and resources. (Moses Aff., ¶ 3).

Admitted that the Group is allowed to use space."Control"is vague

5.      SIPB is guided by a constitution. (Moses Aff., ¶ 5; Ex.1).

Admitted he says that. A constitution is more likely binding, not advisory.

6.      The SIPB constitution provides that a person can become a member of SIPB by "assenting to its principles" and "participating in the work" of the group. (Ex. 1 at Koppel_0001). A SIPB member can also be elected a "keyholder,"a status that confers full privileges, including the maintenance of one's student email address indefinitely after graduation. (Ex. 1 at Koppel_0001; Ex. 3, Deposition of James Koppel at 442).

Admitted

7.      SIPB keyholders retain their status and privileges after graduation. (Ex. 3, Koppel Dep. at 395-397). The SIPB Constitution defines non-student keyholders, including alumni, as "associate keyholders."(Ex. 1 at Koppel_0002; Ex. 3, Koppel Dep. at 395-396).

Admitted.

8.      Alumni members and keyholders often work on SIPB projects, and frequently have been present at the SIPB Office. (Ex.3, Koppel Dep. at 396-400; Moses Aff.,

¶ 6). A keyholder is issued a physical key to the SIPB office, which may be kept after graduation. (Ex. 3, Koppel Dep. at 394; Moses Aff., ¶ 5).

Admitted

9.    SIPB has a nine-member Executive Committee that makes decisions concerning the governance of the organization. (Moses Aff., ¶ 11; Ex. 1 at Koppel_0003). The Executive Committee has an obligation, and a historic practice, of keeping SIPB members informed of its actions. (Ex. 3, Koppel Dep. at 403-404; Ex. 1 at Koppel_0007-0008; Affidavit of Emma Batson, ¶ 3).

Admitted that it communicates to various persons in various ways. Otherwise denied. Denied as vague and argumentative if intended to apply to facts at issue here.

10.    At all relevant times, members of the Executive Committee used email distribution lists to communicate with SIPB members. (Ex. 3, Koppel Dep. at 400; Batson Aff., ¶ 3). One of those lists, SIPB-Office@mit.edu, includes keyholders and members, and is used to convey information relating to the SIPB Office. (Moses Aff., ¶ 8; Affidavit of Olu Brown at ¶ 12).

Admitted as to active members but vague and argumentative. These and other lists at the relevant dates were overinclusive and obsolete to the point that Moses and the EC members did not at the time know who was on what lists. Moses Ex 6. Wm 0396.

11.    The SIPB-Office distribution list is one of two "predominant" email lists used to convey information to SIPB members. (Ex. 3, Koppel Dep. at 401; Batson Aff., ¶ 3).

Denied because vague and argumentative. "Members" can include hundreds of former members. If defendant intends to refer only to active student members, which might be

relevant, this does not say that. The Batson affidavit fails to say what lists were used for what specific purposes at the time. "Predominantly used lists" is vague. Others were used? The identified lists at the time were overinclusive and obsolete to the point that EC members did not know who was on what lists. Moses Ex 6. Wm 0396.

12.    The distribution list SIPB-Private@mit.edu, consists of a subset of SIPB keyholders. (Moses Aff., ¶ 10). Its primary use is for discussions about whether a member should be a keyholder. (*Id.*; Ex. 3, Koppel Dep. at 443).

Denied because not shown. Koppel at deposition said it was a use, not a primary use. The distribution of Private at the time was 144 persons, far in excess of the audience needed to reach the 22 persons eligible to vote on keyholder at the time. See Koppel additional facts below, point(e) as to excess publication. A tailored email list of relevant persons can be prepared <u>in minutes</u> by most MIT students. Koppel Affidavit para 8.

13.    Defendant William Moses is a Ph.D candidate at MIT. (Moses Aff., ¶ 1). At the time of the events at issue in this case, he was 24 years old, and was a SIPB keyholder. (*Id.*, ¶ 2).

Admitted

14.    Plaintiff James Koppel was also a Ph.D candidate at MIT. (Ex. 3, Koppel Dep. at 10-11). He matriculated at MIT in the winter of 2015 and became a SIPB member in August or September 2018. (*Id.* at 390). Koppel has since graduated. (*Id.* at 10-11).

Admitted.

15.    Koppel and Moses met in 2015 at an MIT programming languages retreat. (Ex. 3, Koppel Dep. at 429-430). They began "hanging out" as friends in 2017, including getting meals together. (*Id.* at 430; Ex. 2, Moses Dep.1, at 6). In 2018 and 2019, Moses and Koppel considered

becoming roommates. (Ex. 3, Koppel Dep. at 430-431). Moses appeared to Koppel to be interested in maintaining a friendship during 2019 and early 2020. (*Id.* at 433).

Admitted. They requested to be roommates and were matched by the MIT housing office to be roommates in August 2019. Moses dep.. 1, 7. Moses in May 2019 secretly scuttled that and, unknown to Koppel, secretly disliked Koppel . Koppel Ex. D. (Moses telling Carney in May 2019 he was "not a fan" of Koppel) .

16.     At various times, Koppel would hug Moses and rub Moses's head with his fist. (Ex. 3, Koppel Dep. at 433-434; Ex. 2, Moses Dep 1, 9-10). Koppel may have sometimes come up to Moses and hugged him from behind. (Ex. 3, Koppel Dep. at 435). Koppel's hugging of Moses, and rubbing of his head with his fist, made Moses uncomfortable. (Ex. 2, Moses Dep.1,. at 9). Eventually, in 2019, Koppel determined that Moses perhaps "was not into the hugs."(*Id.* at 436-437). Koppel collected enough "data" to determine that Moses was not "into" the hugs after hugging him between two and ten times during the fall of 2019. (*Id*. at 439).

Admitted that for a time they exchanged hugs. Denied that Moses asked Koppel to stop the hugs. Koppel dep. 435, 438.

17.     On February 10, 2020, Moses was present in the SIPB Office after a meeting. (Ex. 4, Moses Dep.1, 6-7). Someone brought up the subject of whether Koppel should be made a SIPB keyholder. (*Id.* at 6-7). Several members and keyholders stated that Koppel made them uncomfortable. (*Id.* at 6).

Admitted that Moses says this. Who said what in this closed door session is not known or corroborated. Batson affidavit, para.10. The closed -door meeting was key holders only. Id. No "member" would be present. Moses when deposed could recall only one other person, in addition

to him, making a negative comment. Moses depo 1, 27-34. The rumors Moses alleges at the time , see para. 18 below, gave rise to the four false bullet points. Koppel Affidavit("Aff.") para. 1.

18. One member stated that Koppel had made comments in an online forum that the member deemed offensive. (*Id.* at 7). Another member stated that Koppel had belittled that person or their knowledge of certain subjects. (*Id.* at 8). Moses recalls that he may have stated that Koppel made him uncomfortable by giving him unwanted hugs. (*Id.* at 6). .

Denied because Moses when deposed could recall negative comments only by one keyholder, ████████, plus his own "possible" mention of Koppel hugs("touching me in uncomfortable ways"[sic] Moses depo. 1. 27-34. He was asked about every keyholder present. Id. Moses has no memory of any other specific reports and no memory of anyone saying Koppel belittled anyone. Id. See para 110 below as to hugs.

19.     On February 17, 2020, Moses was elected Chair of the SIPB Executive Committee. (Ex. 4, Moses Dep. 20-21). In remarks at a SIPB meeting in connection with his nomination, Moses stated that, if elected, he would seek to continue the ongoing trend of SIPB becoming a kinder and more welcoming place. (*Id.* at 20-21; Ex. 5, p. 3).

Admitted.

20.     After Moses' election, he began a conversation about Koppel among members of the Executive Committee on messaging platform called" Mattermost." (Moses Aff., ¶ 12; Ex. 6). Moses proposed soliciting the views of other SIPB keyholders about whether Koppel should be made a keyholder via an email to SIPB-Private. (*Id.* at WM00387-389). Other Executive Committee members edited Moses's proposed email to SIPB-Private. (*Id.*).

Admitted as to identification of the EC platform, Ex. 5. On February 18, two days prior to that EC discussion, Moses began to solicit negative information about Koppel from persons

outside the EC. Moses depo 1. 107. Koppel Ex D. Denied that other members edited the email.

