# EXHIBIT 2

                                        Volume I
                                        Pages 1 - 181


           UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF MASSACHUSETTS


        Civil Action No: 1-20-CV-11479-LTS


JAMES KOPPEL,                )
        Plaintiff,            )
                             )
    -vs.-                     )
                             )
WILLIAM MOSES,                )
        Defendant.            )


   **VOLUME I ZOOM DEPOSITION OF WILLIAM MOSES**, a

witness called on behalf of the Plaintiff, taken

pursuant to the provisions of the Massachusetts

Rules of Civil Procedure, before Julie B. Starr,

a Registered Professional Reporter and Notary

Public in and for the Commonwealth of

Massachusetts, on March 1, 2021, commencing at

9:56 a.m.


              *COPLEY COURT REPORTING, INC.*
                *The Mercantile Building*
             *71 Commercial St., Suite 700*
             *Boston, Massachusetts  02109*
                  *Tel:  617.423.5841*

Page 5

1  clarification.
2    Q.  Perfect.
3         MR. PYLE:  Do you want to put some
4  stipulations on the record just as to --
5         MR. BOYLAN:  The usual ones.
6         MR. PYLE:  Yeah.  The witness would
7  like an opportunity to read and sign the
8  deposition transcript after it's prepared within
9  30 days.  All objections except as to the form of
10 the question are reserved until trial.
11        MR. BOYLAN:  Good.  Thanks.
12        MR. PYLE:  Thanks.
13        MR. BOYLAN:  Motions to strike are
14 reserved.
15        MR. PYLE:  Motions to strike are
16 reserved until trial.
17   Q.  Mr. Moses, when did you first meet James
18 Koppel?
19   A.  **I do not remember the specific date.**
20   Q.  Was it -- do you think it was in 2015?
21   A.  **That sounds like the approximate year.**
22   Q.  In what context or setting did you meet
23 him?
24   A.  **I believe we worked in the same floor.**

Page 6

1    Q.  At some point did you find out that you
2  were both graduate students at M.I.T. in computer
3  science?
4    A.  **We were not initially both graduate**
5  **students at M.I.T.**
6    Q.  At some point did you come to know him
7  as, James Koppel, at least a casual acquaintance?
8    A.  **At one point I met James Koppel as a**
9  **casual acquaintance.**
10   Q.  Did you at some point view him as a
11 friend?
12   A.  **I was at one point his friend.**
13   Q.  And when you were his friend at that time
14 would you casually meet for coffee, for example,
15 maybe with other people?
16   A.  **I do not drink coffee.**
17   Q.  Well, did you casually meet with James
18 and other people for meals from time to time when
19 you were his friend?
20   A.  **May have had a meal with James in a**
21 **group.**
22   Q.  Did you ever hang out or just spend
23 casual time with him when you were friends?
24   A.  **Can you clarify what is meant by "hang**

Page 7

1  out".
2    Q.  Um, I'll move on.  Did Koppel at some
3  point in time express a desire to be your
4  roommate?
5    A.  **I believe he did at one point.**
6    Q.  And at some point were you matched as
7  roommates?
8    A.  **Can you clarify what is meant by**
9  **"matched"?**
10   Q.  The housing office issued a piece of
11 paper that listed the two of you as roommates.
12   A.  **At one point some office at M.I.T. listed**
13 **us as potential roommates.**
14   Q.  And for whatever reason you did not want
15 to become his roommate; is that true?
16   A.  **At one point I asked not to become his**
17 **roommate.**
18        THE COURT REPORTER:  I have someone
19 in the waiting room, Attorney Boylan.  I am so
20 sorry to interrupt.  I have Michael Lambert.
21        (Pause.)
22        MR. PYLE:  We can resume.
23        MR. BOYLAN:  Could you read back the
24 last question, please.

