# EXHIBIT 3

**James Koppel**
**Confidential**

1

Volume:  I

Pages:  1-292

Exhibits:  1-34

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No. 20-cv-11479-LTS

- - - - - - - - - - - - - - - - - - - x

JAMES KOPPEL,

Plaintiff,

vs.

WILLIAM MOSES,

Defendant.

- - - - - - - - - - - - - - - - - - - x

THIS TRANSCRIPT CONTAINS CONFIDENTIAL INFORMATION

VIDEOTAPED DEPOSITION OF JAMES KOPPEL

Monday, July 25, 2022

Price Lobel Tye LLP

One International Place

Boston, Massachusetts

10:04 a.m. to 5:03 p.m.

Reporter:  Karen A. Morgan, CSR/RPR

Page 10

1  Q.   Any unofficial?
2  **A.   In computer science I took a lot of**
3  **courses in program language and in mathematics I**
4  **took a lot of courses in analysis.**
5  Q.   After you obtained degrees from Carnegie
6  Mellon, what did you do next with regard to your
7  education?
8  **A.   Are you asking what I did after I**
9  **graduated or like my next formal schooling?**
10  Q.   What was your next formal schooling?
11  **A.   I came to MIT in 2015.**
12  Q.   What time of year in 2515 did you enroll
13  at MIT?
14  **A.   Winter.**
15  Q.   And have you since graduated from MIT?
16  **A.   I have.**
17  Q.   When did you graduate?
18  **A.   My diploma says September of 2021 on it.**
19  Q.   And what degree did you get from MIT?
20  **A.   I obtained two degrees.  I obtained an FM**
21  **in computer science and a Ph.D. in computer science.**
22  Q.   And did you prepare a dissertation in
23  connection with your Ph.D. program?
24  **A.   I did.**

Page 11

1  Q.   What was the subject of that dissertation?
2  **A.   Programming languages.**
3  Q.   Could you be more specific?
4  **A.   The construction of program analysis and**
5  **synthesis --**
6     MR. BOYLAN: Speak a little bit more
7  slowly.
8  **A.   My thesis was on the construction of**
9  **program analysis, synthesis and transformation**
10  **tools.**
11  Q.   What was the title of your thesis -- of
12  your dissertation?
13  **A.   The title of my thesis was**
14  **meta-metaprogramming.**
15  Q.   What does that mean?
16  **A.   Metaprogramming is a type of programming**
17  **about program generation and program tooling.**
18  **Meta-metaprogramming was a term that I used to**
19  **describe studying that process, trying to generate**
20  **metaprograms, trying to make them more efficient.**
21  Q.   Are there practical applications to that
22  kind of programming?
23  **A.   Yes.**
24  Q.   What are some practical applications?

Page 12

1  **A.   Reducing the cost of building programming**
2  **tools and making them more general.**
3  Q.   How was your thesis received?
4  **A.   I heard it called impressive.**
5  Q.   Good.
6     **MR. PYLE:** I would like to mark this
7  document as our first exhibit.
8     (Exhibit 1 was marked for
9     identification.)
10  Q.   Mr. Koppel, do you recognize the document
11  that's been put before you?
12  **A.   I do.**
13  Q.   What is it?
14  **A.   It appears to be my CV.**
15  Q.   And can you tell me if this is the most
16  recent CV that you have produced in this case?
17  **A.   I don't recall.**
18  Q.   Okay.  In any event it does include that
19  you have obtained your Ph.D. in computer science so
20  it is at least of September 2021 vintage?
21  **A.   Yes.**
22  Q.   Okay.  I would like to talk about a few
23  entries on this CV with you if I could.
24  **A.   Okay.**

Page 13

1  Q.   What is the Institute for Professional
2  Excellence in Coaching?
3  **A.   They're a coaching organization.**
4  Q.   And do they provide certifications?
5  **A.   Yes.**
6  Q.   How do you obtain a -- become a -- strike
7  that.  Do you become a certified coach by IPEC?
8  **A.   The main certification is from the**
9  **International Coaching Federation.  IPEC has their**
10  **own credential but you get it in the process of**
11  **pursuing a certification from the ICF.**
12  Q.   What's ICF?
13  **A.   The International Coaching Federation.**
14  Q.   And did you become a certified
15  professional coach with IPEC or an associated
16  certified coach with ICF?
17  **A.   Yes.  I became -- I got a CPC, certified**
18  **professional coach, certification from IPEC and an**
19  **ACC, associate certified coach, from the ICF.**
20  Q.   Why did you obtain those certifications?
21  **A.   Because I wanted to become a professional**
22  **coach.**
23  Q.   And are you now a professional coach?
24  **A.   By many definitions, yes.**

Page 222

1  Q.  Do you have any --
2  A.  Yes.
3  Q.  -- idea why you felt that way?
4  A.  Yes.
5  Q.  Please tell me.
6  A.  That's like the immense coldness of like
7  her seeming not to care.  Like I thought she had
8  been a friend to me and I thought I was important to
9  her and she seems not to care about what happens and
10  it's like I felt like I never existed in her life
11  and that she was not bothered at all.
12  Q.  It bothers you even to this today, doesn't
13  it?
14      MR. BOYLAN: Objection.
15  A.  It was a very painful time.
16  Q.  Is it still painful?
17      MR. BOYLAN: Objection.
18  A.  When I think about it as you can see.
19  Q.  You say in this text message, I'd really
20  like things to be okay between us but this will take
21  an active effort.  Would you be willing to come talk
22  in the ombuds office.  Do you see that in this
23  document?
24  A.  I'm having trouble focusing my eyes at the

Page 223

1  moment.
2  Q.  Okay.  Take your time.
3      (Witness perused document.)
4  A.  Yes.
5  Q.  And what's the ombuds office?
6  A.  The office of the ombudsperson at MIT.
7  Q.  What does the ombudsperson do?
8  A.  They help others manage conflicts.
9  Q.  Did you feel at this time that you were in
10  a conflict with Chelsea?
11  A.  Yes.
12  Q.  And what was the source of the conflict?
13  A.  That I was afraid of her and I couldn't go
14  to places I wanted to go because I wanted to avoid
15  her.
16  Q.  Was there something that immediately
17  precipitated this text, some interaction?
18  A.  No.
19  Q.  Had she run into you or something like
20  that?
21  A.  Not immediately before this text.
22  Q.  Well, you asked her to go to the
23  ombudsperson and she replies, no, sorry.  In the
24  meantime I have been and am making a deliberate

Page 224

1  attempt to avoid places where I know you hang out.
2  Hope it helps and sorry for the accident just now.
3  A.  Yes.
4  Q.  The accident goes up to the higher
5  position.  It appears there's a misordering of this.
6  What was the accident she was referring to?
7  A.  On that date a few minutes before that
8  message.
9  Q.  On the 20th?
10  A.  Yes.  I had been -- I had been at a group
11  dinner at someone's house and she was not on the
12  invite list but then she just randomly walked in the
13  door in a private house.
14  Q.  So what happened then?
15  A.  I froze.
16  Q.  And?
17  A.  She said hi to some people.
18  Q.  Did she say hi to you?
19  A.  No.
20  Q.  Was she trying to avoid you?
21      MR. BOYLAN: Objection.
22  A.  Apparently not.
23  Q.  Because she showed up?
24  A.  She stayed in the doorway for several

Page 225

1  minutes as I remember it.
2  Q.  What happened next?
3  A.  She left.
4  Q.  You ask her what is your plan for Splash.
5  A.  Mm-mm.
6  Q.  Splash is the ESP event that takes place
7  before Thanksgiving?
8  A.  Yes.
9  Q.  You say, I volunteered to be the Bush Room
10  manager.
11  A.  Yes.
12  Q.  What's that?
13  A.  It was renamed around that time to moving
14  manager.
15  Q.  Moving manager?
16  A.  Yes, set up and teardown.
17  Q.  Set up and teardown of the facilities for
18  the event?
19  A.  Yes.
20  Q.  And what is the Bush Room?
21  A.  It's a large multipurpose room at MIT.
22  Q.  And would ESP members gather there?
23  A.  During Splash and Spark it traditionally
24  functions as the teachers' lounge and the base of

Case 1:20-cv-11479-LTS   Document 129-3   Filed 01/23/23   Page 5 of 55
Koppel v.
Moses
Confidential
James Koppel
July 25, 2022

Page 226

1  operations.
2  Q.  Chelsea was part of ESP, was she?
3  A.  At this time, no.
4  Q.  At this time, no, but she had been?
5  A.  Yes.
6  Q.  She had graduated in 2015; right?
7  A.  Yes.
8  Q.  But you're asking her what is your plan
9  for Splash.  Why were you asking that question?
10  A.  I knew that she either was or would likely
11  to be a registered teacher.
12  Q.  Alums continue sometimes to participate in
13  ESP activities?
14  A.  You could be an ESP teacher if you wanted
15  to and yes.
16  Q.  Okay.  And Chelsea had participated as a
17  teacher after graduating, had she?
18  A.  Yes.
19  Q.  You say in this text going up to the top
20  of this page when she says she's been making an
21  attempt to avoid places where I know you will hang
22  out, you respond in part, to be honest based on how
23  you've treated me in the past I never expected you
24  to agree to anything like this, this being avoiding

Page 227

1  places where I hang out.  What did you mean by that?
2  A.  I mean that I had perceived her in the
3  recent past to be very cold and uncompromising and
4  to not take other people's feelings into
5  consideration.
6  Q.  What was that based on?
7  A.  I don't remember everything it's based on.
8  Q.  Well, is it based on her being at places
9  where you were going to be?
10  A.  In part.
11  Q.  What else?
12  A.  Things that happened during the
13  relationship.
14  Q.  Prior to the EA Global events?
15  A.  Yes.
16  Q.  I want to be clear I'm not going to ask
17  questions about your prior relationship.
18  A.  Okay.
19  Q.  That's not my intent.
20  A.  Thank you.
21  Q.  And she responds, I didn't know you wanted
22  it until now.  What is she referring to there?
23  A.  I believe she perceives that I wanted some
24  physical distance with her.

Page 228

1  Q.  She says, as regards to Splash, I want you
2  to be comfortable being Bush Room leader but I would
3  also be grateful for the opportunity to socialize
4  with alums.  Do you see that?
5  A.  Yes.
6  Q.  Okay.  You respond by saying you didn't
7  know that you wanted to be distant from her until a
8  few weeks ago I gather.
9  A.  Mm-mm.
10  Q.  You're currently in the bathroom trying to
11  regain your calm and you say, what really pushed me
12  over the edge is that I interpreted your behavior
13  around me the last few times I saw you as an
14  indication you didn't care about what's happened
15  between us.  What did you mean by that?
16  A.  I believe I meant that she knows she hurt
17  me badly and she didn't care about it at all.
18  Q.  And from what did you derive that
19  interpretation?
20  A.  It's like doing things that I would expect
21  someone who has hurt their ex badly would not do in
22  the same room as their ex.
23  Q.  Such as?
24  A.  Talking about her sex life with her new

Page 229

1  boyfriend right in front of me.
2  Q.  What else caused you to have this
3  interpretation?
4  A.  That's the one that stands out the most.
5  Not because it was the most painful.  Because it was
6  the most weird.
7  Q.  She then she says she's tapping out of the
8  conversation and that occurs at 8:19 p.m. on
9  October 20th.  Fair to say that about six days later
10  you respond to her by informing her you want to
11  start hanging out at LW and ET again.  Do you see
12  that?
13  A.  Yes.
14  Q.  What's LW?
15  A.  LW stands for Less Wrong.
16  Q.  What is Less Wrong?
17  A.  It's a website.
18  Q.  And when you say hanging out at LW, what
19  does that mean?
20  A.  I mean attending meet-up groups and events
21  with people who are on the website.
22  Q.  Why were you telling her that that was
23  your plan?
24  A.  Because I did not feel safe going to

Page 230

1  either because I was afraid of running into her and
2  I wanted to.  They both meant a lot to me.
3  Q.  Was she a Less Wrong fan?
4  A.  Yes.
5  Q.  And she had been to meet-ups like that
6  before?
7  A.  Yes.
8  Q.  What is ET?
9  A.  Stands for Epsilon Theta.
10  Q.  Is it a living house?
11  A.  Yes.
12  Q.  Okay.  Sort of like the MIT version of a
13  fraternity or a sorority?
14  A.  No.
15  Q.  Is it an independent living group?
16  A.  Yes.
17  Q.  What does that mean?
18  A.  It means it's a living group that is not a
19  fraternity or a sorority.  It might have a more
20  specific definition but that's a good working
21  definition.
22  Q.  And was Chelsea Voss part of ET?
23  A.  No.
24  Q.  Had she been in the past?

Page 231

1  A.  No.
2  Q.  So why were you letting her know that you
3  were going to go to ET?
4  A.  Because she sometimes attended events and
5  I sometimes attended events there but I stopped
6  because I was afraid of her.
7  Q.  She responds later that day by saying she
8  wants to start hanging out at ESP again but she
9  hasn't been to any meetings because she's physically
10  uncomfortable around you.  Do you see that?
11  A.  I do.
12  Q.  And she proposes that you both go where
13  you want to go and that you just don't interact with
14  each other.  Do you see that?
15  A.  I do see that.
16  Q.  Okay.  You write, wow.  Sorry.  I didn't
17  realize.  What did you mean by that?
18  A.  It was the first time I had heard any
19  claim or reason to believe that she felt
20  uncomfortable around me.
21  Q.  And why did you say I'm sorry?
22  A.  Because she said something that was
23  apparently -- that she claimed that she was hurt in
24  some way and it was caused by me so it's a nice

Page 232

1  thing to do.
2  Q.  You say on the next page that you've been
3  hurt so badly you can't agree that the two of you go
4  and do your own events but not interact with each
5  other and you again raise the ombuds office.  She
6  then responds as, quote, I'm not opposed to you
7  being at a place I'm at but the way you were
8  touching me at EA Global made me uncomfortable
9  interacting with you.  Do you see that?
10  A.  I do see that.
11  Q.  What was your reaction to receiving that
12  text?
13     MR. BOYLAN: Objection.
14  A.  I don't remember what my emotions were at
15  first.  I think I quickly realized that she was
16  probably playing some kind of trick on me.
17  Q.  So if I ask you what was your reaction to
18  that, would you say fear was one of your reactions?
19     MR. BOYLAN: Objection.
20  A.  It was more like doubting my sanity and
21  doubting everything that happened the last few
22  months.
23  Q.  Why were you doubting your sanity?
24  A.  Because like I have a story that she

Page 233

1  treated me in a way that me uncomfortable around her
2  and that she didn't care at all, that she was
3  perfectly happy being around me but she just
4  pretended I didn't exist.  Now she's claiming
5  something totally otherwise that's all my fault.
6  Q.  When you said, I'm sorry.  I didn't
7  realize.
8     MR. BOYLAN: Objection.
9  Q.  Was that part of your reaction to thinking
10  you might have done something wrong?
11     MR. BOYLAN: Objection.
12  A.  Like it's a nice thing to do.  She's
13  claiming I did something wrong or she implies
14  something's wrong.  I didn't know what.  So whatever
15  it is even if I don't know what it is, I still
16  apologize because it's the right thing to do
17  without knowing what the heck I possibly did.
18  Q.  All right.  Well, looking to your
19  immediately response to her text about you touching
20  her, your reaction was, I don't see your words and
21  actions lining up nor does this fit my memory of
22  what happened.  What did you mean by that?
23  A.  I mean that her behavior that I had seen
24  since EAG is not at all consistent with what she had

Page 234

```
1    been saying just now and I could not think of any
2    conceivable touching incident that could possibly
3    explain this message.
4    Q.  Well, you didn't say what are you talking
5    about?  I never touched you, did you?
6        MR. BOYLAN: Objection.
7    A.  That would be a lot more rude than what I
8    said.  That would be a much more rude way to put it.
9    Q.  Well, would it have been true?
10   A.  Can you repeat again what you want to say?
11   Q.  You didn't respond, what are you talking
12   about?  I never touched you at EA Global.
13   A.  She hugged me.  I hugged her back.
14   Q.  Okay.  And you write on the next page, I
15   don't know if you're being earnest or manipulative.
16   A.  Mm-mm.
17   Q.  And then -- well, what did you mean by
18   that?
19   A.  I meant that I didn't know if she was
20   being earnest or manipulative.
21   Q.  You didn't know one way or the other
22   whether you made her uncomfortable?
23   A.  I don't know if she actually believed what
24   she was saying or if she was trying to manipulate
```

Page 235

```
1    me.
2    Q.  Either explanation was possible and you
3    didn't know which one it was.
4        MR. BOYLAN: Objection.
5    A.  I became increasingly convinced over time
6    that she was being manipulative.
7    Q.  Okay.  But I'm asking about your feeling
8    right now when you said, I don't know if you're
9    being earnest or manipulative.
10   A.  Right now --
11       MR. BOYLAN: When?
12       MR. PYLE: I'm sorry.  As of the
13   date of the date of the text which is October 26,
14   2016.
15   A.  Well, I can tell from this that I'm
16   thinking a lot of negative thoughts about her and
17   holding them back so I would know what I was
18   actually thinking.
19   Q.  Well, when you say she's possibly being
20   manipulative, are you really holding back your
21   negative thoughts?
22   A.  Yes.
23   Q.  Okay.  What were your negative thoughts
24   when you wrote that?
```

Page 236

```
1        MR. BOYLAN: Objection.
2    A.  That she was taking delight in my pain.
3    Q.  What else?
4    A.  That she's just like a very cold human
5    person.
6    Q.  What did you mean when you said, I don't
7    know if that's how you feel or you're trying to make
8    me feel guilty?
9    A.  I mean that one explanation for what she
10   says is that she actually believed what she was
11   saying.  She felt that that was right and another
12   explanation is that it was part of her tricks to
13   make me feel guilty and continue to scare me away
14   from going places.
15   Q.  Aren't you saying I don't know if I really
16   made you feel uncomfortable or whether the touching
17   that I did on you at EA Global was welcome?
18       MR. BOYLAN: Objection.
19   A.  I would not endorse that phrasing.
20   Q.  Well, what did you mean by trying to make
21   you feel guilty?  What did you have to be guilty of?
22   A.  I don't know.  Whatever unspecified
23   touching I did that I could not identify.
24   Q.  Well, she said there was touching that
```

Page 237

```
1    made her feel uncomfortable; yes?
2    A.  No.
3    Q.  Previously she said, the way you were
4    touching me at EA Global made me uncomfortable
5    interacting with you.  Do you see that?
6    A.  Yes.
7    Q.  Okay.  Why didn't you ask her to specify
8    what she was talking about?
9        MR. BOYLAN: Objection.
10   A.  I don't know.  I don't recall.
11   Q.  Was it because you knew what she was
12   talking about --
13   A.  No.
14   Q.  -- and you just didn't know why she was
15   reacting this way?
16   A.  Absolutely not.  That's false.
17   Q.  You write, if I made you uncomfortable,
18   I'm sorry.  Do you see that?
19   A.  Yes.
20   Q.  What did you mean by that?
21   A.  If you hurt someone but you have no idea
22   how, it's a nice thing to do to apologize even
23   though you have no idea what you've done.
24   Q.  But you did know how she said you hurt
```

Page 238

1 her, didn't you?
2 　　MR. BOYLAN: Objection.
3 Q.　She said that you touched her in a way
4 　that made her feel uncomfortable, didn't she?
5 　　MR. BOYLAN: Objection.
6 A.　I had no idea what she was referring to.
7 Q.　Well, it seems to be reading the text
8 　message in its entirety is that it's understood what
9 　happened between the two of you, isn't it, because
10 　you didn't say what are you talking about.
11 　　MR. BOYLAN: Objection.
12 A.　I have no clue where you're getting that
13 　from.
14 Q.　I'm getting that from the fact that you
15 　never asked her in what way did I touch you that
16 　made you feel uncomfortable.
17 　　MR. BOYLAN: Objection.
18 A.　Okay.
19 　　MR. BOYLAN: Wait for a question,
20 　please.
21 Q.　Why would you feel compelled to apologize
22 　for hugging her back after she hugged you?
23 　　MR. BOYLAN: Objection.
24 A.　I had no idea what I was apologizing for.

Page 239

1 　All I know is she claimed that I had hurt her in
2 　some way.  I didn't know how and it was the nice
3 　thing to do and I was clearly trying to be the nice
4 　guy in this conflict.
5 Q.　On the next page you say that you're not
6 　in a mental state to give a better apology though
7 　I'd like to if you really want one.  What did you
8 　have in mind there?
9 A.　That when I was feeling better, she could
10 　explain what I did wrong and I could apologize.
11 Q.　But you never followed up and asked her.
12 A.　Never got the chance.
13 Q.　No?
14 A.　Never got the chance.
15 Q.　Well, she asked you eventually after this
16 　long string of texts from you to stop interacting
17 　with her in person and to stop texting her or
18 　sending communications; right?
19 A.　Yes.
20 Q.　And you wrote back that you considered
21 　that a promise by her not to interact with you; is
22 　that correct?
23 A.　Yes.
24 Q.　By the way, what communication platform is

Page 240

1 　this?
2 A.　SMS.
3 Q.　SMS text messages?
4 A.　Mm-mm.
5 Q.　I would like you to just note the time of
6 　that last text message on the last page of this
7 　exhibit.
8 A.　Okay.
9 Q.　1:59 p.m. where she says do not interact
10 　with me in person and then we'll turn to the next
11 　document.
12 　　(Exhibit 31 was marked for
13 　identification.)
14 Q.　Who is this a conversation with?
15 A.　It's a conversation with Elliott Jin.
16 Q.　Who is Elliott Jin?
17 A.　He is a software engineer.
18 Q.　Is he an MIT person?
19 A.　No.
20 Q.　How do you know Elliott Jin?
21 A.　Former co-worker.
22 Q.　Where were you a co-worker with Elliott
23 　Jin?
24 A.　Apptimize.

