# EXHIBIT 4

**CONFIDENTIAL**

VOLUME: II
PAGES: 1-228
EXHIBITS: 15-40,
A-E

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. NO. 1:20-CV-11479-LTS

JAMES KOPPEL,              )
    Plaintiff,          )
                           )
v.                         ) **CONFIDENTIAL**
                           )
WILLIAM MOSES,             )
    Defendant.          )

    **CONTINUED DEPOSITION OF WILLIAM MOSES**, a witness called on behalf of the Plaintiff, pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Margaret G. Oliver, a Professional Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the offices of Freeman, Mathis & Gary, LLP, 60 State Street, 6th Floor, Boston, Massachusetts, on Tuesday, August 2, 2022, commencing at 11:01 a.m.

*COPLEY COURT REPORTING, INC.*
*The Mercantile Building*
*71 Commercial St., Suite 700*
*Boston, Massachusetts 02109*
*Tel: 617.423.5841*

## Page 5

PROCEEDINGS

WILLIAM MOSES, a witness called for examination by counsel for the Plaintiff, having been satisfactorily identified by the production of his driver's license, being first sworn by the Notary Public, was examined and testified as follows:

MR. BOYLAN: The same stipulations as at the last deposition?

MR. PYLE: Yes. And 30 days to read and sign will run for both days after we receive the transcript here?

MR. BOYLAN: Yes.

MR. PYLE: Okay.

CONTINUED DIRECT EXAMINATION
BY MR. BOYLAN:

Q. Good morning, Mr. Moses. Do you recall on about February -- by February 17, 2020, you had become aware of some talk by keyholders after a meeting of the group on February 10?

A. On what subject?

Q. It was about Koppel.

A. I don't right now recall the precise dates, but I do recall a discussion about Koppel.

COPLEY COURT REPORTING, INC.

## Page 6

Q. Okay. Do you recall a discussion about Koppel after a regularly scheduled meeting?

A. I do recall a discussion about Koppel that I believe was after a SIPB meeting of some sort.

Q. Okay. Were you present?

A. I believe so, yes.

Q. Do you remember it was after the election of a keyholder named Rihn?

A. I believe that may have been -- well, I believe that may have been -- I believe there may have been a discussion about Koppel after Rihn's keyholdership election.

Q. And what do you remember of that discussion? Who said what?

A. I remember someone brought up James Koppel in the context of whether or not they should be potentially made keyholderer and specifically that several members and keyholders were made uncomfortable by him.

Q. Okay. Do you remember anybody present at the meeting saying, He's made me uncomfortable, first person?

A. I believe I expressed at that meeting that he had made me individually uncomfortable.

COPLEY COURT REPORTING, INC.

## Page 7

Q. Okay.

A. I do recall others also saying such.

Q. Okay. Did you say why he made you uncomfortable?

A. I am not confident, but I think I may have.

Q. And what do you think you said?

A. If I said something, which to be clear I'm not necessarily confident that I did, I would have said something along the lines of, He hugs me without my permission.

Q. Okay. And what did -- can you think of anything else that anyone else said that was specific other than discomfort?

A. I recall a discussion about the conversation on Zephyr, slash, Discord that Koppel was involved in. And I recall people being made uncomfortable by that discussion.

Q. Who mentioned that at this meeting?

A. Again, I'm not a hundred percent confident about this.

Q. It's okay. I don't care about percentages, just your best memory.

A. So I'm not certain, but I believe Cel may have been the person who brought that up.

COPLEY COURT REPORTING, INC.

## Page 8

Q. Okay. And what else do you remember being raised by anybody as a specific source of discomfort?

A. I think other keyholders or members may have mentioned how there were conversations that they had with him at certain points where he made them feel uncomfortable for a variety of reasons.

Q. Do you remember any details how he made them uncomfortable?

A. Again, I'm not certain here. But I believe at one point someone may have mentioned how he sort of belittled them or their knowledge of certain subjects. And that was --

Q. Who did he belittle?

A. I don't remember.

Q. And when did he belittle somebody?

A. I don't remember.

Q. Okay. Is there anything else you can remember anybody saying that identified a source of discomfort?

A. At this point I'm not certain. But I do believe there were other things said as to origins of discomfort.

Q. Okay. But do you recall that Koppel was

COPLEY COURT REPORTING, INC.

