**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| JAMES KOPPEL,<br>          Plaintiff,<br><br>          v.<br><br><br>WILLIAM MOSES,<br>          Defendant. | No. 20-cv-11479-LTS |

<u>**REPORT AND RECOMMENDATION ON DEFENDANT WILLIAM MOSES'**</u>
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

CABELL, Ch. U.S.M.J.

This case arises from an incident involving two former students at the Massachusetts Institute of Technology ("MIT"). Plaintiff James Koppel ("Koppel") and defendant William Moses ("Moses"), both graduate students at the time, belonged to a student organization known as the Student Information Processing Board ("SIPB"). SIPB leadership decided following certain events to request that Koppel refrain from participating any further in the group and Moses, acting as the organization's chair, sent two emails to other SIPB members communicating the organization's decision. Contending that the emails were false and defamatory, Koppel brought this action which, following prior litigation, asserts a single claim for defamation. Moses moves for summary judgment on the claim and the motion has been referred to me for

a report and recommendation.  For the reasons explained below, I recommend that the motion be denied.

## I.  <u>STANDARD OF REVIEW</u>

Entitlement to summary judgment requires the movant to show "there is no genuine dispute as to any material fact."  *Dusel v. Factory Mut. Ins. Co.*, 52 F.4th 495, 503 (1st Cir. 2022) (citation omitted).  If the movant is "able to make a showing that there is no genuine issue of material fact, the burden shifts to the nonmoving party, who must, with respect to each issue on which [he] would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in [his] favor."  *Id.* (citation omitted); *see Clifford v. Barnhart*, 449 F.3d 276, 280 (1st Cir. 2006) ("[A]s to any essential factual element of its claim on which the nonmovant [or movant] would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment.") (citation omitted).

The record, including all reasonable inferences, is viewed in Koppel's favor as the nonmovant.  *See Motorists Com. Mut. Ins. Co. v. Hartwell*, 53 F.4th 730, 734 (1st Cir. 2022).  Uncontroverted statements of fact in the movant's L.R. 56.1 statement are deemed admitted.  *Ing v. Tufts Univ.*, 2023 WL 5542779, at *1 n.1 (1st Cir. Aug. 29, 2023).

## II.  <u>DEFAMATION LAW</u>

To prevail on a defamation claim, a plaintiff must establish: "(1) that the defendant published a written statement; (2) of and concerning the plaintiff; that was both (3) defamatory, and (4) false; and (5) either caused economic loss, or is actionable without proof of economic loss." *Noonan v. Staples*, 556 F.3d 20, 25 (1st Cir. 2009) (citations omitted).

Even where such a showing is made, Massachusetts law recognizes a conditional common law privilege for otherwise defamatory statements where the publisher and recipient share some legitimate mutual interest 'reasonably calculated' to be served by the communication." *Catrone v. Thoroughbred Racing Ass'n of N. Am., Inc.,* 929 F.2d 881, 887 (1st Cir. 1991) (citations omitted); *Lawless v. Estrella*, 160 N.E.3d 1253, 1260 (Mass. App. Ct. 2020) (stating privilege applies when "publisher and the recipient share a common interest in the subject, and the statement is reasonably calculated to further or protect that interest"), *review denied*, 165 N.E.3d 158 (Mass. 2021).

That said, "Massachusetts law recognizes two ways in which a defendant may relinquish the protection of a conditional privilege: by publishing statements recklessly or by publishing statements with actual malice." *Zeigler v. Rater*, 939 F.3d 385, 393-94 (1st Cir. 2019).  The plaintiff carries "the burden of establishing abuse."  *Id.* at 393.

III.  **THE PARTIES' ARGUMENTS**

Koppel's defamation claim revolves around two purportedly defamatory emails, one sent on February 27, 2020 to a subgroup of SIPB members known as "keyholders,"[1] and a second email sent on March 2, 2020 to a wider audience of SIPB members.  (D. 54, ¶¶ 31-38, 82).  In moving for summary judgment, Moses argues that (1) Koppel has not adduced sufficient evidence to create a triable issue that any portion of the February 27 and March 2 emails were false; (2) the common interest privilege entitled Moses in any event to publish the emails; and (3) Koppel has failed to adduce clear and convincing evidence that Moses recklessly abused the privilege.

Koppel argues in opposition that certain portions of the emails were false; that Moses and the email recipients did not share a common interest, rendering the privilege inapplicable here; and that Moses lost the privilege assuming he initially did enjoy it by unnecessarily and recklessly publishing the communications to a large number of people knowing portions of the emails were false.

---

[1] As explained below, keyholders have more privileges than non-keyholder SIPB members.

IV.   **BACKGROUND**

A.   **Koppel and Moses' Relationship Prior to February 2020**

In 2015, Moses, a Ph.D. candidate at MIT who also received his undergraduate degree from there in 2014, met Koppel at an MIT programming retreat.  (D. 133, ¶¶ 13, 15) (D. 129-3, p. 10) (D. 145, ¶¶ 1-2).[2]  Koppel was a Ph.D. candidate who also received his undergraduate degree from MIT, in 2015.  (D. 133, ¶ 14) (D. 129-3, p. 10).  In 2017, they became friends and spent time with each other, including sharing meals, walking and talking together, and "hang[ing] out in [Moses'] room."  (D. 133, ¶ 15) (D. 129-3, p. 430).  In 2018 and 2019, they considered becoming roommates.  (D. 133, ¶ 15).  In August or September 2018, Koppel became a member of SIPB.  (D. 133, ¶ 14).

At various times, Koppel, who is "autistic to a certain degree," would hug Moses and rub his head with Koppel's fist.  (D. 133, ¶ 16) (D. 129-2, p. 9) (D. 132, ¶ 6).  The hugs and rubs on the head made Moses uncomfortable.  (D. 131-11, pp. 9, 15).  Nonetheless, Moses does not remember thinking that any hug was a sexual advance and does not recall a specific unwanted sexual

---

[2] Unless otherwise indicated, cited paragraphs in Moses' undisputed statement of facts with Koppel's responses (D. 133) refer solely to the uncontroverted and admitted statements in the cited paragraph.  *See* L.R. 56.1.  Page numbers in cited docket entries refer to the page number in the upper righthand corner of the document, except for depositions.  Deposition page numbers refer to the transcript pages.

advance by Koppel.[3]  (D. 133-11, pp. 10, 16).  Moses testified he asked Koppel to stop but Koppel testified that Moses did not ask him to stop.[4]  (D. 133-11, p. 10) (D. 129-3, p. 436).  Around the fall of 2019, Koppel determined that Moses "was not into the hugs" and decided to stop them.  (D. 129-3, pp. 436-438).

**B.  SIPB, Its Constitution, and Email Distribution Lists**

SIPB is a computer science group at MIT.  (D. 133, ¶ 1).  It is officially chartered by MIT and has been in existence for more than 50 years.  (D. 133, ¶ 2).  The group offers classes, talks, and computing infrastructure.  (D. 145, ¶ 3) (D. 133, ¶ 3).  It also controls certain spaces on MIT's campus, including the SIPB Office.  (D. 145, ¶ 3).  The office houses computing-related equipment and resources and is available to SIPB student members and, as defined below, associate keyholders.  (D. 145, ¶ 3) (D. 133, ¶ 4) (D. 129-3, p. 397).

Under SIPB's constitution, any individual may become a member of SIPB by agreeing to its principles and participating in the group's work.  (D. 129-1, Art. III).  An "active member" is "defined as a member in good standing who has participated in some service furthering" SIPB's goals and "attended at least one meeting during the preceding 30 days."  (D. 129-1, Art. III).  The

---

[3] Hence, viewing the record in Koppel's favor, Moses did not consider the hugs and rubs on his head as sexual in nature let alone sexual harassment.

[4] Because the record is viewed in Koppel's favor, Moses did not ask Koppel to stop the behavior.

constitution also defines various membership categories and distinguishes between members and members elected to keyholder status. (D. 129-1, Art. III, IV).

SIPB keyholders are afforded full privileges and retain their status and privileges after graduation. (D. 129-1) (D. 133, ¶ 6). They have a physical key to the SIPB Office and maintain that key as well as their student email addresses indefinitely after graduation. (D. 133, ¶¶ 6, 8). "Student keyholders" are MIT students whereas "associate keyholders" are all other keyholders, including alumni keyholders. (D. 129-1, Art. III) (D. 133, ¶ 7). As stated in the constitution, "[o]nly active student keyholders may vote in elections." (D. 129-1, Art. III). Active student keyholders also nominate and elect SIPB members to become keyholders. (D. 129-1, Art. IV.1). The procedure entails an active student keyholder making a motion to nominate a "member for keyholder status" that is "proposed and seconded by active student keyholders present at" an SIPB meeting. (D. 129-1, Art. IV, § IV.1).

The executive committee of SIPB ("EC") consists of nine members and is charged with the decision-making of SIPB. (D. 129-1, Art. V). Throughout Moses' time at SIPB, the EC made decisions relating to the governance of the group. (D. 145, ¶ 10). The EC held meetings open to all members of the MIT community as well as meetings limited to EC members. (D. 129-1, Art. VII). The SIPB

constitution requires the EC to report the business conducted at an EC meeting to the membership of SIPB.  (D. 129-1, Art. VII).

The SIPB constitution also endows the EC with the authority to sanction any SIPB member who is "found to be detrimental to the functioning and goals of [SIPB]."  (D. 129-1, Art. X).  Pertinent here is the EC's authority to revoke an individual's SIPB membership if two-thirds of the EC vote in favor of this sanction. (D. 129-1, Art. X).  The constitution further commands that any SIPB member under consideration for the sanction of revoking that person's membership "shall have the right to be informed of the reasons for which" this sanction is being considered "and have an opportunity to respond."[5]  (D. 129-1, Art. X).  It also sets out a procedure allowing "the active keyholding membership . . . to overrule the [EC's] decision."  (D. 129-1, Art. IX).