Cel made suggestions, but Moses controlled the edits. Id.

21.     On February 26, 2020 at 4:21 p.m., Moses sent an email to the SIPB-Private list

inviting comment on the prospect of Koppel's keyholdership. (Ex. 7). That email is attached to

the Affidavit of Jeffrey J. Pyle as Exhibit 7.

Admitted it was sent. The February 26 mail was false and misleading. See additional

facts , point (c) below. .

22.     A number of SIPB keyholders responded to the email, some of them alumni.(Ex.

7). These included ▮▮▮▮▮▮, class of 2015, who thanked Moses "for sending out this email

and for doing this delicate, but highly important, work."(Ex. 7 at WM00371)).

Admitted. ▮▮▮ notably offered no report. But see this SOF at 42-44 below, discussing a

2016"social faux pas" by Koppel .

23.     At 5:27 p.m. on February 26, keyholder ▮▮▮▮▮▮▮ replied to the SIPB-

Private email: "Jimmy definitely makes me extremely uncomfortable. He often tries to single me

out and makes it very hard to leave. He also tries to touch me in 'socially acceptable' ways as

much as possible in a very disturbing way."(Ex. 7 at WM00371). ▮▮▮stated that one of her best

friends told her that Koppel's involvement in SIPB, along with that of another" creepy dude,"

was the reason she did not participate in SIPB. (*Id.*)

Admitted she wrote that. ▮▮▮ at the time and before Moses sent her anonymous email to

the group described this initial report as "typed… as a stream of consciousness so maybe

paraphrase it ha-ha. I don't really care as long my name's not attached . Moses Ex.7 Wm 0372

552 pm (emphasis added ) . Moses sent her initial report at 606 pm Id. One day later at 2 pm

▮▮▮ told Moses her initial report , including any mention of a touch was "not something you

can use against" Koppel.. Koppel Exhibit H . She said instead that she found Koppel "subtly off-putting in everything he does." Id. See point (g) below, additional facts below as to ███.

24.     On the same date, keyholder Brian Chen replied to Moses that "several people I trust have told me that they have had uncomfortable interactions with [Koppel] similar to the incidents described in Moses' email. (*Id.* at WM00372). A third keyholder who wished to remain anonymous wrote, "I've definitely noticed [Koppel] making people uncomfortable, not just in SIPB."(*Id.*)

  Admitted those people wrote what is described.

25.     On February 27 at 9:18 a.m., SIPB keyholder ████████ wrote to Moses that in their leadership capacity in another student organization, they had received a report from a keyholder "describing an incident with Jimmy that is nothing short of sexual assault."(Ex. 7, at WM000375). ██████ said they were "viscerally afraid "of Koppel "knowing what he's capable of" and asked that SIPB not give him "any more power."(*Id.*).

  Admitted that this person sent these words. All of it is ancient third hand rumor. Koppel Affidavit, para 3. This relates to a non-event in August 2016 which the ex-girlfriend later described as a "minor social faux pas.". Id. It had no connection to SIPB. Id.

26.     On Thursday, February 27, 2020, the Executive Committee authorized Moses to speak with Koppel and ask him to leave SIPB. (Ex. 2, Moses Dep. at 36-38; Ex. 6, at WM000392-393). Moses met with Koppel that evening. (Ex. 3, Koppel Dep. at 481). Moses informed Koppel that he was unlikely to be elected keyholder and stated:" 'I'm going to ask you to leave SIPB. You make a lot of people, members, keyholders... uncomfortable especially female members or keyholders,...'"(*Id.* at 482). Koppel asked Moses what he had done, but Moses replied that he could not disclose that information. (*Id.*).

Denied in part. Several EC members approved of a conversation, but it is not clear they knew what would be conveyed. Ex. 6, Wm. 393(top). Expulsion could not be "authorized" because, without notice and a hearing, it violated the Constitution. Moses Exhibit 1., Article X.1.1, Koppel 008.

27.    That evening, after the meeting with Koppel, Moses sent a reply to the SIPB-Private email thread in which Koppel's potential keyholdership had been discussed, reporting that the Executive Committee had decided to ask Koppel to disengage from the group. (Ex. 7 at WM000375-376).

Admitted that the email says this. It unfortunately says much more. No "reply" was needed. No question was pending. The February 27 email is false and excessive and wrongful in numerous material ways. See Koppel additional points .below, points (c, e. f) . The EC did not have the power to expel without notice and opportunity be heard. Response 26 above.

28.    Between February 27 and 28, 2020, Moses and Koppel communicated over the application Facebook Messenger about a potential communication to other SIPB members about Koppel's disengagement from the group. (Ex. 8). A true and accurate copy of that communication is attached to the Affidavit of Jeffrey J. Pyle as Exhibit 8.

Admitted that is discussed . Moses at the time was actively deceiving Koppel . See response 29 below

29. Apart from the communications set forth in Exhibit 8, Koppel did not make any request of Moses to limit the distribution of the anticipated notification of Koppel's disengagement from SIPB.

Denied. Koppel did request severe limits on publication, but Moses deceived him on that topic Inaccurate and misleading because of what is omitted. All of Exhibit 8 starting at the

bottom of Wm 00160 is a conversation between Moses and Koppel starting at 608 pm. Moses does not mention the February 26 email already sent to 144 persons, or that Moses bad the already drafted February 27 email which he sent at 621 pm. Koppel Ex B; see Koppel Affidavit para 3, explaining why he resigned without knowing of any specific complaint . Moses concealed any mention of the future March 2 email. Koppel throughout this conversation is distraught because he was being expelled. See additional facts below. On February 28 Moses falsely tells Koppel he "will request" that news of the expulsion be limited to "SIPB folks" concealing he already had sent the February26 and 27 emails to an audience of mostly alumni keyholders on SIPB Private. Koppel asks that communication about his expulsion be limited to what is "necessary to protect SIPB interests." Moses Ex. 8, Wm 0164. Koppel at this point confirms he is entirely deceived. He affirms his trust in Moses by saying: "If this [ expulsion ] is going to happen I'm glad it's coming from someone I trust as much as you." Moses Ex. 8, 00164 and 165(emphasis added}. Moses on Monday March 2 several hours before sending the March 2 email at 9 pm solicitously checked in on Koppel, perhaps to be sure Koppel was still in the dark:

    Moses: Hey how are you doing"

    Koppel**: I'm barely functioning. Thanks for checking in.**

    Moses: Again [let me know ] if you want to chat more.

    Koppel: **Yes, please**. You're back [ next] Saturday, right?

    Moses Ex. 8 Wm 0165(emphases added) .

    29.    The Executive Committee decided that a broader group of SIPB-affiliated persons than the keyholders on SIPB-Private should be notified of Koppel's disengagement from the group and the reasons for it. (Ex. 2, Moses Dep. at 79; Ex. 6, at WM000 397-398). Moses

prepared an initial draft of the email based on input from other SIPB Executive Committee members. (Ex. 6, at Wm000397-398).

Denied. Except for Moses' retrospective assertions, there is no corroboration the EC "decided" or authorized this . Moses Ex. 6 at 0397 starts on March 2 with one keyholder saying she wants "public discussion of Koppel removal." Nothing shows EC authorization at that time or earlier. Nothing shows any EC meeting at the time.

30..    On March 2, 2020 at 1:29 p.m., Moses asked the Executive Committee members on the Mattermost thread what SIPB distribution list the mail should be sent to. (Ex. 6, at WM000399). Emma Batson, the immediate past Chair of the SIPB Executive Committee, responded that it should go to SIPB-Office, on the ground that Koppel's withdrawal should be "pretty general knowledge so people act accordingly."(*Id.*) Batson pointed out that SIPB had made similar announcements via SIPB-Office concerning other personae non grata. (*Id.*; Ex. 2, Moses Dep. at 79-80; Batson Aff., ¶¶ 6-9; Ex. s. 9-11). Batson believed that the SIPB-Office list was the list best suited to reach the relevant audience for the information in the email. (Batson Aff., ¶ 13). Executive Committee member Cel Skeggs concurred. (Ex. 6, at WM000399). Lizhou Sha, an earlier past SIPB Chair, gave Moses the same advice. (Moses Aff., ¶ 15). Moses received no contrary opinions. (*Id.*).