Page 8

1         THE COURT REPORTER:  Yes, *"and for*
2  *whatever reason you did not want to become his*
3  *roommate; is that true"*.  And the answer given
4  was *"at one point I asked not to become his*
5  *roommate"*.
6  CONTINUED DIRECT EXAMINATION
7  BY MR. BOYLAN:
8    Q.  At whatever time you asked not to become
9  his roommate, can you tell us why?
10   A.  **Can you clarify that a bit or be more**
11 **precise?**
12   Q.  Not very easily.  You said to the housing
13 people or somebody, I'd rather not be his
14 roommate, and my question is why did you say that
15 to the housing people?
16   A.  **I did not want to live in the same room**
17 **as him.**
18   Q.  Okay.  Was it personal hygiene perhaps?
19   A.  **There were several reasons.**
20   Q.  At whatever date that was, was James from
21 time to time making you uncomfortable?
22   A.  **What date specifically?**
23   Q.  Well, the date you did not want to be his
24 roommate; by that date was he making you

## Page 9

```
 1  uncomfortable?
 2    A.  At one point James made me uncomfortable.
 3  I'm not sure what date you're referring to in
 4  your question.
 5    Q.  What did you first notice about James'
 6  behavior or speech that made you uncomfortable?
 7        MR. PYLE:  Objection to the form.
 8  You can answer.
 9    A.  Sorry.
10    Q.  You can -- you can try to answer.  I'll
11  rephrase it.
12        If you can recall, how did he make you
13  uncomfortable?
14    A.  James made me uncomfortable by coming up
15  to me and without my permission hugging me and
16  then also rubbing my head with a fist.  And I did
17  not want either of those things to occur and
18  thus, it made me uncomfortable to have them
19  occur.
20    Q.  Was he -- at the time did you think those
21  gestures were inappropriate?
22    A.  They were unwanted.
23    Q.  Okay.  Was the physical hug, would he
24  sometimes hug you from behind?
```

## Page 10

```
 1    A.  Sometimes I did not see these coming.
 2    Q.  Okay.  They made you uncomfortable on --
 3  you didn't think they were in any way sexual,
 4  correct?
 5    A.  I did not see those hugs as a sexual
 6  advance.
 7    Q.  Did you see other -- sometimes were there
 8  hugs where he did hug you and you did think it
 9  was a sexual advance?
10    A.  I do not recall a time where he hugged me
11  and I thought it was a sexual advance.
12    Q.  Did you ask him to stop hugging you?
13    A.  Yes, immediately.
14    Q.  The first or second time he did, you said
15  don't do that please; something like that?
16    A.  So specifically I recall when he hugged
17  me and then occasionally alongside the hug, did
18  the (indicating) fist thing on my head, and I
19  asked him to -- him to stop at that time because
20  it made me uncomfortable.
21    Q.  Got you.  Is touching people's heads
22  something that people do in the SIPB group from
23  time to time?
24    A.  I only recall this from James.
```

## Page 11

```
 1    Q.  Okay.  Do you have any memory of a group
 2  photo of SIPB members within the last couple of
 3  years where everyone is touching somebody's head?
 4    A.  I don't recall any such photo.
 5    Q.  Have you ever seen any -- anybody else at
 6  M.I.T. touching people on the head as a sign of
 7  friendship?
 8    A.  I don't recall any specific incidents.
 9    Q.  When you said please stop the hugs, did
10  he stop?
11    A.  I believe he stopped in that instance,
12  but another hug occurred after the fact.
13    Q.  And was -- did he -- when you said stop
14  with the head touching, did he stop that
15  behavior?
16    A.  Similar to the hug, I believe the
17  behavior at that time may have stopped, but I
18  recall that at a subsequent time it may have
19  occurred.
20    Q.  Okay.  After like say two instances, did
21  the hugs and the tapping on the head, did they
22  stop?
23    A.  There may have been an additional
24  instance.
```

## Page 12

```
 1    Q.  In time you have known James, have you
 2  ever thought that he was a little bit slow to
 3  pick up on social cues?
 4    A.  What do you mean?
 5    Q.  Have you ever thought that James in the
 6  presence of other people sometimes appears to be
 7  awkward in conversation, let's say.
 8    A.  I did not think he was any more awkward
 9  than the average SIPB member.
10    Q.  Did you ever give any -- in the time
11  you've known James Koppel until the present, did
12  you ever give any thought to the idea that he
13  might be to some degree autistic?
14    A.  I do not recall ever thinking this
15  specifically.
16    Q.  Do you have any experience with autistic
17  people?  Do you know who suffers from that?
18    A.  Several classmates of mine were, I
19  believe.
20    Q.  Classmates at M.I.T.?
21    A.  Elementary school as well and high
22  school.
23    Q.  And can you describe any of the features
24  of the behave or of autistic people that you've
```