Page 241

1 Q.　Is that the startup you joined prior to
2 　coming to MIT?
3 A.　Yes.
4 Q.　And you write at the top of this page,
5 　Jesus Christ.  I really didn't appreciate how much
6 　danger I might be in.  Do you see that?
7 A.　Yes.
8 Q.　What was that based on?
9 A.　By this point I believe I understood her
10 　to be threatening me.
11 Q.　With her text about making her feel
12 　uncomfortable?
13 A.　Based on that texts and others and the
14 　totality of the situation.
15 Q.　Based on that text and?
16 A.　Everything else that happened the last few
17 　months.
18 Q.　You mean including her showing up at
19 　events and her having given you the cold shoulder at
20 　EAG?
21 A.　Yes.  Her very much showing up around me
22 　as far as I could tell but hadn't claimed to be.
23 Q.　Well, you say she wasn't uncomfortable
24 　with you but you also said that she did not interact

Page 242

1  with you at any point during those few months;
2  right?
3  **A.  She acted like I didn't exist.**
4  Q.  So she wasn't interacting with you.
5  **A.  Correct.**
6  Q.  Is that because you blocked her on
7  Facebook and she knew about it?
8      MR. BOYLAN: Objection.
9  **A.  That explains why she interacted with me**
10 **on Facebook.**
11 Q.  Well, but isn't it true that if you block
12 somebody on Facebook, it means I don't want to be
13 friends with you anymore in real life?
14 **A.  No.**
15     MR. BOYLAN: Objection.
16 Q.  Are you friends with a lot of people who
17 have you blocked on Facebook?
18 **A.  I don't know.**
19 Q.  Okay.  Wouldn't you say in the real world
20 that it sends a message to block a friend of yours
21 on Facebook?
22     MR. BOYLAN: Objection.
23 **A.  That it sends a kind of message.**
24 Q.  Well, it sends a message of I don't want

Page 243

1  to be involved with you anymore.
2      MR. BOYLAN: Objection.
3  **A.  It can be interpreted that way.**
4  Q.  It can be interpreted that way?  I'm
5  sorry?
6  **A.  That's one interpretation.**
7  Q.  That's a reasonable interpretation.
8  **A.  Yes.**
9  Q.  That she might have drawn from you
10 blocking her on Facebook; right?
11     MR. BOYLAN: Objection.
12 **A.  I said in general.  I did not say this**
13 **case.**
14 Q.  Well, let me ask you in this case.  Would
15 it have been a reasonable interpretation for her to
16 interpret your blocking her on Facebook combined
17 perhaps with your refusal to answer her texts as an
18 indication that you didn't want to have any
19 involvement with her anymore?
20     MR. BOYLAN: Objection.
21 **A.  I don't know.**
22 Q.  Could that be an explanation as to why she
23 pretended you didn't exist --
24 **A.  No.**

Page 244

1  Q.  -- in other sorts of circumstances?
2      MR. BOYLAN: Objection.
3  **A.  No.**
4  Q.  Why not?
5  **A.  Because she was talking about her sex life**
6  **with her new boyfriend right in front of me.**
7  Q.  Okay.  You say to Elliott Jin, she said
8  she's physically uncomfortable around me because she
9  didn't like the way I touched her at EAG.
10 **A.  Yes.**
11 Q.  Even though the first thing she did after
12 I blocked her after EAG is try really hard to get me
13 to see her.  Do you see that?
14 **A.  Yes.**
15 Q.  Okay.  And at the time she had started
16 being cold toward me, the last touch that had
17 happened between us was when she ran up to me from
18 behind and pounced me.  Do you see that?
19 **A.  Yes.**
20 Q.  So is it true then that she started being
21 cold to you immediately after that second pounce
22 hug?
23 **A.  No.**
24 Q.  That she started being cold before the

Page 245

1  pounce hug?
2  **A.  No.**
3  Q.  Was there other stuff that happened after
4  the pounce hug that preceded her change of attitude?
5  **A.  There is a conversation immediately after**
6  **the pounce hug.**
7  Q.  Okay.  So it was during that same
8  interaction.
9  **A.  Yeah, but after the hug had ceased.**
10 Q.  Okay.  What was that conversation?
11 **A.  I don't remember.  You already asked me**
12 **about it.**
13 Q.  But after that when I say the interaction
14 now, the pounce hug and the subsequent conversation,
15 you eventually parted ways?
16 **A.  Yes.**
17     MR. BOYLAN: Objection.  The first
18 pounce hug or second?
19     MR. PYLE: Second.
20 Q.  And then she was cold to you for the rest
21 of the conference.
22     MR. BOYLAN: Objection.
23 **A.  There might have been one more interaction**
24 **that was warm but I don't remember.**

Koppel v.
Moses

Confidential

James Koppel
July 25, 2022

Page 246

1  Q.  Is it possible that she started acting
2  cold toward you because she didn't like what
3  happened during that second pounce hug encounter?
4  A.  Based on my memory that would not make
5  sense.
6  Q.  Why is that?
7  A.  Because it was her hugging me from behind.
8  Running at me from another room.  Running behind.
9  Like I walked by her in a group circle and went to
10  another room.  She left her circle and ran at me
11  from behind and pounce hugged me.  I believe that
12  was the only touching that occurred during the
13  conversation and she continued -- she renewed her
14  commitments to us to hang out so, no, that would not
15  make sense from that.
16  Q.  I'm really scared and I'm probably going
17  to go find a lawyer.
18  A.  Mm-mm.
19  Q.  You write to Elliott Jin.
20  A.  Yes.
21  Q.  On October 27th.  Why did you say that?
22  A.  Because I was -- I was afraid that she was
23  going to actively start a smear campaign against me.
24  Q.  What did you imagine that smear campaign

Page 247

1  would look like?
2  A.  Her e-mailing a bunch of people and saying
3  something really bad about me.
4  Q.  And you thought about getting a lawyer to
5  stop her from doing that?
6  A.  I don't remember what I had in mind.
7  Q.  Were you worried about criminal charges?
8      MR. BOYLAN: Objection.
9  A.  Sorry.  Could you rephrase the question?
10  Q.  Were you worried about criminal charges
11  being brought against you?
12  A.  No.
13  Q.  Why not?
14  A.  Because -- I don't remember.  I don't
15  remember being concerned about criminal charges.
16  Q.  By the way, did this conversation continue
17  beyond this point here where it ends on Koppel 1183?
18  A.  Not that I recall.
19  Q.  Well, in producing documents in this case
20  have you searched for communications with other
21  people about this Chelsea Voss incident?
22  A.  Can you repeat the question in full?
23  Q.  Did you do any search for documents
24  regarding the Chelsea Voss incident in connection

Page 248

1  with this case?
2  A.  Yes.
3  Q.  And this exchange with -- this hangout
4  with Elliott Jin, you do agree with me that it
5  appears to be snippet of a longer conversation?
6  A.  I mean we have frequent communications in
7  this medium for years.  This is not the year's worth
8  of our communications.
9  Q.  No, but I'm asking about your back and
10  forth with Elliott about Chelsea Voss.  Did it
11  continue after Elliott's comment maybe my message
12  didn't get sent?
13  A.  Not that I recall.
14  Q.  Would you able to find out?  It looks like
15  there's a little bubble just below it in part that
16  was cut off from the screen shot.  Do you see that?
17  A.  Yes.
18  Q.  So there was a message there underneath
19  that one.
20  A.  Yes.
21  Q.  Why hasn't that been produced?
22      MR. BOYLAN: Objection.
23  A.  All questions about where conversations
24  were cut off should be directed to Mr. Boylan.

Page 249

1  Q.  Why is that?
2  A.  Because he's the one who knows the rules
3  for what should get produced and what shouldn't.
4      MR. PYLE: All right.  Well, I make
5  a request for the remainder of this conversation to
6  the extent it pertains to Chelsea Voss.
7      MR. BOYLAN: That's fair.  We'll
8  look it.  We'll try to find it.
9      (Exhibit 32 was marked for
10      identification.)
11  Q.  Do you recognize this document,
12  Mr. Koppel?
13  A.  You disclosed it last year.
14  Q.  Did you review it in connection with our
15  disclosure?
16  A.  I did read it around that time.
17  Q.  And turning your attention to the e-mail
18  that begins in the middle of the page.  The sender
19  of the e-mail is redacted.
20  A.  Yes.
21  Q.  Based on your knowledge and information do
22  you know who that sender is?
23  A.  I think so.
24  Q.  Who is it?

Case 1:20-cv-11479-LTS   Document 129-3   Filed 01/23/23   Page 11 of 55

Koppel v.
Moses

Confidential

James Koppel
July 25, 2022

Page 250

1  A.  I believe it is the ex-girlfriend that
2  we've been discussing.
3  Q.  The ex what?
4  A.  I believe it's the ex-girlfriend that
5  we've been discussing.
6  Q.  Chelsea Voss?
7  A.  Yes.
8  Q.  Okay.  And do you see that this e-mail
9  precedes her text to you asking you to stop
10  interacting with her by about three hours?
11  A.  Wait.
12  Q.  Turn back to the text message exhibit.  If
13  you turn to the last page.
14     MR. BOYLAN: Madam Reporter, could
15  you read back the question?
16  (Question was read back by the stenographer.)
17  A.  I cannot make the conclusion from what
18  you've shown me.
19  Q.  Just look at the last page of Exhibit 30.
20  A.  Yes.
21     (Witness perused document.)
22  A.  Yes.  I see that.
23     (Witness perused document.)
24  Q.  The last page.  Do you see her text to you

Page 251

1  please do not interact with me was sent at 1:59 p.m.
2  on October 27, 2016?
3  A.  Sorry.  Repeat the question.
4  Q.  Do you see on this text exchange that her
5  text to you asking you to not interact with her was
6  sent at 1:59 p.m. on October 27, 2016?
7  A.  Yes.
8  Q.  Three hours earlier she sent the e-mail
9  that you see as Exhibit 32; correct?
10  A.  I cannot make that conclusion from what
11  you've shown me.
12  Q.  Why not?
13  A.  Because neither e-mail says a time zone or
14  the document says a time zone.
15  Q.  If you assume that she was on the east
16  coast where she lived at the time she sent the
17  e-mail to Jerry and Mikayla, then you could assume
18  it was around the same time; right?
19  A.  I don't assume that.
20  Q.  Okay.  Well, if you read down around the
21  middle of the e-mail, there's a paragraph that
22  begins, lately though Jimmy has sent me texts asking
23  that I stop participating in all communities he's
24  involved with including ESP and Bush Room.  She

Page 252

1  states that --
2  A.  Can I --
3     MR. BOYLAN: Wait for the question.
4  Q.  She states in the final paragraph above
5  thanks, I want to ask Jimmy to stop texting me and I
6  feel safer doing that if I have told you what the
7  situation is.  Do you see that?
8  A.  I see that.
9  Q.  Okay.  Does that make it seem more likely
10  that was sent by Chelsea Voss?
11     MR. BOYLAN: Objection.
12  A.  I already said it was probably sent by
13  her.
14  Q.  I know that but does that support your
15  conclusion?
16  A.  Does what support my conclusion?
17  Q.  The conclusion that this was sent by
18  Chelsea.
19  A.  Does what support my conclusion?
20  Q.  The fact that she says she plans to ask
21  you to stop texting her and then three hours later
22  she asks you to stop texting her.
23  A.  Yes.
24  Q.  Okay.  Thank you.  She says, quote, in the

Page 253

1  second paragraph, I am uncomfortable interacting
2  with Jimmy.  At a conference we both attended last
3  summer Jimmy touched me without asking in ways I
4  wasn't comfortable with and generally didn't ask
5  before invading my personal space.  Do you see where
6  she writes that?
7  A.  Yes.
8  Q.  And is it your testimony that that simply
9  didn't occur?
10  A.  That what didn't occur?
11  Q.  That you touched her without asking in
12  ways that she wasn't comfortable with?
13     MR. BOYLAN: Objection.
14  A.  When she pounce hugged me, I did not ask
15  her before hugging her back.
16  Q.  Did you touch her in other way?
17  A.  I mentioned the thing with the noses.
18  Q.  Okay.  So you did rub noses?
19  A.  Yes.
20  Q.  So she could have been referring to that
21  when she says --
22  A.  I don't think so.
23  Q.  You have to wait until my question is
24  done.  Could she have been referring to that when

Page 238

1  her, didn't you?
2      MR. BOYLAN: Objection.
3  Q.  She said that you touched her in a way
4  that made her feel uncomfortable, didn't she?
5      MR. BOYLAN: Objection.
6  A.  I had no idea what she was referring to.
7  Q.  Well, it seems to be reading the text
8  message in its entirety is that it's understood what
9  happened between the two of you, isn't it, because
10  you didn't say what are you talking about.
11      MR. BOYLAN: Objection.
12  A.  I have no clue where you're getting that
13  from.
14  Q.  I'm getting that from the fact that you
15  never asked her in what way did I touch you that
16  made you feel uncomfortable.
17      MR. BOYLAN: Objection.
18  A.  Okay.
19      MR. BOYLAN: Wait for a question,
20  please.
21  Q.  Why would you feel compelled to apologize
22  for hugging her back after she hugged you?
23      MR. BOYLAN: Objection.
24  A.  I had no idea what I was apologizing for.

Page 239

1  All I know is she claimed that I had hurt her in
2  some way.  I didn't know how and it was the nice
3  thing to do and I was clearly trying to be the nice
4  guy in this conflict.
5  Q.  On the next page you say that you're not
6  in a mental state to give a better apology though
7  I'd like to if you really want one.  What did you
8  have in mind there?
9  A.  That when I was feeling better, she could
10  explain what I did wrong and I could apologize.
11  Q.  But you never followed up and asked her.
12  A.  Never got the chance.
13  Q.  No?
14  A.  Never got the chance.
15  Q.  Well, she asked you eventually after this
16  long string of texts from you to stop interacting
17  with her in person and to stop texting her or
18  sending communications; right?
19  A.  Yes.
20  Q.  And you wrote back that you considered
21  that a promise by her not to interact with you; is
22  that correct?
23  A.  Yes.
24  Q.  By the way, what communication platform is

Page 240

1  this?
2  A.  SMS.
3  Q.  SMS text messages?
4  A.  Mm-mm.
5  Q.  I would like you to just note the time of
6  that last text message on the last page of this
7  exhibit.
8  A.  Okay.
9  Q.  1:59 p.m. where she says do not interact
10  with me in person and then we'll turn to the next
11  document.
12      (Exhibit 31 was marked for
13      identification.)
14  Q.  Who is this a conversation with?
15  A.  It's a conversation with Elliott Jin.
16  Q.  Who is Elliott Jin?
17  A.  He is a software engineer.
18  Q.  Is he an MIT person?
19  A.  No.
20  Q.  How do you know Elliott Jin?
21  A.  Former co-worker.
22  Q.  Where were you a co-worker with Elliott
23  Jin?
24  A.  Apptimize.

Page 241

1  Q.  Is that the startup you joined prior to
2  coming to MIT?
3  A.  Yes.
4  Q.  And you write at the top of this page,
5  Jesus Christ.  I really didn't appreciate how much
6  danger I might be in.  Do you see that?
7  A.  Yes.
8  Q.  What was that based on?
9  A.  By this point I believe I understood her
10  to be threatening me.
11  Q.  With her text about making her feel
12  uncomfortable?
13  A.  Based on that texts and others and the
14  totality of the situation.
15  Q.  Based on that text and?
16  A.  Everything else that happened the last few
17  months.
18  Q.  You mean including her showing up at
19  events and her having given you the cold shoulder at
20  EAG?
21  A.  Yes.  Her very much showing up around me
22  as far as I could tell but hadn't claimed to be.
23  Q.  Well, you say she wasn't uncomfortable
24  with you but you also said that she did not interact

Page 242

1   with you at any point during those few months;
2   right?
3   **A.   She acted like I didn't exist.**
4   Q.   So she wasn't interacting with you.
5   **A.   Correct.**
6   Q.   Is that because you blocked her on
7   Facebook and she knew about it?
8        MR. BOYLAN: Objection.
9   **A.   That explains why she interacted with me**
10  **on Facebook.**
11  Q.   Well, but isn't it true that if you block
12  somebody on Facebook, it means I don't want to be
13  friends with you anymore in real life?
14  **A.   No.**
15       MR. BOYLAN: Objection.
16  Q.   Are you friends with a lot of people who
17  have you blocked on Facebook?
18  **A.   I don't know.**
19  Q.   Okay.  Wouldn't you say in the real world
20  that it sends a message to block a friend of yours
21  on Facebook?
22       MR. BOYLAN: Objection.
23  **A.   That it sends a kind of message.**
24  Q.   Well, it sends a message of I don't want

Page 243

1   to be involved with you anymore.
2        MR. BOYLAN: Objection.
3   **A.   It can be interpreted that way.**
4   Q.   It can be interpreted that way?  I'm
5   sorry?
6   **A.   That's one interpretation.**
7   Q.   That's a reasonable interpretation.
8   **A.   Yes.**
9   Q.   That she might have drawn from you
10  blocking her on Facebook; right?
11       MR. BOYLAN: Objection.
12  **A.   I said in general.  I did not say this**
13  **case.**
14  Q.   Well, let me ask you in this case.  Would
15  it have been a reasonable interpretation for her to
16  interpret your blocking her on Facebook combined
17  perhaps with your refusal to answer her texts as an
18  indication that you didn't want to have any
19  involvement with her anymore?
20       MR. BOYLAN: Objection.
21  **A.   I don't know.**
22  Q.   Could that be an explanation as to why she
23  pretended you didn't exist --
24  **A.   No.**

Page 244

1   Q.   -- in other sorts of circumstances?
2        MR. BOYLAN: Objection.
3   **A.   No.**
4   Q.   Why not?
5   **A.   Because she was talking about her sex life**
6   **with her new boyfriend right in front of me.**
7   Q.   Okay.  You say to Elliott Jin, she said
8   she's physically uncomfortable around me because she
9   didn't like the way I touched her at EAG.
10  **A.   Yes.**
11  Q.   Even though the first thing she did after
12  I blocked her after EAG is try really hard to get me
13  to see her.  Do you see that?
14  **A.   Yes.**
15  Q.   Okay.  And at the time she had started
16  being cold toward me, the last touch that had
17  happened between us was when she ran up to me from
18  behind and pounced me.  Do you see that?
19  **A.   Yes.**
20  Q.   So is it true then that she started being
21  cold to you immediately after that second pounce
22  hug?
23  **A.   No.**
24  Q.   That she started being cold before the

Page 245

1   pounce hug?
2   **A.   No.**
3   Q.   Was there other stuff that happened after
4   the pounce hug that preceded her change of attitude?
5   **A.   There is a conversation immediately after**
6   **the pounce hug.**
7   Q.   Okay.  So it was during that same
8   interaction.
9   **A.   Yeah, but after the hug had ceased.**
10  Q.   Okay.  What was that conversation?
11  **A.   I don't remember.  You already asked me**
12  **about it.**
13  Q.   But after that when I say the interaction
14  now, the pounce hug and the subsequent conversation,
15  you eventually parted ways?
16  **A.   Yes.**
17       MR. BOYLAN: Objection.  The first
18  pounce hug or second?
19       MR. PYLE: Second.
20  Q.   And then she was cold to you for the rest
21  of the conference.
22       MR. BOYLAN: Objection.
23  **A.   There might have been one more interaction**
24  **that was warm but I don't remember.**

Page 246

1  Q.  Is it possible that she started acting
2  cold toward you because she didn't like what
3  happened during that second pounce hug encounter?
4  **A.  Based on my memory that would not make**
5  **sense.**
6  Q.  Why is that?
7  **A.  Because it was her hugging me from behind.**
8  **Running at me from another room.  Running behind.**
9  **Like I walked by her in a group circle and went to**
10  **another room.  She left her circle and ran at me**
11  **from behind and pounce hugged me.  I believe that**
12  **was the only touching that occurred during the**
13  **conversation and she continued -- she renewed her**
14  **commitments to us to hang out so, no, that would not**
15  **make sense from that.**
16  Q.  I'm really scared and I'm probably going
17  to go find a lawyer.
18  **A.  Mm-mm.**
19  Q.  You write to Elliott Jin.
20  **A.  Yes.**
21  Q.  On October 27th.  Why did you say that?
22  **A.  Because I was -- I was afraid that she was**
23  **going to actively start a smear campaign against me.**
24  Q.  What did you imagine that smear campaign

Page 247

1  would look like?
2  **A.  Her e-mailing a bunch of people and saying**
3  **something really bad about me.**
4  Q.  And you thought about getting a lawyer to
5  stop her from doing that?
6  **A.  I don't remember what I had in mind.**
7  Q.  Were you worried about criminal charges?
8      MR. BOYLAN: Objection.
9  **A.  Sorry.  Could you rephrase the question?**
10  Q.  Were you worried about criminal charges
11  being brought against you?
12  **A.  No.**
13  Q.  Why not?
14  **A.  Because -- I don't remember.  I don't**
15  **remember being concerned about criminal charges.**
16  Q.  By the way, did this conversation continue
17  beyond this point here where it ends on Koppel 1183?
18  **A.  Not that I recall.**
19  Q.  Well, in producing documents in this case
20  have you searched for communications with other
21  people about this Chelsea Voss incident?
22  **A.  Can you repeat the question in full?**
23  Q.  Did you do any search for documents
24  regarding the Chelsea Voss incident in connection

Page 248

1  with this case?
2  **A.  Yes.**
3  Q.  And this exchange with -- this hangout
4  with Elliott Jin, you do agree with me that it
5  appears to be snippet of a longer conversation?
6  **A.  I mean we have frequent communications in**
7  **this medium for years.  This is not the year's worth**
8  **of our communications.**
9  Q.  No, but I'm asking about your back and
10  forth with Elliott about Chelsea Voss.  Did it
11  continue after Elliott's comment maybe my message
12  didn't get sent?
13  **A.  Not that I recall.**
14  Q.  Would you able to find out?  It looks like
15  there's a little bubble just below it in part that
16  was cut off from the screen shot.  Do you see that?
17  **A.  Yes.**
18  Q.  So there was a message there underneath
19  that one.
20  **A.  Yes.**
21  Q.  Why hasn't that been produced?
22      MR. BOYLAN: Objection.
23  **A.  All questions about where conversations**
24  **were cut off should be directed to Mr. Boylan.**

Page 249

1  Q.  Why is that?
2  **A.  Because he's the one who knows the rules**
3  **for what should get produced and what shouldn't.**
4      **MR. PYLE:** All right.  Well, I make
5  a request for the remainder of this conversation to
6  the extent it pertains to Chelsea Voss.
7      **MR. BOYLAN:** That's fair.  We'll
8  look it.  We'll try to find it.
9      (Exhibit 32 was marked for
10      identification.)
11  Q.  Do you recognize this document,
12  Mr. Koppel?
13  **A.  You disclosed it last year.**
14  Q.  Did you review it in connection with our
15  disclosure?
16  **A.  I did read it around that time.**
17  Q.  And turning your attention to the e-mail
18  that begins in the middle of the page.  The sender
19  of the e-mail is redacted.
20  **A.  Yes.**
21  Q.  Based on your knowledge and information do
22  you know who that sender is?
23  **A.  I think so.**
24  Q.  Who is it?

Page 250

1  A.  I believe it is the ex-girlfriend that
2  we've been discussing.
3  Q.  The ex what?
4  A.  I believe it's the ex-girlfriend that
5  we've been discussing.
6  Q.  Chelsea Voss?
7  A.  Yes.
8  Q.  Okay.  And do you see that this e-mail
9  precedes her text to you asking you to stop
10  interacting with her by about three hours?
11  A.  Wait.
12  Q.  Turn back to the text message exhibit.  If
13  you turn to the last page.
14      MR. BOYLAN: Madam Reporter, could
15  you read back the question?
16  (Question was read back by the stenographer.)
17  A.  I cannot make the conclusion from what
18  you've shown me.
19  Q.  Just look at the last page of Exhibit 30.
20  A.  Yes.
21      (Witness perused document.)
22  A.  Yes.  I see that.
23      (Witness perused document.)
24  Q.  The last page.  Do you see her text to you

Page 251

1  please do not interact with me was sent at 1:59 p.m.
2  on October 27, 2016?
3  A.  Sorry.  Repeat the question.
4  Q.  Do you see on this text exchange that her
5  text to you asking you to not interact with her was
6  sent at 1:59 p.m. on October 27, 2016?
7  A.  Yes.
8  Q.  Three hours earlier she sent the e-mail
9  that you see as Exhibit 32; correct?
10  A.  I cannot make that conclusion from what
11  you've shown me.
12  Q.  Why not?
13  A.  Because neither e-mail says a time zone or
14  the document says a time zone.
15  Q.  If you assume that she was on the east
16  coast where she lived at the time she sent the
17  e-mail to Jerry and Mikayla, then you could assume
18  it was around the same time; right?
19  A.  I don't assume that.
20  Q.  Okay.  Well, if you read down around the
21  middle of the e-mail, there's a paragraph that
22  begins, lately though Jimmy has sent me texts asking
23  that I stop participating in all communities he's
24  involved with including ESP and Bush Room.  She

Page 252

1  states that --
2  A.  Can I --
3      MR. BOYLAN: Wait for the question.
4  Q.  She states in the final paragraph above
5  thanks, I want to ask Jimmy to stop texting me and I
6  feel safer doing that if I have told you what the
7  situation is.  Do you see that?
8  A.  I see that.
9  Q.  Okay.  Does that make it seem more likely
10  that was sent by Chelsea Voss?
11      MR. BOYLAN: Objection.
12  A.  I already said it was probably sent by
13  her.
14  Q.  I know that but does that support your
15  conclusion?
16  A.  Does what support my conclusion?
17  Q.  The conclusion that this was sent by
18  Chelsea.
19  A.  Does what support my conclusion?
20  Q.  The fact that she says she plans to ask
21  you to stop texting her and then three hours later
22  she asks you to stop texting her.
23  A.  Yes.
24  Q.  Okay.  Thank you.  She says, quote, in the

Page 253

1  second paragraph, I am uncomfortable interacting
2  with Jimmy.  At a conference we both attended last
3  summer Jimmy touched me without asking in ways I
4  wasn't comfortable with and generally didn't ask
5  before invading my personal space.  Do you see where
6  she writes that?
7  A.  Yes.
8  Q.  And is it your testimony that that simply
9  didn't occur?
10  A.  That what didn't occur?
11  Q.  That you touched her without asking in
12  ways that she wasn't comfortable with?
13      MR. BOYLAN: Objection.
14  A.  When she pounce hugged me, I did not ask
15  her before hugging her back.
16  Q.  Did you touch her in other way?
17  A.  I mentioned the thing with the noses.
18  Q.  Okay.  So you did rub noses?
19  A.  Yes.
20  Q.  So she could have been referring to that
21  when she says --
22  A.  I don't think so.
23  Q.  You have to wait until my question is
24  done.  Could she have been referring to that when

Page 254

1  she said that you touched her in ways that she
2  wasn't comfortable with?
3  **A.  I don't find that plausible.**
4  Q.  Why not?
5  **A.  Because I saw her reaction.**
6  Q.  You said before you're sometimes not good
7  at judging other people's emotions.  Do you remember
8  that?
9  **A.  I don't remember saying that.**
10     MR. BOYLAN: Objection.
11  Q.  Do you remember saying that you're
12  sometimes not good at discerning other people's
13  emotions when they hide them?
14  **A.  Yes.**
15  Q.  Could this be one of those cases?
16     MR. BOYLAN: Objection.
17  **A.  I don't find that likely.**
18     MR. BOYLAN: I would instruct the
19  witness try to answer the questions and not give
20  predictions about what you find likely or not.
21  **A.  Okay.**
22     MR. BOYLAN: Talk about your memory.
23  **A.  Okay.**
24  Q.  I'm moving on to another question.