17

1  Q. Thanks. When you became chair were you
2  aware that certain keyholders had said negative
3  things about Koppel ever getting to be a keyholder?
4  A. I believe the meeting where Koppel was
5  earlier discussed preceded my election as chair.
6  And thus, I believe I had known about some negative
7  comments regarding him.
8  Q. Did you -- at the time you became chair,
9  did you talk to Lizhou Sha about this situation
10 involving a person not becoming a keyholder?
11 A. I believe I had spoken with Lizhou at one
12 point about the process of if someone doesn't become
13 a keyholder.
14 Q. And did he at that time send you several
15 documents related to somebody whose name was
16 Hawkinson?
17 A. I'm -- I believe Lizhou may have sent me
18 some dockets -- documents regarding Jayhawk or I
19 believe the person you are referring to by
20 Hawkinson. I'm not sure that occurred around the
21 time that Lizhou and I were having discussions of
22 the sort of someone becoming not a keyholder.
23      MR. BOYLAN: Can we make these 17a and 17b,
24 please.
                COPLEY COURT REPORTING, INC.

18

1      (E-mail marked as Exhibit No. 17a.)
2      (E-mail marked as Exhibit No. 17b.)
3  Q. Are you looking at 17a and 17b?
4  A. I see both 17a and 17b.
5  Q. Do you see that Lizhou Sha sent them on
6  February 17, one minute apart, to you and Emma
7  Batson?
8  A. I see that the e-mail appears to both go to
9  myself and Emma Batson.
10 Q. And do you recall that -- did you ask Sha
11 to send you these?
12 A. I do not recall.
13 Q. Were they sent to you in connection with an
14 issue that Koppel might get -- might not get
15 nominated?
16 A. I am not certain. It's common amongst the
17 chairs and former chairs to inform each other of
18 things.
19 Q. Yes. And wasn't -- in 17a and 17b wasn't
20 Sha giving you some information about how some
21 previous keyholder had been requested to depart?
22 A. I would need to more extensively read these
23 documents to characterize them. But I do believe
24 that Lizhou had indeed sent these documents to
                COPLEY COURT REPORTING, INC.

19

1  myself and Emma Batson. And they contain
2  information about a keyholder or former keyholder
3  Jayhawk.
4  Q. Yes. And he had been asked to depart,
5  correct?
6  A. I believe at one point he was asked to
7  depart in some degree. I'm not certain that, having
8  not yet read these documents fully, this
9  characterizes that.
10 Q. Sha was sending you these from -- these
11 documents from four years earlier because of the
12 comments, negative comments about Koppel. Isn't
13 that true?
14 A. I'm not sure that's true.
15 Q. Can you think of any other reason other
16 than Koppel that he would be sending you these
17 background four-year-old documents --
18 A. I believe --
19 Q. -- on February 17?
20 A. I believe it's common practice to at that
21 point at least inform the subsequent SIPB chairs of
22 this particular situation irrespective of anything
23 else.
24 Q. Well, maybe you can answer this yes or no.
                COPLEY COURT REPORTING, INC.

20

1  Sha sent you these -- and Emma Batson these
2  documents in connection with Koppel. Isn't that
3  true?
4  A. I am not sure that's true.
5  Q. Well, who else? Why else would he send
6  them?
7  A. I, again, believe it is common for former
8  chairs to inform, at least at that time, the current
9  chairs about the situation in case anything
10 involving this particular situation were to recur.
11 Q. You don't recall if you were named chair on
12 February 17th?
13 A. I don't recall when I was made chair.
14      MR. BOYLAN: Can you make this 18.
15      (Minutes of SIPB Meeting, 2-17-20
16      marked as Exhibit No. 18.)
17      That's the only one I have. But I'll get a
18 clean copy.
19 Q. Would you look through 18 and tell me if
20 it's a copy of the minutes of your election as
21 chair.
22      (Witness complies.)
23 A. This does appear to be a copy of the
24 minutes taken during an election in which I became
                COPLEY COURT REPORTING, INC.