The EC often utilized email distribution lists to communicate with SIPB student members and/or keyholders.  (D. 145, ¶ 7).  In particular, the EC informed SIPB members, including keyholders, of its decisions primarily through the distribution list SIPB-Office@mit.edu ("SIPB-Office").  (D. 145, ¶¶ 8, 10).  Notably,

---

[5] Viewing the record in Koppel's favor and in contravention of the constitution, Moses did not fully inform Koppel of the reasons why the EC was going to ask Koppel to leave SIPB.  (D. 129-3, pp. 482-484).

Moses used SIPB-Office to send the March 2, 2020 email.[6]  (D. 145, ¶ 13, sent. 3) (D. 133, ¶ 32).

The EC also used another email distribution list, SIPB-Private@mit.edu ("SIPB-Private"), which consists of a subset of SIPB keyholders.  (D. 129-3, pp. 440, 443).  Among other uses, SIPB keyholders on this distribution list, including EC members, used SIPB-Private to communicate among themselves and arrive at a consensus regarding whether a person "should or should not be made a keyholder."  (D. 129-3, p. 443) (D. 138, p. 1, ¶ 2) (D. 138, Ex. A, pp. 15, 19) (D. 138, Ex. B).  On February 26, 2020, Moses used SIPB-Private to solicit thoughts from keyholders regarding nominating Koppel for keyholder status.  (D. 131-2).  Previously, Koppel had not been nominated for keyholder status.  (D. 131-11, p. 35).  The following day, Moses used SIPB-Private to send the purportedly defamatory February 27 email to approximately 149 individuals.[7]  (D. 131-3) (D. 131-1, ¶ G) (D. 131-8) (D. 128, ¶ 3, RFP No. 3).

---

[6] Citing an email exchange, which included a newly-elected SIPB Secretary's email description of *outdated* keyholder distribution lists (D. 169-6, p. 11), Koppel describes the SIPB-Office list as overinclusive and obsolete.  (D. 133, ¶ 10, Response) (D. 138, p. 2, ¶ 4).  The analogy is inapt because the email exchange wherein the newly-elected SIPB Secretary comments about outdated email lists is not about SIPB-Office.  (D. 138, ¶ 4).

[7] Koppel alleges a similar number of 144 recipients (D. 133, ¶ 138) and his list of exhibits refers to 154 individuals (D. 131-1, ¶ G).  The exhibit with a list of recipients contains 149 names.  (D. 131-8).  The discrepancy is immaterial.

## C.  <u>Events Leading to the February 27 Email</u>

On February 10, 2020, Moses was present in the SIPB Office with other individuals after a meeting.  (D. 129-4, p. 6).  During the gathering, "someone brought up James Koppel in the context of whether or not" he should be made a keyholder.  (D. 129-4, p. 6).  Moses stated that Koppel made him uncomfortable and may, but may not, have added that Koppel hugged him without his permission.[8] (D. 129-4, pp. 6-7).  More vaguely, Moses testified that "other keyholders or members may have mentioned" having conversations with Koppel that "made them feel uncomfortable for a variety of reasons."  (D. 129-4, p. 8).  When asked to recall the details, Moses posited that someone "may have mentioned" how Koppel belittled that person.  (D. 129-4, p. 8).  Moses could not remember whom Koppel belittled or when the belittling took place.  (D. 129-4, p. 8).  Moses also failed to recall any comments by several other individuals who might have been present.  (D. 131-11, pp. 33-34).

On February 17, 2020, Moses became chair of the EC.  In remarks leading up to his election, he expressed that, if elected, he would seek to continue the ongoing trend of SIPB becoming a kinder and more welcoming place.  (D. 133, ¶ 19).  Emily Batson

---

[8] Moses was "not necessarily confident" that he "said something along the lines" that Koppel hugged him without his permission.  (D. 129-4, p. 7).  A reasonable jury could therefore find that Moses did not state that Koppel hugged him without his permission.  (D. 129-4, p. 7).

("Batson"), the immediately preceding SIPB chair (D. 145, ¶ 15), abided by a similar aspiration as shown in an email she sent in December 2019 on SIPB-Office stating that she "want[ed] to make sure everyone at SIPB feels safe and comfortable."  (D. 129-11).

On February 18, Moses reached out to Andrea Carney ("Carney"), an alumni keyholder who worked at MIT.   (D. 129-4, pp. 23-24). Moses had spoken to Carney prior to February 18, at which time she may have mentioned something to Moses about a comment Koppel had made to her in 2017 regarding street harassment.  (D. 131-11, pp. 107-108)(D. 132, ¶ 1(a), sent. 2).

On February 20 and 21, Moses and EC members Cel Skeggs ("Skeggs") and Georgia Shay ("Shay") communicated over a chatting service regarding Koppel's nomination.  (D. 131-7) (D. 131-12, pp. 93, 97).  In the early morning of February 21, Moses posted an initial draft of what evolved into the February 26 email solicitating input regarding nominating Koppel for keyholder status.  (D. 131-7).

A short time later, Moses initiated a conversation by email among EC members on Mattermost, a messaging platform.  (D. 145, ¶ 11) (D. 129, ¶ 8) (D. 129-6).  Picking up on the February 10 discussion, Moses suggested that he solicit opinions on SIPB-Private regarding whether Koppel should become a keyholder.  (D. 145, ¶ 11) (D. 131-12, p. 97) (D. 129-6).  Moses also provided the initial draft of the proposed solicitation email.   (D. 129-6).

After receiving and incorporating edits from EC members, Moses sent out the February 26 email at 4:21 p.m. on SIPB-Private. (D. 129-7) (D. 131-2).

The email was likely sent to approximately 149 keyholders. (D. 131-1, ¶ G) (D. 131-8). The purportedly defamatory February 27 email sent the next day likely reached approximately the same number of individuals. (D. 131-1, ¶ G) (D. 131-8). Moses could "not recall the specific number of [people]" on SIPB-Private at the time he sent the February 27 email. (D. 129-2, p. 78).

The February 26 email reads, in pertinent part, as follows:

Hello all,

There was a closed-door discussion a few weeks ago about the status of jkoppel. He has been an active member of SIPB for a fair amount of time and has seemingly met the contribution threshold for nomination.

However, in that meeting several keyholders reported aspects of his behavior that make them uncomfortable engaging with him. Social integration is a key aspect of keyholdership and it is also all of our duty to ensure everyone feels comfortable in SIPB spaces (both physical and virtual) . . .

In the interest of allowing for discussion of this while also respecting the confidentiality of peoples' reports, I am happy to serve as an "anonymizer" for anything you wish to include in the discussion but don't wish to share with the entire board.

For the sake of understanding, here are some of the incidents that happened *in roughly the past year* that people have discussed with us so far:

* Arguing that a female keyholder was overreacting in complaining about street harassment[9]
* Repeatedly initiating physical contact with someone who had specifically told him to stop doing so
* Arguing in a public Zephyr conversation that it was sexist against men to treat the Epstein scandal as a sign of a gendered cultural problem
* Repeatedly using degrading language about other SIPB members to make them feel inferior

We're looking to assess what keyholders' thoughts regarding nominating jkoppel are.

(D. 131-2) (emphasis added).

The time-period between sending this solicitation email and the February 27 email was 26 hours.  In response to the solicitation email, Moses received negative feedback from several individuals.  (D. 129-7).  Specifically, Catherine Zeng ("Zeng"), an EC member, commented by email that:

[Koppel] definitely makes me extremely uncomfortable.  He often tries to single me out to talk to and makes it very hard to leave.  He also tries to touch me in "socially acceptable" ways as much as possible in a very disturbing way.  For example, once I made a sarcastic comment and he said something like "you're so funny" and slapped my arm.

One of my best friends has said that Jimmy is one of the reasons (among another creepy dude) she doesn't come to SIPB.

(D. 129-7).  The referenced best friend was Ashley Kim ("Kim"), an MIT undergraduate at the time.  (D. 129-15, pp. 22-23) (D. 129-16, pp. 8-10).

---

[9] Koppel argues that the February 26 email was false because the street harassment did not take place in the past year.  Rather, it occurred in 2017.  (D. 133, ¶ 111).  The defamation claim, however, rests on the false and defamatory statements in the February 27 and March 2 emails.

Regarding Koppel's contact with Zeng's arm, he admits "it was plausible that" he touched Zeng's arm.  (D. 129-3, p. 515).  He also acknowledged that "maybe" he slapped her arm and that the contact was a brief touch that "might have felt—had some effect of gravity to feel as a brush maybe."  (D. 129-3, p. 420).  The incident occurred in late January or early February 2020 in a crowded room in the SIPB Office.[10]  (D. 129-3, pp. 415-416, 419-420) (D. 133, ¶ 40).  Zeng described that the brush to her arm made her uncomfortable or very uncomfortable.  She "felt like [Koppel] was hitting on [her]" and avoided Koppel after the incident.  (D. 129-15, pp. 17, 19-20, 123-124).

After complying with Zeng's request to anonymize the above email, Moses sent Zeng's response to SIPB-Private that evening. (D. 129-7).  In an email to Moses the following day, Zeng added, "It's also confusing because it's hard to point at any particular incident and use that as a reason against him[] [b]ecause everything he does is subtly off putting."  (D. 131-9).  In a second follow-up email, Zeng stated that "it might be hard to" ban Koppel from SIPB without first giving him a warning and that she "would give him a [warning] and if something even remotely comes up again, ban him."[11]  (D. 131-9).