Admitted in part. Mattermost includes two comments about using SPIB -Office, the first a "tentative" suggestion. Ex. 6; Wm 0039. Moses at the time openly questioned whether the email needed to name Koppel. Id. One EC member, evidently in the dark about the facts, said "at some point we want to make it explicitly clear that <u>we don't expect someone's first sign that they're doing something wrong</u>"to be [sic]"oh you're banned from SPIB"; we should make it

clear that people <u>always receive some sort of warning</u> except in the case of especially egregious behavior." Id.(emphasis added)

31.     Moses's understanding at the time he sent the March 2, 2020 email was that the SIPB-Office list included keyholders and members who had an interest in information relating to the SIPB Office. (Moses Aff., ¶ 16). He did not know the number of emails on the SIPB-Office list at the time he sent the March 2, 2020 email. (*Id.*). He did not attempt to identify the holder of each email account on the list before he sent the email. (*Id.*). Moses relied on the collective wisdom of the Executive Committee and Mr. Sha to guide him as to the appropriate audience for the email. (*Id.*).

Admitted his recent affidavit says that. This admits negligence or worse as to excessive distribution. Moses Ex 6 WM 379 shows that Moses knew that Office at the time contained everyone who's attended a single SIPB meeting in the preceding 25 years. See additional facts below as to excessive publication, points (e, f) below . "Wisdom" is argumentative and not shown.. Defendants "understanding" is non -competent argument. See Motion to Strike concurrently served . Moses Ex 6 WM 379 shows that Moses knew that "Office" at the time contained" everyone who's attended a single SIPB meeting in the preceding 25 years." Id. .

32.     On March 2, 2020, Moses sent an email regarding Koppel's disengagement from SIPB to SIPB-Office@mit.edu. A true and accurate copy of that email is attached to the Affidavit of Jeffrey J. Pyle at Exhibit 12.

Admitted. The email is false in multiple ways. See additional facts at point (c) below .

33.     Moses sent the February 27 and March 2 Emails for the following purposes:
(1) to apprise SIPB members of the Executive Committee's actions with regard to Koppel;

(2) to encourage persons who may have been avoiding SIPB because of Koppel to return to the group; (3) to demonstrate that SIPB leadership takes seriously its obligation to ensure that students are comfortable in SIPB spaces; and (4) to begin a discussion about how to ensure that SIPB members can report similar uncomfortable interactions in the future. (Ex. 4, Moses Dep. at 117-118; Moses Aff., ¶ 14; Batson Aff., ¶ 15).

Denied . At the time the only reasons mentioned were that one member of the EC wanted people to recognize that SPIB is willing to make "hard decisions" She wanted the removal of Koppel to be <u>in the future</u> "the subject of public discussion. "Moses Ex. 8, Wm 0397. Disputed as inadmissible. Moses or Baton possibly have inadmissible opinions or beliefs but personally they cannot "know" this. See Koppel Motion to Strike. These points are non—competent argumentative and conclusory as to what "interests" were relevant or legitimately served by the email.

34.     On March 6, Moses received a letter from counsel to James Koppel. (Ex. 13). The letter demanded a "retraction "of the March 2 Email and threatened a lawsuit. (*Id.*). After consulting with MIT counsel, on March 12, Moses sent a further email to SIPB-Office. (Ex. 12 at WM000363).

Admitted

35.     On or about March 20, 2020, Koppel used his access to MIT's computer systems to attempt to determine the recipients of the March 2, 2020 email. (Ex. 3, Koppel Dep. at 522-527; Ex. 14). He ran a computer query that generated a list of 697 email addresses associated with SIPB-Office. (*Id.*). Koppel did not determine whether any of the addresses on the list were terminated and therefore unable to receive March 2 Email. (Ex. 3, Koppel Dep. at 533-535).

Admitted.

36.     In response to a subpoena from counsel to Moses, Olu Brown, MIT's Associate Vice President, Technology, reviewed the status of each of the email addresses on Koppel's list. (Aff. of Olu Brown, ¶¶ 4-9). As he determined, 183 of the 697 email accounts in Koppel's list had been terminated as of March 2, 2020, and therefore could not have received the March 2 Email. (*Id.*, ¶ 6). Brown's affidavit attaches a spreadsheet identifying the 183 email accounts that Brown determined could not have received the email. (*Id.* and Ex. C). The email accounts highlighted in yellow on Exhibit C to the Brown Affidavit could not have received the March 2, 2020 email due to their termination before March 2, 2020. (*Id.*). The maximum number of persons to whom Moses sent the March 2, 2020 email was 508. (Moses Aff. ¶ 17).

Admitted for the purpose of this motion only.

37.     Moses did not send the February 27 or March 2 Emails at issue in this case to any person who did not have an affiliation with SIPB. (Am. Compl. Doc. No. 54, ¶ 58; Answer, Doc. No. 61, ¶ 58; Moses Aff., ¶ 18).

Denied . It went to a number of persons in no way related to SIPB. See Koppel Affidavit para 9, 10."Affiliated"is vague on this record. The Office list was 508 persons, almost all long gone from MIT., Koppel Aff. para 8. Moses on February 28 told Koppel he "personally would do his best…to limit information to where it seems appropriate". He said he would ask it "remain limited to SIPB folks"[sic]. Moses Ex. 8 Wm 0164. Koppel on February 28 did not know the February 26 and 27 emails had already gone to 144 persons on Private..

38.     On February 26, 2020, SIPB keyholder ███████ reported to Moses on that a friend was staying away from SIPB in part because of Koppel. (Ex. 7 at WM000371). That person was ███████. (Ex. 15, Deposition of ███████ at 23-27).

Admitted that is what the deposition says,

39.     During ███'s junior year, she had a conversation with Koppel at the SIPB office while she was using a printer. (Ex. 16, Deposition of █████ at 22-23). As ███ was preparing to leave, Koppel hugged her. (Ex. 3, Koppel Dep. at 425-428). ███ was "freaked out" by this event and decided not to return to the SIPB office. (*Id.*; Ex. 16 at 25). Koppel also made ███ "pretty uncomfortable" by patting her on the head. (*Id.* at 13).

Admitted only in part because omissive and argumentative. See additional facts as to ███ below at point (h). .

40.     During ████████'s junior year, Koppel struck up a conversation with her in the SIPB office. (Ex. 15, ███ Dep. at 17-20). He asked about her experience of working with her boyfriend on a startup, seemingly questioning whether that arrangement could work. (*Id.* at 18-19). During the conversation, Koppel laughed at something ███ said and touched her arm. (Ex. 3, Koppel Dep. at 419-420; 515). The contact was "a brief touch that like might have like felt -- had some effect of gravity to feel as a brush maybe."(Ex. 3, Koppel Dep. at 419-420). ███ testified that the touching "made me very uncomfortable" and "made me feel unsafe in the SIPB office."(Ex. 15, ███ Dep. at 19).

Admitted that the deposition says that but the deposition also makes clear that ███ the next day retracted her initial report about Koppel and said it was <u>not</u> something Moses could "use against "Koppel. See additional facts as to ███ below.

41.     Koppel believes he made SIPB keyholder ████████ uncomfortable with certain comments. (Ex. 3, Koppel Dep. at 484-489). These included describing to ███ how a computer programming tool called "COQ,"("pronounced cock"), came to have its name. (*Id.*).

Denied. Counsel, not Koppel, used that word. The topic arose  in a restaurant when several tables of MIT students were present . Koppel said that the name  for the program was

based on entirely innocent references. Id. at 487 . One is to a mathematical theory called the calculus of constructions, the theory used by the program. Id at 487. ▮ seemed "displeased." Id.

42.     On October 26, 2016, Koppel's ex -girlfriend, SIPB keyholder ▮▮▮▮, told Koppel in a text exchange that she was "physically uncomfortable" around him because of the way he touched her at a conference earlier that year. (Ex. 3, Koppel Dep. at 232 and Ex. 17). Koppel interpreted this statement as a "threat" that could get him "ostracized and/or jailed," and he stated to another MIT student the n Ex. t day that he might call "a lawyer and/or the police."(Ex. 3, Koppel Dep. at 270; Ex. 18).