**17**

1  talking to other members, person to person?
2  A.  **I do recall him talking to other SIPB**
3  **members and in the SIPB office.**
4  Q.  Did anything that he did in the
5  conversation with other members strike you as
6  awkward?
7  A.  **I don't remember specifically those**
8  **conversations.**
9  Q.  Having in mind the -- I'll suggest to you
10  as a point in time I'd like you to keep in
11  mind -- let's pick February 10, 2020, a little
12  more than a year ago; do you have any memory
13  before February 10 or 2020 seeing James do
14  anything at a SIPB meeting that you thought was
15  inappropriate?
16  A.  **There may have been.  I don't recall any**
17  **specifics.**
18  Q.  Did anybody -- you became the Chair on
19  February 17; is that correct?
20  A.  **I don't remember the specific date which**
21  **I became the Chair.**
22  Q.  Were you -- do you remember if you were
23  elected to the Chair but didn't take office for a
24  couple of weeks later?

*COPLEY COURT REPORTING, INC.*

**18**

1  A.  **I believe the procedure is there is an**
2  **election on a Monday and the subsequent Chair**
3  **becomes formally the Chair and not Chair-elect**
4  **upon the start of the subsequent meeting.**
5  **I believe that is the procedure.  We'd**
6  **need to double check the Constitution to be**
7  **absolutely certain.**
8  Q.  What's the Constitution?
9  A.  **The SIPB Constitution.**
10  Q.  Okay.  And that -- how long has SIPB been
11  in existence?
12  A.  **I believe a little more than 50 years.**
13  Q.  And counting alumni and undergraduates
14  and graduate students, how many people would you
15  estimate are members at the present time?
16  A.  **I'm not certain.**
17  Q.  Or associated in any way, if you know?
18  A.  **I -- I'm not certain of a specific**
19  **number.**
20  Q.  Do you have any knowledge of how many
21  people receive e-mails that go out to the SIPB
22  office group?
23  A.  **What do you mean by "information"?**
24  Q.  E-mails, like if -- if you were to send

*COPLEY COURT REPORTING, INC.*

**19**

1  an e-mail to the SIPB office today, how many
2  people would get it, if you know?
3  A.  **I'm not sure of the specific number of**
4  **people.**
5  Q.  Would you say it's more than a hundred?
6  A.  **It may be.  I would need to check.**
7  Q.  Okay.  And could you check that by
8  looking at data on a computer, correct?
9  A.  **Not necessarily.**
10  Q.  Okay.  Well, I'm not the computer
11  scientist here.  There's an easy way to check
12  that, true?
13  A.  **Not quite.  Many e-mails potentially on**
14  **that list are expired so you need to prune all of**
15  **the expired ones at minimum.**
16  Q.  And does the SIPB office e-mail include,
17  let's say as of March 2020, did it include
18  prospectives?
19  A.  **Can you clarify what is meant by the term**
20  **prospective?**
21  Q.  I was going to ask you.  How is the term
22  prospectives used by SIPB?
23  A.  **I believe the term was outdated as of**
24  **several years ago.**

*COPLEY COURT REPORTING, INC.*

**20**

1  Q.  You were still using it in -- last year,
2  weren't you?
3  A.  **No, as of last year we were not using the**
4  **term prospective.  We were using the term member.**
5  Q.  Have you looked at your e-mails in this
6  case?
7  A.  **What do you mean?**
8  Q.  You've disclosed 500 pages of documents.
9  Have you looked at them?
10  A.  **I have.  I have the ones you requested**
11  **right here (indicating).**
12  Q.  Have you seen people in the e-mails, the
13  e-mail trails, SIPB members talking about
14  prospectives in 2020?
15  A.  **Um, there may have been a reference to an**
16  **outdated term prospective.  Specifically, I**
17  **recall a discussion in which an alumni who was**
18  **unfamiliar with the change of terminology from**
19  **prospective to member being clarified by a**
20  **subsequent person saying that the term had been**
21  **changed and it is in reference to member; not**
22  **prospective.  So that is what I recall as of the**
23  **use.**
24  Q.  Is a SIPB member as of March 2020 anyone