Page 255

1     MR. BOYLAN: You're not here to
2  testify about your view of the world and
3  probabilities so stop doing it.
4     MR. PYLE: When I ask for a
5  probability, I'm going to continue to ask it.
6  Q.  You see here that Chelsea says in the
7  first long paragraph that, Jimmy seemed angry at me
8  after I avoided him at the conference and blocked me
9  on Facebook two days later.  She noticed that and
10  figured the polite thing to do would be to let you
11  attend ESP events without bumping into her.  Do you
12  see where she says all that?
13  **A.  Yes.**
14  Q.  So do you have any reason to doubt that
15  she noticed that you blocked her on Facebook?
16  **A.  I have no reason to doubt that she knew
17  that I blocked her on Facebook.**
18  Q.  And do you have any reason to doubt that
19  she noticed that you seemed angry at her?
20  **A.  Yes.**
21  Q.  Why do you have a reason to doubt that?
22  **A.  Because I can't think of a time when I
23  could have both felt anger and her being in my line
24  of sight.**

Page 256

1  Q.  I'm sorry.  I didn't hear your answer.
2  **A.  I can't think of a time when I could have
3  both felt anger and she was in my line of sight.**
4  Q.  In your line of sight?
5  **A.  Yes.**
6  Q.  Okay.
7  **A.  And me in her line of sight.**
8  Q.  So you think she's making that up?
9  **A.  I don't know.**
10  Q.  Well, is it possible that she was able to
11  discern from how you were interacting with her that
12  you were upset with her?
13     MR. BOYLAN: Objection.
14  **A.  What interaction?**
15  Q.  I don't know.  She refers to Jimmy seemed
16  angry at me after I avoided him at the conference.
17  You had seen her between August 2016 and
18  October 2016 at various locations and events;
19  correct?
20     MR. BOYLAN: Objection.
21  **A.  I had.  She had entered my line of sight
22  on more than one occasion during that interval.**
23  Q.  And that included this dinner party where
24  she wasn't on the guest list?

Page 257

1  **A.  Yes.**
2  Q.  Could it have included other events or
3  gatherings?
4  **A.  Yes.**
5  Q.  All right.  So she had some opportunity to
6  see how you were reacting to her presence; yes?
7  **A.  Yes.**
8  Q.  Okay.  So this refers to Splash, does it
9  not?
10  **A.  What refers to Splash?**
11  Q.  This e-mail at the bottom.  Speaking about
12  Bush Room manager and Splash together.
13  **A.  The last full paragraph mentions Splash.**
14  Q.  Okay.  And Splash again is the ESP event
15  that occurs just before Thanksgiving?
16  **A.  The weekend before Thanksgiving, yes.**
17  Q.  What happened at Splash of that year?
18  **A.  Students came and classes were taught.**
19  Q.  What happened at Splash between you and
20  Chelsea Voss?
21  **A.  She did not avoid me.**
22  Q.  What happened?
23  **A.  I remember at one point she sat on my
24  coat.**

Page 258

1  Q.   Sat on your coat?
2  A.   Yes.
3  Q.   Were you wearing it at the time?
4  A.   No.
5  Q.   Okay.  What next?  What else happened?
6  A.   She sat down about two chairs away from me
7     for a long period.
8  Q.   Okay.
9  A.   She walked within one foot of me at one
10    point.
11  Q.   Okay.
12  A.   Maybe less than one foot.
13  Q.   What else happened between you and
14    Chelsea?
15  A.   She came to the room at the time when I
16    was required to be there.  I was required to
17    interact in that room.
18  Q.   And?
19  A.   And I called the police.
20  Q.   Did you call the MIT police?
21  A.   Yes.
22  Q.   What did you say to the police?
23  A.   I don't recall.
24  Q.   Were you calling to report Chelsea's

Page 259

1    presence?
2  A.   I was calling to help deal with the
3    situation that I needed to interact with everyone in
4    the room and this person was in the room who had
5    threatened me while telling me not to interact with
6    her.
7  Q.   That's what you told the MIT police?
8  A.   I don't remember what words I used.
9  Q.   Did MIT send a police officer to the
10    scene?
11  A.   Yes.
12  Q.   What happened?
13  A.   What happened when?
14  Q.   When the police officer arrived.
15  A.   They talked to me for a while.
16  Q.   Who is they?
17  A.   The police officers who came.
18  Q.   There were two?
19  A.   I think there were three actually.
20  Q.   There were three.  And what did you tell
21    them?
22  A.   I don't remember.
23  Q.   Did you tell them why you called them?
24  A.   Presumably.

Page 260

1  Q.   What else did you tell them?
2  A.   I remember they asked me for her birthday
3    and I told them to the best of my memory.
4  Q.   Okay.  Was she there at the time?
5  A.   She was not in the line of sight at the
6    time I was talking to the police officers.
7  Q.   She was in the room?
8  A.   She was in the Bush Room.
9  Q.   And you were in the Bush Room?
10  A.   No.
11  Q.   Where were you?
12  A.   I was outside in the hallway.
13  Q.   In the hallway outside the Bush Room?
14  A.   Yeah.
15  Q.   Why was it you were required to interact
16    with everyone in the room at this time?
17  A.   Because I was in charge of teardown.
18  Q.   And she was there during teardown?
19  A.   Yes.
20  Q.   Did you tell the MIT police officers that
21    you thought she committed some kind of rule
22    infraction by being there at that moment?
23  A.   I told her that she had threatened me.
24  Q.   Told the officers?

Page 261

1  A.   Yes.
2  Q.   And what did you tell them about that?
3  A.   I think I -- I don't remember.
4  Q.   You said she had threatened you before.
5  A.   I told them that she had threatened me.  I
6    don't remember what else I told them about the
7    threat.
8  Q.   Did you tell them that she had threatened
9    you by saying she was made uncomfortable by how you
10    touched her?
11  A.   Not that I recall.
12  Q.   Did you say that she threatened you in any
13    way related to your reputation or --
14  A.   Not that I recall.
15  Q.   -- a smear campaign?
16  A.   Not that I recall.
17  Q.   Do you recall anything further about what
18    you explained to them with regard to why or how she
19    had threatened you?
20  A.   I think I just said like I cannot set foot
21    in that room right now because she threatened me.
22  Q.   And how did she threaten you?
23  A.   With the text exchange that we just saw.
24  Q.   But saying the way you were touching me at

Page 262

1 EA Global makes me uncomfortable around you?
2 A. By everything that was implied from that,
3 yes.
4 Q. So that specifically it's your testimony
5 is the threat?
6 A. Yes.
7 Q. Why is that a threat?
8 A. Why is that a threat?
9 Q. Yes.
10 A. Because I just asked her to leave me alone
11 and she comes back and says, no, I won't leave you
12 alone and you touched me in an inappropriate way.
13 That's a threat.
14 Q. I'm sorry. I'm not really following why
15 that's a threat.
16     MR. BOYLAN: Well, that's not really
17 relevant. Ask the question.
18 Q. Why is that a threat?
19 A. Why is that a threat?
20 Q. Yes.
21 A. Because she's implying that I asked her to
22 leave me alone. She's going to respond by telling
23 people I had done something bad that would get me
24 ostracized.

Page 263

1 Q. You don't think maybe she was just
2 explaining to you how she felt?
3 A. No, I don't.
4 Q. So what happened next with respect to your
5 report to the police?
6 A. Clarify. I don't know if it was a report.
7 Q. Well, you called the police?
8 A. Yes.
9 Q. And they interviewed you?
10 A. Spoke to me, yes.
11 Q. Okay. Then what happened?
12 A. One of the police officers went to the
13 room and took her aside and I walked away. I didn't
14 see that part.
15 Q. Then what happened?
16 A. After like 20, 30, after a while I just --
17 she left. It was not because she was told she was
18 causing a problem. It was because she had to teach
19 a class and then I went back in the room and I
20 directed the teardown.
21 Q. So she left of her own volition to your
22 understanding?
23 A. Yes.
24 Q. And the police didn't tell her to leave?

Page 264

1 A. I don't know what they told her.
2 Q. Did the police come and talk to you again?
3 A. Yes.
4 Q. What did they say?
5 A. I think they said that she had a class to
6 teach. I don't remember what else.
7 Q. What was the date of this event?
8 A. It would have been Sunday before
9 Thanksgiving or whichever Sunday Splash was taught
10 on that year 2016.
11 Q. The Sunday before Thanksgiving in 2016.
12 A. Yes.
13 Q. Okay. Thank you. Why did you think it
14 was appropriate to call the police on Chelsea Voss?
15     MR. BOYLAN: Objection.
16 A. I saw no other option.
17 Q. Really?
18 A. Yes.
19 Q. So you have a conflict with someone and
20 you think that the way to deal with that conflict is
21 to call the police?
22 A. Sometimes.
23 Q. Okay. Can you understand why having
24 somebody call the police on you might make you feel

Page 265

1 uncomfortable?
2 A. If I called the police on you, I would
3 hope you would feel uncomfortable.
4 Q. Please explain.
5 A. Police don't get called you on unless
6 you've done something bad hurting someone to a large
7 extent. I would hope that a normal person when they
8 hurt someone that badly and were that threatening
9 that someone would call the police would feel bad
10 about what they had done.
11 Q. And do you think Chelsea felt bad after
12 the police responded to that event?
13 A. No.
14     MR. BOYLAN: Can we take a --
15 Q. Did you hope to make her uncomfortable by
16 having the police there?
17     MR. BOYLAN: Can we take a short
18 break?
19 A. I hoped to get her removed from the room
20 during the two hours that I was required to be in
21 there and interact with everyone in the room.
22 Q. Did you hope that she would feel
23 uncomfortable as a result of you calling the police?
24     MR. BOYLAN: Objection.

Page 266

1 **A.  I had hoped that she would leave me alone.**
2 Q.  Did you hope that she would feel
3 uncomfortable?
4 **A.  I hoped that she would be uncomfortable if**
5 **she didn't leave me alone.**
6 Q.  Did you hope that she would feel
7 uncomfortable by having the police come and respond
8 to that room at that time?
9     **MR. BOYLAN:** Objection.
10 **A.  Not that I recall.**
11    **MR. BOYLAN:** Can we take a break?
12 He needs a break.
13    **MR. PYLE:** I will agree to take a
14 break now at this point.  Off the record.
15    **THE VIDEOGRAPHER:** The time is 4:25.
16 We are off the record.
17    (A break was taken.)
18    **THE VIDEOGRAPHER:** The time is 4:35.
19 We're back on the record.
20    **MR. PYLE:** I would like to mark this
21 as our next document, please.
22    (Exhibit 33 was marked for
23    identification.)
24 Q.  Mr. Koppel, do you recognize the exhibit

Page 267

1 that's been put before you?
2 **A.  Yes.**
3 Q.  What is it?
4 **A.  It appears to be an e-mail exchange**
5 **between myself the then ESP chairs.**
6 Q.  And who are they?
7 **A.  They are Jerry Wu and Mikayla Murphy.**
8 Q.  Jerry?
9 **A.  Jerry Wu.**
10 Q.  Wu.  Thank you.  What is your e-mail of
11 1:22 a.m. on October 27th about?
12 **A.  Letting them know that I had been**
13 **threatened.**
14 Q.  By Chelsea Voss who you do not name.
15 **A.  That was the unnamed reference.**
16 Q.  And that's the person you describe as a
17 former ESP member and a future Splash teacher.
18 **A.  Yes.**
19 Q.  So you knew at the time she was planning
20 to teach at Splash that year?
21 **A.  Yes.**
22 Q.  You say, unfortunately things have
23 escalated with a recent text conversation and I am
24 currently fearing greatly for my safety.  Is the

Page 268

1 text conversation the text conversation we looked at
2 earlier today?
3 **A.  Yes.**
4 Q.  Where she said you made her feel
5 uncomfortable?
6 **A.  I believe she said that at one point in**
7 **the conversation.**
8 Q.  Why were you currently fearing greatly for
9 your safety?
10 **A.  Because she had threatened me when I told**
11 **her to leave me alone.**
12 Q.  You have to speak up a little bit.
13 **A.  Because she had threatened me after I told**
14 **her to stay away from me.**
15 Q.  Okay.  And you say, I am now terrified to
16 let you know any details or the identity of the
17 other person as it sounds like they may be spinning
18 a story that could get me ostracized and/or jailed
19 and thus it can't be known that I'm warning anyone
20 about them.  What do you mean by ostracized?
21 **A.  I mean that people would not want to**
22 **interact with me if she carried out with the full**
23 **extent of what I perceived her to be implying with**
24 **her threat.**

Page 269

1 Q.  And why did you say that the story could
2 get you jailed?
3 **A.  I don't know.**
4 Q.  Well, you must have had some reason for
5 putting that in there.
6 **A.  I must have had some reason for putting**
7 **that in there.**
8 Q.  Wasn't it because she said that you
9 touched her in a way that made her feel
10 uncomfortable?
11 **A.  I understood her to be threatening a very**
12 **serious accusation against me.**
13 Q.  Of that nature; yes?
14 **A.  Yes.**
15 Q.  And you know that an unconsented sexual
16 touching can be charged criminally as sexual
17 assault?
18 **A.  Of course.**
19    **MR. BOYLAN:** Objection.
20 **A.  Some of them can.  I don't know the**
21 **details.**
22 Q.  And so was that what you had in mind when
23 you said that you might be jailed?
24 **A.  I don't know.**

Page 270

1  Q.  Well, surely you know; right?  I mean you
2  were thinking about a sexual assault charge.
3      MR. BOYLAN: Objection.
4  **A.  I don't recall thinking about criminal**
5  **charges at this time.**
6  Q.  Well, does reading the document that's
7  been put in front of you refresh your recollection
8  that you were thinking about criminal charges at
9  that time?
10 **A.  No, it does not.**
11 Q.  Why else could you have put down that you
12 were worried about being jailed other than being
13 charged with indecent assault and battery or some
14 such crime?
15 **A.  I don't know.  I don't know.  I don't know**
16 **that I had a reason for saying that.**
17 Q.  You say you're e-mailing them to let them
18 know something is up and you will soon be contacting
19 a lawyer and/or police.
20 **A.  Mm-mm.**
21 Q.  Why were you thinking about calling the
22 police on October 27th?
23 **A.  I don't remember.**
24 Q.  Why were you thinking about contacting a

Page 271

1  lawyer on October 27th?
2  **A.  To prepare for anything she might do**
3  **against me.**
4  Q.  What might those things be?
5  **A.  The smear campaign we discussed earlier.**
6  Q.  And possibly a criminal charge too; right?
7  **A.  I don't recall thinking about that but**
8  **it's possible.  This e-mail is some evidence that I**
9  **wanted to discuss.**
10 Q.  Did you ever search for a criminal defense
11 lawyer?
12 **A.  No.**
13 Q.  You write in the next paragraph, I want to
14 be clear.  I really hope I'm just blowing smoke and
15 reading too much into things.  I still think it's
16 more likely than not the other person is innocent.
17 What did you mean by that?
18 **A.  I think I meant that there is -- the**
19 **person was maybe just saying things like to**
20 **intimidate me but not really meaning to follow**
21 **through.**
22 Q.  Why would that make that person innocent?
23 **A.  Because it's a lot better than what I was**
24 **afraid of her doing.**

Page 272

1  Q.  So the converse of being guilty is to have
2  a smear campaign against you?  Strike that question,
3  please.  You used the word innocent.  I'm trying to
4  understand why you chose that word.
5      MR. BOYLAN: Objection.
6  **A.  I don't know.  I might have been referring**
7  **to all the intentional hurt, manipulation I**
8  **perceived her to be doing.  I don't know what it's**
9  **referring to.**
10 Q.  Could you have been referring to the fact
11 that she really did in fact feel uncomfortable based
12 on your interaction at EA Global?
13     MR. BOYLAN: Objection.
14 **A.  I don't know.**
15 Q.  You write toward the end of this e-mail
16 that Chelsea is well liked and very charismatic, the
17 type you'd never suspect of being capable of
18 anything like this.  Unfortunately that is the exact
19 profile of various kinds of sociopaths which I
20 strongly suspect this person is.
21 **A.  Mm-mm.**
22 Q.  Do you strongly suspect Chelsea Voss to be
23 a sociopath?
24 **A.  I think I was using the term too broadly**

Page 273

1  at the time.
2  Q.  You would not say that today?
3  **A.  I do not suspect her of being diagnosed**
4  **with APSD.**
5  Q.  What's APSD?
6  **A.  Antisocial personality disorder.  ASPD.**
7  **Antisocial personality disorder.**
8  Q.  Well, regardless of a particular diagnosis
9  what are you trying to convey when you say she was a
10 sociopath?
11 **A.  That she was a very uncaring, hurtful,**
12 **manipulative person.**
13 Q.  Were you saying that she was lying?
14     MR. BOYLAN: Objection.
15 **A.  I believe she told many lies.**
16 Q.  But yet you say you still think it's more
17 likely than not that the person is innocent so can
18 you explain that contradiction?
19     MR. BOYLAN: Objection.
20 **A.  I don't know exactly what I was thinking.**
21 **I was probably -- I mean -- so I might have been**
22 **thinking that by the time I believe she had hurt me**
23 **very intentionally in many ways the preceding year**
24 **and at the time I thought this could be a**

Page 262

1  EA Global makes me uncomfortable around you?
2  A.  By everything that was implied from that,
3  yes.
4  Q.  So that specifically it's your testimony
5  is the threat?
6  A.  Yes.
7  Q.  Why is that a threat?
8  A.  Why is that a threat?
9  Q.  Yes.
10  A.  Because I just asked her to leave me alone
11  and she comes back and says, no, I won't leave you
12  alone and you touched me in an inappropriate way.
13  That's a threat.
14  Q.  I'm sorry.  I'm not really following why
15  that's a threat.
16  MR. BOYLAN: Well, that's not really
17  relevant.  Ask the question.
18  Q.  Why is that a threat?
19  A.  Why is that a threat?
20  Q.  Yes.
21  A.  Because she's implying that I asked her to
22  leave me alone.  She's going to respond by telling
23  people I had done something bad that would get me
24  ostracized.

Page 263

1  Q.  You don't think maybe she was just
2  explaining to you how she felt?
3  A.  No, I don't.
4  Q.  So what happened next with respect to your
5  report to the police?
6  A.  Clarify.  I don't know if it was a report.
7  Q.  Well, you called the police?
8  A.  Yes.
9  Q.  And they interviewed you?
10  A.  Spoke to me, yes.
11  Q.  Okay.  Then what happened?
12  A.  One of the police officers went to the
13  room and took her aside and I walked away.  I didn't
14  see that part.
15  Q.  Then what happened?
16  A.  After like 20, 30, after a while I just --
17  she left.  It was not because she was told she was
18  causing a problem.  It was because she had to teach
19  a class and then I went back in the room and I
20  directed the teardown.
21  Q.  So she left of her own volition to your
22  understanding?
23  A.  Yes.
24  Q.  And the police didn't tell her to leave?

Page 264

1  A.  I don't know what they told her.
2  Q.  Did the police come and talk to you again?
3  A.  Yes.
4  Q.  What did they say?
5  A.  I think they said that she had a class to
6  teach.  I don't remember what else.
7  Q.  What was the date of this event?
8  A.  It would have been Sunday before
9  Thanksgiving or whichever Sunday Splash was taught
10  on that year 2016.
11  Q.  The Sunday before Thanksgiving in 2016.
12  A.  Yes.
13  Q.  Okay.  Thank you.  Why did you think it
14  was appropriate to call the police on Chelsea Voss?
15  MR. BOYLAN: Objection.
16  A.  I saw no other option.
17  Q.  Really?
18  A.  Yes.
19  Q.  So you have a conflict with someone and
20  you think that the way to deal with that conflict is
21  to call the police?
22  A.  Sometimes.
23  Q.  Okay.  Can you understand why having
24  somebody call the police on you might make you feel

Page 265

1  uncomfortable?
2  A.  If I called the police on you, I would
3  hope you would feel uncomfortable.
4  Q.  Please explain.
5  A.  Police don't get called you on unless
6  you've done something bad hurting someone to a large
7  extent.  I would hope that a normal person when they
8  hurt someone that badly and were that threatening
9  that someone would call the police would feel bad
10  about what they had done.
11  Q.  And do you think Chelsea felt bad after
12  the police responded to that event?
13  A.  No.
14  MR. BOYLAN: Can we take a --
15  Q.  Did you hope to make her uncomfortable by
16  having the police there?
17  MR. BOYLAN: Can we take a short
18  break?
19  A.  I hoped to get her removed from the room
20  during the two hours that I was required to be in
21  there and interact with everyone in the room.
22  Q.  Did you hope that she would feel
23  uncomfortable as a result of you calling the police?
24  MR. BOYLAN: Objection.

Page 266

1   A.  I had hoped that she would leave me alone.
2   Q.  Did you hope that she would feel
3   uncomfortable?
4   A.  I hoped that she would be uncomfortable if
5   she didn't leave me alone.
6   Q.  Did you hope that she would feel
7   uncomfortable by having the police come and respond
8   to that room at that time?
9       MR. BOYLAN: Objection.
10  A.  Not that I recall.
11      MR. BOYLAN: Can we take a break?
12  He needs a break.
13      MR. PYLE: I will agree to take a
14  break now at this point.  Off the record.
15      THE VIDEOGRAPHER: The time is 4:25.
16  We are off the record.
17      (A break was taken.)
18      THE VIDEOGRAPHER: The time is 4:35.
19  We're back on the record.
20      MR. PYLE: I would like to mark this
21  as our next document, please.
22      (Exhibit 33 was marked for
23      identification.)
24  Q.  Mr. Koppel, do you recognize the exhibit

Page 267

1   that's been put before you?
2   A.  Yes.
3   Q.  What is it?
4   A.  It appears to be an e-mail exchange
5   between myself the then ESP chairs.
6   Q.  And who are they?
7   A.  They are Jerry Wu and Mikayla Murphy.
8   Q.  Jerry?
9   A.  Jerry Wu.
10  Q.  Wu.  Thank you.  What is your e-mail of
11  1:22 a.m. on October 27th about?
12  A.  Letting them know that I had been
13  threatened.
14  Q.  By Chelsea Voss who you do not name.
15  A.  That was the unnamed reference.
16  Q.  And that's the person you describe as a
17  former ESP member and a future Splash teacher.
18  A.  Yes.
19  Q.  So you knew at the time she was planning
20  to teach at Splash that year?
21  A.  Yes.
22  Q.  You say, unfortunately things have
23  escalated with a recent text conversation and I am
24  currently fearing greatly for my safety.  Is the

Page 268

1   text conversation the text conversation we looked at
2   earlier today?
3   A.  Yes.
4   Q.  Where she said you made her feel
5   uncomfortable?
6   A.  I believe she said that at one point in
7   the conversation.
8   Q.  Why were you currently fearing greatly for
9   your safety?
10  A.  Because she had threatened me when I told
11  her to leave me alone.
12  Q.  You have to speak up a little bit.
13  A.  Because she had threatened me after I told
14  her to stay away from me.
15  Q.  Okay.  And you say, I am now terrified to
16  let you know any details or the identity of the
17  other person as it sounds like they may be spinning
18  a story that could get me ostracized and/or jailed
19  and thus it can't be known that I'm warning anyone
20  about them.  What do you mean by ostracized?
21  A.  I mean that people would not want to
22  interact with me if she carried out with the full
23  extent of what I perceived her to be implying with
24  her threat.

Page 269

1   Q.  And why did you say that the story could
2   get you jailed?
3   A.  I don't know.
4   Q.  Well, you must have had some reason for
5   putting that in there.
6   A.  I must have had some reason for putting
7   that in there.
8   Q.  Wasn't it because she said that you
9   touched her in a way that made her feel
10  uncomfortable?
11  A.  I understood her to be threatening a very
12  serious accusation against me.
13  Q.  Of that nature; yes?
14  A.  Yes.
15  Q.  And you know that an unconsented sexual
16  touching can be charged criminally as sexual
17  assault?
18  A.  Of course.
19      MR. BOYLAN: Objection.
20  A.  Some of them can.  I don't know the
21  details.
22  Q.  And so was that what you had in mind when
23  you said that you might be jailed?
24  A.  I don't know.