                                                                                        21                                                                                      23

 1  chair.
 2      Q.  Thanks.  And did you see in there that you
 3  said, among other things, before that you were voted
 4  on you said you wanted to make the place friendlier
 5  and more welcoming?
 6      A.  I see quoted here that the minutes say that
 7  I said, quote, I think that continuing the trend
 8  that SIPB has become a kinder and more welcoming
 9  place should continue.  I think that we would try to
10  make sure that we don't neglect people who come to
11  the first meeting.  I want to make sure that SIPB
12  needs to be involved in representing student
13  computing interests.
14      Q.  Great.  And you don't have to read the
15  whole thing.  Do you see that you told the group
16  that you were good at delegating?
17      A.  I see that I said that I have been
18  historically known for delegating work at SIPB
19  events and projects referring to the fact that I had
20  previously run an event.
21      Q.  You'd run one event, but you delegated it?
22      A.  I had at least one event where I at least
23  delegated some of the work.
24          MR. BOYLAN:  Can I make this the next one,

 1  remember a specific conversation that I had that
 2  told people to call me about Koppel.
 3      Q.  Looking at Exhibit 19, the first full
 4  paragraph says, "The question of jkoppel key holder
 5  ship came up recently."
 6          Do you see that?
 7      A.  I do see that.
 8      Q.  Did you write that?
 9      A.  I believe that I wrote that text.
10      Q.  And you wrote it on February 18 at
11  1:53 p.m. approximately?
12      A.  Assuming this is an accurate printout, this
13  appears to be the time of that text.
14      Q.  Okay.  And you wrote it to Andrea Carney,
15  correct?
16      A.  That does appear to be the recipient.
17      Q.  Andrea Carney was a keyholder at this time?
18      A.  I believe Andrea Carney was a keyholder at
19  this time.
20      Q.  She was not a voting keyholder, correct?
21      A.  I do not believe she was a student at the
22  time.
23      Q.  Okay.
24      A.  To clarify, you can still vote as a

                    COPLEY COURT REPORTING, INC.                                                            COPLEY COURT REPORTING, INC.

                                                                                        22                                                                                      24

 1  19.
 2          (Signal Messages marked as Exhibit No. 19.)
 3      Q.  Just look through document 19, please.
 4      A.  Okay.
 5          (Witness complies.)
 6          Okay.  Also, I think you gave me two.
 7      Q.  There's only one with the sticker on it.
 8  Is this a -- what do you call this kind of printout?
 9  What's the platform?
10      A.  I believe this is a conversation that was
11  held on Signal.
12      Q.  Is it also possible to speak as on the
13  telephone through Signal?
14      A.  It is.
15      Q.  Did you when you were chair sometimes do
16  that from time to time?
17      A.  At various points in time I may have called
18  people using Signal.
19      Q.  Do you remember that after March 2 -- and
20  you can feel free to look at the calendar -- after
21  March 2 from time to time you would ask people to
22  use the telephone or Signal to talk about Koppel?
23      A.  I recall at various points using the
24  telephone or Signal to call people.  I don't

 1  keyholder in various matters even as an alumni.
 2  There are certain votes that may not necessarily be
 3  open to all alumni.  But a lot of votes do often
 4  have alumni participate and vote in them.
 5      Q.  Isn't it true that only active students can
 6  vote on keyholdership?
 7      A.  I believe so, yes.
 8      Q.  And you ask her -- you say that "Koppel
 9  keyholdership came up recently."  "He makes many
10  people uncomfortable and, quote, consensus (in the
11  chairs) is to not" -- and I take it not nominate
12  him; is that correct?  Is that what you were
13  writing?
14      A.  I believe that is the intention.
15      Q.  Okay.  And then you said in there, "in the
16  near future there will be a thread on SIPB private
17  discussing."
18      A.  I see that.
19      Q.  And you wanted her to chime in, correct?
20      A.  Specifically, I recall prior to this text
21  conversation Andrea expressing discomfort in various
22  ways about Mr. Koppel.  And I recall her expressing
23  an interest to participate if some sort of
24  conversation like this were to arise regarding his

                    COPLEY COURT REPORTING, INC.                                                            COPLEY COURT REPORTING, INC.