---

[10] The record is viewed in Koppel's favor, and he recalls the room as "very crowded."  (D. 129-3, p. 416).

[11] Koppel argues that Zeng's February 27 emails "renounced and effectively withdrew all [of Zeng's February 26] initial report."  (D. 131, pp. 8-9) (citing,

The incident with Kim, who graduated in 2020, took place her junior year in 2019. (D. 131-15, pp. 8-9, 23). Specifically, while using a printer in the SIPB Office, Kim had a conversation with Koppel, who was a friend. (D. 131-15, pp. 11, 22-24). As she was leaving, Koppel asked for a hug, and she complied. (D. 131-15, pp. 23-25). Kim described herself as "moderately freaked out by" the hug. (D. 131-15, p. 23). Because of previous "similar experiences" with the referenced "creepy dude," a former SIPB chair, the hug with Koppel made her more uncomfortable than she otherwise would have been. (D. 131-15, pp. 23-25). After the hug with Koppel, Kim decided not to return to the SIPB Office.[12] (D. 131-15, pp. 23-25).

Brian Chen ("Chen"), another EC member, also replied to the solicitation email. He stated that "several people I trust have told me that they have had uncomfortable interactions with [Koppel]" and "[a]t least one may have stayed away from SIPB due in part to [Koppel's] presence." (D. 129-7). In a similar response to the February 26 email, Alex Dehnert ("Dehnert") stated that an acquaintance of his "mentioned in a conversation several

---

*inter alia*, D. 133, ¶ 165). To the contrary, and as accurately characterized by Moses (D. 139, ¶ 165, Response) (D. 137, pp. 8-9), Zeng's February 27 emails (D. 131-9) do not support Koppel's viewpoint that Zeng retracted, renounced, or withdrew her initial report.

[12] Although Moses knew about the contents of Zeng's email, i.e., that Zeng's friend no longer came to the SIPB Office because of Koppel and "another creepy dude," there is no indication that Moses knew the particulars of the interaction between Koppel and Kim at the time Moses received Zeng's email on February 26.

months back that [Koppel] had made her uncomfortable." (D. 129-7). Dehnert could not recall the details and thought that the acquaintance could be the same person that Chen's report referenced. An anonymous keyholder likewise responded to Moses that "I've definitely noticed [Koppel] making people uncomfortable, not just in SIPB."[13] (D. 129-7). Moses sent this last reply through SIPB-Private. (D. 129-7).

Later that evening on Mattermost, Moses related his personal opinion that the evidence was "overwhelming that [Koppel] should not be a keyholder." He further stated that, like Skeggs, he thought the matter "merit[ed] a separation of [Koppel] from SIPB." (D. 129-6). Moses also stated that "many people" told him to "be explicit in saying the reason for this is because of how [Koppel] makes women uncomfortable." (D. 129-6). Previously, Moses had received an email from a female alumni keyholder stating he "should make it clear to [Koppel] that the reason you're not offering him membership is due to his behavior towards the women in the [SIPB] office." (D. 129-7).

In another response to the February 26 email the next morning, keyholder Pravi Samaratunga ("Samaratunga") replied as follows:

> When I was [in] student leadership, I received a report from someone . . . describing an incident with [Koppel] that is nothing short of sexual assault . . . I received this report about three years ago, and the incident was

---

[13] The foregoing emails are considered to show Moses' knowledge of reports of uncomfortable interactions with Koppel.

> quite old even at the time, but it strongly indicates that
> Jimmy should not be given any more power then he has . . .
> Please don't nominate him . . . [The victim] was very very
> afraid of Jimmy and I am too.  He may have the capacity
> to learn and grow, but I don't trust that.

(D. 129-7).  Koppel described the incident as "a 'social faux pas'
involv[ing] an ex-girlfriend," Chelsea Voss ("Voss"), who "ran to
greet [him] and jumped on [him]" in "August or September 2016 in
California."  (D. 132, ¶ 4) (D. 129-3, pp. 226, 230-234, 237, 250).
The incident took place at an event or conference in California.
(D. 129-3, pp. 233-234, 237, 244-245).  A text exchange between
Koppel and Voss ensued in October 2016.  (D. 129, ¶ 20) (D. 129-
17).

Voss, in turn, responded to the February 26 solicitation
email by simply thanking Moses for sending it.  (D. 129-7).  Moses
did not know that Voss was Koppel's former girlfriend when he sent
the February 26 email (D. 131-11, p. 161) or the February 27 and
March 2 allegedly defamatory emails.

During the afternoon of February 27, at least three EC members
on Mattermost expressed support for Moses having an immediate
conversation with Koppel.  (D. 129-6).  Later that afternoon, Moses
had an hour-long meeting with Koppel from 4:30 to 5:30 p.m. in a
conference room on the MIT campus.  (D. 129-3, pp. 481-482).
During the meeting, Moses told Koppel about "reports from SIPB
members that he made them uncomfortable," especially female
members or keyholders.  (D. 129-2, pp. 37, 39) (D. 129-3, p. 482).

When Koppel asked what he had done, Moses refrained from giving him specifics because the individuals had asked to remain anonymous.  (D. 129-2, p. 38) (D. 129-3, p. 482).  Moses also informed Koppel that his nomination for keyholder status was unlikely and, given the circumstances, "the [EC] would like to ask him to disengage."  (D. 129-2, pp. 36-37).  During the meeting, Koppel agreed to be expelled from SIPB and not to go to the SIPB Office.  (D. 132, ¶ 2).

D.  **The February 27 Email and Events Leading to the March 2 Email**

Shortly after the meeting, at 5:51 p.m., Moses reported back to the EC members on Mattermost that he had finished the conversation with Koppel and that he (Moses) would be sending out the February 27 email shortly.  (D. 129-6).  Previously that day, Moses circulated a draft of the February 27 email on Mattermost, received comments from four recipients of the group, and emailed revisions, which culminated in the final version.  (D. 129-6).

The purportedly defamatory email sent out on SIPB-Private at 6:11 p.m. reads as follows:

> It is *clear* from this conversation (most of which was through individual replies to me), that jkoppel should not be nominated for keyholdership.  Moreover, given the *severity, consistency, and widespread nature of his interactions*, the EC has concluded that we should request jkoppel to refrain from participating in SIPB any more.  I have just spoken with jkoppel informing him of this conclusion.
>
> This decision was not taken lightly, but is a necessity that reflects *the vast majority* of people who took part in

18

this discussion (again mostly through individual replies). He has also been given *several opportunities to change his behavior*, and *failed to do so*. I am sad that this is something that our members had *to endure*, and SIPB will take a strong stance against *sexual harassment*.

This discussion has also made it clear that SIPB needs to do better to be *a safe environment* for everyone to take part in. Specifically, we need to establish mechanisms that make it easy for members to come forward *when they are made uncomfortable*. This is a topic that we will discuss at length the next EC meeting and I would encourage all members to contribute their ideas.

SIPB is not just a club of those who care about the community, but it is first and foremost a community where everyone should feel *safe and supported*. If something ever makes you uncomfortable, or you simply have ideas for ways we as an organization could improve, you can always share them with me or any member of the EC.

Yours,
The Chair

(D. 131-3) (emphasis added).

From February 27 to March 2, Moses and Koppel communicated on Facebook Messenger about a potential communication to other SIPB members regarding Koppel's disengagement from SIPB. (D. 133, ¶ 28). Koppel asked Moses for reassurance that the information would not "go[] outside SIPB," to which Moses replied he would "request that it remain limited to SIPB folks." (D. 129-8). Koppel expressed appreciation for Moses' efforts to limit the damage "to what the EC sees as necessary to protect SIPB interests." (D. 129-8).

On the morning of March 2 on Mattermost, Skeggs raised the issue of "send[ing] out our public email about" Koppel. (D. 129-

6).  Further, Skeggs set out five bullet points of items to include in the public email.  Among other items, these consist of the EC's decision to remove Koppel, an outline of incidents that "widely made people uncomfortable with behavior that was continued despite being told to stop," and "[a]n explanation that this was somewhat exceptional."  (D. 129-6).

Early that afternoon, Moses circulated a first draft of the March 2 email over Mattermost, which included, *inter alia*, Skegg's suggestions.  After a different EC member commented on the draft, Moses asked what email distribution list to use for the message and suggested various email distribution lists, including SIPB-Office.  He also raised the issue of whether to identify Koppel by name, indicated it was necessary given the circumstances, and asked for thoughts from the group.  Batson, who preceded Moses as SIPB chair, agreed it was necessary to include Koppel's name.  She further responded with a tentative thought that "it should go out by" SIPB-Office.  (D. 19-6).  Batson also informed the group, including Moses, that she used the SIPB-Office list to "sen[d] the Matt Stephenson email" (D. 129-11)[14] and that Lily Chung ("Chung") used SIPB-Office to "announce[] the revocation of jhawks' membership."  (D. 129-6) (D. 129-10).  By affidavit, Moses avers that Lizhou Sha ("Sha"), a past SIPB chair, gave him the same

---

[14] As described in the email, Stephenson was not a member of the MIT community and was known to have caused problems in the past.  (D. 129-11).

guidance to use SIPB-Office.  (D. 145, ¶ 15).  Sha also forwarded Moses her and SIPB Vice Chair Eric Lujan's August 2016 email sent on SIPB-Office regarding John Hawkinson's potential disengagement from SIPB.  (D. 129-9).  Skeggs, a prior SIPB vice chair, concurred with the use of SIPB-Office and the identification of Koppel by name.  (D. 129-6) (D. 145, ¶ 15).  In short, before Moses sent the 6:11 p.m. March 2 email, there was a history of using SIPB-Office to announce John Hawkinson's disengagement from SIPB and three current EC members (D. 129, ¶ 8) (D. 129-6) supported the use of SIPB-Office.