Admitted that Koppel was alarmed at the time. Koppel Aff para..3. The email was not consistent with any facts. See Koppel Aff. para. 3.

43.     In November 2016, Koppel called the MIT police when ▮▮ appeared at an extracurricular event that he was attending. (Ex. 3, Koppel Dep. at 258-266). When officers arrived, Koppel told them that he could not be in the same room as ▮▮ because she had "threatened" him, referring to the text exchange described above. (*Id*. at 260). The officers spoke to ▮▮, and then informed Koppel that she would soon be leaving to teach a class. (*Id.* at 263-264). When Koppel was asked at his deposition if calling the police on someone might make them uncomfortable, he replied, "If I called the police on you, I would hope you would feel uncomfortable."(*Id.* at 264-265).

Admitted that Koppel was slightly alarmed a month later because Koppel hoped to avoid any disruption of his assigned task to clear a room related to an MIT conference. at the time. Any misunderstanding with the ex-girlfriend was amicably resolved after this date. Koppel Aff. para. 3..Koppel in this testimony made clear he did not intend to cause discomfort to the ex- girlfriend. The last sentence is common sense.

44.     In July 2019, ▮▮▮ recounted in another communication to Koppel that at the conference in 2016, he had squeezed her right buttock, an act that, she explained, she interpreted "as an expression of romantic and se sexual affection and I felt really uncomfortable about it."(Ex. 3, Koppel Dep. at 324-328; Ex. 19 at Koppel_01169). Koppel responded,"[while it is possible I squeezed your butt, it seems very unlikely that I did so intentionally."(Ex. 3, Koppel Dep. at 326-344; Ex. 20 at Koppel_01189). At his deposition, Koppel denied that he squeezed ▮▮▮'s buttock, and said that all he had meant by saying it was "possible" was that it "would not have violated any laws of physics."(Ex. 3, Koppel Dep. at 326-331).

Admitted the transcript says this. This refers to the same misunderstanding about a 2016 non- event. The misunderstanding has been amicably resolved. See Koppel Aff. para 3.

45.     Representatives of an independent living group at MIT called Epsilon Theta ("ET") asked Koppel in 2018 and 2019 to refrain from participating in that group's team for a student activity, and to stay away from the house during rush season, because members were" uncomfortable with your presence."(Ex. 3, Koppel Dep. at 349-356; Ex. 21; Ex. 22).

Admitted they said this. No one was identified. The only known origin of this is a person who at the time was a close friend of the ex- girlfriend. Id at 355.

46.     Koppel has had "difficulty reading people's signals as to whether they want[] physical contact" with him and has "struggled with that" over time. (Ex. 3, Koppel Dep. at 341).

Denied he said this. He said at the page cited that "everyone struggles with this and "everyone can be continuously learning" about this. Koppel he is autistic . He has worked hard to overcome the adverse impacts on his social relations. Koppel Affidavit para.6.

47.     SIPB maintains email lists that contain more members than SIPB-Office. (Moses Aff. ¶ 18). The distribution list SIPB-list-of-lists@mit.edu contains approximately 2,538 unique

email addresses, some of which may have been terminated. (*Id.*). The list SIPB-Announce@mit.edu currently contains approximately 880 unique email addresses, some of which, again, may have been terminated. (*Id.*).

Koppel cannot admit or deny.

48.    The SIPB Executive Committee previously used the SIPB-Office list to notify SIPB members that a particular person is no longer associated with SIPB or is not welcome in SIPB-controlled spaces, and the reasons why. (Batson Aff., ¶ 5; Ex. s. 9-11). This has included informing the members of the SIPB-Office list in 2018 that another person, John Hawkinson, made other SIPB members "very uncomfortable."(Batson Aff., ¶ 8; Ex. 10).

Denied. Hawk was secretly expelled by the EC alone and there was no public explanation. Batson, an affiant here, in 2018 in the aftermath of the secret expulsion by the EC wrote that the MIT Student Affairs Office was the "catalyst" for the expulsion. Ex. 10, Wm 0421. She said the EC had been [confidentially] deliberating on this issue" for almost the entire fall semester."(emphasis added). Id. Long-term keyholders criticized the 2018 Hawk expulsion as based on inaccurate and false rumors ,"pretext", and "dissembling" "by the EC. Ex. 10, Wm 419-420; 0422. Others protested that Hawk should have been given a "fair and open hearing" and that the denial of that was "disgraceful, "and "Kafkaesque" Id. Moses Ex. 10 Wm 0421, 9:19 p.m. See additional facts as to Hawk . point(i) below. The other person, Moses Exhibit 11, was never affiliated with MIT and was a subject of a campus- wide notice that he should be reported to the police if seen. Moses Ex. 11.

***

Additional Facts by Plaintiff Koppel

a. Moses solicited negative opinions in writing starting February 26 without any authorization, excuse, or justification.

101.    Some SIPB members are elected to keyholder status after they are nominated for keyholder by existing keyholders. Moses dep.1. 23-24 . Members are nominated only after a consensus is built among active student keyholders eligible to vote.. Koppel Ex. F, Wm 0495 (conversation among several EC members on February 20, 2020). The "actual vote" is almost always a "formality" after a person is nominated. Id. . Koppel was never nominated for keyholder. Moses dep. 1,35.

102.    Nothing in the record shows or identifies precedent for widespread discussion of a member not yet nominated for keyholder. The February 10 discussion of Koppel was by keyholders only took place in a closed door session. Batson Aff. ¶ 10.

103.    As of February 20, Moses said a "decision seemingly already been made" against Koppel being nominated. Koppel Ex. F, Wm 0495 (conversation among several EC members on February 20, 2020). He wondered if "replies"[sic] should go to only to the Chair because the "public discussion ""might devolve in unexpected directions" Id. 0496. Moses wanted to prevent a conversation outside the EC from "going awry." Id. Moses addressed this problem by starting to draft what became the February 26 solicitation by use of four false bullet points. Id. see Koppel Ex. A.

104.    Prior to sending the four-bullet point email on February 26 ("the solicitation email") Moses discussed it in a limited way on Mattermost, a platform used by the Executive Committee (EC). Exhibit 6.

105.    One not named person proposed that any discussion of Koppel be done entirely within the Executive Committee. Moses Ex. 6, Wm 03871, 1:14 a.m. That was ignored. One member suggested the conversation be in the EC and also on SIPB private without "revealing all of the details." Id. Wm 387.[2]

106.    Moses suggested that the four-point solicitation invite or allow for of anonymous reporting. Moses Ex. 6, Wm 390. The EC participants were unclear as to the purpose of the solicitation (whether to decide not to nominate or to establish they could not agree about nominating. Id. Wm 391. One member thought that the recency of the allegations was crucial. Id. Moses said the first point it ("arguing… street harassment) was a year old or "a bit more." Ex. 6, WM 391. In fact, that was an electronic conversation in 2017 unrelated to SIPB. Koppel Aff. ¶ 1. Unknown to Koppel in 2017, a non-voting keyholder had taken took offense to something Koppel wrote in 2017, not telling him she was offended or why. Koppel Aff. ¶ 1.

107.    One EC member assumed on February 26 from the prior discussion in Moses Exhibit 6 because any member should get "one cycle of feedback and a chance to improve" that person then wrote, referring to the bullet points circulated on February 20 (Id. at 00389) that sounds "like Koppel <u>had one cycle of feedback and then a chance to improve "saying "It sounds like that cycle has happened informally already possibly several times</u>"Ex. 6. Wm 392, Foss 7:35 p.m. Moses did not correct that false impression. Moses knew it was false. Koppel Aff. ¶ 1; Moses Ex. 12, last page, Wm 0363, 11:11 a.m. (putative February 12 retraction). Moses at 9:19 p.m. told the group that"I've had many people many people say without prompting [sic]…. that

---

[2] The numbers here start at 101 to signal that these paragraphs are offered by plaintiff. The words conversation and discussion are used here to refer to electronic communications unless otherwise noted.

Koppel makes women uncomfortable."Ex. 6, 392. No person is named. Id. The record has no support for this.