*COPLEY COURT REPORTING, INC.*

**Page 33**

1    A.   There may have been something negative
2    but I don't recall any specific comments.
3    Q.   I don't mean to interfere, but if you say
4    no, that works. How about Jay Medeira; did he
5    say anything about Koppel.
6    A.   I don't recall.
7    Q.   Miriam Rittenberg; did she have anything
8    to say about Koppel on February 10th?
9    A.   I don't recall any specific comment from
10   Miriam on that day.
11   Q.   Someone whose last name is Theng,
12   T-H-E-N-G; do you remember that person?
13   A.   I believe I know who you're referring to.
14   Q.   M. Theng; do you know who that is?
15   A.   I believe so.
16   Q.   Could you share with us who?
17   A.   I believe, and I could be wrong here, but
18   Mark Theng.
19   Q.   Did Mark Theng say anything about Koppel
20   that you can recall?
21   A.   I don't recall anything.
22   Q.   Was somebody named Ben Stefan who goes by
23   Mitch B; was he present?
24   A.   I don't believe there is someone named

COPLEY COURT REPORTING, INC.

**Page 34**

1    Ben Stefan who goes by Mitch B.
2    Q.   Oh, Mitch Berger; was Mitch Berger
3    present?
4    A.   I don't recall if that person was
5    present.
6    Q.   Sorry if I asked, but do you recall if
7    Ben Stefan saying anything?
8    A.   I don't recall if Ben Stefan said
9    anything.
10   Q.   Was Koppel present for part of this
11   meeting?
12   A.   I don't recall.
13   Q.   Was any of the discussion on February 10
14   conducted in the presence of Koppel?
15       MR. PYLE: Object to the form.
16   Q.   You can answer, sir.
17   A.   Can you clarify the question?
18   Q.   Yeah. Do you remember anything on
19   February 10 being said while Koppel was present
20   about Koppel?
21   A.   I do not recall. To clarify as well, I
22   do not recall if Koppel was present.
23   Q.   Okay. Do you recall one way or the other
24   whether you were elected Chair on February 17th?

COPLEY COURT REPORTING, INC.

**Page 35**

1    A.   I recall my election for Chair. I don't
2    recall if that was the specific date.
3    Q.   Did anyone else -- was anyone else
4    nominated for Chair at the time you were elected?
5    A.   Nate may have been nominated Chair but I
6    don't recall specifically.
7    Q.   And there was a vote?
8    A.   I believe there was a vote.
9    Q.   And you won, correct?
10   A.   I believe I won, yes.
11   Q.   Who was elected Vice Chair; do you
12   remember?
13   A.   Georgia Shea.
14   Q.   In the time that you've been a member of
15   SIPB and including the time that you were a key
16   holder, was it the normal process to become a key
17   holder that someone would nominate a member and
18   it would get discussed and voted up yes or no?
19   Is that the normal process?
20   A.   That is a part of the process.
21   Q.   Is it fair to say that Koppel was never
22   nominated for key holder, true?
23   A.   I do not recall him ever being nominated
24   for key-holdership.

COPLEY COURT REPORTING, INC.

**Page 36**

1    Q.   And is it fair to say that, without
2    getting into too much nuance, as of about
3    February 27th by reason of a conversation with --
4    between you and Koppel, you informed him that he
5    was not welcome to be a member; is that correct?
6       MR. PYLE: Object to the form. You
7    can answer.
8    A.   I believe I informed Koppel that the
9    Executive Committee would like to ask him to
10   disengage. No formal specifics.
11       THE WITNESS: Hold on while I get
12   some water.
13   Q.   How long on February 27th -- you had a
14   person to person conversation with Koppel, right?
15   A.   I recall an in-person discussion with
16   Koppel.
17   Q.   And it was about 50 minutes let's say,
18   plus or minus?
19   A.   I don't recall the specific duration.
20   Q.   Was it -- you think it might have been
21   five minutes?
22   A.   I believe it was longer than five
23   minutes.
24   Q.   And what do you remember you saying and

COPLEY COURT REPORTING, INC.