Page 270

1  Q.  Well, surely you know; right?  I mean you
2  were thinking about a sexual assault charge.
3      MR. BOYLAN: Objection.
4  **A.  I don't recall thinking about criminal**
5  **charges at this time.**
6  Q.  Well, does reading the document that's
7  been put in front of you refresh your recollection
8  that you were thinking about criminal charges at
9  that time?
10 **A.  No, it does not.**
11 Q.  Why else could you have put down that you
12 were worried about being jailed other than being
13 charged with indecent assault and battery or some
14 such crime?
15 **A.  I don't know.  I don't know.  I don't know**
16 **that I had a reason for saying that.**
17 Q.  You say you're e-mailing them to let them
18 know something is up and you will soon be contacting
19 a lawyer and/or police.
20 **A.  Mm-mm.**
21 Q.  Why were you thinking about calling the
22 police on October 27th?
23 **A.  I don't remember.**
24 Q.  Why were you thinking about contacting a

Page 271

1  lawyer on October 27th?
2  **A.  To prepare for anything she might do**
3  **against me.**
4  Q.  What might those things be?
5  **A.  The smear campaign we discussed earlier.**
6  Q.  And possibly a criminal charge too; right?
7  **A.  I don't recall thinking about that but**
8  **it's possible.  This e-mail is some evidence that I**
9  **wanted to discuss.**
10 Q.  Did you ever search for a criminal defense
11 lawyer?
12 **A.  No.**
13 Q.  You write in the next paragraph, I want to
14 be clear. I really hope I'm just blowing smoke and
15 reading too much into things.  I still think it's
16 more likely than not the other person is innocent.
17 What did you mean by that?
18 **A.  I think I meant that there is -- the**
19 **person was maybe just saying things like to**
20 **intimidate me but not really meaning to follow**
21 **through.**
22 Q.  Why would that make that person innocent?
23 **A.  Because it's a lot better than what I was**
24 **afraid of her doing.**

Page 272

1  Q.  So the converse of being guilty is to have
2  a smear campaign against you?  Strike that question,
3  please.  You used the word innocent. I'm trying to
4  understand why you chose that word.
5      MR. BOYLAN: Objection.
6  **A.  I don't know.  I might have been referring**
7  **to all the intentional hurt, manipulation I**
8  **perceived her to be doing.  I don't know what it's**
9  **referring to.**
10 Q.  Could you have been referring to the fact
11 that she really did in fact feel uncomfortable based
12 on your interaction at EA Global?
13     MR. BOYLAN: Objection.
14 **A.  I don't know.**
15 Q.  You write toward the end of this e-mail
16 that Chelsea is well liked and very charismatic, the
17 type you'd never suspect of being capable of
18 anything like this.  Unfortunately that is the exact
19 profile of various kinds of sociopaths which I
20 strongly suspect this person is.
21 **A.  Mm-mm.**
22 Q.  Do you strongly suspect Chelsea Voss to be
23 a sociopath?
24 **A.  I think I was using the term too broadly**

Page 273

1  at the time.
2  Q.  You would not say that today?
3  **A.  I do not suspect her of being diagnosed**
4  **with APSD.**
5  Q.  What's APSD?
6  **A.  Antisocial personality disorder.  ASPD.**
7  **Antisocial personality disorder.**
8  Q.  Well, regardless of a particular diagnosis
9  what are you trying to convey when you say she was a
10 sociopath?
11 **A.  That she was a very uncaring, hurtful,**
12 **manipulative person.**
13 Q.  Were you saying that she was lying?
14     MR. BOYLAN: Objection.
15 **A.  I believe she told many lies.**
16 Q.  But yet you say you still think it's more
17 likely than not that the person is innocent so can
18 you explain that contradiction?
19     MR. BOYLAN: Objection.
20 **A.  I don't know exactly what I was thinking.**
21 **I was probably -- I mean -- so I might have been**
22 **thinking that by the time I believe she had hurt me**
23 **very intentionally in many ways the preceding year**
24 **and at the time I thought this could be a**

Page 322

1  A.  Yes.
2  Q.  Is it your understanding that Chelsea Voss
3  asked Mr. Yuan to reach out to you?
4  A.  Yes.
5  Q.  In July of 2019?
6  A.  No.
7  Q.  Earlier than that?
8  A.  Yes.
9  Q.  When?
10  A.  Either late May or early June of that
11  year.
12  Q.  Okay.  Do you have any documents between
13  you and Mr. Yuan about that outreach?
14  A.  There was previous correspondence.
15  Q.  And did you ultimately agree to use
16  Mr. Yuan as an intermediary to discuss your dispute
17  with Chelsea Voss?
18  A.  No.
19  Q.  Well, you wrote a long list of your
20  demands in Exhibit 37; correct?
21      MR. BOYLAN: Objection.
22  A.  Where?
23  Q.  So at the top it says so as far as what I
24  want her to do.  Do you see that?

Page 323

1  A.  Yes.
2  Q.  Okay.  He responds, can I quote all that.
3  A.  Yes.
4  Q.  So he is quoting all that to Chelsea;
5  right?
6  A.  Yes.
7  Q.  Okay.  And you say yes.
8  A.  Yes.  So okay.  He agreed to be
9  intermediary for that specific set of things.
10  Q.  And you were comfortable with him acting
11  in that capacity?
12  A.  Comfortable enough.
13  Q.  Okay.  And there's additional back and
14  forth about whether he should be an intermediary but
15  on the second page of this exhibit he forwards you a
16  document called Disarmament.pdf; correct?
17  A.  Yes.
18  Q.  And was it your understanding that was a
19  direct communication from Chelsea Voss?
20  A.  It was.
21  Q.  I have one more question about this page.
22  On the first page of Exhibit 37 do you see in about
23  the middle of the page where it says, I need a
24  statement from her nullifying the threat in some

Page 324

1  way.
2  A.  Mm-mm.
3  Q.  Not to use it as leverage against me.  Not
4  to use it in any way that if it's a false statement
5  would violate slander laws.  Do you see that?
6  A.  Yes.
7  Q.  What did you mean by if it's a false
8  statement?
9      MR. BOYLAN: Objection.
10  A.  If you say something false and damning
11  about someone, then you can be legally liable as you
12  and your client should be well aware.
13  Q.  And you were not exactly saying that her
14  statement would be false.  You're saying if it's a
15  false statement; right?
16      MR. BOYLAN: Objection.
17  A.  I did not need to get her to agree that it
18  was false.  I just needed to get her to agree to
19  stop threatening me.
20      (Exhibit 38 was marked for
21      identification.)
22  Q.  Do you recognize Exhibit 38, Mr. Koppel?
23  A.  Yes.
24  Q.  What is it?

Page 325

1  A.  This is the document entitled Disarmament
2  that was represented to me as having come from the
3  ex.
4  Q.  And you received this then from Mr. Yuan,
5  did you not?
6  A.  Yeah.  It was sent in the previous.  It
7  was attached in the communication with the previous
8  exhibit printout.
9  Q.  Can you turn back quickly to Exhibit 37,
10  the second page?  After you received the disarmament
11  document, you responded, wow.  That was really good.
12  Do you see that?
13  A.  Yes.
14  Q.  Why did you think that was really good?
15  A.  Because it sounded like it came from
16  someone who was actually capable of empathy.
17  Q.  Why else?
18  A.  I think anything I could say would fall
19  under that umbrella.
20  Q.  Okay.  You say, also I still don't
21  entirely believe her story.  Do you see that?
22  A.  Yes.
23  Q.  And what were you trying to convey there?
24  A.  I don't know.  I don't know what I wanted

Page 326

1 Giao Chu to understand.
2 Q.  Turning to Exhibit 38, please.  If you
3 would turn to the --
4 A.  Are we done with this exhibit?
5 Q.  For now.
6 A.  Okay.
7 Q.  On the second page of Exhibit 38 you see
8 here she writes at the top, here's everything that
9 happened at EA Global from my point of view that
10 made me feel uncomfortable.  At the end of a
11 greeting hug that we shared, one of two, your hand
12 grabbed and squeezed my butt.  It was my right butt
13 cheek.  At the same time you seemed to me to grin
14 and a laugh in a way that I interpreted as
15 affectionate and that reminded me of sexual context.
16 I interpreted it as an expression of romantic and
17 sexual affection and I felt really uncomfortable
18 about it.  Do you see that?
19 A.  Yes.
20 Q.  What's false in this statement?
21 A.  I never touched her butt at that event.
22 Q.  You never grabbed and squeezed her butt?
23 A.  I never touched her butt at that event.
24 Q.  She later says that you -- she was looking

Page 327

1 at a conference program and you pulled the program
2 out of her hands without asking.  I felt like my
3 personal space had been violated.
4 A.  Mm-mm.
5 Q.  Is there anything false about that?
6 A.  I do not recall doing that.
7 Q.  Is it something you might have done?
8 A.  It is and I believe I said so in the
9 following document.
10 Q.  And then in Paragraph 3 she writes that
11 you followed her at a time she wanted to be alone,
12 quote, and I felt uncomfortable that you had
13 followed me, end quote.  Do you see that?
14 A.  I do see that.
15 Q.  Had you followed her at the conference?
16 A.  No.
17 Q.  So that's false according to you?
18 A.  Yes.
19 Q.  Could you turn to Page 1172, please?  Do
20 you see the paragraph that begins, when I sent you
21 my text about EAG, it came in part from a place of
22 wanting to be understood.
23 A.  Mm-mm.
24 Q.  But mostly it came from a place of fear.

Page 328

1 A.  Mm-mm.
2 Q.  Do you see then that later in that
3 paragraph she writes, I felt scared that you might
4 intend to hurt me and I felt angry you might not
5 care what impact you might have on me.  Do you see
6 that?
7 A.  Wait.  Can you repeat what I would have
8 seen?
9 Q.  Middle of the paragraph the sentence
10 beginning I felt scared.
11 A.  I don't remember the exact quote you read
12 but I see at least part of it matching here.
13 Q.  Okay.  And do you have any reason to doubt
14 that she was fearful at the time she sent you the
15 text about EAG?
16      MR. BOYLAN: Objection.
17 A.  I have lots of reasons to doubt she was
18 fearful in general.  I did not see her react.  I did
19 not see her face or anything physical about her at
20 the time she sent the text because it was remote.
21 Q.  But again you say that -- strike that.
22      (Exhibit 39 was marked for
23      identification.)
24 Q.  Mr. Koppel, what is Exhibit 39?

Page 329

1 A.  That appears to be an e-mail from myself
2 to the ex-girlfriend.
3 Q.  And your e-mail to Chelsea Voss is dated
4 July 24, 2019; correct?
5 A.  It appears so.
6 Q.  And this would appear to be the day after
7 you received the disarmament document; correct?
8 A.  Not correct.
9 Q.  On Exhibit 37 which I note you're looking
10 at you'll see the disarmament document was sent to
11 you on July 23rd at 4:39 p.m.?
12 A.  Correct.
13 Q.  And this document is dated July 24, 2019?
14 A.  Twenty minutes past midnight.
15 Q.  Okay.  So it was the following day.
16 A.  Well, as the calendar goes but it was the
17 same day by standards.
18 Q.  That's fine.  Similar to your text to the
19 intermediary you wrote, hello.  Wow, that was really
20 good referring to her disarmament document; correct?
21 A.  Yes.
22 Q.  It means a lot to me and brought tears to
23 my eyes.  Is that what you wrote?
24 A.  I do see those words there.

Page 330

1  Q.   Turning to the second page at the bottom
2  do you see where it begins, here's my recollection
3  of what happened at EAG 2016?
4  A.  I do.
5  Q.   And do you then state your memory of
6  events that took place at EAG?
7  A.  I might have edited it to be less
8  confrontational but I do state -- I might have
9  edited it to less directly accuse her of lying but I
10  do state a version of my recollection at the time.
11  Q.  Is everything in this recounting of your
12  memory of the events at EAG true?
13     (Witness perused document.)
14  A.  I believe you intend to interpret the word
15  possible in a way that --
16  Q.  Mr. Koppel, I'm asking you a different
17  question.  Is everything in this document true?
18  Please go ahead and read it and tell me what's not
19  true, if anything?
20  A.  I was answering your question.  I believe
21  you intend to interpret the word possible in a way
22  that I did not intend it.  As I intended these words
23  to be read, I believe -- as I intended these words
24  to be read, everything that I wrote here is true.

Page 331

1  Q.   Okay.  I gather then you're looking at a
2  paragraph on Page 1189 of this exhibit?
3  A.  Yes.
4  Q.   And the paragraph begins, while it is
5  possible I squeezed your butt, it seems very
6  unlikely I did so intentionally.  Is that what you
7  were referring to when you talked about the word
8  possible?
9  A.  Yes.  I believe that you intended to --
10  Q.   My questions don't have to do with my
11  intent, Mr. Koppel.
12     MR. BOYLAN: You're raising your
13  voice.  Keep it calm, please, Mr. Pyle.
14  Q.   Well, let me ask you this question.  What
15  did you mean to convey by the sentence, while it is
16  possible I squeezed your butt, it seems very
17  unlikely I did so intentionally.
18     MR. BOYLAN: Objection.
19  A.  It would not have violated any laws of
20  physics.
21  Q.   What?
22     MR. BOYLAN: That's not a question.
23  Q.   What do you mean by it would not have
24  violated any laws of physics?

Page 332

1  A.  If you can prove that I squeezed her butt,
2  you will not win a Nobel prize in physics.
3  Q.   Is that a joke?
4  A.  No.  I mean mostly not.  It's a little
5  humorous but that's one of the ways of putting what
6  I just said.
7  Q.   So are you saying it would have been
8  physically possible for me to have squeezed your
9  butt?
10  A.  Well, if it turns out right now that you
11  actually had squeezed my butt a few minutes ago and
12  you didn't realize it, then you would not win a
13  Nobel prize in physics.
14  Q.   Mr. Koppel, you didn't say it would have
15  been physically possible for me to have squeezed
16  your butt, did you?
17     MR. BOYLAN: Objection.
18  Q.   Those aren't the words on this page, are
19  they?
20  A.  Would you repeat that as a whole question?
21     MR. PYLE: Could you please repeat
22  the last question I asked?
23     (Question was read back by the stenographer.)
24  A.  There are too many exits in that sentence.

Page 333

1  Q.   Did you write that it would have been
2  physically possible for you to have squeezed her
3  butt?
4  A.  I did not use those words.
5  Q.   No, you didn't.  You spoke in the past
6  tense, didn't you?
7     MR. BOYLAN: Objection.
8  A.  If I check if this is past or subjective,
9  I believe it's past but this is like grammar
10  nitpick.  I don't know why you're asking this.
11  Q.   So you're saying that it is possible that
12  you squeezed her butt at EAG in 2016?
13     MR. BOYLAN: Objection.
14  A.  Not in the way I believe you intend that
15  word to be used.
16  Q.   Which word?
17  A.  Possible.  How many times do we have to go
18  over this?
19  Q.   As many times until we get some clear
20  testimony.  What did you mean by it seems very
21  unlikely I did so intentionally?
22  A.  Before I answer may I represent that I've
23  given you the same answer to questions many times.
24  I do not like to be told I'm not giving testimony

Page 334

1  when I believe I'm doing so.  So to your question
2  whether I did it intentionally, it's a lot more
3  polite than saying you're an f'ing liar.
4  Q.  So are you suggesting that you lied in
5  this document in order to smooth things over with
6  Chelsea?
7      MR. BOYLAN: Objection.
8  A.  I am saying that I did not accuse of her
9  lying in this document directly.
10  Q.  What's interesting is that you move on to
11  say that you do remember the event; right?
12  A.  Sorry.  What?
13  Q.  You did not claim to have a lack of memory
14  about what happened during that event, did you?
15  A.  This document recounts my recollection of
16  the events of the EA Global conference.
17  Q.  Your recollection of these events is
18  pretty good, isn't it?
19      MR. BOYLAN: Objection.
20  A.  I've relived it many times.
21  Q.  Because you testified unequivocally
22  yesterday and today that you never squeezed her
23  butt; correct?
24  A.  Yes.

Page 335

1  Q.  And you remember the event and remember
2  that you did not do that; is that your testimony
3  today?
4  A.  Yes.
5      MR. BOYLAN: Objection.
6  Q.  Would you say your memory of events is
7  better today in 2022 than it was on July 24, 2019?
8  A.  I'm laughing because I think you're going
9  to be very disappointed if you keep going down this
10  line of questioning.  I did not testify that my
11  memory today is better than it was in 2019 but let's
12  keep playing.
13  Q.  Because you remember saying that you
14  flirtatiously pulled in Chelsea to touch noses.  Do
15  you see that in this paragraph?
16  A.  That's right.
17  Q.  And do you in fact remember that today?
18  A.  No.
19  Q.  You don't remember that today?
20  A.  I only remember writing about it back
21  then.  I have an image in my mind but I believe the
22  image is from reading this and not from my memory.
23  Q.  And do you believe that you were truthful
24  when you wrote that you flirtatiously pulled her in

Page 336

1  to touch noses?
2  A.  Yes.
3  Q.  And you write in a hypothetical sense
4  given that I felt it was very dangerous and risky to
5  touch noses, it sounds very unlikely that I would
6  have intentionally squeezed your butt.  Do you see
7  that?
8  A.  Yes.
9  Q.  Why are we taking about probabilities here
10  if you remember the event?
11      MR. BOYLAN: Objection.
12  A.  It's a little bit external justification
13  and it's a lot more polite than calling her an f'ing
14  liar.
15  Q.  So you're saying here you weren't being
16  direct with her in this paragraph.  You were
17  massaging the truth in order to smooth things over?
18      MR. BOYLAN: Objection.
19  A.  I was being less forceful than I believed
20  because that would be a lower conflict thing to do.
21  Q.  Was the disarmament document the first
22  time that Chelsea Voss had told you that you had
23  squeezed her butt at EAG?
24  A.  It was.

Page 337

1  Q.  And so that was news to you?
2  A.  Yes.
3  Q.  After Chelsea Voss told you in the text
4  message in October of '16 and the correspondence
5  after that that you had made her uncomfortable in
6  October or in September of -- sorry.  August of
7  2016.  Strike that whole question.  I'll start
8  again.
9  A.  Okay.
10  Q.  After Chelsea Voss told you that you had
11  made her uncomfortable at EAG, did you ever consider
12  that you might have done something wrong?
13  A.  All the time.  Of course.
14      MR. BOYLAN: Objection.
15  Q.  Tell me about that.
16  A.  I replayed my memories back then of EAG
17  things since over and over to try to find out what
18  the heck she could possibly be talking about.
19  Q.  And then in the disarmament document you
20  finally learned what she was talking about?
21  A.  I finally learned what she claims to be
22  talking about, yes.
23  Q.  Did you consider at that time as of
24  July 2019 that it might not be a good idea in the

Case 1:20-cv-11479-LTS   Document 129-3   Filed 01/23/23   Page 28 of 55

Koppel v.
Moses

Confidential

James Koppel - Vol. 2
July 26, 2022

Page 338

1  future to touch women without asking?
2  A.  Excuse me?
3  Q.  Did you consider after receiving the
4  disarmament document that it might not be a good
5  idea to touch women without asking them in the
6  future?
7  A.  This is a have you stopped beating your
8  wife question.
9  Q.  I'm asking what you considered.
10     MR. BOYLAN: Objection.
11  A.  Yeah.  You're saying that I ever thought
12  so to begin with.
13  Q.  I'm sorry?
14  A.  You're suggesting that I ever thought so
15  to begin with.  This is a have you stopped beating
16  your wife question.  You know what I'm talking
17  about; right?
18  Q.  So do you have an answer?
19     MR. BOYLAN: Objection.
20  A.  Can you rephrase the question in a way
21  which doesn't make assumptions like that?
22  Q.  Well, you say you replayed the EAG Global
23  event in your mind over and over to figure out what
24  you could have done wrong; right?

Page 339

1  A.  Yes.
2  Q.  Did that make you do any soul searching
3  about your treatment of women?
4  A.  Excuse me?
5  Q.  I think you understand the question.
6  A.  There's a lot of assumptions in there.
7  Q.  I think it can be answered yes or no.
8     MR. BOYLAN: Did you do any soul
9  searching?
10  A.  About my treatment of women?
11     MR. BOYLAN: That's the question.
12  A.  That's a pretty broad thing and I submit
13  that -- well, that's like a very -- I don't like
14  lumping large kinds of behavior into categories like
15  that.  No.  I reject the assumption there was ever
16  anything wrong with my, quote, treatment of women
17  whatever that means.
18  Q.  Well, okay.  And rejecting that assumption
19  is your answer no?
20     MR. BOYLAN: Objection.
21  A.  This is a have you stopped beating your
22  wife question.  I have not stopped beating my wife
23  because I never beat her.
24  Q.  I didn't ask you if you stopped beating

Page 340

1  your wife.  I asked you if you did any soul
2  searching concerning your treatment of women after
3  Chelsea Voss told you that you had made her feel
4  uncomfortable?
5  A.  I don't recall if I did but I never have
6  any trouble with my, quote, treatment of women,
7  unquote.
8  Q.  Did you consider at any time that you
9  might want to look for clearer signals from people
10  that they want physical contact before you initiate
11  it?
12  A.  I have gotten a bit better at reading
13  people's signals over the years.
14  Q.  Explain that, please.
15  A.  It's something I have been improving
16  continuously since I was a child.
17  Q.  Something you have been improving
18  continuously since you were a child?  Reading
19  people?
20  A.  Yes.
21  Q.  And do you think that you're improving in
22  reading people's willingness to have physical
23  contact?
24  A.  Yes.

Page 341

1  Q.  Okay.  You haven't always been as good at
2  that as you are today?
3  A.  I'm not sure where my relative ability is
4  today versus before the pandemic.  The pandemic was
5  not good for keeping any in-person social skills up
6  for anyone both neurotypical and non,
7  non-introductory.
8  Q.  But before the pandemic you may have had
9  more difficulty reading people's signals as to
10  whether they wanted physical contact with you?
11     MR. BOYLAN: Objection.
12  A.  I think this is something that everyone
13  struggles with and everyone can be continuously
14  learning.
15  Q.  And you've struggled with that.
16  A.  Of course.  I think it's something
17  everyone struggles with.
18  Q.  Is it fair to say you were still nervous
19  about Chelsea Voss's accusations of you even in July
20  of 2019?
21  A.  She still had a gun pointed at my head
22  metaphorically.
23  Q.  That's because she had accused you of
24  inappropriate touching.

Page 342

1  A.   Both that and her follow-on behavior.
2  Q.   And you agree she had accused you
3  effectively of sexual misconduct.
4       MR. BOYLAN: Objection.
5  A.   She had threatened to.
6  Q.   Arguably even sexual assault.
7  A.   I didn't have any details at the time.
8  Q.   That's why you wrote to Mikayla Murphy
9  back in 2016 that you were worried about even being
10 jailed; right?
11 A.   I don't recall why I said that and I
12 realized yesterday I should stop speculating about
13 what I meant what I said in six year old e-mails
14 because I'm pretty sure at least one of the
15 speculations is wrong.
16 Q.   And she explained in the disarmament
17 document that she thought you made an inappropriate
18 romantic advance; right?
19 A.   Sorry. Where is that?
20 Q.   In the disarmament document she thought
21 that you had made a romantic advance at her that
22 made her uncomfortable. Do you remember that?
23 A.   Where does it say that?
24 Q.   Well, second page of the disarmament

Page 343

1  document Exhibit 38. Second page of that.
2  A.   Which paragraph are you referring to?
3  Q.   The numbered paragraph one at the top of
4  the page midway through it. She says that she
5  interpreted your conduct, quote, as an expression of
6  romantic and sexual affection.
7  A.   I do see where it says that.
8  Q.   So she was saying that you had made a
9  romantic advance at her that made her feel
10 uncomfortable; right?
11 A.   I believe she's being careful with her
12 words and so I'm not going to impute meaning that
13 she did not say.
14 Q.   Do you recall we asked you in an
15 interrogatory to identify all instances where people
16 had made accusations like that against you?
17      MR. BOYLAN: Objection.
18 A.   That was not in the interrogatory. I'm
19 not going to make summaries.
20 Q.   Do you recall that the interrogatory asked
21 you about any instances of accusations of
22 inappropriate touching or sexual misconduct?
23 A.   I believe that was not in any
24 interrogatory. I'm not going to make summaries.