## Page 117

1 nominated could not have been kept confidential,
2 just the EC or just the active student keyholders?
3    MR. PYLE: Objection.
4  Q. Why did you have to go beyond that?
      MR. PYLE: Objection. You can answer.
6  A. Sorry. Can you repeat the question.
7  Q. Yes. Koppel was -- at some point it was
8 decided he was not going to get nominated, correct?
9  A. At one point it was decided that Koppel
10 would not get nominated, correct.
11  Q. And very near that time it was decided that
12 he was indeed going to be invited to leave, correct?
13  A. Koppel was also asked to leave.
14  Q. Okay. Why couldn't that have been kept
15 confidential?
16  A. "That" referring to what specifically?
17  Q. Not nominated, asked to leave. Why
18 couldn't that have been kept just within the EC and
19 possibly to the active student keyholders who may
20 have been curious or not? Why couldn't that just
21 have been the entire group aware of Koppel's issues?
22  A. There are several reasons why.
23  Q. Tell me.
24  A. One reason why was because as it appeared

## Page 118

1 from the conversation at minimum with Catherine and
2 likely others, there may have been certain people
3 who were not showing up to the SIPB office as a
4 result of Koppel. The fact that they were afraid to
5 go to the SIPB office is not something that SIPB
6 wants to occur.
7    And for anyone who was avoiding the SIPB
8 office as a consequence of Koppel should be able to
9 feel that they can go to the SIPB office without
10 having to encounter someone for whom the reason is
11 that they would not go to the office.
12  Q. So you publicized information about Koppel,
13 among other things, to encourage people who may have
14 stayed away because of him -- by the way, did you
15 know who exactly had stayed away because of Koppel?
16 Did Catherine tell you?
17  A. At the time I didn't know who specifically
18 had chosen to stay away from SIPB.
19  Q. If you asked, she would have told you
20 Ashley Kim, right?
21  A. I'm not sure she would have told me that.
22  Q. And Ashley we know had reasons of sexual
23 harassment not to come, namely Miguel, right?
24  A. I believe in addition to Koppel since I

## Page 119

1 believe she said that she came after Miguel -- the
2 incident with Miguel, and in fact, it was Koppel who
3 was ultimately the one who led Ashley to stop
4 continuing to go to SIPB.
5  Q. You might want to reread her testimony.
6    MR. BOYLAN: But anyway --
7    MR. PYLE: Objection.
8    MR. BOYLAN: -- would you mark this as
9 Exhibit E.
10    (Letter marked as Exhibit E.)
11 BY MR. BOYLAN:
12  Q. Have you read through Exhibit E?
13  A. I skimmed it. I'm going to read it a
14 little more closely.
15    (Pause.)
16    Okay. I've read the document.
17  Q. Is it fair to say Koppel never got anything
18 from the Executive Committee? He had a talk with
19 you, but the Executive Committee never gave him any
20 official notice that he was being asked to leave,
21 true?
22    MR. PYLE: Objection.
23  A. I believe you communicated with the
24 Executive Committee in addition to my conversation

## Page 120

1 with Koppel.
2  Q. Can you think of any reason why everything
3 about Koppel and his possible problems, getting to
4 be a keyholder, couldn't have just been done
5 confidentially by the Executive Committee, a
6 practical reason?
7  A. Sorry. Can you say the question again.
8  Q. Why couldn't everything about Koppel
9 starting February 10 have been handled by the
10 Executive Committee alone? Why not?
11  A. So there are several reasons for this.
12 First of all, president -- all to my knowledge
13 potential keyholdership or non-keyholdership
14 discussions begin as an e-mail on SIPB private.
15 SIPB private is explicitly chosen as that e-mail
16 list.
17  Q. Do you know you haven't disclosed a single
18 non-nomination e-mail? Do you have any?
19  A. I have e-mails --
20    MR. PYLE: Objection.
21  A. But I don't know if they were requested.
22  Q. You've seen them?
23  A. I have e-mails of people who ultimately
24 were not nominated.