By way of background, John Hawkinson ("Hawk") was an MIT alumni and widely-known journalist in 2016, according to Koppel. (D. 133, ¶ 176).  The August 2016 email recounted that the MIT administration had asked Hawk to refrain from participating in all MIT student groups "due to complaints raised about his presence in various student groups."  (D. 129-9).  It also recited that, although Hawk "remains [an] SIPB member, he has effectively lost much of the privileges that being [an] SIPB member . . . accords him."  (D. 129-9).

In December 2018, the EC revoked Hawk's SIPB membership as an alumni keyholder.  Specifically, on December 18, 2018, Chung, an SIPB member, sent out an email via SIPB-Office informing the recipients of the EC's termination of Hawk's membership.  (D. 129-10) (D. 129, ¶ 12).  Beyond referring to MIT's previous decision

prohibiting Hawk "from interacting with any student groups," Chung's email did not set out a reason.  (D. 129-10).

Chung's email generated comments and complaints.  (D. 129-10).  As a result, Batson, as a member of the EC, sent out an email three days later on December 21 through SIPB-Office explaining her thoughts on the matter.  (D. 129-10).  Similar to the February 27 and March 2 emails but with fewer reasons for the expulsion, Batson explained that "[a] large number of SIPB members have been made very uncomfortable by [Hawk]" and she did not "want this to keep happening."  (D. 129-10).  She further noted that "[t]he EC ha[d] been deliberating" about the matter "for almost the entire fall semester."  (D. 129-10).

## E.   <u>The March 2 Email</u>

Having "received no advice to the contrary," Moses used SIPB-Office for the March 2 email.  (D. 145, ¶ 15, sent. 4) (D. 129-12).  The email reads:

Hello all,

I am writing to let you know about a hard conversation that SIPB keyholders had this past week about SIPB member Jimmy Koppel (jkoppel).

Many keyholders shared stories about how he had made them *deeply uncomfortable*, which *continued in spite of requests to stop*.  Given the *severity, consistency, and widespread nature of his interactions*, we have requested that jkoppel refrain from participating in SIPB any more (interacting in SIPB spaces, participating in SIPB projects & events, etc).  I have already spoken with jkoppel informing him of this, which he has agreed to.

This decision was not taken lightly, but is a necessity that and reflects both the need for SIPB to be a place where everyone is comfortable and the will of the current keyholders.

This circumstance and required response was *quite exceptional* and also reflects a need for SIPB to do better to be *a safe environment* for everyone.  Specifically, we need to establish mechanisms that make it easy for members to voice their concerns when they are made uncomfortable *as this had apparently gone on for some time*.  At minimum, we need to introduce some sort of anonymous reporting as keyholders only felt comfortable sharing anonymously or just to the chair.  We will discuss this at the next EC meeting on 3/6 and I would encourage all members to contribute their ideas.

SIPB is not just a club of those who care about computing, but it is first and foremost a *community where everyone should feel safe* and supported.  If someone ever makes you uncomfortable, you can always bring this up to me or any member of the EC.  We will respect any requests for confidentiality, including not sharing with other EC members.

Sincerely,
The Chair

(D. 129-12) (emphasis added).

Moses did not know the number of recipients on SIPB-Office when he sent the March 2 email.  (D. 131-12, p. 151) (D. 139, ¶ 140, sent. 1).  His "understanding at the time he sent the" email "was that the SIPB-Office list included keyholders and members who had an interest in information relating to the [physical] SIPB Office."  (D. 145, ¶ 16).[15]

---

[15] Koppel moves to strike this paragraph in Moses' affidavit because it references Moses' "understanding" of the SIPB-Office distribution list.  He argues that Moses' understanding constitutes a belief or opinion that is not within Moses' personal knowledge.  (D. 134, pp. 2-3).  To the contrary, Moses' "understanding" shows Moses' state of mind, namely, what Moses understood and

F.   <u>The Aftermath of the March 2 Email</u>

That evening, several recipients of the March 2 email responded to the email.  An alumni keyholder, Matthew Belmonte ("Belmonte"), commented that "[m]aking someone uncomfortable is not itself an offence."  (D. 129-12).  He also pointed out that "it might be best to follow" the "constitutional procedure for dis-membering."  (D. 129-12).

On March 6, an attorney representing Koppel wrote to the EC and described the March 2 email as defamatory, inaccurate, and unlawful.  (D. 129-13).  The letter demanded that the EC issue a retraction through the same email distribution list.  Accordingly, on March 12 the EC sent the following communication through SIPB-Office clarifying several points in the March 2 email:

> Hello all,
>
> We are writing in connection with an email sent on March 2 by William Moses <wmoses@mit.edu> on behalf of the SIPB executive board (the email).
>
> We believe that transparency is an important principle, but that email included certain details relating to Mr. James

---

was thinking at the time.  For that reason, the court will consider it part of the summary judgment record.  Koppel's reliance on *Holland v. Select Portfolio Servicing, Inc.*, 301 F. Supp. 3d 218, 224 (D. Mass. 2018), is misplaced.  The court in *Holland* distinguished *In Cermetek, Inc. v. Butler Avpak, Inc.*, 573 F.2d 1370 (9th Cir. 1978), which struck an affidavit using "'I understand' language," partly because the affidavit at issue in *Holland* stated it was based on the affiant's personal knowledge.  *Holland*, 301 F. Supp. 3d at 224.  Moses makes the same personal knowledge averment in his affidavit.  (D. 145, ¶ 1).  Koppel's additional argument that the balance of the paragraph shows Moses knew nothing about the distribution list of SIPB-Office fails to persuade.  Moses attests to his personal knowledge under penalty of perjury, and the affidavit elsewhere evidences Moses' knowledge about various SIPB email distribution lists, including SIPB-Office.  (D. 145, ¶¶ 1, 8, 19).  In addition, Moses describes the makeup of SIPB-Office on Mattermost.  (D. 129-6, p. 13).

Koppel (jkoppel) that, on further reflection, we have concluded could have remained within the SIPB leadership. I apologize on behalf of the SIPB executive board.

In addition, the email conveyed several points which we wish to clarify. *James was not informed or "warned" of any prior alleged conduct by SIPB leadership, nor did he fail or refuse to cure or alter any conduct after any warning or warnings from SIPB leadership.*

Although not our intent, the email may have given the impression that any issue related to this subject was clear or not disputable.  On the contrary those communications involved discussion of points on which reasonable persons can and do disagree.

We apologize for any resulting confusion or misperceptions.

Sincerely,
The Executive Committee of the Student Information Processing Board

(D. 129-12, p. 7) (emphasis added).

On or about March 20, Koppel ran a number of searches on MIT's computer system and determined that SIPB-Office had 697 email addresses.  (D. 129-3, pp. 522-525, 527).  He nevertheless acknowledged the possibility that fewer than 697 people actually received the March 2 email.  (D. 129-3, pp. 534-535).  The parties agree that the maximum number of persons to whom Moses sent the March 2 email was 508.  (D. 133, ¶ 36).

## V.  <u>DISCUSSION</u>

As noted above, a plaintiff alleging defamation must show that the statements at issue were both false and defamatory.  *See Noonan v. Staples*, 556 F.3d at 25.  The court presumes without deciding the issue that the statements in question here were

defamatory where Moses does not argue that they were not.  With
respect to the falsity element, Moses argues that Koppel has not
adduced any evidence that any portions of the February 27 and March
2 emails are false.  He argues further that, irrespective of
falsity, he was privileged to publish the emails because his
statements were of common interest and were not published
recklessly or with malice.  The court addresses each of these
assertions in turn.

### A.  **Falsity**

Although Koppel references multiple statements, he focuses
principally on two purportedly false statements that were present
in both emails.  In the first, Moses cites "the severity,
consistency, and widespread nature of his interactions" in the
context of "sexual harassment" (the "first statement") (D. 131)
(citing, *inter alia*, D. 133, ¶¶ 116-119, 128) (D. 54, ¶¶ 33, 35).
Regarding the second, Moses writes that Koppel had "been given
several opportunities to change his behavior and failed to do so"
(the "second statement").  (D. 131, p. 8) (citing, *inter alia*, D.
133, ¶¶ 116, 128, 155) (D. 54, ¶¶ 32, 35).  The February 27 and
March 2 emails use slightly different words for the first and
second statements but each statement conveys the same meaning:
first, that Koppel engaged in the severe, consistent, and

widespread sexual harassment or sexual misconduct;[16] and misconduct; and second, that he was asked to stop, or given opportunities to change, the behavior but failed to do so.

It is well established that "[w]hen a statement is substantially true, a minor inaccuracy will not support a defamation claim." *Salmon v. Lang*, 57 F.4th 296, 320 (1st Cir. 2022) (quoting *Lawless*, 160 N.E.3d at 1257-1258); *accord Noonan*, 556 F.3d at 28. For example, a statement that the "plaintiff was 'found not guilty,' where, in fact, the charges against him were dismissed" remains substantially true. *Salmon*, 57 F.4th at 321 (citation omitted). Furthermore, the truth of a statement is "determined as of the time of the defamatory publication." Restatement (Second) of Torts § 581A cmt. g (1977). It is also appropriate to consult dictionaries to assess whether a defamatory statement is false. *See Heagney v. Wong*, 915 F.3d 805, 813-814 (1st Cir. 2019) (citing dictionary definition of phrase in defamatory statement to ascertain whether statement was false, albeit in conjunction with determining truth as absolute defense).