108.     Five hours after the solicitation email was sent, Moses told the EC the evidence is"quite overwhelming [sic] that Koppel should not be a keyholder"and that expulsion (separation) from the group was appropriate. Moses Ex.6, 392, 9:19 p.m. Moses again said Koppel"makes women uncomfortable."Id. Moses at that time had displayed to the group one anonymous first- person accusation. Ex. 7, Wm 0071, 5:27 p.m. That lone accusation(by ████) was expressly withdrawn, however at 2:00 p.m. the next day as"not something you can use against Koppel."Koppel Ex. D, texts from ████to Moses at 2:00 p.m. February 27; see additional facts as to ████, below at 170.


**b. The February 26 solicitation by Moses was knowingly false. It successfully invited rumors and <u>negative hearsay.</u>**

109.     The four-bullet point memorandum, Koppel Ex. A, was sent February 26, 2020 at 4:21 p.m. Each of the four bullet points was false and is not supported by any known fact. Koppel Aff. ¶ 1.

110.     In addition to the points in the Koppel affidavit, Moses when deposed could not recall when the hugs started or when he asked that they stop. Moses Dep. 3.85, 3.83. Moses never viewed the hugs as sexual. Moses Dep. 1, 10, 16.

111.     Before he sent the February 26 email Moses asked the person who was the source of the street harassment point when it had happened. Moses Dep. 3.40. Moses did not wait for an answer. The Koppel comment about street harassment was not"recent"or within the last year but took place in 2017 in a private conversation. Koppel Aff. ¶ 1. That 2017 conversation was with ████. Moses by 2019 knew ████ did not like Koppel. See Koppel Ex. D, 2019 showing that

██████ helped Moses **s**ecretly change his March 2019 MIT room assignment with Koppel. ██████ told Moses at the time "you would hate living with Koppel." Koppel Ex. D. Moses replied that he was"not a fan"of Koppel. Id. Koppel thought they were good friends at all times prior to learning from someone else about the March 2 email. Koppel Aff. ¶ 3.

112.    The "sexist comment" by Koppel was to the effect that"some men walk on eggshells" and was not about Epstein. Koppel Aff. ¶ 1 c.

113.    The first several replies to the four-bullet point email were from persons who did not know Koppel. They said who said the [false] bullet points alone justified refusal to nominate Koppel. Ex. 7, Wm 370, 4:29 p.m.; 4:37 p.m. Carney wrote "the most serious issue <u>was initiating physical contact after being asked to stop</u>."4:52 p.m.[3] Moses concealed from Carney, from the entire audience of Private, 144 people (Koppel Ex. G), and from the EC, that this bullet point in fact related to hugs by Koppel to Moses, <u>not</u> to sexual harassment of anyone. Moses Dep. 1, 9, 16, 131-132. Moses did not tell the EC or the SIPB Private audience that the "physical contact after being requested to stop" referred to Koppel giving Moses friendly hugs. Id. Koppel until March 2 thought Moses was a good friend based on several years of apparent friendship. Koppel Aff. ¶ 3.

114.    One person, ████, initially reported only to Moses that Koppel makes her uncomfortable because of" inappropriate "conduct, namely that Koppel had at some point touched her. Ex. 7, 00371, 5:27 p.m. ████ also said Jimmy is "one of the reasons (among another creepy dude)"[sic]"that a [not-named friend] doesn't come to meetings."[4] 371 at 5:27 p.m. That was false.

---

[3] Carney at person at 6:50 p.m. again said inaccurately that "Koppel has already been told to change and has refused. 7, 374. Moses again did not tell the group that was false. Carney also told the audience that "Koppel" might someday cause the group to be unsafe."374, 7:19 p.m. Carney has evidently disliked Koppel since 2017. See Koppel Ex. D and additional facts.
[4] That friend is ███████. The" creepy dude" is Miquel Young, a recent Chair of SIPB. See facts as to ███. Point (h) below. Young in 2020 was a friend of Moses and actively conferred with

See additional facts as to ▮▮, point (h) below. Moses within the hour n of the initial ▮▮ report without attribution (i.e. anonymously) to the whole group. Ex. 7, 00372, 5:57 p.m.

115.    ▮▮ the next. afternoon in a text directly to Moses recognized that the February 26 email was seeking <u>negative</u> comments. She described her initial report about touching on the arm as"<u>not something you [Moses] can use against [Koppel].</u>"Koppel Ex. H, See additional facts as to ▮▮ below at point(g).


c. <u>The February 27 e-mail was false in numerous material respects.</u>

116.    The February 27 defamation was sent to Private, an audience of 144 persons at 6:11 p.m., 26 hours after the February 26 solicitation. Koppel Ex. A, B; Ex. 7, WM 0375-0376. Moses tells the audience that it is "clear" from the "conversation..,m<u>ost of which was through individual replies to me</u>" that Koppel should not be nominated for keyholdership. Moreover, given the <u>severity, consistency, and widespread nature [sic] of his interactions</u>"[sic]"the EC has concluded "that we should request Koppel refrain from participating in the group anymore." The expulsion is described as a "necessity" which reflects the "vast majority" of people who took part in the discussion ("<u>again through individual replies").</u> Moses writes that Koppel "has been given several opportunities to change his behavior and failed to do so."Moses describes the severe, consistent, and widespread bad behavior by Koppel ("interactions") as something "our members had to endure". He asserts that the group takes "<u>a strong stand against sexual harassment</u> "and says the discussion has made it clear that the group needs to do better to be "safe environment" and a

---

Moses about Koppel multiple times between February 21 and March 6. See Koppel Ex. I, chats between Young and Moses about the Koppel expulsion between February 21 and March 6.

"community where everyone should feel safe and supported."(emphases added throughout). Every point here is false.

117.     Every aspect of the February 27 email referring to the prior "conversation" Ex. 7, is false and very likely deliberately false. The documents which have been disclosed, Exhibit 7, Wm 00370 – 376 are the entirety of disclosed communications to Moses in the "hard conversation." He published some reports to the group anonymously. The entire conversation, including all reports solely to Moses, does not show any fact or report consistent with "severe, consistent and widespread" sexual harassment. The entire conversation lasting close to 24 hours has 10 participants, of whom 3 are long -gone alumni ("cruft") and do not know Koppel in any way. Of the balance, 5 were active keyholders probably already aware of the negative rumors on February 10 behind closed doors.

118.     As of 6:11 p.m. on February 27 (Koppel Ex. B) Moses had received at most one firsthand report of unwanted touching by Koppel. That sole report was by ███ who wrote her report as "a stream of consciousness" , the next day at 2 p.m. by text directly to Moses withdrew her complaint to say, instead, that the one instance of Koppel touching her arm in the course of a public conversation was "not something Moses could use against Koppel," but that she thought instead that Koppel, who is slightly autistic, was, "subtly off putting" as to "everything he does." Koppel Ex. H; response to para 23 above. As of 6:11 p.m. on February 27 there were no first-hand report identifying severe, consistent, or widespread s sexual harassment or unwelcome touching. No report mentions any facts as to multiple instances of unwelcome touching.[5] No report shows harassment that had " apparently gone on for some time" without detection.

---

[5] The one hearsay report of an ancient rumor (Moses Ex. 7, Wm 075 at 9:18 a.m.) refers to a non-event in California in 2016 unrelated to SIPB. See Koppel Aff. ¶ 4; see Koppel responses to SOF as to ███ , ¶¶ 42-44.

119.    Except for ███, the February 26"conversation"initiated by the four false bullet points, Exhibit 7, Wm 070, produced as of 6:11 p.m. on February 27 (Koppel Ex. B) no evidence of"severe, consistent, or widespread"…"sexual harassment" by Koppel. No one on the EC used that term at prior dates as to Kopple. Moses had no evidence that Koppel had caused any member to"endure"…"sexual harassment" but wrote "I am sad this is something our members had to endure"[sic].) Koppel Ex. B.

120.    The deliberate falsity of the February 27 email is visible because t Moses falsely asserts, twice, that "most" of the negative facts were sent privately only to Moses. In fact, the one negative report (███: touching on the arm) was "shared" to the full group. No recent first-hand report was sent only to Moses.[6] His description of the very weak or non- existent reports conceals and deliberately mischaracterizes the vague hearsay reported to him. There was one relevant entirely private report ("replies to me") which was the ███ report of an ancient non-event. Koppel Aff. ¶ 4. Moses is falsely asserting, however, that all of his factual statements on February 27, Koppel Ex. B, are based on a volume of reliable non-disclosed facts ("individual replies to me"). No such facts are shown. The conversation, Exhibit 7, does not support or corroborate what Moses wrote, Koppel Ex. B, in a different way because the entire "conversation" was a solicitation of additional negative information based on false talking points . The conversation was certainly not "clear" support ("clear from this conversation") for what Moses wrote on February 27.