Page 37

1 what do you remember him saying?
2    A.   I recall letting Koppel know on behalf of
3 the Executive Committee that we had received
4 reports of him making people uncomfortable. I
5 also recall informing him that it was unlikely
6 that Koppel would be nominated for
7 key-holdership. I also recall mentioning to
8 Koppel that in light of various circumstances, we
9 would like to request that he disengage, simply
10 request; no formal specific actions.
11    Q.   No formal specific actions by the -- by
12 whom, by the Executive Committee?
13    A.   The Executive Committee did not take
14 formal actions at the time.
15    Q.   Well, the Executive Committee had
16 authorized you to go speak to Koppel, correct?
17    A.   Yes.
18    Q.   So when you met with Koppel you told him
19 the Executive Committee would be taking -- other
20 than your person to person conversation -- you
21 did not think the Executive Committee was going
22 to take any further steps?
23    A.   What do you mean by "further steps"?
24    Q.   Further steps to make sure that he

Page 38

1 disengaged, for example.
2    A.   Can you clarify a little bit more?
3    Q.   Well, backtrack. You requested he
4 disengage, correct?
5    A.   On behalf of the Executive Committee I
6 told him it would be best if he disengage.
7    Q.   And did he say yes, I agree to disengage?
8    A.   I believe he requested more information,
9 but he agreed to disengage.
10    Q.   And did you tell him if he disengaged the
11 Executive Committee would take no further action?
12    A.   I don't recall a specific statement of
13 that sort.
14    Q.   Did Koppel in this meeting ask you how he
15 had made people uncomfortable?
16    A.   He may have.
17    Q.   Did you tell him any instances of how he
18 had made people uncomfortable?
19    A.   People asked me to be anonymous and as a
20 consequence, I told him I was refraining from
21 giving specifics.
22    Q.   When you had this February 27 meeting, is
23 it fair to say you were telling Koppel of reports
24 that he had made SIPB members uncomfortable as

Page 39

1 opposed to making somebody on the street
2 uncomfortable?
3    A.   I believe I mentioned to Koppel that SIPB
4 members had made reports of being made
5 uncomfortable.
6    Q.   All right. Did some SIPB members report
7 that he had made them uncomfortable at SIPB
8 meetings?
9    A.   I do not recall specifically at a SIPB
10 meeting at the time.
11    Q.   Did you tell Koppel in this meeting
12 anything about the Zephyr communications?
13    A.   I may have.
14    Q.   You told him in substance that some of
15 his postings were viewed as sexist or
16 inappropriate?
17    A.   I don't recall specifically how or if I
18 referred to it.
19    Q.   In talking to Koppel, saying -- you told
20 him there -- you had reports from SIPB members
21 that he made them uncomfortable. Were the Zephyr
22 posting one of the things that you included in
23 the concept of a report?
24    A.   I would consider a report of the Zephyr

Page 40

1 comments to be one of the reasons.
2    Q.   And similarly, were the reports of things
3 posted on Lily Chin's blog, were those one of the
4 things that had made members uncomfortable?
5         MR. PYLE: Object to the form. You
6 can answer.
7    A.   Can you clarify the question?
8         MR. BOYLAN: Can you read it back?
9         THE COURT REPORTER: *"And similarly,
10 were the reports of things posted on Lily Chin's
11 blog, were those one of the things that had made
12 members uncomfortable"*.
13    A.   Yeah, so I still would like clarification
14 of the question.
15    Q.   Well, okay. So Koppel posted on Lily
16 Chin's blog, correct, from time to time?
17    A.   I believe Koppel posted on her Zephyr
18 Class, which is linked to Discord but it's
19 distinct from her blog.
20    Q.   When I refer to Lily Chin, we understand
21 that's the thing I'm talking about, whatever you
22 just described.
23    A.   Not completely.
24    Q.   Okay. You're having trouble with that?

COPLEY COURT REPORTING, INC.