Page 344

1  Q.   Okay. Let's look at the text of the
2  interrogatory.
3       MR. PYLE: Go off the record,
4  please.
5       THE VIDEOGRAPHER: The time is
6  11:17. We're off the record.
7       (Discussion off the record.)
8       (Exhibit 40 was marked for
9  identification.)
10      THE VIDEOGRAPHER: The time is
11 11:19. We're back on the record.
12 Q.   Do you recognize Exhibit 40, Mr. Koppel?
13 A.   Yes.
14 Q.   Turn to Page 4 of this document. Please
15 read to yourself Interrogatory No. 5.
16      (Witness perused document.)
17 A.   Okay.
18 Q.   And please take a look at your response.
19      MR. BOYLAN: Could he read answer
20 four before he does that?
21      MR. PYLE: I'm asking him to look at
22 number five.
23 A.   I read answer five.
24 Q.   Okay. And Interrogatory 5 asks you to

Page 345

1  identify each and every instance in which any person
2  made any complaint, allegation, report or assertion
3  that you had engaged in sexual misconduct of any
4  kind including but not limited to unwanted touching,
5  sexual harassment, sexual assault, inappropriate or
6  unwanted sexual or romantic advances or offensive
7  comments of a sexual nature at any time. Do you see
8  that?
9  A.   Yes.
10 Q.   And you responded, since 2015 I am aware
11 of no instances where someone reported that I had
12 engaged in any of the above-described conduct toward
13 them. Do you see that?
14 A.   I do see that.
15 Q.   That wasn't true, was it?
16 A.   What makes you think that's not true?
17 Q.   The fact that we've just been discussing
18 Chelsea Voss's accusation of inappropriate touching
19 and unwanted sexual advances made in 2016.
20      MR. BOYLAN: Objection.
21 A.   How does that contradict what I wrote?
22 Q.   I'm asking the questions here. You can
23 explain to me, Mr. Koppel, why it doesn't contradict
24 what you wrote.

Case 1:20-cv-11479-LTS   Document 129-3   Filed 01/23/23   Page 30 of 55

Koppel v.
Moses
Confidential
James Koppel - Vol. 2
July 26, 2022

Page 346

1  A.  It is true.  It doesn't contradict
2  anything I wrote.
3  Q.  Why?
4  A.  Why?  Because when I wrote this, I was
5  aware of no instances where someone had reported
6  that I engaged any of the above-described conduct
7  towards them.
8  Q.  Well, Chelsea Voss had reported it to you,
9  hadn't she?
10      MR. BOYLAN: Objection.
11  A.  That was not a report.
12  Q.  Why is it not a report or complaint,
13  allegation or assertion?
14  A.  I only answered about report.
15  Q.  So you intentionally withheld that
16  information in this interrogatory?
17      MR. BOYLAN: Objection.
18  A.  I gave a truthful answer.
19  Q.  Why did you withhold that information, Mr.
20  Koppel?
21      MR. BOYLAN: Objection.
22  A.  I think you're asking for attorney-client
23  communications.
24  Q.  Can you answer the question without

Page 347

1  disclosing attorney-client communications?
2  A.  Why?  Because it's my duty to give you a
3  truthful answer.  I'm not aware of any other duty
4  beyond that in the interrogatories.  If I am, well,
5  you should talk to Mr. Boylan about that.
6  Q.  Weren't you withholding that information
7  so you'd win this case?
8  A.  No.
9      MR. BOYLAN: Objection.
10  Q.  You didn't think that that information
11  would harm your position in this case?
12  A.  I don't see any relevance.
13  Q.  Really?
14  A.  Correct.
15  Q.  The allegedly defamatory e-mail says that
16  you made other SIPB keyholders uncomfortable.  Do
17  you recall that?
18  A.  I think it was members or keyholders, yes.
19  Q.  I'm sorry.  Members and keyholders?
20  A.  Members or keyholders.  Pick which one.
21  Q.  Okay.  And you had made Chelsea Voss
22  uncomfortable?
23  A.  No.  Not true.
24  Q.  Correct?

Page 348

1      MR. BOYLAN: Objection.
2  Q.  Had she reported that you made her
3  uncomfortable?
4      MR. BOYLAN: Objection.
5  A.  I did not know that at the time.
6  Q.  Well, had she stated to you that you made
7  her uncomfortable?
8  A.  Yes.
9  Q.  And you withheld that information to
10  advance your position in this case against my client
11  Mr. Moses for defaming you; right?
12  A.  What do you mean I withheld information?
13  I'm pretty sure you know more about it than I do.
14  Q.  Okay.  At the time you answered this
15  interrogatory, Mr. Koppel, you didn't know that we
16  knew about the Chelsea Voss incident, did you?
17  A.  I did know that.
18      MR. BOYLAN: Objection.
19  Q.  How did you know that?
20  A.  Because you had already disclosed several
21  hundred documents.
22  Q.  Hadn't we in fact disclosed them after the
23  date of this document?
24  A.  No.  Before.

Page 349

1  Q.  Well, the record will speak for itself on
2  that.
3  A.  To clarify my answer, some of the
4  documents I'm referring to you disclosed around this
5  time or later but I already knew at this point that
6  Mr. Moses had had a long conversation with her
7  directly which is the basis of my statement that you
8  know more about it than I do.
9  Q.  How did you know Mr. Moses had a
10  conversation with Chelsea Voss?
11  A.  Because he disclosed that interaction
12  around the conversation.
13  Q.  Mr. Koppel, remind us again what the ET
14  house is.
15  A.  It's an independent living group.
16  Q.  At MIT?
17  A.  Yes.
18  Q.  And MIT students live there?
19  A.  Yes.
20  Q.  Did you often visit ET during your time at
21  MIT?
22  A.  Some periods, yes.
23  Q.  And did you have friends at ET?
24  A.  Yes.

Page 350

1  Q.   What kind of things would you go do with
2  folks over at ET house?
3  **A.   Play games mostly.**
4  Q.   This is a house that was interested in
5  games?
6  **A.   Yes.**
7  Q.   Okay.  What else did you do?
8  **A.   I think I described.  I'm not -- actually**
9  **I don't know that there's that much in the way of**
10 **not playing games that happened there actually.**
11 Q.   And did you have friends at the ET house?
12 **A.   Yes.**
13 Q.   Who were some of your friend at the ET
14 house?
15 **A.   Linus Hamilton, Lotta Blumberg, Adam**
16 **Hesterberg.  I'd say I was friendly with a lot of**
17 **people there.  I think Linus and Adam were the two**
18 **biggest ones.**
19 Q.   What is Mystery Hunt?
20 **A.   It's an event that happens at MIT.**
21 Q.   What's the nature of the event?
22 **A.   Puzzles.**
23 Q.   Can you describe it in a little more
24 detail?

Page 351

1  **A.   It's a weekend where there are a lot of**
2  **puzzles and people put together teams and solve them**
3  **and the grand price is to write the hunt for next**
4  **year.**
5  Q.   And do people sleep over in the same house
6  while they're working on puzzles together sometimes?
7  **A.   They can.**
8  Q.   They can?
9  **A.   Yeah.**
10 Q.   Did people used to stay at ET while
11 working on Mystery Hunt?
12 **A.   To my knowledge.**
13 Q.   Were you one of them?
14 **A.   No.**
15 **(Exhibit 41 was marked for**
16 **identification.)**
17 Q.   Do you recognize Exhibit 41, Mr. Koppel?
18 **A.   Yes.**
19 Q.   What is it?
20 **A.   Appears to be an e-mail from Luke**
21 **Sciarappa myself.**
22 Q.   And it asks you to find a different team
23 other than ET to work with for Mystery Hunt and it
24 says, one of the reasons is, quote, some of our

Page 352

1  members have expressed that they would not be
2  comfortable with you being on the team.  Do you see
3  that?
4  **A.   Yes.**
5  Q.   Did you respond to this e-mail?
6  **A.   I don't recall.**
7  Q.   Did you talk to Luke Sciarappa about being
8  asked not to work on the ET Mystery Hunt team?
9  **A.   I don't recall.**
10 Q.   Did you ask him why people said they were
11 not comfortable with you being on the team?
12 **A.   Of course not.**
13 Q.   Why?
14 **A.   That's a very rude and invasive thing to**
15 **do.**
16 Q.   Really?  To ask why someone is asking you
17 not to interact with a group is a rude and invasive
18 thing to do?
19 **A.   Yes.**
20 Q.   Okay.  So your testimony is you didn't
21 respond to this at all?
22 **A.   No.  I don't remember my response.**
23 Q.   But it would have been rude for you to
24 respond so you think that you probably didn't?

Page 353

1       MR. BOYLAN: Objection.
2  **A.   That's not what I said.**
3  Q.   Well, I guess I'm trying to figure out is
4  it possible that you responded and just don't
5  remember?
6       MR. BOYLAN: Objection.
7  **A.   Yes.**
8  Q.   Why were members of ET house uncomfortable
9  with you being on the team?
10      MR. BOYLAN: Objection.
11 **A.   Because my ex had followed through on her**
12 **threat.**
13 Q.   So you think Chelsea had told folks at ET
14 that you touched her in a way that made her
15 uncomfortable in 2016?
16 **A.   Yes.**
17 Q.   Okay.  Why do you think that that's why
18 they were uncomfortable with you?
19 **A.   Because we have the chat logs that you so**
20 **kindly disclosed to us explaining that is the**
21 **reason.**
22 Q.   And who at ET to your knowledge was
23 uncomfortable with you being part of the Mystery
24 Hunt team?

Case 1:20-cv-11479-LTS   Document 129-3   Filed 01/23/23   Page 32 of 55

Koppel v.
Moses
Confidential
James Koppel - Vol. 2
July 26, 2022

Page 354

1  A.  Pravina Samaratunga.
2  Q.  Who else?
3  A.  That's the only one I know.
4  Q.  Do you think there might be any other
5  reasons why people were uncomfortable with you being
6  on the team?
7  A.  No.
8       (Exhibit 42 was marked for
9       identification.)
10 Q.  Do you recognize this Exhibit 42?
11 A.  Yes.
12 Q.  What is it?
13 A.  It's an e-mail from Mollie Wilkinson to
14  myself.
15 Q.  And in that e-mail dated August 31, 2019
16  Ms. Wilkinson says she's concluded that it would be
17  best to request that you avoid ET events during
18  rush.
19 A.  Mm-mm.
20 Q.  Because there are still some at the house
21  uncomfortable with your presence.
22 A.  Mm-mm.
23 Q.  Do you see that?
24 A.  I do see that.

Page 355

1  Q.  Did you respond to this e-mail?
2  A.  I don't recall.
3  Q.  Did you have any conversations with Mollie
4  Wilkinson about this e-mail or the subject of it?
5  A.  I don't recall if I responded.  I
6  definitely did not speak to her in person about
7  this.
8  Q.  And do you know who was uncomfortable with
9  your presence at the ET house in August of 2019?
10 A.  I was never told.
11 Q.  Okay.  Do you have an idea who was
12  uncomfortable?
13 A.  Yes.
14 Q.  Who was that?
15 A.  Same person as before.  Pravina
16  Samaratunga.
17 Q.  So just Pravina you think is uncomfortable
18  with you being around?
19 A.  Yes.
20 Q.  Okay.  And is it your same answer that
21  she's uncomfortable because of what Chelsea Voss
22  told her?
23 A.  That's the only thing to my knowledge.
24

Page 356

1       (Exhibit 43 was marked for
2       identification.)
3  Q.  Mr. Koppel, do you recognize Exhibit 43?
4  A.  Yes.
5  Q.  What is it?
6  A.  It appears to be a Facebook post by Andrea
7  Carney.
8  Q.  And on the second page of this exhibit
9  beginning at Koppel 1113.
10 A.  Mm-mm.
11 Q.  Does this appear to be a direct message
12  exchange between you and Andrea Carney around the
13  same time?
14 A.  Yes.
15 Q.  And her Facebook post is about men who
16  approached her on the street; correct?  Strike that.
17  Her Facebook post is about street harassment; right?
18 A.  This does discuss that.
19 Q.  Okay.  And she talks about the differences
20  between the street harassment she experiences in
21  Dorchester versus Cambridge; right?
22 A.  Yes.
23 Q.  And you initiate a direct text exchange
24  with her, Messenger exchange in response to this

Page 357

1  asking her how often do guys approach you.  Do you
2  see that?
3  A.  It appears so.
4  Q.  Why did you ask her that question?
5  A.  I learned after yesterday I should stop
6  speculating about what I was thinking when I sent a
7  text five years ago.
8  Q.  Because your lawyer told you to stop
9  speculating?
10 A.  No.
11     MR. BOYLAN: Objection.  Don't even
12  answer that.
13 A.  I'm not even going to answer that.
14 Q.  Do you have any idea why you asked her how
15  often do guys approach you?
16 A.  I would guess I wanted an answer to that
17  question.
18 Q.  Was it just curiosity?
19 A.  What do you mean by just curiosity?  Like
20  what?
21 Q.  Why were you curious about how often guys
22  approach Andrea Carney?
23 A.  I don't know.
24 Q.  No idea?

Case 1:20-cv-11479-LTS  Document 129-3  Filed 01/23/23  Page 33 of 55

Koppel v.
Moses
Confidential
James Koppel - Vol. 2
July 26, 2022

Page 390

1  Q.  When did you join SIPB?
2  A.  **2018.**
3  Q.  What month?
4  A.  **August or September.**
5  Q.  And why did you join SIPB?
6  A.  **Because I was interested in the privileges**
7     **of keyholdership.**
8  Q.  The privileges of what?
9  A.  **Keyholdership.**
10 Q.  Keyholdership.  I see.  What's a keyholder
11    first of all?
12 A.  **A keyholder is like a second tier**
13    **membership in the organization and you have certain**
14    **privileges.**
15 Q.  A higher tier membership?
16 A.  **Yes.**
17 Q.  And what are the privileges that a
18    keyholder of SIPB holds?
19 A.  **The largest one is lifetime access to MIT**
20    **computing services.**
21 Q.  MIT computing services?
22 A.  **Yes.**
23 Q.  Okay.  And what MIT computing services
24    would you have access to as a SIPB keyholder?

Page 391

1  A.  **All of them.**
2  Q.  Can you give me some examples of why
3     someone would be interested in having that for life?
4  A.  **Enterprise Dropbox subscription.**
5     **Enterprise Zoom subscription.  Access to Eduroam.**
6  Q.  Eduroom?
7  A.  **Eduroam.**
8  Q.  Eduroam.  What is Eduroam?
9  A.  **It is a network of wifi hot spots.**
10 Q.  Any others?
11 A.  **Yes.**
12 Q.  What others interested you?
13 A.  **Access to MIT VPN.**
14 Q.  Virtual private network?
15 A.  **Yes.**
16 Q.  Any others?
17 A.  **Yes.**
18 Q.  Can you tell me?
19 A.  **Access to MIT library online resources.**
20 Q.  When did you first become aware of SIPB?
21 A.  **In 2012 or 2013.**
22 Q.  Before you even came to MIT?
23 A.  **Yes.**
24 Q.  How did you become aware of SIPB then?

Page 392

1  A.  **I was told about it.**
2  Q.  By whom?
3  A.  **Jonathan Losh.**
4  Q.  And you came to MIT in the spring of 2015;
5     correct?
6  A.  **Yes.**
7  Q.  And why didn't you join SIPB at that time?
8  A.  **I was not interested at that time.**
9  Q.  And when did you become interested in
10    joining SIPB?
11 A.  **I don't recall.**
12 Q.  Was it as late as August of 2018?
13 A.  **No.**
14 Q.  Can you give me a ballpark of when you
15    first wanted to join SIPB?
16 A.  **Sometime between 2016 and 2018.**
17 Q.  Did you at any time review the
18    constitution of the Student Information Processing
19    Board?
20 A.  **In what time frame?**
21 Q.  Well, when was the first time you reviewed
22    it?
23 A.  **I don't recall.**
24

Page 393

1     (Exhibit 50 was marked for
2     identification.)
3  Q.  Mr. Koppel, do you recognize Exhibit 50?
4  A.  **Yes.**
5  Q.  What is it?
6  A.  **It appears to be a copy of the SIPB**
7     **constitution as of October 2018.**
8  Q.  And you produced this document; correct?
9  A.  **Seems so.**
10 Q.  In fact, it's the very first document that
11    you produced in this case; correct?
12 A.  **It is numbered so.**
13 Q.  Do you maintain that this document has
14    some significance to this litigation?
15 A.  **Yes.**
16 Q.  Why?
17 A.  **I believe we outlined that in our**
18    **complaint.  It says -- it gave some rules that were**
19    **not followed.**
20 Q.  Some rules about due process for people in
21    your position?
22 A.  **Some rules about due process, yes.**
23 Q.  And any other significance this has?
24 A.  **You should ask Mr. Boylan about that.  I**

Page 394

1   think there might have been one.
2   Q.   Well in any event, is it your allegation
3   that this is a document that binds SIPB?
4   A.   Yes.
5   Q.   So your allegation is this is a document
6   that set forth the rules of SIPB?
7   A.   It sets forth -- it does not set forth the
8   rules about printer use.  It does not set forth the
9   etiquette for when you leave the door open but it
10  does set forth rules.
11  Q.   And it defined certain terms; correct?
12  A.   I think so.
13  Q.   Okay.  On Page 1 it states that one of the
14  privileges and responsibilities of a keyholder, and
15  I'm looking at Section 3.2, is that they hold a key
16  to the office; right?
17  A.   I found it.  Yes.
18  Q.   And to your understanding is that true
19  that keyholders literally hold a key to the SIPB
20  office?
21  A.   Yes.
22  Q.   And when are they granted that key?
23  A.   Sometime after being granted keyholdership
24  status.

Page 395

1   Q.   Do they necessarily ever lose that key?
2   A.   If they dropped it in the sewer, they will
3   have lost it.
4   Q.   But does SIPB ever take the key back?
5   A.   I don't know.
6   Q.   Okay.  Turning to the second page at the
7   top you see it defines the term keyholder again;
8   correct?
9   A.   No.
10  Q.   Well, does it discuss student and
11  associate keyholders?
12  A.   Yes.
13  Q.   And you see that it defines two levels of
14  keyholdership, one of which is student keyholders
15  and the other of which is associate keyholders;
16  correct?
17  A.   Yes.
18  Q.   And how is an associate keyholder defined?
19  A.   It says any keyholder who is not a student
20  keyholder shall be an associate keyholder.
21  Q.   Okay.  And a student keyholder is defined
22  as key-holding members who are also students of the
23  Massachusetts Institute of Technology; correct?
24  A.   Yeah.  I would just note I want a bathroom

Page 396

1   break within five minutes.
2   Q.   Sure.  That's fine.  Is that how it
3   defines student keyholders?
4   A.   Repeat the question in full.
5   Q.   Does it define student keyholders as
6   key-holding members who are also students of the
7   Massachusetts Institute of Technology?
8   A.   Yes.
9   Q.   So what's an example of an associate
10  keyholder?
11  A.   A person keyholder who is not a student.
12  Q.   Perhaps a keyholder who was a student and
13  has graduated?
14  A.   That's one example.
15  Q.   Okay.  From time to time did you observe
16  that alumni of MIT were involved in the work of
17  SIPB?
18  A.   Yes.
19  Q.   Can you give some examples of that?
20  A.   There are a couple who attended meetings.
21  Q.   Were there projects that SIPB was
22  responsible for?
23  A.   SIPB was responsible for several projects.
24  Q.   Did alums sometimes run those projects?

Page 397

1   A.   Not to my knowledge.
2   Q.   Did alumni ever participate in those
3   projects?
4   A.   Yes.
5   Q.   Were alumni ever physically present at the
6   SIPB office?
7   A.   Yes.
8   Q.   Was that a frequent occurrence?
9   A.   Yes.
10  Q.   Were there some faculty at MIT who were
11  SIPB keyholders?
12  A.   I believe so.
13  Q.   Do you know some examples that?
14  A.   Issac Zhuang.
15  Q.   Who else?
16  A.   I believe a member, not sure a keyholder,
17  Adam Belay.  I'm not sure.  Maybe.
18  Q.   Okay.  Did SIPB during your time there
19  have an Executive Committee?
20  A.   Yes.
21  Q.   And what were the duties that you observed
22  the Executive Committee doing?
23  A.   They had a chair, a vice chair.  They had
24  a treasurer who does treasury stuff.  They have a

Page 398

1  secretary who takes meeting minutes.
2  Q.  Do they take certain actions on behalf of
3  the organization sometimes?
4  **A.  Can you be more specific?**
5  Q.  Well, did you ever understand that the
6  Executive Committee made decisions for SIPB itself?
7  **A.  Yes.**
8  Q.  Okay.  And from time to time did you as a
9  SIPB member receive communications from the
10  Executive Committee?
11  **A.  I received communications from members of**
12  **the Executive Committee and I'm being pretty close**
13  **to needing a bathroom break.**
14  **MR. PYLE:** Let's go off the record.
15  **THE VIDEOGRAPHER:** The time is
16  12:36.  We are off the record.
17  (A break was taken for lunch.)
18  **THE VIDEOGRAPHER:** The time is 1:20.
19  We are back on the record.
20  Q.  Mr. Koppel, who is Quentin Smith?
21  **A.  He is an MIT alum.**
22  Q.  What year did he graduate from MIT?
23  **A.  I don't know.**
24  Q.  Do you have a range in which you think he

Page 399

1  might have graduated?
2  **A.  Between 1999 and 2005.**
3  Q.  And during your time at MIT from 2015
4  until you got your Ph.D. in 2021, were you aware he
5  was running a particular project for SIPB?
6  **A.  No.**
7  Q.  Was he working on something called
8  Scripts?
9  **A.  Yes.**
10  Q.  What is Scripts?
11  **A.  It's a web hosting service.**
12  Q.  And does SIPB operate Scripts?
13  **A.  Yes.**
14  Q.  And was Quentin involved with Scripts?
15  **A.  Yes.**
16  Q.  But he wasn't running it?
17  **A.  I'm not aware of that description being**
18  **applicable to him.**
19  Q.  Was he in charge of the program?
20  **A.  Not to my knowledge.**
21  Q.  Okay.  Is he a maintainer?
22  **A.  Yes.**
23  Q.  What's a maintainer?
24  **A.  A maintainer has various meanings in**

Page 400

1  **Scripts projects of someone who was given**
2  **credentials to change the running version of the**
3  **system.**
4  Q.  Okay.  Did you receive -- I think we left
5  off last before the break talking about
6  communications from SIPB leadership.  Did you
7  receive from time to time e-mails from members of
8  the SIPB Executive Committee?
9  **A.  I had already answered yes.**
10  Q.  And which members of the Executive
11  Committee do you recall sending out SIPB-wide
12  e-mails?
13  **A.  Angel Alvarez, Emma Batson and Lily Chung.**
14  Q.  Were they past SIPB chairs?
15  **A.  No.**
16  Q.  Was Emma Batson a SIPB chair?
17  **A.  Yes.**
18  Q.  Was Lily Chung?
19  **A.  No.**
20  Q.  What position was Lily Chung?
21  **A.  I don't know.**
22  Q.  And just in general what kind of
23  communications would you receive as a SIPB member
24  from SIPB chairs?

Page 401

1  **A.  Technical things, information about**
2  **events, information about keyholdership elections,**
3  **information about general elections, information**
4  **about Jayhawk being expelled, things about other**
5  **projects.  A lot of that stuff.**
6  Q.  And do you recall what -- did the SIPB
7  chairs use an e-mail list to send out these
8  communications?
9  **A.  Yes.**
10  Q.  And do you recall what e-mail list the
11  SIPB chairs typically used?
12  **A.  There were a couple e-mail lists.**
13  Q.  And what were those e-mail lists?
14  **A.  The predominant e-mail lists were**
15  **SIPB@mit.edu and SIPB-Office@mit.edu.**
16  Q.  Those were the two primary e-mail lists
17  that SIPB chairs used to communicate with SIPB
18  membership?
19  **A.  The two primary lists that I was a member**
20  **of.**
21  Q.  Fair enough and you at the time were a
22  member but not a keyholder of SIPB; correct?
23  **A.  Yes.**
24  Q.  Did you expect as a SIPB member that the

Page 402

1 chair of SIPB would send out e-mails of this nature
2 to describe the actions and activities of SIPB
3 folks?
4    MR. BOYLAN: Objection.
5 A. E-mails of what? Describe what?
6 Q. That was a really terrible question. Did
7 you have an expectation that you would receive
8 e-mails of the kind that you just mentioned?
9 A. Not necessarily from the chair. I had an
10 expectation that I would receive e-mails.
11 Q. From SIPB leadership?
12 A. And others.
13 Q. And are you aware that there is a duty set
14 forth in the SIPB constitution to keep SIPB
15 membership informed?
16 A. No.
17 Q. Would you turn to Page 008 of the
18 constitution you have before you and the previous
19 page shows the section heading of this matter I'm
20 going to describe to you. Section 7.4, Meetings of
21 the Executive Committee. Do you see that?
22 A. I see the first line of Page 8 begins the
23 meeting of the Executive Committee.
24 Q. If you turn back a page to 007.