---

[16] Only the February 27 email uses the words "sexual harassment". Regardless, the March 2 email recites similarly that "keyholders shared stories" of how Koppel "made them deeply uncomfortable" and almost immediately thereafter describes "his interactions as "sever[e]." (D. 129-12). As such, the March 2 email allows for an ordinary construction of the interactions as constituting sexual misconduct. *See generally Heagney v. Wong*, 915 F.3d 805, 814 (applying "ordinary construction of" phrase to determine if it was true or false). As an aside, neither Moses nor Koppel distinguish interactions which made only keyholders, as opposed to keyholders and non-keyholders, deeply uncomfortable. Solely for purposes of summary judgment, the issue is waived.

Here, the court finds based on the record that a jury could find that the first statement, which characterized Koppel's sexual harassment or sexual misconduct related interactions as "*sever[e]*, consisten[t], and *widespread*," was false when made.[17]   *See generally* Restatement (Second) of Torts § 617(b) & cmt. a (1977) (stating that, subject to court's control, jury determines whether "matter was true or false").

To begin, a jury could find that "severe" interactions would as a matter of common sense exclude interactions between Koppel and another person that merely made that person uncomfortable. Under this ordinary construction, a jury could find further that only three published statements reflected *severe* interactions: (1) Zeng's report that Koppel slapped her arm, which took place in late January 2020; (2) Samaratunga's report of an incident of sexual assault, which took place in 2016 and which Koppel described as involving his former girlfriend, Voss; and (3) Zeng's report of her best friend, i.e., Kim, no longer coming to the SIPB Office because of Koppel and "another creepy dude."

Even construing the record in Koppel's favor, the remaining reports at most concerned people being made to feel merely uncomfortable as opposed to deeply uncomfortable and subjected to

---

[17] "Severity" is  defined as a "fact or condition of something being extremely bad or serious."  Oxford's Advanced Learner's Dictionary, https://www.oxfordlearnersdictionaries.com/us/definition/english (henceforth, "Oxford's Advanced Learner's Dictionary").

sexual misconduct or sexual harassment.  For instance, Moses testified that keyholders or SIPB members on February 10 may have mentioned conversations with Koppel that made them "uncomfortable for a variety of reasons," such as belittling.  Chen, Dehnert, and an anonymous keyholder reported about one person or several persons being made to feel uncomfortable.  Moses testified that Koppel made him uncomfortable by hugging him and, at times, rubbing Moses' head.  During a 2018 SIPB dinner, Koppel told a story about a mathematical theory based on "a pun on COC," whereupon he felt some displeasure from Skeggs, and, perhaps, indicated the incident might have made Skeggs uncomfortable.  (D. 129-3, pp. 486-488).[18] As none of these other anecdotal reports involved instances of sexual harassment or misconduct, they fall short of reflecting "severe" interactions with Koppel involving sexual harassment or misconduct.

In sum, only three of the interactions involving Koppel that Moses knew of involved sexual harassment or sexual misconduct (Zeng in late January 2020; Kim in 2019; and, as reported by Samaratunga, Voss in or around 2016).[19]  Consequently, a reasonable factfinder

---

[18] The testimony as to whether the incident might have made Skeggs uncomfortable is not clearcut.  Specifically, after describing the incident and others, Koppel was asked "[w]hat other incidents might have made [Skeggs] uncomfortable." Koppel answered that he could not "recall any others at this time."  (D. 129-3, p. 488).

[19] As to Voss, Samaratunga did not identify the year as 2016.  She did state, however, that she received the "report about three years ago," i.e., 2017, and that "the incident was quite old even at that time."  (D. 129-7).

could conclude from this small number that Moses' characterization
of the reports he received as reflecting *severe*, consistent, and
*widespread* interactions implicating sexual harassment or sexual
misconduct was false.[20]

The second statement likewise allows a jury to conclude it
was false as opposed to substantially true.  The relevant portion
of the February 27 email states that Koppel was given "several
opportunities to change his behavior and failed to do so."  (D.
131-3).  The March 2 email similarly refers to "requests to stop"
the behavior.  (D. 131-4).  But, based on the record, there is
little indication that Koppel was given opportunities to change or
received requests to stop the sexual harassment or sexual
misconduct.

Rather, the replies to Moses in response to the February 26
email described the alleged sexual harassment or sexual
misconduct, but they did not mention a request to stop or an
opportunity to change the behavior.  (D. 129-7).  There were also
few, if any, communications posted on Mattermost regarding Koppel
being given opportunities to change or requests to stop the
behavior.  (D. 129-6).  Moses' testimony describing the February
10 gathering does not indicate anyone mentioning that Koppel was

---

[20] "Widespread" commonly means "existing or happening over a large area *or among
many people*."  Oxford's Advanced Learner's Dictionary (defining widespread)
(emphasis added).

given an opportunity to change the behavior or asked to stop the
behavior.

Viewing the record in Koppel's favor, no clear opportunities
to change or requests to stop accompanied the few reported
interactions involving sexual harassment or sexual misconduct
incidents.  Likewise, and again viewing the record in Koppel's
favor, Moses did not ask Koppel to stop the hugs or the rubs on
the head.  Further, as previously noted, Moses did not inform the
February 10 group that Koppel hugged him without his permission.
The court finds from the foregoing that the record does not
establish beyond dispute that Koppel was given repeated
opportunities to change his behavior or received more than one
request to stop his behavior and that he failed to do so.[21]

In sum, a jury could conclude that the first and second
statements in the February 27 and March 2 emails were false.
Summary judgment is therefore not warranted on this specific
ground.

### B.   **The Common Interest Privilege**

Moses argues that regardless of whether the two sets of
statements were false and defamatory, he had a conditional

---

[21] Moses appears to interpret each incident of sexual harassment or misconduct
as innately creating an opportunity for Koppel to change his behavior, such
that Koppel's continuation of the behavior after each incident purportedly
amounted to a missed opportunity to change.  (D. 125, p. 21) (D. 137, p. 8,
n.4).  A jury could just as easily assume, however, that any potential
opportunity arose only as a result of Koppel being put on notice by the person
being subjected to the misconduct.

privilege to send the emails because he and the recipients shared a common interest in the EC's request that Koppel disengage from the group, and the emails were reasonably calculated to serve that interest.

Koppel, relying on Belmonte's response to the March 2 email, demurs and maintains that the defamatory statements in the emails did not promote any common interest.  As previously noted, Belmonte, an alumni keyholder, responded to the email by stating that "[m]aking someone uncomfortable is not itself an offence" and that "[a]nonymous accusations, and charges and arguments that cannot be confronted and potentially rebutted by the accused, are a dangerous tool."  (D. 129-12).  Moses in turn counters that Belmonte's response confirms that recipients, including Belmonte, had an interest in the EC's actions regarding Koppel.  (D. 137).

On summary judgment, the underlying "burden of establishing the existence and applicability of a conditional privilege rests with the publisher [Moses] of the allegedly defamatory communication."  *Zeigler*, 939 F.3d at 393 (1st Cir. 2019).  Assuming Moses can do so, the burden then shifts to Koppel to show by clear and convincing evidence that Moses abused the privilege.  *Catrone*, 929 F.2d at 887 (citations omitted); *accord Singh v. Blue Cross/Blue Shield of Mass., Inc.*, 308 F.3d 25, 47 (1st Cir. 2002).

Massachusetts law generally follows section 596 of the Restatement (Second) of Torts (1977), which sets out the common

interest privilege in defamation cases.  *See, e.g., Downey v. Chutehall Const. Co., Ltd.*, 19 N.E.3d 470, 477 (Mass. App. Ct. 2014) (citing, *inter alia*, Restatement (Second) of Torts § 596 (1977), to show Massachusetts law adheres to common interest privilege); *see also Hiles v. Episcopal Diocese of Ohio*, 744 N.E.2d 1116, 1123, n.10 (Mass. App. Ct.) (dicta quoting Restatement (Second) of Torts § 596 cmt. e (1977)), *rev'd on other grounds*, 744 N.E.2d 1116 (Mass. 2001).  Notably, section 596, comment e, instructs that "[t]he common interest of members of . . . *non-profit* associations . . . is recognized as sufficient to support a privilege for communications among themselves concerning the qualifications of . . . members and their participation in the activities of the society."  Restatement (Second) of Torts § 596 cmt. e (1977) (emphasis added).  The court takes judicial notice that MIT is a nonprofit organization.  *See Lengerich v. Columbia Coll.*, 633 F. Supp. 2d 599, 607 n.2 (N.D. Ill. 2009) (taking judicial notice college is "not-for-profit corporation" as listed on government website); https://collegescorecard.ed.gov/search (listing MIT as nonprofit).

Correspondingly, Massachusetts cases extend the common interest privilege "to the educational arena." *Tynecki v. Tufts Univ. Sch. of Dental Med.*, 875 F. Supp. 26, 35 (D. Mass. 1994). For example, a college teacher is afforded "a conditional privilege to make statements about a fellow teacher in furtherance of the"

college's interest "that its faculty members act in a professional way." *Panse v. Nelson*, No. 01-P-1304, 2003 WL 342117, at *1 (Mass. App. Ct. Feb. 14, 2003) (unpublished).

The court therefore must first determine whether Moses, the publisher and EC chair at the time, and the recipients of the two emails with the defamatory statements shared "a common interest in the subject", and then assess whether the statements were "reasonably calculated to further or protect that interest." *Downey*, 19 N.E.3d at 476 (citations omitted); *see Zeigler*, 939 F.3d at 392-393 (stating "common law privilege for otherwise defamatory statements" applies where publisher and "recipient have a common interest, and the communication is of a kind reasonably calculated to protect or further it") (citation omitted); *Lawless*, 160 N.E.3d at 1260 (same). As discussed below, the court finds that Moses has established that the privilege applies.