---

[6] Moses admits there is no evidence that Koppel was ever given any advance notice of any accusations or given any "opportunity to change his behavior" and "did not fail to do so." Compare Koppel Ex. A with Moses Ex. 12, last page (putative retraction on March 12).

     d.     <u>The March 2 email is false in multiple ways.</u>

121.     The March 2 e-mail is false in virtually all the ways already described as to the February 27 e-mail and includes several new falsehoods. Moses on March 2 describes the discussion commenced on February 26 by the four bullet points as a "hard conversation"[sic] that took place among SIPB keyholders "this past week."

122.     There is no evidence of any such conversation among the active student keyholders, although that easily could have been done. Koppel Aff. ¶ 8. The March 2 audience of SIPB-Office is hundreds of MIT keyholder, at least 508, worldwide. See Koppel Aff. ¶ 8. The March 2 reference to "many" keyholder" reports in the "conversation" suggests that the very limited conversation involved participants who had reliable first-hand knowledge. That was false. ¶¶ 112, 113, above. As of February 20, 2020, there were approximately 22 active student key holders. Koppel Ex. E. The March 2 e-mail falsely suggests that this small, arguably reliable group was the source of the information described in the March 2 e-mail. That falsity is particularly harmful because the March 2 e-mail thereby conveys that that a very limited group, 22 active key holders "shared" stories which involved first-hand knowledge of severe, consistent, and widespread misbehavior by Koppel. The implication that a very limited group had knowledge of multiple instances of severe and widespread stories misbehavior suggests that Koppel is an egregious and dangerous predator who has committed numerous widely-<u>known</u> violations of decency. Moses confirms this false impression by invoking emergency conditions: immediate expulsion was a "necessity" for the group to be a "safe environment for everyone." "This circumstance [sic] and the <u>required</u> [sic] response are <u>quite exceptional</u> and <u>reflect a need for the group to do better to be a safe</u> environment."(emphasis added) . Koppel is a recently identified extreme menace to everyone. His bad behavior is severe, consistent, and widespread. He has persisted in bad conduct

("interactions")"despite requests to stop. "His widespread bad behavior" had apparently gone on for some time" before recent detection. The decision that Koppel be immediately expelled from spaces used by the group, and participation in all projects and events and "reflects the will of the current keyholders.". The active student keyholders including the EC, a total of 22 persons, Koppel Ex. E, They were never polled. A tailored email list easily could have been prepared for that group only. Koppel Aff. ¶ 8. Moses did not bother because the EC already knew by February 20 Koppel would not be nominated or elected. Exhibit 7, first two pages.

123.     Preemptive non-nomination or expulsion prior to nomination required notice from the EC and an opportunity to be heard. Constitution, Moses Exhibit 1, Article X, Koppel 008. Moses nevertheless wrote that this "exceptional" but "required" response, the immediate (unconstitutional) public banishment of a mere member, plus worldwide notice of the expulsion, is "necessary" for the group to be a "safe environment" for everyone. That is unsupported. The EC was scheduled to meet on March 6. Koppel Ex. F, page 3. top. There was no emergency. But see Koppel Ex H, Moses telling ▮ he had to send the February 27 email "immediately". The EC alone could confidentially expel Koppel without giving any reasons it did in 2018 to Hawk. See Moses Ex. 10. Hawk moreover was well known. Moses was not. His expulsion was of no interest to anyone except Koppel. Others had no valid interest in publicizing it.

124.     The March 2 email falsely says that Koppel has covertly engaged in serial and widespread molestation or sexual abuse ("interactions") which was so severe and well- known that "many keyholders" were able on short notice to "share "negative" stories" of his horrific conduct. The sole "story" from any keyholder, however, was that Koppel touched ▮ on the arm in public, a story which was "not something Moses could use against Koppel." ▮ instead said she found Koppel to be "subtly off-putting in everything he did." Koppel Ex. H.

125.    Even the March 2 statement that Koppel agreed to immediate expulsion is defamatory because, by artful omission, Moses suggests that Koppel acknowledged the truth of the concealed accusations. That is false. Koppel agreed to be expelled on February 27 at about 5 p.m. because he trusted his friend Moses and even though Moses refused to tell Koppel any of the specifics of any allegation. Koppel Aff. ¶ 2.

126.    The February and March 2 defamations are internally inconsistent. The inconsistencies show falsehood. It is not possible that Koppel's bad acts (i) persisted and were concealed for an extended length of time ("had apparently gone on for some time") before recent detection… we are "are sorry this is something you have had to endure"… [SIPB has]"a need to do better..") **and** that (ii) the same bad acts were previously not identified but were the subject of" many" "consistent, severe reports "shared just "last week "by well-informed keyholders **and** that (iii) the very same concealed bad acts had already been the subject of generous but unsuccessful warnings to Koppel plus "opportunity to change" which he rejected or refused . If the first is true for example there is no time for Kopple to be offered and to reject t opportunities to correct his behavior .

127.    Until March 2 Koppel thought Moses was his friend. Koppel Aff. ¶ 3. In March 2019 they applied to be "matched" to live together at MIT. Moses 3.83. When they lived in the same dorm they hung out in the room of the other. Moses 3.85. On February 12, 2020 Moses sent Koppel a birthday greeting. Moses Dep. 3.83 ("Happy Birthday friendo"). Koppel Aff. ¶ 3.

128.    The February 27 and March 2 emails in different forms of words inexplicably and falsely say that Koppel had been warned and failed to correct his behavior, instead persisting in severe, consistent, sexual harassment. The deliberate falsehoods about warning were the only defamation retracted on March 12. Moses Ex. 7. The "retraction" is otherwise wholly insufficient.

e. <u>Excessive publication.</u>

129.    Starting February 10, any publication about Koppel beyond the Executive Committee was needless and excessive. Moses on February 20 asked the EC whether Koppel should merely be not nominated or should also be <u>told</u> he would not be nominated. Moses Depo. 2. 99. . Broader discussion was not on the table. Similarly Moses asked the EC whether he or the EC should tell Koppel. Id. 2. 94.At that point in time the entire issue was to be handled by the EC alone and confidentially . That was how Hawk was expelled . Response to SOF para 49 , above; see additional facts as to Hawk, point (i) below. .

130.    As of February 21 and all later times, no publicity as to Koppel was needed or permitted outside the EC Public solicitation of negative comments and the announcements of the decision to expel (Koppel, Ex. A, B, C) were improper and excessive because the only permissible mechanism for expulsion is <u>confidential</u> EC hearings before the EC after notice and an opportunity to be heard. Moses Ex. 1. Article 11, Constitution. See Response to SOF, para. 48 above as to Hawk.

131.    The publications here were needless and excessive on this specific record. If expulsion had been proposed on February 21. Koppel very likely would have agreed. He agreed to expulsion on February 27 at 4 p.m. in a person-to-person meeting with Moses despite not being told any reasons. Koppel Aff. ¶ 3.

132.    There is no evidence Koppel ever sought to be nominated to be a keyholder. His nomination or non-nomination was not an urgent topic for any discussion by the EC until Moses decided to open a discussion of it. See Moses Ex 6.

133.    There is no evidence of any custom or practice of distribution of emails to Private to discuss a person who was not yet nominated and not yet seeking nomination to keyholder.

134.    There is no evidence of any custom or practice of distribution of emails to Private or Office as to a member deemed by the EC as not able to satisfy the social integration requirement and therefore not likely to be a keyholder.

135.    There is no evidence of any custom or practice of distribution of emails to Private or Office to discuss non-nomination of a member.

136.    There is no evidence of any custom or practice of distribution of emails to Private to solicit negative opinions as to a member by use of negative examples (the four-bullet points).