Page 77

1  along -- this person didn't want you to share his
2  entire e-mail, but you sent it to everybody on
3  the SIPB private. You sent everybody a part of
4  his e-mail that included the phrase "viscerally
5  afraid". Do you remember doing that?
6     A.  **I did not, I believe, receive an e-mail**
7  **from William Qian. I may have received a**
8  **different form of communication.**
9     Q.  A form of words that you passed on,
10 correct?
11    A.  **I, upon his request, forwarded a set of**
12 **words.**
13    Q.  A set of words and the words included
14 "viscerally afraid", correct?
15    A.  **Um, it may have. I would need to check**
16 **the document.**
17    Q.  Okay. I'm sure we can find it. Did it
18 cross your mind in forwarding that excerpt from
19 that text that the phrase "viscerally afraid" was
20 inflammatory?
21    A.  **I -- I simply forwarded the text as**
22 **requested. I was not the author of the text.**
23    Q.  Well, you asked permission to forward it
24 and that's the part you selected to forward?

COPLEY COURT REPORTING, INC.

Page 78

1     A.  **No. Specifically I recall -- I recall**
2  **Will asking me to forward text on his behalf.**
3     Q.  That's your memory?
4     A.  **That is my memory.**
5     Q.  And you thought sending something to the
6  whole group -- by the way -- sorry. How many
7  people were on SIPB private at the time on
8  February 26, February 27?
9     A.  **I do not recall the specific number.**
10    Q.  It's more than a hundred, isn't it?
11    A.  **It may be more than a hundred.**
12        MR. BOYLAN: Can we go off the
13 record. Just turn off the audio for a second.
14        (A brief recess was taken.)
15    Q.  Would you go to -- we're at Exhibit 1.
16 Sorry. Let's just compare. Is Exhibit 1 very
17 similar to Exhibit 5, if not word for word?
18    A.  **Let me find Exhibit 5. It is not word**
19 **for word the same as Exhibit 5.**
20    Q.  Okay. A lot of it is similar, correct?
21 It's a revision?
22    A.  **There are parts of the text that are**
23 **shared between the two.**
24    Q.  Okay. Do you recall that Exhibit 5 --

COPLEY COURT REPORTING, INC.

Page 79

1  well, it says sent on Thursday, February 27,
2  correct?
3     A.  **It says sent on Thursday, yes.**
4     Q.  And do you know if March 2 was a Monday?
5     A.  **I believe it may have been a Monday.**
6     Q.  And were you in Denver over the weekend?
7     A.  **I believe I was in Denver at one point**
8  **around that time.**
9     Q.  And is it fair to say between Thursday at
10 6 p.m. and Monday -- we'll call it Monday,
11 whatever March 2 is, at 7 p.m., 7:23 time, a
12 decision was made to send this e-mail about
13 Koppel to SIPB office, correct?
14    A.  **I believe there was a discussion in the**
15 **Executive Committee to send an e-mail.**
16    Q.  Did you -- did you take part in that
17 discussion?
18    A.  **I believe I asked the Executive Committee**
19 **if and where an e-mail should be sent.**
20    Q.  And were you instructed to send this to
21 SIPB office?
22    A.  **I believe that is what the Executive**
23 **Committee said to do.**
24    Q.  Is that in some e-mail that you

COPLEY COURT REPORTING, INC.

Page 80

1  disclosed, those instructions?
2     A.  **I believe there is a Mattermost thread.**
3     Q.  If you don't mind, I refer to all these
4  e-mails and texts, Zephyr -- bear with me if I
5  just call them e-mails.
6     A.  **I will clarify for you, but go ahead.**
7     Q.  Okay. Was the -- was there any
8  discussion before the sending of the e-mail on
9  February 27 of keeping the name Koppel, J.
10 Koppel, keeping his name out of the e-mail; just
11 saying somebody was doing these things. Was that
12 discussed?
13    A.  **I recall a discussion of whether or not**
14 **to include the name.**
15    Q.  Okay. And did you say we can't include
16 the name; this has got to be kept confidential?
17    A.  **Apologies. Can you repeat the question?**
18    Q.  Did you take the position that his name
19 should not be mentioned; that it need not be
20 mentioned?
21    A.  **I recall being unsure whether or not the**
22 **name should be mentioned.**
23    Q.  Anyway, you sent the e-mail on February
24 27 that did mention his name, correct?

COPLEY COURT REPORTING, INC.