Page 403

1 A. Okay.
2 Q. Do you see Section 7.4 is titled Meetings
3 of the Executive Committee?
4 A. Yes.
5 Q. And do you see at the end of that section
6 on the next page?
7 A. There's a final paragraph in this section.
8 Q. The last sentence, all business conducted
9 at a meeting of the Executive Committee must be
10 reported to the general membership of the board by
11 the next general meeting of the board to remain
12 valid. Do you see that?
13 A. Yes.
14 Q. And you maintain in this litigation that
15 the SIPB leadership should follow the rules set
16 forth in this constitution; right?
17    MR. BOYLAN: Objection.
18 A. Among others, yes.
19 Q. And so you agree then that the SIPB
20 leadership has an obligation to keep the members of
21 SIPB informed about the activities of the Executive
22 Committee; correct? As a general matter.
23 A. I think there's some more specific version
24 of that that I would endorse.

Page 404

1 Q. Such as what?
2 A. So like obviously a lot of things it says
3 above that there is closed door stuff. A lot of
4 things happen behind closed doors should not be
5 disclosed. A lot of things are discussed but never
6 taken action on and a lot of things are just plain
7 sensitive.
8 Q. Subject to these caveats the Executive
9 Committee does have some obligation to keep the
10 members of SIPB informed about its actions; right?
11 A. It says so here. They have some
12 communication responsibilities.
13 Q. Do you contend that the Executive
14 Committee violated the SIPB constitution in this
15 case?
16 A. I contend that your client violated the
17 SIPB constitution.
18 Q. Mr. Moses did?
19 A. Yes.
20 Q. Okay. And what is that contention?
21 A. The primary one is Section X1 and I
22 believe Mr. Boylan has a few others in mind.
23 Q. In what way did Mr. Moses violate Section
24 X1?

Page 405

1 A. Any member under consideration for these
2 sanctions by the Executive Committee shall have the
3 right to be informed of the reasons for which these
4 sanctions are being considered and have an
5 opportunity to respond.
6 Q. Okay. Why do you say Mr. Moses violated
7 that provision?
8 A. I was not informed of the reasons why I
9 was being told that I was no longer allowed in SIPB
10 spaces and I have not had an opportunity to respond.
11 Q. Do you have any other claim that Mr. Moses
12 or anyone else violated the SIPB constitution with
13 respect to you?
14 A. Yes.
15 Q. What are those claims?
16 A. Also Section X3.
17 Q. Okay. How did Mr. Moses or anyone else
18 violate Section X3?
19 A. I was given the impression that if I tried
20 to invoke my right to an appeal, Moses would call
21 the police.
22 Q. Who would call the police?
23 A. The guy sitting to your left.
24 Q. Mr. Moses?

Page 406

1  A.  Yes.
2  Q.  And when did you receive that impression?
3  A.  On Thursday, February 27th.
4  Q.  During your in-person meeting with him?
5  A.  Yes.
6  Q.  Okay.  Well, we can get to that in a
7  moment.  Do you have any other claim that Mr. Moses
8  or anyone else violated the SIPB constitution?
9     (Witness perused document.)
10  A.  Let's see.  Arguably Section 3.1.
11  Q.  Just a moment.
12  A.  I said arguably.  I'm not going to dwell
13  on it.
14  Q.  Section 3.1 reads, any person may join and
15  remain a member of the board by assenting to its
16  principles described in this constitution and
17  participating in the work of this board.  What is
18  your claim that that was violated?
19  A.  I'd have to stop and think about that.  I
20  see arguments it's been violated but I'm not going
21  to say that right now.
22  Q.  Okay.
23     (Witness perused document.)
24  A.  There's argument they violated Section

Page 407

1  3.3.
2  Q.  What in way did they violate Section 3.3?
3  A.  By aggressively seeking to give -- by
4  aggressively seeking to get non-sitting keyholders
5  involved in the decision.  Again arguably.
6  Q.  Okay.
7  A.  Section 3.4.  Section 4. -- scratch that.
8  It's irrelevant.  We won't scratch anything it says.
9  Scratch what I was about to say is in it.  Section
10  4.7.
11  Q.  How was that provision violated?
12  A.  It says revocation of membership should be
13  accomplished by the procedure outlined in Article 4.
14  Q.  You maintain that that procedure was not
15  followed here?
16  A.  Correct.
17  Q.  Who decides the meaning of this
18  constitution?
19     MR. BOYLAN: Objection.
20  A.  The way things are going it might be a
21  jury.
22  Q.  Okay.  Do you see in Article 5.1 it reads,
23  the Executive Committee shall interpret by a
24  majority vote on any portion of this constitution

Page 408

1  should a question arise?
2  A.  I do see that.
3  Q.  Okay.  I think we can move on from this
4  element of the questioning.  After you joined SIPB
5  in 2019, did you come to meet Catherine Zeng?
6  A.  Yes.
7  Q.  Who is Catherine Zeng?
8  A.  She is an MIT alum.
9  Q.  When did you first meet Catherine Zeng?
10  A.  In late August or early September of 2019.
11  Q.  2019.  Okay.  And how did you meet her?
12  A.  I went to an orientation game night she
13  was helping to run.
14  Q.  For SIPB?
15  A.  Yes.
16  Q.  Did you talk to her there?
17  A.  She talked to me.  I can't recall talking
18  to her.
19  Q.  Okay.  Did you ultimately have
20  conversations with Catherine Zeng at other
21  occasions?
22  A.  Yes.
23  Q.  And where physically were you when you had
24  conversations like that?

Page 409

1  A.  One of them -- like conversations like
2  what?
3  Q.  With Catherine Zeng in person.
4  A.  I can only recall one in-person
5  conversation with Catherine.
6  Q.  Okay.  Before we get to that, you
7  mentioned just a minute ago you saw her at an
8  orientation event?
9  A.  Yes.
10  Q.  In August and that's where you first met
11  her?
12  A.  Yes.
13  Q.  This was an orientation of whom?
14  A.  People that SIPB was trying to recruit.
15  Q.  Were these freshmen?
16  A.  Some of them.
17  Q.  Okay.  And you were present for Catherine
18  Zeng's deposition, were you not?
19  A.  I was present.
20  Q.  And do you recall she had a memory of you
21  speaking sharply to a group of freshmen?
22  A.  I believe she has multiple different
23  descriptions.  I am not certain that was one of
24  them.

Page 410

1  Q.  Well, I think she used the term yelling at
2  freshmen but I don't recall.
3      MR. BOYLAN: Objection.
4  A.  I believe she did use the term at some
5  point.
6  Q.  Okay.  Was that this event, the
7  orientation?
8  A.  Was what this event?
9  Q.  Well, did you yell at freshmen at the
10 freshmen orientation event where you met Catherine
11 Zeng?
12 A.  No.
13 Q.  Did you raise your voice in any way at a
14 group of freshmen?
15 A.  Not that I recall.
16 Q.  Is it possible you did?
17     MR. BOYLAN: Objection.
18 A.  Not in any specific capacity.
19 Q.  Did you get annoyed at a group of freshmen
20 for their failure to understand some issue you were
21 discussing with them?
22 A.  Not plausible.
23 Q.  I'm sorry?
24 A.  Not plausible.

Page 411

1  Q.  Not plausible?
2  A.  Yes.
3  Q.  What does that mean?
4  A.  A, why would anyone be discussing an issue
5  at a game night.  B, why would I get annoyed.
6  Q.  You're not asking the questions, Mr.
7  Koppel.  I am.
8  A.  Okay.
9  Q.  My question is did you get annoyed at any
10 freshmen at this event?
11 A.  No.  Not plausible.
12 Q.  It's not plausible?
13 A.  No.
14 Q.  Well --
15     MR. BOYLAN: Can we strike
16 everything after not plausible?  I think he said no.
17     MR. PYLE: We're not striking
18 anything.
19 Q.  Mr. Koppel --
20     MR. BOYLAN: You need to move on.
21 Q.  Mr. Koppel, when you say something is not
22 plausible, I just want to understand -- make sure I
23 understand the meaning.  Are you saying that it is
24 something that could have happened but you don't

Page 412

1  remember happening and don't think happened or what
2  exactly are you trying to say?
3      MR. BOYLAN: Objection.
4  A.  Like saying it contradicts everything else
5  I know that's relevant.
6  Q.  Nobody is asking you for a judgment on
7  relevance.  We're asking you for your memory of
8  these events.
9  A.  I didn't make any judgment on relevance.
10 Q.  Please tell me everything you recall about
11 this event involving orientation of freshmen.
12 A.  Sure.  There was some games played.  I
13 believe it was at this event I met someone named
14 Justice.  I believe it was at this event that I met
15 someone named Ritz.  Full name Mauricio who was not
16 a freshman by the way.  This is I recall my first
17 interaction with Zeng.
18 Q.  What else do you recall?
19 A.  I recall a board game called Secret Hitler
20 was played.
21 Q.  Okay.  What else do you recall?
22 A.  I recall that there was a card in the
23 game.  They went over the rules.  I recall there was
24 a card in the game that said ya because it's a

Page 413

1  German theme but it was formatted in a way if you
2  read upside down it also said ya with an exclamation
3  point with like a j upside down.
4  Q.  What else do you recall?
5  A.  I recall the game Super Smash Brothers
6  Melee was played.
7  Q.  Repeat that, please?
8  A.  I recall the game Super Smash Brothers
9  Melee was played.
10 Q.  Okay.  What else do you recall?
11 A.  I recall that Catherine asked me to play
12 it one-on-one against her not in a group.
13 Q.  Okay.  Please continue.
14 A.  I recall feeling very weirded out by the
15 way she did this.
16 Q.  And why was that?
17 A.  Because I believe we had never met or
18 interacted at this point and she's acting like we're
19 already friends.
20 Q.  Did you play with game with her
21 one-on-one?
22 A.  I did.
23 Q.  And how was that experience?
24 A.  It was a lot of fun.  I think she was

Page 414

1 clearly better than me but I put up a good fight.
2 Q.   What else happened at this event?
3 A.   During the other game Secret Hitler I
4 recall that Catherine kind of as her stated
5 justification for wanting to use the game stated
6 that she wanted to do it because she liked the name
7 Justice and not for any game-related reason.
8 Q.   Okay.  What else do you remember?
9 A.   Catherine was playing Mark mostly when we
10 were one-on-one.  I was playing Falco because
11 they're both characters in the game.
12 Q.   Okay.  You have a pretty detailed memory
13 of this event, don't you?
14 A.   I remember some details.
15 Q.   Did you have a conversation with any
16 freshmen during this event?
17 A.   I played war games with them.  I don't
18 recall any conversation.
19 Q.   When Catherine said that she recalls you
20 getting upset at freshman or yelling at freshmen, is
21 it your contention that that just didn't happen?
22 A.   Correct.  That is my contention.
23 Q.   Are you contending that Catherine is
24 lying?

Page 415

1     MR. BOYLAN: Objection.
2 A.   I am contending she made a false
3 statement.
4 Q.   Okay.
5 A.   It's not my purpose here to state the
6 reasons by which this occurred.
7 Q.   Well, do you think she made an
8 intentionally false statement?
9 A.   I don't know.
10 Q.   After this game event, did you speak to
11 Catherine Zeng on other occasions?
12 A.   Yes.
13 Q.   Okay.  And what were those occasions?
14 A.   I only recall one other in-person
15 interaction with her.
16 Q.   When was that?
17 A.   It was in late January, early February of
18 2020.
19 Q.   Late January, early February of 2020?
20 A.   Yeah.
21 Q.   Okay.  Tell me everything you recall about
22 that.
23 A.   I recall that we had earlier discussed
24 online about having a conversation about startups

Page 416

1 and at the SIPB meeting I realized I had been
2 sitting right next her or across from her and so I
3 decided that that would be a good time to have the
4 conversation if that were going to happen.
5 Q.   And this was in the SIPB office?
6 A.   Yes.
7 Q.   Okay.  Please continue.
8 A.   This would have occurred about 7:50 p.m.
9 on a Monday, like the first Monday of February or
10 the last Monday of January.  You might be able to
11 figure out which if you check the minutes or
12 attendance records.
13 Q.   Okay.
14 A.   I recall the room had been very crowded
15 so the reason -- I believe when I sat down at a
16 chair across from her, it was the only empty chair
17 in the room.
18 Q.   Okay.
19 A.   I recall asking her about why she had left
20 her first company and she said -- her answer was I
21 didn't want to spend five years working on a boba
22 machine.
23 Q.   Okay.  What else happened?
24 A.   I recall her explaining to me how they had

Page 417

1 got into Y Combinator.  You know, they applied at
2 the deadline.  I recall her explaining to me how
3 they had gotten into Y Combinator even though they
4 applied at the deadline.
5 Q.   This is Y Combinator?
6 A.   Yes.  We discussed it yesterday.
7 Q.   It's the speed at which you say some
8 words.
9 A.   Sorry.
10 Q.   Go ahead.
11 A.   Yeah.  So Y Combinator things.  I remember
12 the way she explained I didn't want to spend five
13 years working on a boba machine.  Like the other
14 biggest moment I remember.  That's all that's coming
15 to mind right now.
16 Q.   During this discussion about her startup
17 on the boba machine, did you discuss or mention or
18 did she discuss or mention her boyfriend at the
19 time?
20 A.   Her boyfriend, the person she's dating
21 now?
22 Q.   No.  Her boyfriend then.
23 A.   Not that I recall.
24 Q.   Did she say that she was working on a

Page 418

1    startup with her boyfriend at any time to you?
2  **A.  She told me that in Facebook Messenger**
3  **some months previous.**
4    Q.  Did you raise that issue with her or that
5    fact with her when you were discussing this subject
6    in the SIPB office?
7  **A.  Not that I recall.**
8    Q.  Okay.  Have you told me everything that
9    you recall about the content of your conversation?
10 **A.  The only thing that's coming to mind is I**
11 **might have asked her about like future plans or**
12 **future startups but I don't know that I asked her**
13 **that and I don't remember any details as far as the**
14 **content.**
15   Q.  Did you touch Catherine Zeng at any point
16   during this conversation?
17 **A.  Not that I recall.**
18   Q.  Did you touch her arm?
19 **A.  Not that I recall.**
20   Q.  Did you rub her arm from her shoulder to
21   her elbow?
22 **A.  Not that I recall and sounds very weird.**
23   Q.  Did you say words like you're so funny?
24 **A.  Not that I recall.**

Page 419

1    Q.  You were present at Catherine Zeng's
2    deposition in this case we just established.
3  **A.  Correct.**
4    Q.  Do you recall her saying that you slapped
5    her arm, said you're so funny and then moved your
6    hand down her arm?
7      MR. BOYLAN: Objection.
8  **A.  I recall her giving multiple different**
9  **descriptions.  I'm not confident that was one of**
10 **them.**
11   Q.  All right.  Well, you heard testimony and
12   the transcript will speak for itself.  Do you
13   maintain that her testimony about that encounter is
14   false?
15 **A.  I am not confident I never said you're so**
16 **funny and I'm not confident that I never touched her**
17 **arm.**
18   Q.  You're not confident that you never
19   touched her arm?
20 **A.  Correct.**
21   Q.  You might have touched her arm?
22 **A.  Correct.**
23   Q.  During this conversation or prior to it
24   were you attracted to Catherine physically?

Page 420

1  **A.  Definitely not.**
2    Q.  No?
3  **A.  That was too rude.  That was too rude.**
4  **I'm not saying she's a terrible and unattractive**
5  **person.  I was not attracted to her.**
6    Q.  Okay.  So if you touched her arm and I
7    understand you're not confident that you didn't.
8  **A.  Mm-mm.**
9    Q.  Was it a come-on toward her?
10 **A.  No.**
11   Q.  Okay.  But you might have touched her arm
12   as she described in her deposition testimony?
13 **A.  Well, the way it says I rubbed her**
14 **shoulder and elbow, like my brain was like what the**
15 **heck is that so not that way.  The slap maybe.  A**
16 **brief touch that like might have like felt -- had**
17 **some effect of gravity to feel as a brush maybe.**
18   Q.  And do you recall that she left the SIPB
19   office shortly after that happened?
20 **A.  No.**
21   Q.  Okay.  Do you recall anything about how
22   long she stayed after that interaction?
23 **A.  No.  The conversation ended.**
24   Q.  You heard her testify that your touching

Page 421

1    of her arm made her feel unsafe in the SIPB office.
2    Do you remember that?
3  **A.  No.**
4    Q.  Do you remember her saying that it made
5    her feel very uncomfortable?
6  **A.  I remember her saying that it made her**
7  **feel uncomfortable.**
8    Q.  Do you have any reason to doubt that that
9    was true?
10     MR. BOYLAN: Objection.
11 **A.  Yes.**
12   Q.  Why?
13 **A.  Because she's given multiple contradictory**
14 **explanations of a lot of different things.  She has**
15 **also revealed her bias and I don't think I should be**
16 **impeaching her right now.**
17   Q.  Well, I want to know the factual basis for
18   your statement that her claim to have been made
19   uncomfortable was untrue.
20 **A.  I believe she -- I believe she generally**
21 **has not shown to be a credible witnesses period.**
22   Q.  Well, tell me the facts that underlie that
23   statement.
24 **A.  She has changed her story multiple times.**

Page 422

1  She has admitted her bias.
2  Q.  When did she admit her bias?
3  A.  During the deposition.
4  Q.  What did she say in that respect?
5  A.  She said that she's here to defend Billy
6  and that Billy is her friend and she's here to,
7  quote, defend SIPB even though SIPB is not a party.
8  Q.  Okay.  From that you conclude that there's
9  a bias against you?
10  A.  I believe that she has enough motivation
11  to give testimony that she believes will be
12  favorable to your client.
13  Q.  Do you maintain that she was intentionally
14  untruthful when she said that you made her feel
15  unsafe and uncomfortable?
16       MR. BOYLAN: Objection.
17  A.  I don't know.
18  Q.  Well, do you maintain that she was
19  untruthful?
20       MR. BOYLAN: Objection.
21  A.  I don't know.  Sorry.  I don't know if
22  she's untruthful.  I don't know if she's untruthful.
23  I don't know how she felt.
24  Q.  So you don't really know how she felt at

Page 423

1  the time?
2  A.  Correct.  I'm not sure she does either.
3  Q.  Do you know someone named Ashley Kim?
4  A.  Yes.
5  Q.  Who is Ashley Kim?
6  A.  She's an MIT alum.
7  Q.  When did you first meet Ashley?
8  A.  January 2017.
9  Q.  How did you meet Ashley?
10  A.  We met during Mystery Hunt.
11  Q.  Was Ashley affiliated with the ET house in
12  any way?
13  A.  Not to my knowledge.
14  Q.  Were you working on a --
15  A.  Clarify.  I'm not aware of her being
16  anymore affiliated than I was.
17  Q.  Okay.  But she visited ET house from time
18  to time?
19  A.  Yes.
20  Q.  Was she on the ET Mystery Hunt team?
21  A.  Not to my knowledge.
22  Q.  Did you meet her in some other team?
23  A.  Yes.
24  Q.  What team was that?

Page 424

1  A.  So okay.  So I'm blushing right now
2  because the name is pretty comical.  The spelling of
3  the name has a lot of airplane emoji in it.
4  Q.  This is Galactic Trendsetters?
5  A.  The proper pronunciation of the team is
6  whoosh Galactic Trendsetters neow.
7  Q.  Okay.  And you worked with her on the
8  whoosh Galactic Trendsetters neow team?
9  A.  No.
10  Q.  But you met her in that context?
11  A.  Yes.  It was a large team and I met her at
12  the very end of the hunt.
13  Q.  And did you have interactions with Ashley
14  outside of the context of the Mystery Hunt?
15  A.  Yes.
16  Q.  Tell me about those.
17  A.  We were both active in ESP for a while.
18  Q.  The Educational Studies Program?
19  A.  Yes.
20  Q.  Okay.  And what were your interactions
21  with her in that context?
22  A.  We became friends.
23  Q.  Okay.  Tell me about other interactions
24  you had with Ashley Kim.

Page 425

1  A.  We went to retreat together.  I believe we
2  were -- there were multiple occasions when we were
3  driving to or from retreat and I was the driver and
4  she was a passenger.
5  Q.  Okay.
6  A.  So we had been separately like given an
7  unsolicited introduction by mutual friends which we
8  have disclosed, was discussed at her deposition and
9  I just generally ran into her places from time to
10  time.
11  Q.  Did you ever see her at the SIPB office?
12  A.  Once.
13  Q.  Please tell me about that.
14  A.  It would have been in late October, early
15  November of 2019.  I was at a different board game
16  night.  A different board game night from the one I
17  discussed.  Different people although I believe we
18  were playing the same game I mentioned earlier
19  called Secret Hitler and it was during the beginning
20  of one of these games she walked in apparently to
21  use the printer and I kind of turned away from the
22  game and then eventually officially left the game to
23  talk to her and we had a long conversation.
24  Q.  Okay.  Then what happened?

Case 1:20-cv-11479-LTS   Document 129-3   Filed 01/23/23   Page 42 of 55

Koppel v.
Moses
Confidential
James Koppel - Vol. 2
July 26, 2022

Page 426

1 A. I said goodbye and she left.
2 Q. Did you ask her for a hug?
3 A. Not that I recall.
4 Q. Did she give you a hug?
5 A. Not that I recall.
6 Q. Did you give her a hug?
7 A. Not that I recall.
8 Q. It's possible you did?
9 A. I think it's likely there was a mutual
10 hug.
11 Q. Okay. Why is that likely?
12 A. Because we had a hugging kind of
13 friendship and I like hugs and she testified that
14 there was a hug.
15 Q. Okay. You were there for her deposition,
16 were you?
17 A. I was.
18 Q. On Zoom?
19 A. Yes.
20 Q. When I say there, I don't mean there.
21 A. Sure.
22 Q. And do you recall her saying that that
23 event contributed to her decision not to go to the
24 SIPB office anymore?

Page 427

1 A. No.
2 Q. Do you recall her saying that it was the
3 straw the broke the camel's back?
4 A. I think she used that phrase.
5 Q. And that thereafter she decided not to go
6 to SIPB anymore?
7 A. No.
8 Q. Okay. Well, what did she testify about
9 that subject?
10 A. I believe she testified that it gave her a
11 flashback of a different incident involving someone
12 else and that that memory caused her to come to the
13 SIPB office less.
14 Q. Do you have any reason to doubt that what
15 she said was true?
16 MR. BOYLAN: Objection.
17 A. I have lots of reason to doubt her
18 characterization but I don't have reason to doubt
19 that she spoke honestly in that regard.
20 Q. What characterization did you think is in
21 doubt?
22 A. That the hug caused her to leave the SIPB
23 office.
24 Q. Why do you doubt the truth of that?

Page 428

1 A. Because she later clarified that it was
2 more the fact that it reminded her of something
3 else.
4 Q. Okay. What I think I hear you saying is
5 you don't doubt the truth of her testimony in her
6 deposition; correct?
7 MR. BOYLAN: Objection.
8 A. Not in that part.
9 Q. Not having to do with the hug, the
10 flashback and those matters?
11 A. Correct.
12 Q. If she told people after that that
13 avoiding you and the other person involved in the
14 prior incident was the reason she didn't go to SIPB
15 anymore, you don't doubt the truth of that statement
16 either, do you?
17 MR. BOYLAN: Objection.
18 A. I never heard that statement.
19 Q. Well, didn't you hear her testify about it
20 at her deposition?
21 MR. BOYLAN: Objection.
22 A. I never heard that statement.
23 Q. Did you hear Catherine Zeng testify that
24 that's more or less what Ashley told her?