To begin, Moses states by affidavit that he sent the February 27 and March 2 emails "to advance what [he] considered to be the interests of SIPB." (D. 145, ¶ 14). "Those interests include: (1) notifying . . . SIPB members of a significant action" taken by the EC; (2) "informing SIPB members that Koppel would no longer be at the SIPB office," which "thereby potentially encourage[ed] persons who may have been avoiding Koppel that it was now safe to participate" in SIPB; (3) "conveying to SIPB members that the [EC] takes seriously any incident where other SIPB persons are made to

feel uncomfortable"; and (4) fostering the start of "a discussion about how to ensure that SIPB members could feel comfortable . . . reporting similar interactions in the future." (D. 145, ¶ 14).[22]

Examining the recipients of the two emails and whether they shared one or more of these interests with Moses necessitates defining those recipients. As noted, Moses sent the March 2 email through SIPB-Office. Email addresses of individuals on SIPB-Office include the "addresses of some SIPB keyholders and non-keyholding SIPB members." (D. 145, ¶¶ 7-8). In addition, the SIPB-Office list has "been used to communicate with SIPB-affiliated persons." (D. 145, ¶ 8). The individuals on SIPB-Office are therefore SIPB members or, more broadly, SIPB-affiliated persons.

Moses sent the February 27 email through SIPB-Private. SIPB-Private contains email addresses only of a subset of SIPB keyholders. (D. 129, p. 443) (D. 145, ¶ 9).[23]   Relatedly, SIPB-

---

[22] Koppel moves to strike Moses' attestations in paragraph fourteen of his affidavit because Moses has no personal knowledge of the above, four enumerated interests. Rather, he only has knowledge of "what he (Moses) was trying to do." (D. 134). However, Moses' affidavit affirmatively recites that his statements are made "on personal knowledge," and the statements address what Moses, as chair of the EC, "considered to be the interests of SIPB" that the emails sought to advance. (D. 145, ¶ 1, 14). Further still, after joining SIPB in 2017, Moses "engaged in numerous projects and activities with SIPB." (D. 145, ¶ 3). It was through those activities that Moses became "thoroughly familiar with SIPB's . . . *interests*." (D. 145, ¶ 4) (emphasis added). Accordingly, what Moses considered to be the above four interests of SIPB is a matter that falls within his personal knowledge. Koppel's motion to strike paragraph fourteen is therefore denied.

[23] Koppel moves to strike paragraph nine of Moses' affidavit because Moses lacks personal knowledge, and because the paragraph omits the exact number of persons on SIPB-Private. (D. 134). However, Moses' affidavit affirmatively recites it

Office "includes all of the email accounts associated with" SIPB-Private.  (D. 128, ¶ 11).

As SIPB members or SIPB-affiliated persons, the recipients of the two emails have an interest in significant decisions by the EC, i.e., the first interest Moses identified.  Plainly, they also have an interest that the EC take seriously any incident in which SIPB members are subjected to sexual harassment or sexual misconduct.  That interest is encapsulated within the broader third interest Moses identified that the EC take "seriously any incident where other SIPB persons are made to feel uncomfortable."  (D. 145, ¶ 14).  At a minimum, Moses and SIPB members and SIPB-affiliated recipients therefore share the first interest and a subset of the third interest.

Going on, the court finds further that the defamatory statements were reasonably calculated to further those two interests.  First, the defamatory statements concern Koppel's alleged misconduct (the severe, consistent, and widespread interactions of sexual harassment or sexual misconduct and Koppel's failure to stop such conduct after several opportunities)

---

was made "on personal knowledge."  (D. 145, ¶ 1).  Further, Moses' knowledge about other SIPB email distribution lists (D. 145, ¶ 19) supports the notion that he also had familiarity with SIPB-Private.  Moreover, Moses joined SIPB in 2017 and engaged in numerous projects and SIPB activities.  By virtue of his activities with SIPB, Moses became "thoroughly familiar with SIPB's philosophy, its history, and its interests."  (D. 145, ¶ 4).  Even if Moses did not know the exact number of individuals on SIPB-Private, his involvement with SIPB and his status as a keyholder render him competent to testify about SIPB-Private and sufficiently knowledgeable about the makeup of SIPB-Private's distribution list.  The court thus denies Koppel's motion to strike paragraph nine.

that made Koppel undesirable for continued membership. Second, the emails communicated the EC's noteworthy action of requesting that Koppel not participate in SIPB in light of this alleged misconduct set out in the defamatory statements. As such, the defamatory statements are reasonably calculated to further the interests of notifying SIPB members of a significant action (the first interest) and that the EC takes seriously sexual harassment and sexual misconduct incidents (the subset of the third interest).

Accordingly, the facts in the record fully and convincingly support Moses' contention that: (1) he and the recipients of the defamatory statements in the two emails shared the first interest and a subset of the third interest; and (2) the defamatory statements of alleged sexual harassment and sexual misconduct and the opportunities given and requests to stop such behavior are reasonably calculated to further those two interests. The court finds therefore that Moses enjoyed a conditional privilege to publish the defamatory statements at issue.

## C.  **Abuse of Privilege**

As noted previously, though, "[a] conditional privilege may be lost" if the holder abuses the privilege through (1) "unnecessary, unreasonable or excessive publication of the statements"; (2) publication of the statements with knowledge of their falsity or with reckless disregard of the truth; or (3) proof that "the defendant acted with actual malice." *Lawless*, 160 N.E.3d

at 1261 (quoting *Barrows*, 976 N.E.2d at 838-839).  Regardless of the manner of abuse, recklessness . . . should be required." *Catrone*, 929 F.2d at 889 (quoting *Bratt*, 467 N.E.2d at 132).

Moses argues that he did not act recklessly in a manner that abused the privilege, and argues further that Koppel has regardless failed to show by clear and convincing evidence that his publication of the emails was excessive or done with actual malice or with knowledge that his statements were false.

Koppel argues in response that all three disqualifying grounds are present here, assuming the privilege ever applied. The record shows, so he contends, that Moses:  (1) published the statements in a "both unnecessary and excessive" manner by sending them to all the SIPB-related recipients; (2) solicited negative opinions from the EC and SIPB-Private recipients "when [Koppel] had not even asked to be considered for keyholder status," thus showing malice; and (3) recklessly abused the privilege by deliberately and falsely stating that Koppel had been given prior warnings.  The court considers each ground in turn.

1.  <u>**Unnecessary, Excessive, and Reckless Publication**</u>

For a defendant "to lose a conditional privilege to publish defamatory material by 'unnecessary . . . or excessive publication,' the plaintiff must prove that the defendant published the defamatory information recklessly."  *Bratt*, 467 N.E.2d at 129 (internal citation omitted); *accord Foley v. Polaroid*

*Corp.*, 508 N.E.2d 72, 79 (Mass. 1987) (quoting and reaffirming this conclusion in *Bratt*, 467 N.E.2d at 129); *Lawless*, 160 N.E.3d at 1261. It is well established that negligence does not amount to recklessness and does not destroy the conditional privilege. *Bratt*, 467 N.E.2d at 131; *accord Downey*, 19 N.E.3d at 477.

Pertinent to this issue, Moses argues that he adhered to the precedent of using SIPB-Private and SIPB-Office as the proper audience for the February 27 and March 2 emails. (D. 125, p. 18) (D. 145, ¶¶ 8, 10) (D. 129-9, 129-10, 129-11). In other words, he submits that he did not deviate from the historical use of these distribution lists for similar purposes. (D. 125, p. 18).

Adherence to the EC's usual practice to use SIPB-Private to publish discussions among keyholders and to use SIPB-Office to publish EC decisions mollifies any unnecessary or excessive publication. *See O'Brien v. Town of Pembroke*, No. 21-P-99, 2022 WL 1052073, at *3 (Mass. App. Ct. Apr. 8, 2022) (affirming allowance of motion for judgment on pleadings, finding no excessive publication or actual malice, and noting no allegation of deviation from board of health's usual procedure to publish report to the public record) (unpublished).

Further, the EC also had a history of using SIPB-Office to communicate decisions to SIPB members. (D. 145, ¶ 10). In particular, the EC had a history of using SIPB-Office "[f]rom time to time" to inform SIPB members that an individual was no longer

associated with SIPB or a member of SIPB.  (D. 127, ¶ 5).  Thus, in response to Moses' query on Mattermost asking what distribution list to use for the March 2 email, Batson, a former SIPB chair, posted her "tentative[]" thought that "it should go out on sipb-office."  (D. 129-6).  She explained that, "[f]or historical purposes," that was the list she used to send the Matt Stephenson email "and that was the list [Chung]" used to "announce[] the revocation of [Hawk's] membership."[24]  (D. 129-6) (D. 129-10) (D. 145, ¶¶ 10, 15).  Similarly, Moses asseverates that Sha, a past SIPB chair, gave him "the same guidance" to use SIPB-Office.  (D. 145, ¶ 15).  Skeggs, an EC member, also concurred with the use of SIPB-Office.  Against this backdrop, any failure to limit publication of the February 27 email to the EC was not unnecessary or excessive publication and it was not reckless.