137.    In February 2020 the total number of active keyholders eligible to vote on a new keyholder was 22. Koppel Ex. F. That number includes the EC. Id

138.    Moses did not know how many people were in the audience of Private as of February 2020. Moses Dep. 1, 78. In fact it was 144. Koppel Ex. G. As of. February 2020 only 22 recipients of Private were active student key holders. Koppel Ex. I. The other 122 persons (144 minus 22) were excessive. The excess people are many alumni keyholders ("cruft") who cannot vote on keyholder. They did not know Koppel or anything about him. See Moses Ex. 7. 4:37 p.m. and 6:22 p.m. (Hey, I graduated in 2013 but …").(emphasis added )

139.    It is relatively simple for anyone skilled in computer science to make or update a distribution list for e-mail. It takes at most several minutes. Koppel Aff. ¶ 7.

140.    Moses on March 2 did not know how many people were in the audience of "Office" or if it was up to date, or who exactly was in that audience. Moses Dep. 1, 159. Moses at the time said Office included every person who ever went to one meeting ("prospective") plus anyone who was ever a "member" by reason of going to several meetings. Moses Dep. 2, 153, 144. Moses

knew this prior to sending the March 2 e-mail. See WM 379 ("are we sure we want all prospective ever to get?"). The distribution of Office at the time was at least 508 persons. SOF ¶ 36. Moses at the time did not know the extent of the Office distribution. Moses dep. 3, 151.

141.    On February 21 Moses was told by a former Chair that "everything [about Koppel] ] should be sent only to the Executive Committee or to the Chair. Koppel Ex. I, same as Moses dep. Ex. 21a, Wm 0383. Moses ignored that advice. .

142.    On March 1, Moses was told by the SIPB secretary that she did not know which of the various lists of keyholders were up-to-date and that some lists were "extremely out of date." Moses Ex. 7, page Wm 0396.

143.    The Private audience, Koppel Exhibits A, B, included about 144 persons, of whom at least 122 (144 minus 22) are irrelevant to EC consideration or nomination or any the election by active shareholders. The 22 possibly relevant persons were never directly polled by Moses. That alone shows the excessive publication of the four-bullet point memorandum and the February 27 email.

144.    Moses in the February 27 and March 2 emails unintentionally admitted that at most the 22-active student keyholders (which includes the EC) were the only possibly proper audience for the February 26 accusations, the February 27 e-mail, and the March 2 e-mail. The February 26 e-mail was supposedly sent to report on a closed-door keyholder session. That email and the March 2 e-mail report the expulsion as entirely based on" many" shared keyholder stories.

145.    As a mere member Koppel was free to cease his membership at any time. Only the EC had any interest in loss of members, and that was a general interest in retaining members. The EC alone could expel. See Moses Ex. 10 (expulsion of Hawk after six months of confidential deliberations by the EC with no reasons announced.)

146.     Nothing in the record establishes any precedent or custom for the use of Private or Office after the EC has determined that a member will not be nominated and will not become a keyholder because of social integration problems. But see Exhibit A. Confidential EC treatment seems to be obviously preferable when a has member satisfied the work contribution requirement but has persistent social problems e.g. alcohol abuse or non-treated psychological problems. In those hypothetical instances a private conversation is the obvious first step. Other steps could follow, including confidential expulsion by the processes mandated by the Constitution.

147.     Nothing in the record establishes any precedent or custom for the use of Private or Office to request negative comments or to use false facts to have a controlled discussion of a member not yet nominated for keyholder. Koppel Ex. A, B, C.

148.     The only documents in the record having to do with use of Office, Moses Exhibits 9, 10, and 11 do **not** involve nominations for keyholder. Moses Exhibits 9 and 10 conclusively show that Office was **not** used to expel Hawk. Hawk was expelled by the EC alone in 2018 <u>after six months of confidential consideration by the EC. He was expelled but no public reasons were provided on Office or otherwise</u>. Exhibit 10 a discussion that erupted after the secret expulsion. The other "Office" offering by Moses Ex. 11, relates to a person unrelated to MIT who was the subject of reliable police warnings that the person should be reported to the police immediately if seen on campus.

149.     Consideration of expulsion could and should have been limited to the EC, a total of nine persons. Koppel Ex. F, Moses Ex 10,(Hawk) .

150.     The emails on February 20 <u>and</u> February 26 <u>and</u> March 2 were excessive because all of them relied on rumor. The February 26 email relied on false rumor to solicit more rumors.

All disputed "facts "in the February 27 and March 2 e-mails were false and at best based on false rumor.

151.     Transmission of Koppel Ex. C on March 2 was excessive because the worldwide audience of at least 508 did not have any valid interest in the expulsion of a mere member. Before it was sent, one EC member referred to the March 2 email as "our public email about jkoppel" Moses Ex 6, Wm 0397(emphasis added) .

152.     After the resignation of Koppel on February 27 (confirmed in the March 2 e-mail, Koppel Ex. C,) there was no valid "interest" of SIPB in using his name to "serve" any putative objectives such as to "encourage the return of people he possibly had driven away." ."There is no evidence he drove anyone away. If that were true, all 22 active keyholders would soon know he was gone. They easily could tell all active members or anyone else. They are not potted plants.

153.     The distribution of Exhibits A, B, and C was excessive because Koppel and his name were not relevant to any group interest in "future encouragement of anonymous reports, "or establishment of an anonymous reporting or in the false suggestion that SIPB was now safe because of his expulsion. General expression of vigilance against harassment or avoidance of discomfort   are not related to Kopple. Linkage of his name of his name to these topics is defamatory.

154.     When Moses first learned he was being sued, he researched Massachusetts case law as to excessive publication of a defamation. Moses Dep. 2, 152-153.

f. Recklessness by Moses, malice, reliance on rumor and other facts showing loss of any putative
conditional privilege.

In addition to examples elsewhere visible in this record Koppel offers these added examples of facts relevant to waiver of privilege.

155.    Even though ▉▉ at 2 p.m. on February 27 reminded Moses that Koppel had <u>not been</u> warned, Moses falsely wrote to the group of 144 at 6:21 p.m. that Koppel "had been given several opportunities to change his behavior and failed to do so. I am sad this is something our members had to endure." Koppel Ex. B. On March 2 Moses repeated this falsehood in different words saying that Koppel "made many shareholders deeply uncomfortable and continued to do so despite requests to stop." Koppel Ex. C.

156.    On March 12 Moses retracted those falsehoods about prior notice saying that "James was not informed or warned of any prior alleged conduct by SIPB leadership nor did he fail or refuse to cure or alter any conduct after any warning or warnings by SIPB leadership." Moses Ex. 12, Wm 00363.

157.    Once Koppel agreed to be expelled at 5:00 p.m. in February 27, there was no need to send anything about him to anyone. There was no urgency. Moses could have confirmed to the EC alone that Koppel agreed to withdraw. The EC was scheduled to meet on March 3. Koppel Ex. F, last page.

158.    Moses on March 6 made an appointment and went to the Title IX Office at MIT (IHDR) with at least one other non-victim to report sexual harassment by Koppel. Moses "may have" showed MIT administrators the initial, already withdrawn, ▉▉ report, Moses Depo. 2. 89 (that ▉▉ had been touched), <u>despite knowing it was withdrawn</u>. ▉▉ declined to go. Id. 2. 09.

159.    The facts show that Koppel was targeted for special, bad faith, treatment. The false publicity of Koppel at issue here showed the MIT community and the world that Moses was taking

a "strong stand" against sexual harassment. It was designed to show that at "least one [MIT] group was willing to make hard decisions [sic] on that subject. Moses Dep. 2. 163. Widespread public denunciation of Koppel as a sexual predator worked to rehabilitate the reputation of the group after the concealed conduct by Young in 2017. See point (h) below, facts as to ██. The disputed emails showed MIT and the world a picture of SIPB management, especially Moses, as vigilant, caring, and "willing to take a strong stand against sexual harassment." Ex. B.

160.     Miquel Young dela Sota ("Miquel"or"Young") in 2020 was a friend of Moses and actively conferred with Moses <u>about Koppel</u> several times between February 21 and March 6. Koppel Ex. I, Young, when told of the request for a retraction on March 6, asked Moses <u>about the consequences for both of them</u>. Koppel Ex. I, Wm 0022 ("we"). Moses at later dates tells others that Young is "freaking out" about the Koppel communications by Moses.. Id. last page.