## Page 77

1  along -- this person didn't want you to share his
2  entire e-mail, but you sent it to everybody on
3  the SIPB private. You sent everybody a part of
4  his e-mail that included the phrase "viscerally
5  afraid". Do you remember doing that?
6     A.  **I did not, I believe, receive an e-mail**
7  **from William Qian. I may have received a**
8  **different form of communication.**
9     Q.  A form of words that you passed on,
10  correct?
11     A.  **I, upon his request, forwarded a set of**
12  **words.**
13     Q.  A set of words and the words included
14  "viscerally afraid", correct?
15     A.  **Um, it may have. I would need to check**
16  **the document.**
17     Q.  Okay. I'm sure we can find it. Did it
18  cross your mind in forwarding that excerpt from
19  that text that the phrase "viscerally afraid" was
20  inflammatory?
21     A.  **I -- I simply forwarded the text as**
22  **requested. I was not the author of the text.**
23     Q.  Well, you asked permission to forward it
24  and that's the part you selected to forward?

## Page 78

1     A.  **No. Specifically I recall -- I recall**
2  **Will asking me to forward text on his behalf.**
3     Q.  That's your memory?
4     A.  **That is my memory.**
5     Q.  And you thought sending something to the
6  whole group -- by the way -- sorry. How many
7  people were on SIPB private at the time on
8  February 26, February 27?
9     A.  **I do not recall the specific number.**
10     Q.  It's more than a hundred, isn't it?
11     A.  **It may be more than a hundred.**
12        MR. BOYLAN: Can we go off the
13  record. Just turn off the audio for a second.
14        (A brief recess was taken.)
15     Q.  Would you go to -- we're at Exhibit 1.
16  Sorry. Let's just compare. Is Exhibit 1 very
17  similar to Exhibit 5, if not word for word?
18     A.  **Let me find Exhibit 5. It is not word**
19  **for word the same as Exhibit 5.**
20     Q.  Okay. A lot of it is similar, correct?
21  It's a revision?
22     A.  **There are parts of the text that are**
23  **shared between the two.**
24     Q.  Okay. Do you recall that Exhibit 5 --

## Page 79

1  well, it says sent on Thursday, February 27,
2  correct?
3     A.  **It says sent on Thursday, yes.**
4     Q.  And do you know if March 2 was a Monday?
5     A.  **I believe it may have been a Monday.**
6     Q.  And were you in Denver over the weekend?
7     A.  **I believe I was in Denver at one point**
8  **around that time.**
9     Q.  And is it fair to say between Thursday at
10  6 p.m. and Monday -- we'll call it Monday,
11  whatever March 2 is, at 7 p.m., 7:23 time, a
12  decision was made to send this e-mail about
13  Koppel to SIPB office, correct?
14     A.  **I believe there was a discussion in the**
15  **Executive Committee to send an e-mail.**
16     Q.  Did you -- did you take part in that
17  discussion?
18     A.  **I believe I asked the Executive Committee**
19  **if and where an e-mail should be sent.**
20     Q.  And were you instructed to send this to
21  SIPB office?
22     A.  **I believe that is what the Executive**
23  **Committee said to do.**
24     Q.  Is that in some e-mail that you

## Page 80

1  disclosed, those instructions?
2     A.  **I believe there is a Mattermost thread.**
3     Q.  If you don't mind, I refer to all these
4  e-mails and texts, Zephyr -- bear with me if I
5  just call them e-mails.
6     A.  **I will clarify for you, but go ahead.**
7     Q.  Okay. Was the -- was there any
8  discussion before the sending of the e-mail on
9  February 27 of keeping the name Koppel, J.
10  Koppel, keeping his name out of the e-mail; just
11  saying somebody was doing these things. Was that
12  discussed?
13     A.  **I recall a discussion of whether or not**
14  **to include the name.**
15     Q.  Okay. And did you say we can't include
16  the name; this has got to be kept confidential?
17     A.  **Apologies. Can you repeat the question?**
18     Q.  Did you take the position that his name
19  should not be mentioned; that it need not be
20  mentioned?
21     A.  **I recall being unsure whether or not the**
22  **name should be mentioned.**
23     Q.  Anyway, you sent the e-mail on February
24  27 that did mention his name, correct?

COPLEY COURT REPORTING, INC.