Page 429

1 MR. BOYLAN: Objection.
2 A. I don't recall.
3 Q. Okay. But you have no reason to doubt
4 that she decided to avoid SIPB after that event?
5 A. Correct. She never said anything about
6 avoiding me.
7 Q. She only said something about avoiding
8 SIPB; right?
9 A. Correct.
10 Q. Okay. You don't have any doubt that she
11 decided to avoid SIPB; correct?
12 A. I have seen her in the SIPB office a grand
13 total of once which I have described.
14 Q. Does that --
15 A. I had never seen her there before or
16 after. I don't have any reason to doubt.
17 Q. When did you meet Billy Moses?
18 A. 2015.
19 Q. How did you meet Billy?
20 A. We both attended the MIT programming
21 languages offsite.
22 Q. Programming languages offsite?
23 A. Yes.
24 Q. What's that?

Koppel v.
Moses

Confidential

James Koppel - Vol. 2
July 26, 2022

Page 430

1  A.  It was slash is an annual retreat where
2  people conducting research in the programming
3  languages and software engineering group at MIT go
4  to an offsite location to bond, socialize, discuss
5  research.
6  Q.  Did you talk to Billy there?
7  A.  We at least met.
8  Q.  Okay.  Did you over time from 2015 forward
9  develop what you considered to be a friendship with
10  Billy Moses?
11  A.  During 2017, yes.
12  Q.  And how did that come about?
13  A.  He started incessantly asking me to hang
14  out.
15  Q.  And you agreed?
16  A.  Yes.
17  Q.  And what sort of things would you do when
18  you hung out?
19  A.  Eat food, walk and talk, hang out in his
20  room, help him sell things.  Help him sell his old
21  possessions.
22  Q.  Okay.  What else did you do with Billy
23  over the years?
24  A.  We made active plans to become roommates.

Page 431

1  Q.  When was that?
2  A.  First in 2018.  Then in 2019.
3  Q.  Tell me about the 2018 plans.
4  A.  We discussed it but then discovered it was
5  too late.
6  Q.  Okay.  And what about 2019?
7  A.  I made sure to ask him before it was too
8  late.  He then responded and said, yes, let's do it.
9  Q.  Okay.  That when what happened?
10  A.  We did it.
11  Q.  You signed up to be roommates?
12  A.  Correct.
13  Q.  But did you ultimately live together?
14  A.  No.
15  Q.  What happened?
16  A.  I received a text from him one day after
17  he had already been assigned to move into my
18  apartment that it was not going to happen.
19  Q.  And what did that text convey?
20  A.  It said something something.  It
21  turns out I'm not going to be moving in.
22  Q.  Okay.  Did he give a reason?
23  A.  He claimed the reason is he heard reports
24  of mold in the room.

Page 432

1  Q.  Of mold in the room?
2  A.  Yes.
3  Q.  And then what happened?
4  A.  I freaked out and started mistaking grease
5  for mold.
6  Q.  Did you have somebody come look at the
7  stains?
8  A.  He said that someone had come to look
9  before this happened and they found none.
10  Q.  Billy said that?
11  A.  Yes.
12  Q.  So it turns out what Billy heard was
13  mistaken?
14  A.  He said that the house manager had come in
15  or sent someone in.  They found some mold but he
16  still didn't want to risk it.
17  Q.  They found some mold?
18  A.  No.  Sorry.  They did not find any mold
19  but he did not want to risk it.
20  Q.  Okay.  So he ultimately didn't live with
21  you?
22  A.  Correct.
23  Q.  And this was in the summer of 2019?
24  A.  It was during May 2019.

Page 433

1  Q.  May of 2019.  The plan was or the proposal
2  was to live together starting when?
3  A.  Starting in fall of 2019.
4  Q.  Okay.  That ultimately did not happen?
5  A.  Yes.
6  Q.  But did Billy remain friendly to you after
7  that time?
8  A.  Yes.
9  Q.  Did you still hang out?
10  A.  Yes.
11  Q.  In the fall of 2019?
12  A.  Yes.
13  Q.  How about in the early months of 2020?
14  A.  He asked me to but I was busy.
15  Q.  During January or February of that year?
16  A.  Yes.
17  Q.  Okay.  And as far as you could tell, Billy
18  was still very much interested in maintaining a
19  friendship with you at that time; right?
20  A.  Yes.
21  Q.  Okay.  Did you sometimes hug Billy Moses?
22  A.  Yes.
23  Q.  Okay.  And how often would you say that
24  occurred?

Koppel v.
Moses

Confidential

James Koppel - Vol. 2
July 26, 2022

Page 434

1  A.  I don't know.
2  Q.  Frequent?
3  A.  I don't know.
4  Q.  Okay.
5  A.  I can only recall one instance.
6  Q.  Well, you say you started becoming friends
7    with him around 2017; correct?
8  A.  Good friends.
9  Q.  Yes.
10  A.  We had been on friendly terms more like
11    casual friends or friendly acquaintances before we
12    became like friends friends starting in 2017.
13  Q.  Okay.  And did you say that -- you said
14    earlier you like hugs; right?
15  A.  Yes.
16  Q.  Would you go up to him and give him a hug
17    during 2017?
18  A.  I don't recall.
19  Q.  2018?
20  A.  I don't recall.
21  Q.  2019?
22  A.  There was a goodbye hug that I do recall.
23  Q.  Goodbye from what?
24  A.  From having just spent a few hours hanging

Page 435

1    out.
2  Q.  Hanging out?
3  A.  Yes.
4  Q.  Was that in 2019?
5  A.  Yes.
6  Q.  Where were you then?
7  A.  I was on Pacific Street in Cambridge.
8  Q.  At a dorm facility?
9  A.  Outside.
10  Q.  Outside.  Okay.  And did Billy ever tell
11    you to stop hugging him?
12  A.  Never.
13  Q.  Okay.  Did you ever used to run up behind
14    Billy and hug him from behind?
15  A.  Not that I recall.
16  Q.  Is it possible you did?
17  A.  Unlikely but yeah.  Unlikely.  I'm not
18    going to rule it out.
19  Q.  Is that something you would do to some
20    people?
21  A.  No.
22  Q.  If you see a good friend with their back
23    to you, would you come up behind them and surprise
24    them by giving them a big hug?  Is that something

Page 436

1    you have done before?
2  A.  I might have although I generally find
3    that like a hug from the back feels less good than a
4    hug from the front so I can't say I'm a fan of doing
5    it that way.  I can't say I never did.
6  Q.  Okay.  Your testimony today is that Billy
7    Moses never asked you to stop hugging him?
8  A.  Absolutely.  That's my testimony.
9  Q.  And is it also your testimony that you did
10    not persist in hugging him after he asked you to
11    stop?
12  A.  There were no requests to stop so by
13    definition.
14  Q.  Did he ever give you any sense that your
15    hugs were not welcome?
16  A.  No.
17  Q.  When was the last time you remember
18    hugging him?
19  A.  Let me clarify.  So the September -- not
20    September.  The fall 2019 hug was the last time I
21    remember.  I remember -- one thing I remember is
22    that I picked up that he was not into the hugs but
23    not that they were unwelcome and I did decide to no
24    longer give him hugs after that.

Page 437

1  Q.  You did?
2  A.  I did.
3  Q.  Why did you pick up that he was not into
4    the hugs?
5  A.  So I don't remember all the reasons.  They
6    were subtle.  I think one thing is like there is the
7    end of hug signal where during the hug you start
8    tapping on the back as an end of hug signal and he'd
9    do that relatively early.
10  Q.  Okay.  Do you remember that from the
11    August 2019 event?
12  A.  I don't remember the month.
13  Q.  It was sometime -- was there a goodbye hug
14    around that time?
15  A.  During the fall.
16  Q.  During the fall of 2019?
17  A.  I'm not confident he did that then but I
18    believe that is around the time that I decided to
19    stop hugging him.
20  Q.  That he might have done that at an earlier
21    hug?
22  A.  I mean lots of hugs have the tap at the
23    end.
24  Q.  Sure.

Page 438

1   A.  I can't confidently say that like -- and
2   by some point I collected enough data that he was
3   doing that earlier than average.
4   Q.  Okay.  At what point did you think you
5   picked up on the fact that he was cutting short your
6   hugs?
7   A.  As I said, in the fall of 2019.  I believe
8   that was the last hug I ever gave him because I had
9   picked up by that point and decided not to.
10   Q.  Okay.  So prior to the fall of 2019 hug
11   that you were testifying about you had picked up on
12   that signal beforehand.
13   A.  I might have gathered a little bit of
14   data.  I mean I might have seen some type of signals
15   that he wasn't as into them as I was but by that
16   point I had seen enough to at least have enough
17   confidence that I decided to stop giving him hugs.
18   Q.  At some point you discerned that he wasn't
19   into the hugs even if they weren't necessarily
20   unwelcome.  Do I remember you saying that?
21   A.  Yeah.  I mean I have the interpretation
22   that he was just not a big hugger.
23   Q.  Okay.  About how many interactions did it
24   take to gather enough data to make that conclusion?

Page 439

1   A.  I don't know.
2   Q.  Five?
3   A.  I don't know.
4   Q.  Ten?
5   A.  I don't know.
6   Q.  Twenty?
7   A.  I don't know that we had that many.
8   Probably didn't have that many hugs.  Somewhere
9   between two and 20.
10   Q.  Okay.
11   A.  Probably on the lower side.
12   Q.  Maybe ten?
13       MR. BOYLAN: Objection.
14   A.  I don't know.  Probably less.
15       (Exhibit 51 was marked for
16       identification.)
17   Q.  Mr. Koppel, are you familiar with
18   Exhibit 51?
19   A.  I am.
20   Q.  What is Exhibit 51?
21   A.  It's an e-mail thread started by your
22   client on the SIPB-Private mailing list.
23   Q.  Do you know at this time that my client
24   had recently been elected to be chair of the SIPB

Page 440

1   Executive Committee?
2   A.  I do know that.
3   Q.  Okay.  What's the SIPB-Private list to
4   your knowledge?
5   A.  It is one of the lists of SIPB keyholders.
6   Q.  You were not on this list; right?
7   A.  Correct.
8   Q.  Okay.  Did you at some point try to find
9   out how many people were on this list?
10   A.  Yes.
11   Q.  What did you do to do that?
12   A.  I looked at the mailing list on a system
13   that MIT has called Moira, M-O-I-R-A.
14   Q.  It's fair to say you did a Moira query on
15   this list?
16   A.  I think that works as a layman's
17   description.
18   Q.  That works what?
19   A.  I am trying to remember exactly which
20   things doing the query, which databases.  I think
21   that works as a layman description.
22   Q.  As a what description?
23   A.  As a layman description.
24   Q.  Layman's description.  Okay.  Sorry.  I

Page 441

1   thought you were calling my description lame.  It
2   was a lame description.  And what did you find when
3   you did the Moira query on the SIPB-Private list?
4   A.  There were about 140 people on this list.
5   Q.  Okay.  And was that literally the number
6   of accounts that you saw when you got the query?
7   A.  Yes.
8   Q.  And is it fair to say that a Moira query
9   shows you which accounts on the list are active MIT
10   accounts?
11   A.  I don't know what defines an active MIT
12   account.
13   Q.  One that hasn't been discontinued or
14   suspended.
15   A.  If an account is deleted, then I believe
16   it would be removed from all mailing lists.  It no
17   longer exists.
18   Q.  But you found 140 people on this list;
19   correct?
20   A.  Thereabouts.  I believe he mentioned the
21   number in some documents.  That document is more
22   reliable than my testimony right now.
23   Q.  Okay.  Did you recognize the names on the
24   list?

Case 1:20-cv-11479-LTS   Document 129-3   Filed 01/23/23   Page 46 of 55

Koppel v.
Moses
Confidential
James Koppel - Vol. 2
July 26, 2022

Page 442

1 A.   Many of them.
2 Q.   And do they all appear to be SIPB
3 keyholders?
4 A.   I don't have anything to contradict that.
5 Q.   Okay.  Was it -- strike that.  If all the
6 recipients of the SIPB-Private e-mail were
7 keyholders, they would necessarily all be active
8 accounts; right?
9     MR. BOYLAN: Right.
10 A.   I don't know.
11 Q.   Well, isn't it true that if you're a
12 keyholder, one of the privileges is that you keep
13 your MIT account after graduation?
14 A.   Yes.
15 Q.   Okay.  And are you confident in your
16 testimony that as soon as an account is deactivated
17 that it no longer appears as a user on the list?
18 A.   Moderately.
19 Q.   But not completely confident?
20 A.   In my time in SIPB I gained significant
21 knowledge about infrastructure at MIT.  I still work
22 with MIT's infrastructure but there are still many
23 others who are more knowledgeable than myself.
24 Q.   Do you know what the purpose of the

Page 443

1 SIPB-Private list is?
2 A.   No.
3 Q.   Okay.  You have no information about that
4 at all?
5 A.   I do have information.
6 Q.   You do have information?
7 A.   Yes.
8 Q.   What is that information?
9 A.   I believe it to be a place where a subset
10 of SIPB keyholders can discuss amongst themselves
11 anything they want.
12 Q.   Do you know if it is used to discuss
13 whether a person should or should not be made a
14 keyholder?
15 A.   Yes.
16 Q.   That is in fact a purpose of the
17 SIPB-Private list?
18 A.   Yes.
19 Q.   Looking at the first e-mail in Exhibit 51,
20 you see Mr. Moses says that in a closed door meeting
21 several keyholders reported aspects of your
22 behavior.
23 A.   Yes.
24 Q.   Made them uncomfortable engaging with you.

Page 444

1 Do you see that?
2 A.   Yes.
3 Q.   Okay.  And there were some examples given
4 below.
5 A.   Like in about minutes bathroom break?
6 Q.   A ten-minute bathroom break?
7 A.   No.  Not a ten-minute bathroom break.
8 Starting in ten minutes from now a short bathroom
9 break.
10 Q.   Sure.  Let me just ask a couple questions
11 about this document.  Then we can take a break.  You
12 see that he has given examples of behavior that made
13 people uncomfortable allegedly?
14 A.   I am seeing he is stating some things and
15 he's claiming that they happened.
16 Q.   You see there's four bullet points?
17 A.   Yes.
18 Q.   The first one is arguing that a female
19 keyholder was overreacting in complaining about
20 street harassment.  Do you see that?
21 A.   Yes.
22 Q.   That is your exchange with Andrea Carney;
23 right?
24 A.   No.  I mean I gave my testimony about that

Page 445

1 earlier.
2 Q.   It's a reference accurate or not to the
3 exchange with Andrea Carney?
4 A.   I believe he's intending some combination
5 of himself and Andrea are intending to use the
6 existence of an exchange of that conversation about
7 sexual harassment as a pretext for the bullet point.
8 Q.   Repeatedly initiating physical contact
9 with someone who has specifically told him to stop
10 doing that.
11 A.   Mm-mm.
12 Q.   Do you maintain that that is false?
13 A.   Yes.
14 Q.   Arguing in a public Zephyr conversation
15 that it is sexist against men to treat the Epstein
16 scandal as a sign of a gendered cultural problem.
17 Do you see that?
18 A.   Yes.
19 Q.   Isn't that a fair representation of what
20 you argued in the conversation with Jonah Ko and
21 Lily Chen?
22 A.   No.
23     MR. BOYLAN: Objection.
24 Q.   Why is that inaccurate?

Page 478

1  A.  That sentence this decision was not taken
2  lightly I believe is a false statement of fact.
3  Q.  Okay.  Please go on.
4  A.  It is a necessity that reflects the vast
5  majority of people who took part in this discussion.
6  I already discussed the individual replies part.  I
7  think the necessity that reflects the vast majority
8  of people thing is a very misleading
9  characterization.
10  Q.  What else is false?
11  A.  The next sentence.  He has also been given
12  several opportunities to change his behavior and
13  failed to do so.
14  Q.  Okay.
15  A.  What's false about that?  Everything.  I
16  am sad this is something our members had to endure
17  implies a false statement or several.  SIPB will
18  take a strong stand against sexual harassment.
19  Well, that's a subject for next week's deposition.
20  Q.  What do you mean by that?
21  A.  Ask Mr. Boylan.
22      MR. BOYLAN: Please answer the
23  questions.  Try to answer the questions.
24  A.  We'll be asking about --

Page 479

1      MR. BOYLAN: No.  Gosh.  He's asking
2  you what's false.
3  A.  Sure.
4  Q.  What's false about the statement SIPB will
5  take a strong stance against sexual harassment?
6  A.  He has tried to cover up much more
7  credible accusations of sexual harassment by another
8  SIPB member.
9  Q.  Okay.  What else is false in this e-mail?
10  A.  This discussion has also made it clear
11  that SIPB needs to do better to be a safe
12  environment for members to take part in.  I think
13  this discussion has made it clear that Moses was a
14  good liar but not that.
15  Q.  I'm sorry.  What's false about that
16  statement?  I'm asking for facts not your
17  characterization.
18  A.  Sure.  He is pretending that he had
19  gotten -- I believe the only, quote, possible
20  factual basis of this is that SIPB is not a safe
21  environment because someone was once touched in the
22  arm but didn't complain about it.
23  Q.  Okay.
24  A.  That is not -- specifically we need to

Page 480

1  establish mechanisms that make it easy for members
2  to come forward when they are made uncomfortable.
3  That would not have made a difference here because
4  there were no such incidents notwithstanding the arm
5  touching thing allegedly.  This is a topic we will
6  discuss at length at the next EC meeting.  I don't
7  recall it being in the EC meeting minutes disclosed.
8  It's not relevant.
9  Q.  Anything else that's false about you in
10  this e-mail?
11  A.  The remaining paragraph again implies I
12  had done -- that my existence had somehow violated
13  the things that he is saying here.  Is that enough?
14  Q.  That's enough for now.
15  A.  There's a lot of false things.
16  Q.  You had a meeting with Mr. Moses just
17  before this e-mail was sent out, didn't you?
18  A.  I did.
19      (Exhibit 52 was marked for
20      identification.)
21  Q.  What is Exhibit 52?
22  A.  It appears to be Facebook Messenger
23  conversation between myself and your client.
24  Q.  And do you recognize this communication?

Page 481

1  A.  I do.
2  Q.  And this is a communication leading up to
3  and following your conversation with Billy Moses
4  about the Executive Committee decision; right?
5  A.  It does precede and follow that
6  conversation, yes.
7  Q.  So did you meet with Mr. Moses on
8  February 27th?
9  A.  I did.
10  Q.  Okay.  What time of day?
11  A.  About 4:30 to 5:30 p.m.
12  Q.  So you met for about an hour?
13  A.  Yes.
14  Q.  Okay.  I would like you to tell me
15  everything that you heard during that conversation.
16  A.  Sure.  So Billy about 4:30 a little before
17  p.m. walks into my office and it was -- my door was
18  open.  I was technically holding office hours but I
19  was not expecting any students to come in that day.
20  He said, is now a good time to talk and I said, yes,
21  because I wanted to know what this was about.  Then
22  he walked down the hall.  We walked to his office.
23  I don't remember that we headed to his office but he
24  probably grabbed something.  Then we walked over to

Page 482

1  the Room 32-G725, that's 32 hyphen G725, which is a
2  conference room on the seventh floor of the Gates
3  Tower in the Stata Center at MIT and he started -- I
4  think we exchanged some pleasantries during this and
5  then he started closing the shades to the window
6  because there was a window between the conference
7  room and the hallway. It had shades. He started
8  closing them and I kind of felt this stomach
9  dropping sensation at that point and he said to me,
10  well, unfortunately I do have some bad news. You
11  are very unlikely to be elected a SIPB keyholder and
12  I'm going to ask you to leave SIPB. You make a lot
13  of people, members, keyholders, I forget which,
14  uncomfortable especially female members or
15  keyholders, whichever. The thing I just said is
16  close to but not an exact quote. Any questions so
17  far?
18  Q.  No. Please continue.
19  A.  And I asked what I did and he said he
20  couldn't tell me and I told him -- I mentally went
21  through a list of the female SIPB keyholders and I
22  told him that I had done so. I couldn't think of
23  anyone who had a problem with me. I don't remember
24  what he said. He was dismissive. I definitely

Page 483

1  asked him what I did a lot. He always said he
2  couldn't tell me. At some point he said, oh,
3  actually, there is something I can tell you about
4  which is that there was a report that I had said
5  something in a chat room in September on the Epstein
6  scandal that made some people pretty uncomfortable.
7  I said -- I don't remember what I said at first. I
8  said at some point the only way to take offense to
9  that statement -- I said at some point the only way
10  to take offense to that statement is to be a bigot
11  and he said, Jimmy, we're not making moral
12  judgments. Besides, there's still a verbal thing.
13  There's still physical things. He said he couldn't
14  tell me anything else. Everything else was this is
15  something you did. This is something you said. He
16  said at some points, oh, we're getting all these bad
17  reports. I'm caught in the middle as your friend.
18      At some point I think someone had
19  the room so we moved from 32-G725 to a room on the
20  fourth floor called the Kiva Auditorium. It was
21  somewhere in the middle or towards the latter third
22  of the conversation. He told me that there had been
23  an e-mail thread that had started three weeks prior
24  where someone said, Jimmy has obviously met the

Page 484

1  contribution requirement to be a keyholder but he
2  makes me uncomfortable and I said, was it started by
3  Cel? I think he said no.
4  Q.  C-E-L.
5  A.  Yes.
6  Q.  Okay. Let me stop you there. Why did you
7  ask that question?
8  A.  Because I thought that Cel would be the
9  most likely -- the only person who could conceivably
10  do something like that.
11  Q.  Why did you think that?
12  A.  I believe Cel had a reputation for being
13  mean.
14      MR. BOYLAN: Could you read that
15  back?
16  (Answer was read back by the stenographer.)
17  Q.  Okay. Had you had problems with Cel
18  before?
19  A.  I noticed that Cel kind of seemed to
20  dislike me from day one so I tried to be extra nice
21  to them in return.
22  Q.  Had there been any indication to you that
23  you were making Cel uncomfortable at any point?
24  A.  There was one point where I was having a

Page 485

1  discussion with another SIPB member about artificial
2  intelligence and Cel was also in the room and then
3  Cel said coldly to both of us, I don't like people
4  who have philosophical discussions about AI.
5  Q.  I don't like people who have philosophical
6  discussions about AI?
7  A.  Not exact prose but I believe that's an
8  accurate characterization.
9  Q.  Okay. And were you having a philosophical
10  discussion about artificial intelligence at that
11  time?
12  A.  Yes.
13  Q.  Okay. What happened next?
14  A.  I don't remember.
15  Q.  Did you leave the room or stop the
16  conversation? What happened?
17  A.  I think the conversation had already
18  ended.
19  Q.  And was it that that led you to believe
20  that you had perhaps made Cel uncomfortable in some
21  way?
22  A.  Not the only thing.
23  Q.  What else?
24  A.  I remember much earlier after I had met

Page 486

1  Cel.
2  Q.  After what?
3  A.  Much earlier like in 2018.  There was a
4  SIPB dinner at a restaurant called Mary Chung's.
5  It's like an annual tradition and there were some
6  people at a table next to us that were discussing --
7  that was discussing a programming language and the
8  improving tool which is used by many researchers at
9  MIT including several in SIPB.
10  Q.  Programming language and what tool?
11  A.  And research tool.
12  Q.  Research tool.  And?
13  A.  The name of this tool is spelled C-O-Q and
14  it's pronounced cock.
15  Q.  Okay.
16  A.  And Cel made some comment like they're
17  talking about cock at the other table and I really
18  don't like this.  Like something about it being
19  unwelcoming.
20  Q.  Were you at that table talking about COQ?
21  A.  No.  I was at the table with Cel.  It was
22  a different table talking about COQ that Cel was
23  overhearing.
24  Q.  What did you say in response?