To be sure, Koppel identifies four individuals (Andrew Twyman, Michael Phillips, Lillian Chin, and Zoe Anderson) who he contends received the March 2 email but had no affiliation with SIPB, as evidence of Moses' recklessness in sending the email. (D. 132, ¶¶ 9-10).  But even assuming arguendo this assertion is

---

[24] Koppel moves to strike Batson's corresponding affidavit statement (D. 127, ¶ 13, sent. 3) as "inaccurate hearsay."  (D. 134, p. 5).  To be clear, the court has not relied on the affidavit.  Regardless, Batson's post on Mattermost is not hearsay because it is being offered to show Moses' knowledge of the EC's past use of SIPB-Office rather than for the truth of the matter asserted.  *See* Fed. R. Evid. 801(c)(2).

true,[25] the incidental publication to four individuals out of several hundred more who had a legitimate interest in receiving the email does not convert a privileged publication into an excessive one. *See* The Restatement (Second) of Torts § 604 cmt. b (1977) (addressing excessive publication and explaining individual does not abuse privilege by using communication method "that involves an incidental publication of the defamatory matter to persons to whom he is not otherwise privileged to publish it,

---

[25] The court does not credit Koppel's assertion regarding these four individuals, for a number of reasons. First, Koppel's affidavit statements regarding the first three individuals (Twyman, Phillips, and Chin) demonstrably reflect a lack of personal knowledge. Koppel states, for example, that Twyman attended a 1995 and a 1996 SIPB meeting, and that Phillips attended a 1995 SIPB meeting (D. 132, ¶ 9), but Koppel lacks personal knowledge about Twyman's and Phillips' attendance at these 1995 and 1996 meetings because the meetings predated Koppel's tenure at MIT by two decades. *See Perez v. Volvo Car Corp.*, 247 F.3d 303, 316, 320 (1st Cir. 2001) (affidavit by member of family that owned car business who eventually became its general manager could not attest about origins of relationship between family's car business, car manufacturer, and guarantor because relationship began before affiant family member became general manager). As to Chin, Koppel attests that she never attended an SIPB meeting, and that she confirmed receipt of the March 2 email in a document (D. 132, ¶ 9.c), but the court cannot locate this document in the record, and Moses' reply brief represents that Koppel did not provide it to the court. (D. 137, p. 5, n.2). Further, there is no indication that Koppel personally attended all the SIPB meetings during Chin's SIPB membership, reviewed attendance records for such meetings, or is "competent to testify on the matters stated" in those records. Fed. R. Civ. P. 56(c)(4); *cf. Bonner v. Triple-S Mgmt. Corp.*, 68 F.4th 677, 687 (1st Cir. 2023). Accordingly, Koppel does not have personal knowledge that Chin never attended an SIPB meeting. Finally, regarding Anderson, Koppel's former student, Koppel avers that: (1) on March 6, 2020, she told him that she received the March 2 email; (2) SIPB minutes show she never attended an SIPB meeting; and (3) she was on another SIPB distribution list because of an activities fair not run by SIPB. (D. 132, ¶ 10). However, Koppel's first statement about what Anderson said to him would not be "admissible for the truth of the matter asserted," Fed. R. Evid. 801(c), namely, that Anderson received the March 2 email. As to the second averment, there is no indication that Koppel reviewed all the SIPB meeting minutes or otherwise has personal knowledge that Anderson never attended an SIPB meeting. With regard to the third averment, there is no suggestion Koppel has personal knowledge that Anderson was on another mailing list because of an activities fair not run by SIPB.

if the method . . . is customary and sanctioned by business or other necessity").

Koppel nevertheless contends that Moses' failure to limit the publication to the nine-member EC constitutes needless and excessive publication because, inter alia, it was not necessary for Moses to discuss Koppel's behavior with anyone outside the EC where the EC alone had the power to expel a member from the group.[26] (D. 131, p. 7) (citing, inter alia, D. 133, ¶¶ 129-132, 138, 143). Similarly, Koppel reasons that if Moses' goal was to encourage persons who were avoiding SIPB facilities because of Koppel to return, then Moses could have met that goal by simply limiting the publication to SIPB members who frequented the facilities.

But even assuming Moses in hindsight could have sent the emails to a narrower group of recipients, that does not mean he acted recklessly. *See Bratt*, 467 N.E.2d at 132 (concluding that loss of conditional privilege "through 'unnecessary, unreasonable or excessive publication' requires proof that the defendant acted

---

[26] Moses relies on *Sheehan v. Tobin*, 93 N.E.2d 524 (Mass. 1950), to argue that it was not excessive to publish the emails to SIPB members, rather than to the more limited group of EC members. Moses further points out that that it was not excessive to inform the entire membership of a group about a decision by the group's leaders. In *Sheehan*, the President of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("the union") disseminated the allegedly defamatory statements to all the members of the union "in the only way provided," namely, the union's "official magazine which was sent to all members." *Id.* at 528. Thus, in *Sheehan*, "there was no other method" to inform the membership about the proceedings of the board." *Id.* at 526. Given this finding in *Sheehan*, Koppel justifiably distinguishes the case because Moses had other options to publish the emails to a more limited audience, such as the nine-member EC or the active student keyholders.

recklessly"). "Recklessness is a difficult standard to meet."
*Downey*, 19 N.E.3d at 477. "Simply showing a deviation from best
practices, without more, does not suffice to ground a finding of
recklessness." *Zeigler*, 939 F.3d at 395 (citing *Shore v. Retailers
Comm. Agency, Inc.*, 174 N.E.2d 376, 381 (Mass. 1961)). Moses did
not deviate from the historical practice of using SIPB-Office to
notify SIPB members about the revocation of Hawk's membership.
Further, three current EC members supported the use of SIPB-Office,
albeit Batson voiced only a tentative thought. More, they
communicated their support to Moses on Mattermost.

On this record at the summary judgment stage, Koppel has
failed to show that Moses excessively published the emails or acted
recklessly by using SIPB-Private or SIPB-Office.[27]

## 2. **Actual Malice**

Moses argues that Koppel has failed to adduce any evidence
that he acted with actual malice in sending the emails. Koppel
counters that Moses acted with actual malice by soliciting negative
opinions about Koppel using the false premise of nominating him to
keyholder status when, in fact, Koppel never sought keyholder
status. (D. 131, p. 8).

---

[27] Koppel also argues that a former SIPB Chair advised Moses that "everything
[about Koppel] should be sent only to the Executive Committee or to the Chair"
is not convincing. (D. 131, p. 7) (citing, *inter alia*, D. 133, ¶ 141) (D. 131-
10, p. 2). For reasons already stated, the failure of Moses to send the emails
only to the EC and, instead, send them to wider audiences was not unnecessary
or excessive publication and it was not reckless publication.

As noted, the conditional privilege may be lost if "the defendant acted with actual malice." *Lawless*, 160 N.E.3d at 1261 (citation omitted).  "Malice, in this sense," occurs when the defamatory words are "spoken out of some base ulterior motive." *Dragonas*, 833 N.E.2d at 687; *see Zeigler*, 939 F.3d at 396 ("[A]ctual malice occurs when 'defamatory words, although spoken on a privileged occasion, were not spoken pursuant to the right and duty which created the privilege but were spoken out of some base ulterior motive.'") (citations omitted).  An ulterior motive may consist of "an 'intent to abuse the occasion [giving rise to the privilege] by resorting to it "as a pretence."'" *Zeigler*, 939 F.3d at 396 (quoting *Dragonas*, 833 N.E.2d at 687).  An ulterior motive may also take the form of "a direct intention to injure another." *Id.* (quoting *Dragonas*, 833 N.E.2d at 687).

The court finds that Koppel has not adduced sufficient evidence to show that Moses acted with actual malice.  Critically, Moses sent the emails chiefly to advance the first interest (notifying SIPB members of a significant decision by the EC) and the subset of the third interest (conveying to SIPB members that the EC takes seriously any incident in which members are subjected to sexual harassment or sexual misconduct). (D. 145, ¶ 14).  As a result, he does not cede the privilege. *Id.* ("[A] defendant cedes the protection of the conditional privilege through actual malice only 'if the publication [was] not made <u>chiefly</u> for the purpose of

furthering the interest which is entitled to protection.'") (quoting *Dragonas*, 833 N.E.2d at 688). Moreover, when the publication is made "to protect the interest in question, the fact that it [was] inspired in part by resentment or indignation at the supposed misconduct of the person defamed does not constitute an abuse of privilege." *Id.* (quoting Restatement (Second) of Torts § 603 cmt. a (1977)). Thus, even if Moses was motivated in part by indignation toward Koppel's reported behavior, the privilege remains intact. Further, given the history of the friendship between Koppel and Moses, Koppel's actual malice argument is even less convincing. *Cf. Dragonas*, 833 N.E. at 688 (ongoing antagonistic relationship between defendant, a school principal, and plaintiff, a teacher, supported reversing allowance of defendant's summary judgment motion premised on actual malice).

Somewhat relatedly, Koppel argues "there was no valid 'interest' of SIPB" to use his name. (D. 131, pp. 6-7) (citing, *inter alia*, D. 133, ¶ 152). Moses responds that it was necessary to use Koppel's name to alert the individuals who were avoiding SIPB Office that they could return without seeing or interacting with Koppel. (D. 125, p. 19, n.7).

As indicated, the privilege may be lost "because the defamatory matter is published for some purpose other than that for which the particular privilege is given." *Sheehan*, 93 N.E.2d at 529 (citing Restatement (Second) of Torts § 599 cmt. a (1977));

*see Zeigler*, 939 F.3d at 396 (quoting *Dragonas*, 833 N.E. at 687). One of the interests Moses identified for sending the emails was to inform "SIPB members that Koppel would no longer be at the SIPB office, thereby potentially encouraging persons who may have been avoiding Koppel that it was now safe to participate in the group." (D. 145, ¶ 14). Using Koppel's name served this legitimate interest. Specifically, it was necessary to inform SIPB members who were avoiding SIPB Office because of Koppel that they could return without encountering him. Although Moses could have limited the emails to a more targeted audience, such as one that included Zeng and other identified individuals who expressed discomfort interacting with Koppel, Moses logically and commonsensically testified there were likely others avoiding "the SIPB office as a result of Koppel." (D. 129-4, pp. 117-118). In this regard, Moses therefore acted to serve the second interest he identified. (D. 145, ¶ 14) ("informing SIPB members that Koppel would no longer be at the SIPB office thereby potentially encouraging persons who may have been avoiding Koppel that it was now safe to participate in the group"). Further still, two EC members voiced support for identifying Koppel by name in the March 2 email and agreed with Moses that the circumstances made it necessary to use Koppel's name. (D. 129-5, p. 9) (D. 129-6, p. 14).