161.     Moses on March 6 2020 as to these defamations wrote to a mutual friend that Miguel [Young ] was "relapsing to a freakout era" of [symbol for approximately] 2017". Koppel Ex. I. Moses Dep. 3, 8, 10, 13. Moses says he "was not sure"[sic] if Miquel was anxious about prior sexual harassment.[7] Moses Dep. 3, 11. Miquel graduated in 2020. Id.

162.     Moses, despite being pointedly reminded of this issue by ██ at 2:00 p.m. that day, falsely wrote to the Private group of 144 on February 27 that Koppel "had been given several opportunities to change his behavior and failed to do so. I am sad this is something our members had to endure." Koppel Ex. B.

---

[7]. ██, a close friend of Moses, was harassed by Young at the time, 2017, and like ██, complained about him to the EC, also to no effect. ██ depo. 94, 104-105.

163.     On March 2 Moses repeated this falsehood in different words saying that Koppel "made many shareholders deeply uncomfortable and continued to do so despite requests to stop." Koppel Ex. C.

164.     On March 12 Moses retracted these inexplicable falsehoods saying that "James was not informed or warned of any prior alleged conduct by SIPB leadership nor did he fail or refuse to cure or alter any conduct after any warning or warnings by SIPB leadership." Moses Ex. 12, Wm 00363. One question as to malice and recklessness is how and why Moses was ever allowed to assert these obvious falsehoods. And why did he invent this? How did the EC not prevent it? The EC obviously was not paying attention. It certainly was not "authorizing" known falsehoods.

g.   <u>Additional facts as to</u> ██.

165.         ██ on February 26 made an initial anonymous report to Moses based on a "stream of consciousness" email which she . Moses sent the redacted version to the full group of 144 people on February 26. Ex. 7, Wm 00371 5:27 p.m.; Wm 00372, 5:57 p.m. The next day, at 2 p.m. (four hours before Moses sent the February 27 email (at 6:21 p.m.) ██ by text renounced and effectively withdrew all her initial report. Koppel Ex. H. ██ said her prior report including the touch on the arm was "not something [Moses] can use against"[Koppel]. Id.

166.         ██ in the 2:00 p.m. text made clear that she had thought more about the solicitation email and her initial responses to it. She texted Moses that the request for negative comments in the four-bullet point e-mail the prior evening was <u>"confusing</u> because it's hard to <u>point at any particular incident and use that as a reason against him. Because everything he does</u> <u>is subtly off putting"</u>. Id. (emphasis added). Koppel Ex. H.

167.     She went on to tell Moses at 2:00 p.m. on February 27 that if Koppel hasn't been given a warning before" about any particular incident " it might be hard to just ban him, so I would give him a warning and if he does something even remotely minor comes up, ban him"[sic]. Koppel Ex. H. (emphasis added).

168.     Moses ignored ▮'s retraction of her comment about touching, which he had edited and forwarded to everyone the prior evening. There is no record Moses never mentioned ▮'s clear change of position. Koppel Exhibit H, to anyone. He then also inexplicably ignored ▮'s clear, valid point that prior notice was needed for fairness and as required by the Constitution. Koppel Ex H

h. <u>Additional facts as to ▮.</u>

169.     Any possibly relevant facts as to ▮ start with and end with the "creepy dude." ▮ in 2016-2017 was a freshman at MIT. She intermittently went to SIPB meetings that year. ▮ 48. Her interest in the club continued into the summer of her freshman year, 2017. During the "entirety" of that summer, three months, ▮ was sexually harassed or molested by Miguel Young ("Young") ▮, 45-46. Young in 2017 was a recent former Chair of SIPB. ▮'s memory of that prolonged harassment continues to be so traumatic that in July 2021 during her deposition she commenced to cry uncontrollably when this subject came up. She said she did not want to discuss details of those three months. ▮ 45-46.

170.     Koppel is part of any narrative by ▮ only because an innocent 2019 hug by Koppel in the SIPB office location triggered ▮'s memory of the trauma of molestation or harassment by Young in 2017 in that identical location. Memory of that 2017 trauma, not the 2019 hug, was "the one main" thing that caused ▮ to resolve to never again go to the SIPB office in

2019. █ 44. The hug caused █ to think" apparently nothing good happens in the SIPB office… so I will just stop going" there. █ 23, 25. Her prolonged 2017 trauma, not the 2019 hug, was "the one main" thing that caused █ to stop going to the SIPB office. █ 46.

171.    The abuse by Young had made █ "supremely "and "profoundly" uncomfortable over an extended period of time, three months, in the summer of 2017 and thereafter later. █ 24, 46. Her "slight" discomfort with Koppel as to the hug was "the straw that broke the camel's back" causing her to permanently stay away from the SIPB office. 26, 44. The sole "main cause" was Young. █, 26, 44. The 2019 hug in the SIPB office made █ "slightly" uncomfortable because of █s' "other experiences" involving unwanted physical contacts with Young in the identical location, the SIPB office, 24. The single main cause she stayed away from SIPB was Young. █, 26, 44.

172.    █ reported this prolonged harassment by Young in 2017 to senior people in the group, including the Executive committee and more senior men and women. █ 44. The latter would include Emma Batson, an affiant here, active in SIPB since 2016. █, 46. Nothing came of these complaints. 44, 50. Young, to her knowledge was not expelled or disciplined. █ 50.

173.    The 2019 hug with Koppel caused █ "slight "discomfort" the same as she would feel" as to "any other uninvited physical contact" by anyone. █, 13. █ by 2019 knew Koppel well, having interacted with him for over two years in multiple contexts. █ Dep. 10-20. █ as of 2019 viewed Koppel as a friend who was "affectionate" but never romantic or seductive. 31, 44.

174.    █'s specific memory of the hug was to "give [Koppel] the hug and move on." █ 43. She saw Koppel as a friend and "did not want to make a big deal by declining" to hug him. Id. 23, 41. █ became deeply uncomfortable at the time of the hug not because of Koppel

but because of "other experiences" unrelated to Koppel but involving unwanted physical contacts in the same location, the SIPB office, 24. The single main cause she stayed away from SIPB was Young. ██, 26, 44. ██ had no complaint as to Koppel, ever.

                i.        <u>Additional facts as to Hawk.</u>

175.    In 2018 in the aftermath of the secret and not explained the Hawk expulsion by the EC , Batson said the Student Affairs Office was the "catalyst" for the expulsion. Ex. 10, Wm 0421. She described the as the result of the <u>EC [confidentially] deliberating on this issue "for almost the entire fall semester</u>."(emphasis added). Id. Long-term keyholders criticized the 2018 Hawk expulsion as based on inaccurate and false rumors, "pretext" and "dissembling" by the EC. Moses Ex.10, Wm 419-420; 0422. Others protested that Hawk should have been given a "fair and open hearing "and that the denial of that was "disgraceful," and "Kafkaesque." Id. Ex. 10 Wm 0421, 9:19 p.m.

176.    Hawk is entirely unlike Koppel . The reasons for his expulsion were concealed from all keyholders and <u>deliberated at length, confidentially, within the EC</u>.  His expulsion was never announced or explained. Moses Ex. 10. Unlike Koppel by 2016 and in 2018 Hawk was a long-term public figure at MIT , or close to it, because of his long very public activities at MIT and in the wider community and at SIPB. He was, with considerable publicity,,  expelled from the MIT student newspaper in 2004. Ex. 10, Wm 0421-0422. As of 2016 Hawk was a widely known journalist and critic who wrote about MIT real estate lobbying and community issues in ways that were public and very controversial. Moses Ex. 10, Wm 420. Hawk remained widely known. His secret and non-explained expulsion by SIPB in 2018 was strongly criticized by SIPB alumni.

Moses Ex. 10. The Batson suggestion that Hawk was expelled for making current students "uncomfortable" lacks any support.

***

Respectfully submitted,

James Koppel,
by his attorneys,

*/s/ Paul G. Boylan*
Paul G. Boylan, BBO 052320
Kirsten Patzer, BBO 668564
Freeman Mathis & Gary, LLP
60 State Street, Suite 600
Boston, Massachusetts 02109
pboylan@fmglaw.com
Dated: February 14, 2023          Tel: (617) 963-5972