Page 487

1  A.  I think I said something about the story
2  of how that name came to be which is that it's sort
3  of a quadruple pun.  It was invented by a guy named
4  Terry Calkins or Cawkins.  I don't know how to
5  pronounce it, that it was also a pun on COC, the
6  calculus of constructions, which is a mathematical
7  theory on which it's based.  I think there was a
8  third thing and the fourth thing is, quote, revenge
9  on the Americans for inventing the word bit.
10  Q.  Bit?
11  A.  Yes.
12  Q.  Okay.
13  A.  Which has a vulgar meaning in French.
14  Q.  Understood.  And so you told that story to
15  Cel?
16  A.  I believe I told something similar to what
17  I just said at that table.
18  Q.  Okay.  And what happened next?
19  A.  I felt some displeasure from Cel.
20  Q.  And how did that displeasure manifest
21  itself?
22  A.  Like kind of cold, condescending tone.
23  Like a scowl.
24  Q.  Is that the extent of your memory of that

Page 488

1  conversation?
2  A.  Yes.
3  Q.  What other incidents with Cel made you
4  think that you might have made her uncomfortable?
5  A.  I mentioned earlier about having tried
6  extra hard to be nice to Cel in return.  So I would
7  sometimes see Cel pass in the hallway and I made
8  sure to always be very friendly, hi, Cel, as they
9  walked past.  At some point I know Cel kind of like
10  stopped responding.  Just like turned away.
11  Q.  Okay.
12  A.  The most recent time of this happening was
13  on February 26th of 2020.
14  Q.  Okay.  What other incidents might have
15  made Cel uncomfortable?
16  A.  I cannot recall any others at this time.
17  Q.  But does that more or less summarize why
18  you asked Billy was it Cel who made this accusation
19  in the e-mail thread?
20  A.  It was Cel who started the e-mail thread
21  that he alleged had existed and was started three
22  weeks earlier.
23  Q.  So we stopped at the point in the
24  conversation where you asked that question is it

Page 489

1  Cel.
2  A.  Yes.
3  Q.  Can you please continue with your memory
4  of this conversation with Billy Moses?
5  A.  When he said that, quote, there was -- not
6  quote.  When he said that fact that -- he said my
7  recollection of what he said that there was the
8  Zephyr conversation in September that makes people
9  pretty uncomfortable, I asked was it Fay who
10  reported that.
11  Q.  You asked if it was Fay?
12  A.  Yeah.
13  Q.  Who's Fay?
14  A.  I'm forgetting the last name of this
15  person.  Fay.  If we go back to the conversation.
16      MR. PYLE: For the record the
17  witness is looking at Exhibit 46.
18  A.  I don't see Fay's name in these logs but
19  somewhere I believe Fay had participated in this
20  chat room on that day.
21  Q.  Okay.  And what did Fay say?
22  A.  I don't remember.
23  Q.  Okay.  Do you recall Fay not liking your
24  contributions to the discussion?

Page 514

1 did he?
2     **MR. BOYLAN:** Objection.
3 **A.  I do not recall him saying the word**
4 **police.**
5 Q.  Okay.  You have no memory of him saying
6 anything about calling the police and now you're
7 claiming something about calling the police?
8     **MR. BOYLAN:** Objection.
9 **A.  Sure.**
10 Q.  You're the only one around here who has
11 called the police on people.
12 **A.  I don't know that.  Unlikely.**
13 Q.  Please continue with anything else that
14 you say is false in this e-mail.
15 **A.  This decision was not taken lightly I**
16 **think is very false.  Is a necessity that and**
17 **reflects both the need for SIPB to be a place where**
18 **blah, blah, blah, everyone is comfortable. I don't**
19 **think reflects that.**
20 Q.  Why not?
21 **A.  Because this had nothing to do with people**
22 **being comfortable and I didn't find any stories**
23 **other than the arm touching.**
24 Q.  So you admit that you touched Catherine

Page 515

1 Zeng's arm during that meeting; right?
2     **MR. BOYLAN:** Objection.
3 **A.  I don't recall admitting that.**
4 Q.  Well, you acknowledge that it's possible
5 it happened?
6 **A.  When there's the use of the word possible,**
7 **I'll admit it was plausible.**
8 Q.  It was plausible that it happened.  More
9 likely than not it happened?
10 **A.  I don't know.**
11     **MR. BOYLAN:** Objection.
12 Q.  Okay.  Well, do you maintain that -- never
13 mind.  What else is false in this e-mail?
14 **A.  The will of the current keyholders.  I**
15 **think that's false.**
16 Q.  Why?
17 **A.  Because it's not the will of the**
18 **keyholders.**
19 Q.  Do you see anybody in the February 26th to
20 27th discussion defending you and suggesting that
21 you should be made a keyholder?
22     **MR. BOYLAN:** Objection.
23 **A.  I did not see anything in writing in that**
24 **e-mail suggesting I be made a keyholder.**

Page 516

1 Q.  Anything else?
2 **A.  The circumstance and required response was**
3 **quite exceptional.  The only exception is him**
4 **breaking the law.  Also reflects a need for SIPB to**
5 **do better to be a safe environment for everyone.**
6 **Definitely not.**
7 Q.  You don't think SIPB should be a safe
8 environment for everyone?
9 **A.  I don't see that has anything to do with**
10 **this.**
11 Q.  You don't think that touching people
12 without asking in the SIPB office is worth making a
13 decision about asking someone to leave?
14     **MR. BOYLAN:** Objection.
15 **A.  I don't think that telling people that if**
16 **you touch someone on the elbow at any point you're**
17 **going to be kicked out of a -- you're going to be**
18 **kicked out by a shadowy group and accused of heinous**
19 **bad actions that's going to make SIPB an**
20 **uncomfortable place.**
21 Q.  How about demanding unsolicited hugs from
22 people in the SIPB office?  Do you think that's
23 something that he had no right to do anything about?
24     **MR. BOYLAN:** Objection.

Page 517

1 **A.  I think you're trying to make an**
2 **indication that something happened.  I'll just say**
3 **right now that he has testified that he was not**
4 **alleging or aware of any alleged unsolicited hugs in**
5 **the office at the time of this e-mail.**
6 Q.  Isn't it true he was aware that Ashley Kim
7 wasn't coming to the SIPB office anymore because of
8 you?
9 **A.  No.**
10     **MR. BOYLAN:** Objection.
11 **A.  Not only was not aware of that but we had**
12 **heard testimony to the controversy -- to the**
13 **contrary.**
14 Q.  And your testimony today is that each of
15 these facts is specifically definite to imply false
16 facts?  Each of these statements is sufficiently
17 definite to imply false facts against you?
18     **MR. BOYLAN:** Objection.
19 **A.  I believe that they are false facts that a**
20 **reasonable reader could infer from these.**
21 Q.  You don't think this e-mail is just vague?
22     **MR. BOYLAN:** Objection.
23 **A.  There's already been a ruling on that.**
24 Q.  Okay.  You don't think it's vague?

Page 518

1   A.   It's not vague enough to --
2        (Reporter clarification.)
3   Q.   I'm not asking you for a legal conclusion.
4   Have you ever have described this communication as
5   vague?
6   A.   I might have.
7   Q.   Who did you describe this communication as
8   vague to?
9   A.   I don't recall.
10  Q.   Was it Leah McKelvey?
11  A.   Possibly.
12  Q.   And what did you say to Leah McKelvey?
13  A.   I don't recall.
14       (Exhibit 54 was marked for
15       identification.)
16  Q.   What's Exhibit 54, Mr. Koppel?
17  A.   It appears to be a conversation between
18  myself and Leah McKelvey.
19  Q.   When did this take place?
20  A.   Sometime in the summer of 2020.
21  Q.   The summer of 2020?
22  A.   Yeah.
23  Q.   How do you know that?
24  A.   I remember -- I remember talking to Leah

Page 519

1   around that time and I believe also I switched
2   communication platforms with her and a lot of other
3   people.
4   Q.   You're discussing with Leah the e-mails at
5   issue in this case; right?
6   A.   I mentioned an e-mail.
7   Q.   Well, first you said they blasted it to
8   700 people simultaneously.  That's a reference to
9   the March 2nd e-mail; right?
10  A.   That's right.
11  Q.   And then you say before that there was a
12  more private discussion over three weeks on a
13  mailing list with only 300 people.  Do you see that?
14  A.   That's right.
15  Q.   That's a reference to what you say Billy
16  told you in your meeting with him?
17  A.   That's right.
18  Q.   Okay.  One of the 700 showed me the big
19  e-mail.  Do you see that?
20  A.   Yes.
21  Q.   Okay.  When you go to the next page, you
22  say, they, I assume meaning SIPB, only said vague
23  stuff to 700 people.  Do you see where you said
24  that?

Page 520

1   A.   Yes.
2   Q.   And you see also, the only concrete thing
3   in the big e-mail was the requests to stop thing.
4   Do you see that?
5   A.   I see that.
6   Q.   Okay.  What did you mean by vague stuff?
7   A.   It's a lot more vague than the first
8   February 26th e-mail.
9   Q.   Well, you weren't comparing it to the
10  other e-mail at that moment.  You called it vague;
11  correct?
12       MR. BOYLAN: Objection.
13  A.   I probably could have thought of something
14  like the 26th e-mail, the four bullet points, and
15  compared it to that in my head.
16  Q.   Well, you hadn't seen that e-mail yet.
17  A.   I hadn't.
18  Q.   You had only seen the March 2nd e-mail and
19  you were saying -- you were calling it vague?
20  A.   I did use that word.
21  Q.   Okay.  And the only concrete thing is the
22  requests to stop thing.  You say that also; right?
23  A.   I did say that.
24  Q.   Okay.

Page 521

1   A.   I did use those words.
2   Q.   Do you understand that Mr. Moses has
3   asserted the common interest privilege in defense of
4   your defamation claim?
5   A.   I recall the common interest privilege
6   being asserted in argument and disclosed in certain
7   e-mails.  I recall giving a list of about 18
8   affirmative defenses.  I do not recall the list.
9   Q.   Okay.  And do you have an understanding of
10  that privilege?
11  A.   Let's say no.
12  Q.   Do you have an understanding that a
13  privilege can be lost -- a privilege in a defamation
14  case can be lost if the allegedly defamatory
15  communication is sent to many people?
16  A.   I know there is a legal principle about
17  over publication.
18  Q.   Over publication.  You're familiar with
19  that principle?
20  A.   I'm not compared to yourself and Mr.
21  Boylan.
22  Q.   Do you understand then that part of that
23  principal had to do with whether the recipients of
24  the communication have an interest in receiving the

Koppel v.
Moses

Confidential

James Koppel - Vol. 2
July 26, 2022

Page 522

1 information?
2 A.  No comment.  I don't know about that.
3 Q.  Okay.  So the answer is I don't know?
4 A.  Yeah.
5 Q.  All right.  Do you maintain that the
6 March 2nd e-mail was sent to people who have no
7 interest in receiving the information in the
8 March 2nd e-mail?
9      MR. BOYLAN: Objection.
10 A.  Yes.
11 Q.  Okay.  And how many people to your
12 knowledge received the March 2nd e-mail?
13 A.  I believe my count was 697.
14 Q.  And what is that count based on?
15 A.  A few weeks after the e-mail, I downloaded
16 a list of everyone on that list from Moira and I did
17 a count.
18 Q.  Did you disclose that list to us in
19 discovery?
20 A.  Yes.
21 Q.  And you simply counted the lines -- the
22 user names rather contained on that list, did you?
23 A.  I used a program to count the unique user
24 names and e-mail address.

Page 523

1 Q.  Unique user names and e-mail addresses?
2 A.  Mm-mm.
3 Q.  Okay.
4      MR. PYLE: Can we take a short
5 break?  I want to go retrieve a document.
6      THE BOYLAN: Sure.
7      THE VIDEOGRAPHER: The time is 3:51.
8 We are off the record.
9      (A break was taken.)
10      THE VIDEOGRAPHER: The time is 4:05.
11 We're back on the record.
12 Q.  Mr. Koppel, a moment ago did you state
13 that you ran a search to see who was on the
14 SIPB-Office list?
15 A.  I don't think I said that.
16 Q.  Okay.  Did you run a search on Moira at
17 any time to generate a list of 600 something names?
18 A.  I would not describe it as a search.  I
19 did use software to get a list of names.
20 Q.  Can you tell me exactly what you did?
21 A.  Sure.  So there's a command -- there's the
22 program for managing mailing lists.  I believe Moira
23 is the name of a larger system and there are several
24 commands for using it.  There's one called the

Page 524

1 Blanche which is named after the character from A
2 Streetcar Named Desire.  Blanche is a tool that
3 allows people to add and remove people from the
4 mailing list while sparing their members.  So I
5 wrote what's called a shell script, a very short
6 program that runs commands to use the Blanche tool
7 to get all the user names and e-mail addresses that
8 are on SIPB -- wait.  Are you talking about
9 SIPB-Office or SIPB-Private?
10 Q.  Well, let's talk about SIPB-Office.
11 A.  Well, I would have done the same thing for
12 both so.
13 Q.  What did you do?
14 A.  So I got all the user names, e-mail
15 addresses and there could also be other mailing
16 lists in the mailing list.  So I also made it every
17 time it saw a mailing list, it repeats people on
18 that mailing list.  So for example I was not
19 directly a member of the SIPB-Office mailing list at
20 any point.  Instead there is another list called
21 SIPB-Prospectives-2018 which is a member of
22 SIPB-Office and I was a member of that.
23 Q.  Okay.  And please tell me what else you
24 did.

Page 525

1 A.  I then ran another command to sort the
2 output of this list and then removed duplicates.
3 Q.  And what else did you do?
4 A.  Then I ran another command to count the
5 number of lines.
6 Q.  And is that what resulted in the number
7 690 or thereabouts?
8 A.  697.  Yes, it is.
9 Q.  Okay.  I'm going to show you a document
10 and ask you if this is the product of that search.
11     (Exhibit 55 was marked for
12 identification.)
13 A.  Okay.
14 Q.  Is this the product of the process you
15 just described?
16 A.  No.
17 Q.  No?  What is this?
18 A.  It appears to be a portion of a
19 spreadsheet.
20 Q.  And is it a spreadsheet that you created?
21 A.  No.
22 Q.  You produced this document I'll represent
23 to you.
24 A.  Yes.

Case 1:20-cv-11479-LTS   Document 129-3   Filed 01/23/23   Page 53 of 55

Koppel v.
Moses

Confidential

James Koppel - Vol. 2
July 26, 2022

Page 526

1  Q.  Can you identify it any further?
2  A.  Yeah.  This is a document -- this is a
3  database of SIPB alumni that I believe was prepared
4  by your client or one of his co-organizers in
5  preparation of the SIPB 50th anniversary.
6  Q.  So why did you produce that in this
7  litigation?
8  A.  Because it contains evidence about who
9  some of the user names in the other documents are.
10  Q.  I see.  Any user names in particular that
11  you thought were significant?
12  A.  Well, I recall the user name RK who was a
13  recipient of the e-mail and I note from this
14  document that he is a member of the MIT class of '76
15  to '79.
16  Q.  RK?
17  A.  Yeah.
18  Q.  All right.
19  A.  I don't remember who but I also learned
20  from this document that there was a professor at
21  Berkeley who was on this list.  Those are two that
22  come to mind that I learned from this list that I
23  might not have learned if I did not have access to
24  this list.

Page 527

1  Q.  Okay.  I'm going to show you another
2  document, please.
3      (Exhibit 56 was marked for
4      identification.)
5  Q.  What is this document, Mr. Koppel?
6  A.  I believe this is a list of 697 names.
7  Q.  This is the 697 name list?
8  A.  Yes.  These are their e-mail addresses.
9  Q.  When did you conduct the process that you
10  described that led to the creation of this list?
11  A.  On or about March 20th of 2020.
12  Q.  Okay.  So within 18 days or so of when the
13  allegedly defamatory e-mail was sent?
14  A.  Yes.
15  Q.  Looking through the list do you -- strike
16  that.  Do you understand that each of these entries
17  in the list represents an MIT user name?
18  A.  No.
19  Q.  So what is the second entry, A-A-N-D-R-E?
20  A.  That's what's called a Kerberos identifier
21  or handle.
22  Q.  What is Kerberos?
23  A.  Kerberos is an encryption protocol but is
24  used as a metonym within MIT for names of people's

Page 528

1  accounts in the MIT systems.
2  Q.  So in discussion of say e-mail, my e-mail
3  is jpyle@princelobel.com.  A-A-N-D-R-E would be the
4  e-mail handle for aandre@MIT.edu?
5  A.  Aandre would be the Kerberos e-mail handle
6  associated with the e-mail aandre@MIT.edu.
7  Q.  And so each of the entries here represents
8  a person; yes?
9  A.  To my knowledge, yes.
10  Q.  And it also represents an MIT account?
11  A.  No.
12  Q.  No.  Why not?
13  A.  A few of these are e-mail addresses that
14  are not MIT.
15  Q.  Well, focusing now for the ones that are
16  not e-mail addresses.  I see the first one is a
17  gmail address.
18  A.  Yes.
19  Q.  But focusing on the ones that are not
20  e-mail addresses, those are the handle for an MIT
21  account; right?
22  A.  I would agree with that characterization
23  to the best of my knowledge.
24  Q.  You would.  Okay.  And do you understand

Page 529

1  that from time to time accounts are terminated or
2  suspended?
3  A.  Yes.
4  Q.  Okay.  Is there a schedule on which
5  accounts are eliminated or suspended?
6  A.  I don't know.
7  Q.  Okay.  Do you understand that in January
8  of every year there's a purge of old MIT accounts?
9  A.  I believe that.
10  Q.  You do believe that?
11  A.  Yes.
12  Q.  Why do you believe that?
13  A.  I believe on a recent disclosure we got
14  from a third party we saw a document that had that
15  claim somewhere in it.
16  Q.  Was that third party Emma Batson?
17  A.  Yes.
18  Q.  And so you understand too that SIPB
19  keyholders are unusual in that they are allowed to
20  maintain their MIT accounts after they -- long after
21  they graduate; right?
22  A.  That is a privilege offered to SIPB
23  keyholders.
24  Q.  Or at least it has been a privilege

Page 530

1 offered to SIPB keyholders; right?
2 **A.  Yes.**
3 Q.  Okay.  And when you created the document
4 that's listed as Exhibit 56, did you check to ensure
5 that each of the handles that you list here were
6 active MIT accounts as of the time of the March 2,
7 2020 e-mail?
8 **A.  I don't know what you mean by active.**
9 Q.  Meaning accounts that had not been
10 terminated or suspended.
11 **A.  As far as I know, if an account had been**
12 **terminated or suspended, it would not appear on this**
13 **list.**
14 Q.  What's the basis for that?
15 **A.  It is my understanding that accounts that**
16 **are terminated just don't exist anymore and are**
17 **removed from all lists because they don't exist.**
18 Q.  Well, if an account doesn't exist, then it
19 doesn't receive an e-mail; right?
20 **A.  And you also would not see it when trying**
21 **to query information about it.**
22 Q.  If I told you that -- do you see the entry
23 for adin on the page first, A-D-I-N?
24 **A.  Yes.**

Page 531

1 Q.  Okay.  If I told you that adin was not an
2 active account as of March 2, 2020, do you have any
3 information to dispute that?
4 **A.  Yes.**
5 Q.  What's that information?
6 **A.  That this account name appears in this**
7 **list.**
8 Q.  Is it your understanding that when an
9 account is terminated, it automatically gets removed
10 from all lists that are associated with it?
11 **A.  Yes.**
12 Q.  And again I'm sorry.  What's the basis of
13 that understanding?
14 **A.  My understanding but as some supplemental**
15 **evidence having reviewed the list -- well, I would**
16 **see a lot more names on old SIPB-Prospectives lists**
17 **if this is not the case.**
18 Q.  Well, so you told me a moment ago that
19 there's sort of a yearly purge of accounts; right?
20 **A.  Yes.**
21 Q.  Okay.
22 **A.  And so like, you know, there's X number of**
23 **names that are on the SIPB-Prospectives-2000 list**
24 **and I understand the few e-mails that are there are**

Page 532

1 **only those which still exist and there used to be**
2 **more.**
3 Q.  Is there a process that you could have
4 done to determine whether each of these handles as
5 of the date you ran the search was an active MIT
6 account?
7 **A.  Not that I know of.**
8 Q.  Okay.  You couldn't do that through Moira
9 or Blanche?
10 **A.  It's my understanding that if this e-mail**
11 **address appears in the system, then it still exists**
12 **as an e-mail address.**
13 Q.  Would it surprise you to learn that adin
14 was deactivated on February 2, 2017?
15 **A.  I don't know that to be true and I don't**
16 **know whatever you said means that that person would**
17 **not receive an e-mail.**
18 Q.  Well, suppose adin were -- adin's account
19 was deactivated in 2017.  You acknowledge that the
20 e-mail, the March 2, 2020 e-mail would not have gone
21 to adin?
22 **A.  I don't know that.**
23 Q.  Why not?
24 **A.  I don't know anything about the state of**

Page 533

1 **like being deactivated but still in the system.**
2 Q.  Well, what do you mean by still in the
3 system?
4 **A.  Like still appearing in MIT databases as**
5 **an account.**
6 Q.  Would it go to a null address and not
7 arrive at a recipient?
8 **A.  I don't know that.**
9 Q.  Have you done any inquiry to determine
10 what happens in that circumstance?
11 **A.  I have not tried e-mailing all these**
12 **people, you know, like, hey.  Does your e-mail**
13 **address still work?  Thank you for asking.**
14 Q.  You haven't done anything else to try to
15 determine whether all of these user names listed in
16 Exhibit 56 were actually active as of March 2, 2020?
17 **A.  There is one other thing I did.**
18 Q.  What's that?
19 **A.  Which is some evidence.  There's another**
20 **command called, don't laugh, the command is called**
21 **finger which gives you a little bit extra**
22 **information associated with the user name and I --**
23 **so I produced another document that has a long list**
24 **of names which was a result of using the finger**

Page 534

1   command on these user names here to get their actual
2   names.
3   Q.   Did you produce that more recently?
4   A.   No.  I think it was in our first batch.
5   Q.   Okay.  And what did the finger process
6   result in?
7   A.   Yeah.  So I do not know what means the
8   finger returns entry.  It returns normal.  If it did
9   not give a name, I don't have reason to believe that
10  that is evidence the person did not receive the
11  e-mail except that I would -- except that I would
12  think that if it does give me a name, it's more
13  evidence the person is very much still in the system
14  so I would say a super majority of the names on this
15  list got results from the finger command.
16  Q.   Okay.  But not all of them did.
17  A.   Not all of them.
18  Q.   How many of them got results from the
19  finger command?
20  A.   I don't recall.  It was less.
21  Q.   It was some subset of the 697?
22  A.   It was a number smaller than the 697.
23  Q.   So it's possible that fewer than 697
24  people actually received the e-mail on March 2nd;

Page 535

1   right?
2   A.   That's right.
3   Q.   And what would you do to -- can you think
4   of anything else you would do to determine how many
5   people actually received the e-mail?
6   A.   Well, in this document right here I could
7   phone all these people up and ask them if they
8   received the e-mail.
9   Q.   Okay.  Anything else beyond that rather
10  cumbersome process?
11  A.   I do not know anything that's not in that
12  direction of what I've described so far.
13  Q.   Is there a service called LDAP?
14  A.   Yes.
15  Q.   What's that?
16  A.   It's called a key value store.  It's a
17  database.
18  Q.   And what's contained in the database?
19  A.   Everything.  A lot of different random
20  stuff involving the computers.
21  Q.   Does it have an directory for MIT people?
22  A.   I don't know.
23      (Exhibit 57 was marked for
24      identification.)

Page 536

1   Q.   Mr. Koppel, can you identify Exhibit 57?
2   A.   It appears to be identical or very similar
3   to Exhibit 56.
4   Q.   I'll represent that you produced it much
5   more recently.
6   A.   Oh.
7   Q.   Within the last couple of weeks.
8   A.   I think it's most likely a duplicate.
9   Q.   You think it's just a duplicate of the
10  list of 690 that you previously produced?
11  A.   I think it's likely.  I haven't found a
12  discrepancy yet and there are like the same number
13  of pages.
14  Q.   Did you rerun the search at some later
15  time after your first search?
16  A.   I mean the database would have changed so
17  no.
18  Q.   Do you continue to have access to the MIT
19  facilities needed to run searches of this nature?
20  A.   I do not have access to the March 20, 2020
21  copy of the database.
22  Q.   No, but you still have access to the Moira
23  query system and all that?
24  A.   Yes.

Page 537

1   Q.   Okay.
2       (Exhibit 58 was marked for
3       identification.)
4   Q.   Mr. Koppel, what is this document?
5   A.   It appears to be the subset of another
6   document limited to people who appear as attendees
7   at a SIPB meeting in the meeting minutes between
8   sometime around my first meeting and February 27th
9   of 2020.
10  Q.   Did you create this document in the last
11  few weeks?
12  A.   No.
13  Q.   Who created this document?
14  A.   I did.
15  Q.   When did you create this document?
16  A.   I don't remember.
17  Q.   I'll represent to you you disclosed it
18  within the last few weeks.
19  A.   That's correct.
20  Q.   How did you go about creating this
21  document?
22  A.   I wrote a review program which took
23  another file as input, a list of user names, and
24  then scanned through the minutes within a given time