In short, Koppel's actual malice argument lacks merit.[28]

### 3.  **Deliberately False Statements of Prior Warnings**

Moses argues that he did not recklessly publish the two statements knowing they were false.  Koppel in response argues that Moses deliberately published the false statement that Koppel had been given prior warnings.  (D. 131, p. 8) (citing, *inter alia,* D. 133, ¶¶ 128, 155).

"One manner" to abuse the privilege is by "publication with knowledge of falsity or with reckless disregard of the truth." *Tosti v. Ayik*, 437 N.E.2d 1062, 1065 (Mass. 1982) (citing Restatement (Second) of Torts § 600 (1977)) (additional citation omitted).  As to the former, publishing the statement "with actual knowledge of [its] falsity" may abuse the privilege. *Catrone*, 929 F.2d at 891 (citing *Sheehan*, 93 N.E.2d at 529, and *Foley*, 508 N.E.2d at 79); *see Foley*, 508 N.E.2d at 79-80 ("Of course, a statement made with knowledge of its falsity . . . would be

---

[28] As a final matter related both to unnecessary or excessive publication and to actual malice, Koppel argues (D. 131, p. 8) (citing, *inter alia*, D. 133, ¶¶ 130, 146, 168), and the record supports, that the SIPB constitution requires prior notice and an opportunity to be heard before revocation of an individual's SIPB membership.  The constitution also requires that the person under consideration for revoking his or her SIPB membership be informed of the reasons for considering this sanction.  As previously stated, Koppel was not fully informed about the reasons for the EC's decision to ask him to leave SIPB.  Nevertheless, these constitutionally sanctioned requirements do not implicate unnecessary or excessive publication.  Rather, they concern membership revocation and the revocation procedure.  To the extent Koppel's argument invokes actual malice, Moses' failure to follow the constitutional procedure does not suffice to show the necessary ulterior motive.  Koppel's argument that Moses' failure to act consistent with SIPB's constitution evinces excessive publication and/or malice is neither persuasive nor convincing.

reckless within the meaning of the rule.") (citing *Bratt*, 467
N.E.2d at 131, and *Tosti*, 437 N.E.2d at 1065); *Lawless*, 169 N.E.3d
at 1262 (stating "to defeat privilege, there must be some facts in
dispute which, if believed, would show that the defendant published
those statements knowing they were false") (affirming summary
judgment for defendant).   As to publication with reckless
disregard, "a defendant may act recklessly by publishing a
statement 'without reasonable grounds for believing it was true,'
particularly if the statement concerns 'verifiable matters' that
are 'susceptible of precise check.'"   *Zeigler*, 939 F.3d at 394
(quoting *Shore*, 174 N.E.2d at 381).

Here, in this court's view, a factfinder could conclude based
on the record that Moses published the second statement knowing it
was false, and published the first and the second statements with
reckless disregard.   Turning to the first statement, Moses knew of
three interactions indicative of sexual harassment or stories from
SIPB members about Koppel making them deeply uncomfortable:   Zeng
in late January 2020, Kim in 2019, and, as reported by Samaratunga,
Voss in or around 2016.   Moses also knew about the additionally
reported interactions concerning Koppel that made SIPB members
feel merely uncomfortable (the "uncomfortable interactions").

A jury could find that Moses did not subjectively believe
that the uncomfortable interactions were so extreme as to be

severe.[29]   For example, the hugs Koppel gave Moses made him feel uncomfortable, but he did not consider them sexual in nature. Although Moses testified that he asked Koppel to stop the hugs, he continued his friendship with Koppel, and the two discussed becoming roommates.   As such, a jury could infer that Moses did not actually believe the interactions were extremely bad because, if they were, Moses would have distanced himself from Koppel rather than continue their friendship unchanged.   Similarly, Moses described comments at the February 10 gathering by SIPB members recounting that Koppel made them uncomfortable.   The comment Moses recalled concerned belittling.   Here again, a jury could infer that belittling, by definition, is not necessarily severe and, further, that Moses did not believe it was severe.   Similar reasoning discredits an actual belief, if any, by Moses that Koppel's repeated use of degrading language to SIPB members was severe.[30]

---

[29] As previously explained, severity is commonly defined as something extremely bad or serious.

[30] The February 26 email cites the degrading language as one of four examples of incidents that generated reports from SIPB members of uncomfortable interactions.   Two of the other examples (arguing that a female keyholder was overreacting by complaining about street harassment as well as arguing that it was sexist to treat the Epstein scandal as a gendered cultural problem) allow a jury to reasonably infer that Moses did not believe these relatively innocuous incidents were extremely bad or serious.   The summary judgment record is sparse regarding Moses' beliefs and thus does not preclude the jury from drawing this reasonable inference.   Construing the record in Koppel's favor, the final example (initiating physical contact with someone who told Koppel to stop) allows the jury to draw a similar conclusion.

With the vastly reduced number of uncomfortable interactions that Moses believed or had reasonable grounds to believe were severe, Moses nonetheless proceeded to characterize the interactions as widespread. Whereas Moses had a basis to believe the three incidents involving sexual harassment or sexual misconduct in 2016, 2019 and 2020 were severe, it is debatable whether he also had reasonable grounds to believe they were widespread, i.e., among many people. Bolstering this inference is the large length of time encompassed by the reported incidents - in or around 2016 to February 2020. It stands to reason that such a long time-period would have generated more reported incidents had they occurred. As such, a jury could find that Moses published the first statement with reckless disregard for its truth or falsity.

Regarding the second statement, the February 27 email states that Koppel was "given *several opportunities* to change his behavior and *failed to do so*." (D. 131-3) (emphasis added). The March 2 email recites that the incidents that made keyholders "deeply uncomfortable . . . *continued* in spite of *requests to stop*." (D. 129-12) (emphasis added). By using the words "several opportunities" and "requests" in the plural form, each email carries the message that Koppel was given more than one opportunity or request to stop the sexual harassment and sexual misconduct.

In fact, a jury could conclude that Moses did not believe (or have reasonable grounds to believe) that Koppel had been given several opportunities or asked to stop the behavior on more than one occasion.  The incidents reported to Moses regarding Voss, Zeng, and Kim do not reflect prior opportunities or requests to stop the sexual harassment or sexual misconduct by these individuals along with Koppel's failure to do so.  Indeed, Zeng's second follow-up email or text to Moses on February 27 informs him that "it might be hard to" ban Koppel without first giving him a warning.  (D. 131-9) (D. 131-1, ¶ H).  Moses' description of the February 10 gathering does not indicate that an attendee mentioned asking Koppel to stop the misconduct.  (D. 131-11, pp. 33-34).  Similarly, the record does not set out opportunities to change or requests to stop the sexual harassment or sexual misconduct in the individual replies to Moses resulting from the February 26 email.  (D. 129-7).  There were few, if any, communications posted on Mattermost that would cultivate an actual belief by Moses that the second statement was not false.  Viewing the record in Koppel's favor, Moses did not request Koppel to stop the behavior of the hugs and rubs on the head, and he did not consider the behavior sexual in nature.

Hence, there is little to indicate that Moses had information of repeated requests to stop the sexual harassment or sexual abuse.  Thus, a jury could reasonably infer that Moses published the second

statement with reckless disregard of the statement's truth or with actual knowledge that it was false.[31]  Accordingly, because a jury could find Moses liable for defamation if it found he abused the common-interest privilege in publishing the first and the second statements, summary judgment in inappropriate.[32]

In conclusion, based on the evidence in the summary judgment record, a jury could find that the first and second statements in the February 27 and March 2 emails were false (and defamatory). The court finds that Moses nonetheless had a conditional privilege to send the emails to the recipients, but finds further that Koppel has met his burden of showing, solely for purposes of summary judgment, that Moses may have lost the conditional privilege through abuse or reckless conduct.[33]  Summary judgment therefore is not warranted.

---

[31] Assuming that the standard proposed by Moses applies, (D. 125, p. 19) (citing *Hipsaver, Inc. v. Kiel*, 984 N.E.2d 775, 768 (Mass. 2013)), the record also sufficiently shows that Moses "in fact entertained serious doubts as to the truth of his publication." *Hipsaver*, 984 N.E.2d at 768.

[32] As a final matter, Koppel summarily asserts that the February 27 and March 2 emails "relied on rumor." (D. 131, p. 7) (citing D. 133, ¶ 150).  Although Moses received several second-hand reports about Koppel's conduct, the characterization of the emails as relying on rumor is an overstatement.  Rather, based on the reported comments as well as commentary during the February 10 gathering, communications with Carney, and communications with EC members and keyholders on Mattermost, Moses published the February 27 and March 2 emails. In any event, Koppel does not develop a specific argument that the emails relied on rumor.

[33] To be clear, the court makes no finding with respect to whether Moses actually abused or lost a conditional privilege to send the emails; it would be left to a jury to make such a determination.

## VI.   <u>CONCLUSION</u>

Per the foregoing, the court **RECOMMENDS**[34] that the defendant's summary judgment motion (D. 124) be **DENIED**.

/s/ Donald L. Cabell
DONALD L. CABELL, Ch. U.S.M.J.

DATED:   December 21, 2023

---

[34] The parties are hereby advised that under the provisions of Federal Rule of Civil Procedure 72(b), any party who objects to this recommendation must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.   The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.   The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.   *See Keating v. Secretary of Health and Human Servs.*, 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986).